RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Ave.
Los Angeles, California 90034
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: RB@LNBYG.COM, MYK@LNBYG.COM, KJM@LNBYG.COM

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>RIALTO BIOENERGY FACILITY, LLC, a Delaware limited liability company,<br><br>            Debtor and Debtor-in-Possession | Case No.: 23-01467-CL11<br><br>Chapter 11 Case<br><br>**OMNIBUS DECLARATION OF DR. YANIV SCHERSON IN SUPPORT OF DEBTOR'S EMERGENCY FIRST DAY MOTIONS FOR ENTRY OF:**<br><br>1. **AN INTERIM ORDER: (I) AUTHORIZING THE DEBTOR TO (A) USE CASH COLLATERAL AND (B) OBTAIN POST-PETITION FINANCING ON A SENIOR LIEN BASIS, (II) GRANTING ADEQUATE PROTECTION; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF; AND**<br><br>2. **AN ORDER AUTHORIZING DEBTOR TO PROVIDE ADEQUATE ASSURANCE OF FUTURE PAYMENT TO UTILITY COMPANIES PURSUANT TO 11 U.S.C. § 366**<br><br>DATE:     TBD<br>TIME:     TBD<br>PLACE:   Courtroom 5<br>              325 West F Street<br>              San Diego, CA 92101 |

I, Dr. Yaniv Scherson, declare as follows:

1.     I am the Chief Operating Officer of Anaergia, Inc. ("Anaergia"), which is the parent company of Anaergia Services LLC ("AS"), which in turn, is a member of Rialto Bioenergy Facility, LLC (the "Debtor").   AS owns 51% of the membership interests in the Debtor.  I joined Anaergia in 2014 as the Managing Director for the Western United States and managed applications and process engineering globally, developing technical tools, modeling and standards while supporting global projects in concept, financial modeling and process design.  I have served in my current position as Chief Operating Officer of Anaergia since 2021. As COO, I am responsible for overseeing all business line sales, project development, contracting and negotiation, project execution and operations, and project financing.

2.     I also spearhead Anaergia's market outreach and regulatory engagement strategy in California.

3.     I am also the Vice President and a member of the Board of Managers of the Debtor and have served in those roles since 2017 and 2020, respectively.

4.     I hold a Ph.D. and a Master's of Science degree in Mechanical Engineering from Stanford University, where I was also a Postdoctoral Scholar in Civil and Environmental Engineering. I also hold a Bachelor's of Science degree in Mechanical Engineering and Materials Science from the University of California, Berkeley. I am a licensed Professional Civil Engineer and hold a Contractors A license in California.

5.     At Anaergia, I develop projects (such as the Debtor's project) integrating organics recycling from solid waste with anaerobic digestion and wastewater. These projects sequester carbon, generate renewable energy and fertilizer, and close the loop on organic waste. I am passionate about solid waste, wastewater, sustainability, and carbon neutrality. I believe novel technologies and efficient process systems that align economic and environmental interests are key to protecting the environment and mitigating the adverse effects of climate change on humankind.  The Debtor's facility, as described in further detail below, is an example of such technologies and systems that align economic and environmental interests.

6.      I make this Declaration in support of the: (a) *Debtor's Emergency First Day Motion For Entry Of An Interim Order: (I) Authorizing The Debtor To (A) Use Cash Collateral And (B) Obtain Post-Petition Financing; (II) Granting Adequate Protection; (III) Scheduling A Final Hearing; And (IV) Granting Related Relief* ("Motion") filed by Rialto Bioenergy Facility, LLC (the "Debtor"), the chapter 11 debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case; and (b) *Debtor's Emergency First Day Motion For Entry Of An Order Authorizing Debtor To Provide Adequate Assurance Of Future Payment To Utility Companies Pursuant To 11 U.S.C. § 366* filed by the Debtor.

7.      I have personal knowledge of the facts set forth in this Declaration and if called to do so, could and would testify competently as to such facts.

**The Debtor and the Debtor's Operations**

8.      On May 25, 2023 (the "Petition Date"), the Debtor commenced a bankruptcy case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

9.      The Debtor owns and operates an extremely valuable, state-of-the-art, multi-feedstock bioenergy facility in Rialto, California, that convert organic waste, such as food waste, yard waste, and biosolids into carbon-negative renewable natural gas, with the capability to also generate renewable electricity and soil amendment/fertilizer. The Debtor's facility, which is the largest of its type in North America, utilizes anaerobic digestion technology to convert the organic waste received from waste haulers into renewable natural gas.

10.      The importance of the Debtor's facility to the realization of the State of California's ambitious goals (especially for Southern California, including Los Angeles County) to reduce methane emissions and combat climate change, as well as to the City of Los Angeles's compliance with State mandates, cannot be overstated.

11.      In 2006, the California legislature passed AB 32, an unprecedented clean air initiative designed to reduce greenhouse gases in the State to 1990 levels by 2020.   To accomplish this goal, State lawmakers passed subsequent legislation including AB 1826, a bill that requires certain businesses, such as restaurants, to establish an organic waste recycling program and bans food waste and other organics from landfills starting in 2016 and phasing in

the program completely by 2019, and SB 1383 - a statewide organic waste recycling and surplus food recovery law that established methane emission reduction targets for the State to reduce pollutants. SB 1383 aims to reduce methane emissions from landfills – the leading source of fugitive methane emissions – by requiring the diversion of organic waste from landfills and instead converting organic waste into carbon negative renewable fuel and natural fertilizer. The law's stated goal of 75% diversion of organic waste from landfills will result in roughly 20M tons per year of organic waste diversion and require over 100 facilities similar to the Debtor's in the State of California.

12.    The State is grossly underserved in organic recycling outlets. SB 1383 requires jurisdictions to provide organics collection services, conduct outreach and education, plan and secure access to recycling and recovery facilities, and monitor and enforce compliance; waste generators to subscribe to organic waste collection programs and properly sort waste; and haulers to use appropriate facilities for organics diversion.  Other than the Debtor's facility, only a few small-scale solutions exist and there remains an urgent need for new commercial organics management facilities across the State.  I estimate that California needs 100 facilities similarly sized as the Debtor to handle 20 million+ to meet a 75% diversion target.

13.    In advance of SB 1383 requirement, the City of LA established a commercial and multifamily waste collection franchise called RecycLA in which zones in the City of LA were awarded to haulers on an exclusive franchise basis. RecycLA requires haulers to offer organic waste collection and diversion service to commercial and multifamily generators with an obligation to divert set quantities of organic waste each year. RecycLA's initial requirement commenced in January 2021 with diversion requirements subject to liquidated damages commencing in January 2022. Implementation of the City's organic waste collection program was delayed during 2021 mainly due to COVID, and in 2022 the City of LA was supposed to pass an ordinance requiring generators to sign up for organic waste collection service pursuant to SB 1383 but did not pass this ordinance until a year later in January 2023. Currently the City of LA has implemented a city-wide ordinance requiring generators to sign up for organic waste

collection and has issues multiple notices to generators informing them of this requirement with information on how to sign up.

14.     The Debtor was formed and originally wholly-owned by AS. AS, based in Carlsbad, California (which is where I am based) is the wholly-owned United States operating subsidiary of Anaergia (www.anaergia.com), a company headquartered in Canada which is in the business of offering sustainable solutions for the generation of renewable energy and the conversion of waste to resources.  As noted above, AS currently owns 51% of the membership interests in the Debtor.  GDIF (North America) NRP Hold Co. ("GDIF"), an entity managed by Igneo Infrastructure Partners, an infrastructure investment fund manager, currently owns 49% of the membership interests in the Debtor.  The Debtor is managed by a four-person Board of Managers.

15.     In 2013, in furtherance of Anaergia's efforts to introduce and implement its waste management and conversion solutions to the State of California, the Debtor acquired a biosolids drying facility in Rialto with a vision of creating an organics recycling and biosolids management infrastructure for the Los Angeles region.  The land on which the Debtor's facility is located is owned by the City of Rialto and ground leased by the City to the Rialto Utility Authority ("RUA").  The Debtor is a party to a ground sublease agreement with the RUA for the site of the Debtor's facility.[1]  The initial term of the sublease is 22 years, which may be extended for up to two additional consecutive five-year periods.

16.     The acquisition, construction, rehabilitation, renovation, installation, improvement and equipping of the Debtor's state-of-the-art facility was financed by a combination of Debtor contributions totaling approximately $10 million[2], grants totaling approximately $35 million from various State and Federal agencies, and bonds issued by the

---

[1] The Debtor is also a party to a Facility Operation Agreement with the City of Rialto and the RUA pursuant to which the parties acknowledged the benefits the Debtor's facility will provide to the City of Rialto and related areas in assisting the State of California in meeting California's waste conversion and climate goals and requirements, and pursuant to which the RUA is required to pay the Debtor certain fees for processing biosolids and the Debtor is required to pay the RUA certain host fees.

[2] Includes cost expenditures and cash.

California Pollution Control Financing Authority (the "Authority"), a political subdivision and public instrumentality of the State of California, in the amount of approximately $117 million. Additional details regarding the bonds and the Debtor's Loan Agreement with the Authority are provided below.

17.     The Debtor commenced operations around January 2021.  The Debtor's facility has the capacity to process approximately 700 tons of organic waste per day, 300 tons of Biosolids, and produce 850,000 MMBtu of carbon negative renewable natural gas per year.

18.     The Debtor utilizes feedstock that is pre-processed utilizing proprietary diversion technology called "OREX" which is sold to waste haulers by AS's affiliate Anaergia Technologies, LLC (defined above as "AT").  The OREX technology processes mixed municipal solid waste and source separated organic waste into organic content rich feedstock that is fed to the facility. One of AT's "OREX" lines has been installed at Waste Management's facility in Sun Valley, which provides feedstock via tanker truck deliveries to the Debtor.  It is anticipated that two additional "OREX" lines that have been sold to another franchise waste hauler in the Los Angeles region and are being installed, will come online toward the end of 2023, which is projected to significantly increase feedstock quantity.

19.     The Debtor has no direct employees. The Debtor's day-to-day operations are conducted by AS pursuant to an Operations and Maintenance Services Agreement, as amended and restated on November 14, 2019 (the "Operations Agreement").  Pursuant to the Operations Agreement, AS provides all site and home office personnel to the Debtor.  Site personnel, among other things, operate the Debtor's facility on a daily basis; implement the Debtor's operations and maintenance procedures, chemical procedures, and environmental compliance processes; perform routine and preventative maintenance actions on all facility systems and equipment; retain, manage and oversee third party vendors for major maintenance and repair work; and handle other day-to-day tasks such as facility administration budgeting, payroll, procurement, accounts payable and other personnel matters.  Home office personnel, among other things, assist the Debtor with monitoring regulatory compliance, performing human resources functions,

handling accounting, procurement and insurance matters, and monitoring site personnel and facility performance.

20.     AS also leases certain equipment and other property to the Debtor.  AS charges the Debtor for such services and rentals, and receives reimbursement from the Debtor with respect to costs of the Debtor paid by AS.  The Initial Budget (defined below) contains the following line items taking into account payments proposed to be made to AS as compensation and reimbursement of expenses: Intercompany Labor; Intercompany Operations and Maintenance Fee and Leases; Intercompany Credit Card Expenses; and Intercompany Insurance[3].  The Debtor is preparing and will file a separate motion for the entry of an order authorizing insider compensation and reimbursements (the "Insider Compensation Motion") which will provide additional detail regarding the compensation, and reimbursements (such as for labor costs), proposed to be paid to AS in the ordinary course of business.  The Debtor is not requesting emergency relief with respect to such payments but reserves the right to do so if it becomes necessary.  As will be explained in further detail in the Insider Compensation Motion, the Debtor would be unable to function without the services and personnel provided by AS.

21.     The Debtor currently has two primary sources of revenue: tip fees generated from haulers diverting organic waste to the Debtor's facility and the sale of renewable natural gas. By 2024, the Debtor expects additional revenue from the sale of fertilizer.

**Events Leading To The Debtor's Chapter 11 Bankruptcy Filing And The Debtor's Goals**

22.     The pandemic caused a number of significant financial issues for the Debtor. First, the Debtor experienced cost overruns and delays with respect to the construction, improvement, maintenance and operations of its facility.  Second, the closure and decline of sales by businesses caused by the pandemic, including restaurants and other food related businesses, led to a significant decline in organic waste volumes that are necessary to producing

---

[3] Anaergia, Inc. pays insurance costs and the Debtor reimburses Anaergia, Inc. for the Debtor's share of insurance costs paid by Anaergia, Inc.

renewable natural gas.  Third, the timing of the construction and commencement of operations of the facility was designed to be aligned with the timeframe originally envisioned by RecycLA and SB 1383 for the implementation and enforcement by jurisdictions such as the City of Los Angeles of regulations requiring businesses to divert organic waste to facilities such as the Debtor.  However, as a result of the pandemic, the implementation and enforcement of SB 1383 was delayed.  The Debtor originally anticipated that the City of Los Angeles would pass an ordinance implementing the mandates of SB 1383 in 2021, but as a result of the closure of and other negative impacts experienced by businesses due to the pandemic, an ordinance was not passed until December 2022 (with an effective date of January 18, 2023), notices of non-compliance were not provided to waste generators until March 2023, and penalties for non-compliance by waste generators will not be enforced until January 2024.

23.    As a result of the foregoing, the Debtor has not yet started to receive the level of feedstock it anticipates receiving once enforcement of SB 1383 is fully implemented nor has the Debtor had the opportunity to capitalize on its unique position as essentially the primary facility servicing the City of Los Angeles.  Thus, the Debtor has already built and is operating the largest singular outlet for the diversion of organic waste for conversion to renewable natural gas in the State of California servicing the largest City in the State with not enough feedstock to operate at a capacity level to cover its costs and take advantage of the strong and growing demand for renewable fuels.

24.    At current feedstock levels, the Debtor is operating at a loss.  Thus, the Debtor's members have been required to fund the Debtor's operations and have collectively contributed an additional $55 million to continue to fund the Debtor's operations and fulfill the Debtor's debt service obligations, but the members are no longer in a position to provide additional funds to the Debtor.  Such funding has helped the Debtor remain in a position to ultimately capitalize on the anticipated increase in feedstock diversion once California and local law, which has already passed and is being implemented, is enforced and the effects of such enforcement are realized.

25.    The Debtor is improving the environmental outlook for the State of California, and the Debtor is in a desirable competitive position in the very near future as it is the largest

digestor facility in North America offering best in-class technology, and was built as an essential infrastructure facility to serve the largest city in the State of California.  The Debtor's facility is diverting waste today that is reducing greenhouse gas emissions by eliminating the fugitive release of methane into the air which occurs when organic waste is sent to landfill, and the Debtor's early entry into a growing asset class has positioned it to take advantage of the expected growth in the "waste to energy" market.  Given its large scale, strategically located site near Los Angeles, and costs and difficulties of development including the acquisition of necessary permits, there are enormous barriers to entry at the same or equal level by competitors. The Debtor is uniquely positioned to provide essential solutions and critical infrastructure to the State of California.

26.    However, the Debtor is currently experiencing a cash shortage and absent additional funding and reorganization, will be unable to reach the "finish line" in terms of finally receiving the volume of feedstock which the Debtor's facility is designed to handle and which the Debtor anticipates it will receive once waste generators, jurisdictions and haulers begin to comply with SB 1383.  As a result of the Debtor's current cash shortage and concerns regarding the Debtor's ability to service its debt obligations to the Authority and bondholders, and pay operating expenses, prior to any collection and enforcement action being taken against the Debtor which could severely impact the Debtor's operations and control over its assets, the Debtor determined that the most prudent course of action would be to file this Chapter 11 bankruptcy case.

27.    The Debtor's goals while in Chapter 11 are to conduct an organized and efficient restructuring of its financial affairs, obtain the funding necessary to help the Debtor continue to operate and reach profitability (which the Debtor anticipates will occur when applicable waste diversion laws that have already passed are fully implemented and enforced – which the Debtor estimates will occur during the second half of 2024), and emerge from bankruptcy in a position to take advantage of its competitive position for the benefit of all stakeholders.  Based upon the valuation of the Debtor's assets, the Debtor fully expects that all of the Debtor's creditors will ultimately be paid in full.

**The Debtor's Primary Assets and Debts**

28.    The Debtor's primary assets are comprised of: (1) the facility and all of the equipment owned by the Debtor which, as discussed further below, currently carries a valuation of $196.6 million; (2) the Debtor's cash on hand in the amount of approximately $8,000; (3) approximately $11 million in a "Debt Service Reserve Fund" money market account (the "Debt Service Reserve") which has been invested in a fixed income contract with MassMutual at the direction of the Debtor[4]; and (4) approximately $4.7 million held in accounts designated as Revenue Fund, Principal Account and Interest Account (collectively, the "Revenue Funds")[5] which are all money market accounts held with UMB which, absent this bankruptcy filing, would be applied (in particular, the funds in the Principal Account and Interest Account which consists of 5 months of pre-petition principal and interest payments made by the Debtor) by UMB on June 1, 2023 to satisfy bond payment obligations to bondholders.  It is our position that all of the money in the Debt Service Reserve and the Revenue Funds constitute the Debtor's money, subject only to the liens of UMB.

29.    The bonds that partially financed the Debtor's project were issued by the Authority.  More specifically, on or about January 1, 2019, the Authority and the Debtor entered into a Loan Agreement pursuant to which the Authority issued and delivered under an Indenture in favor of UMB, as trustee, $117,200,000 of California Pollution Control Financing Authority Solid Waste Disposal Revenue Bonds (Rialto Bioenergy Facility, LLC Project) Series 2019 (AMT) (Green Bonds) (the "Bonds").  The Bonds were used to partially finance the acquisition, construction, rehabilitation, renovation, installation, improvement and equipping of the Debtor's facility, fund twenty-four (24) months of capitalized interest, fund a reserve for bonds issued by the Authority, and pay a portion of the costs of issuance of the Bonds. A copy of the Loan Agreement is attached as **Exhibit 5** to this Declaration.

---

[4] The Debt Service Reserve was funded entirely from the proceeds of the Bonds (as defined in the Motion).

[5] The various accounts (and the designations on the accounts) are held with UMB pursuant to the Indenture.

30.     As required by the Loan Agreement, the Debtor made principal payments totaling $5,225,000 on June 1, 2021 ($1,260,000), December 1, 2021 ($1,265,000), June 1, 2022 ($1,350,000) and December 1, 2022 ($1,350,000). Additionally, there were original issue discounts granted at the time the Bonds were established. As of April 30, 2023, the outstanding obligations under the Bonds was $109,766,923.

31.     The Debtor's debt to the bondholders under the Loan Agreement, which remain at approximately $110 million, are subject to various pledge and security agreements providing to UMB, for the benefit of the bondholders, a first position lien and security interest in substantially all of the Debtor's assets.

32.     The Debtor's checking account at HomeStreet Bank which has approximately $8,000 in cash is a "Gross Revenue Fund" of the Debtor's cash subject to UMB's lien.

33.     As of the Petition Date, as far as I know, the Debtor is not in default under any enforceable provision of the Loan Agreement.

34.     The Loan Agreement expressly and explicitly recognized and provided for the Debtor to access the Gross Revenue Funds, and for these Gross Revenue Funds to be used to the Debtor, to pay its operating expenses.

35.     Concurrently with the Loan Agreement, the Authority and UMB entered into an Indenture pursuant to which UMB was appointed as the Bond Trustee to service the bondholders and the Authority with respect to the issuance of the Bonds and the repayment thereof. A copy of the Indenture is attached as **Exhibit 6** to this Declaration.

36.     The money in the "Revenue Fund" and subaccounts under Section 5.02 of the Indenture is money which belongs to the Debtor, subject only to the lien of UMB.

37.     I understand that Section 5.07(A) of the Indenture authorizes UMB as trustee to create and establish a separate account known as "Debt Service Reserve Fund" which is held and applied as directed by the Indenture. I understand the Debt Service Reserve Fund was funded entirely from proceeds of the Bonds.  I understand that so long as no Event of Default has occurred and is continuing, this fund is to be used solely to pay the principal and interest on the Bonds in the event of a deficiency in the amounts required to be on deposit in the Revenue Fund.

11

38.     As of the Petition Date, as far as I know, the Debtor is neither in default of its any enforceable obligations under the Loan Agreement nor is there a deficiency in the Revenue Fund.

39.     Finally, the Debtor owes: (a) its members (AS and GDIF) the aggregate sum of approximately $55 million; (b) AS approximately $3.1 million in unpaid fees and other compensation; and (c) its pre-petition trade vendors approximately $3.3 million.

## The Debtor's Urgent Need For Use Of Cash Collateral And/Or Debtor-In-Possession Financing

40.     The Debtor has no current access to funds beyond the Debtor's limited cash balance and expected post-petition revenue from the Debtor's post-petition business operations. These limited sources are not sufficient to enable the Debtor to continue to operate the facility and maintain its business operations.  The only way for the Debtor to avoid facing the risk of an immediate shutdown of its facility and business operations (which would have catastrophic consequences for the City of Los Angeles and society at large as well as the Debtor's creditors and equity holders) is for the Debtor to gain immediate access to a sufficient amount of funding to enable the Debtor to continue to operate the facility and maintain its business operations.

41.     Prior to commencing its bankruptcy case, the Debtor requested the bondholders to defer payments of principal and interest and to provide the Debtor with additional funding, but the bondholders declined to do so.  This was not the first time that the Debtor approached the bondholders for financial relief, only to have that request declined.  Commencing in December, 2020, the Debtor contacted UMB and counsel for the bondholders on several occasions, explaining the financial challenges it faced and requesting that the Debtor be granted financial relief from the obligation to make debt service payments on the Bonds, and in every instance the bondholders have refused the request.  As a result of the bondholders' latest decision not to provide the Debtor with financial assistance, the Debtor only has two possible sources of funding beyond its limited cash on the Petition Date and post-petition revenue from business operations. One source is to obtain debtor in possession financing (*i.e.,* DIP financing) from a third-party funding source, and the Debtor made extensive pre-petition efforts to obtain DIP financing

proposals.  The Debtor received a number of DIP financing proposals, but each of them is requiring that its post-petition financing be secured by a first priority senior lien against all of the Debtor's assets.  The other source which the Debtor is requesting authority to use is the funds in the Debtor's checking account at HomeStreet Bank, Debt Service Reserve and the Revenue Funds (which collectively constitutes the Debtor's cash and the Cash Collateral of the bondholders), as follows:

| HomeStreet Bank | ******0751 | Checking Account | $7,988.93 |
| UMB Bank, N.A. | ****92.1 | CPCFA Rialto 2019 Revenue Fund (the Revenue Fund) | $0.00 |
| UMB Bank, N.A. | ****92.2 | CPCFA Rialto 2019 Bond Fund Interest (the Interest Acccount) | $3,466,851.72 |
| UMB Bank, N.A. | ****92.3 | CPCFA Rialto 2019 Bond Fund Principal (the Principal Account) | $1,207,830.42 |
| UMB Bank, N.A. | ****92.4 | CPCFA Rialto 2019 Reserve Fund (the Debt Service Reserve Fund) | $11,085,044.74 |

42.    As noted above, as of the Petition Date, the Debtor's cash consists of approximately $8,000 in its checking account (maintained at HomeStreet Bank), and the funds in the Debt Service Reserve and the Revenue Funds totaling approximately $15.7 million (held with UMB).  Approximately $11 million of this amount is being held with UMB as the "Debt Service Reserve" and approximately $4.7 million of this amount (*i.e.,* the Revenue Funds) constitute principal and interest payments made by the Debtor pre-petition to UMB which, absent the bankruptcy, would be paid over to the bondholders by UMB on June 1, 2023.

43.    Attached as **Exhibit 2** to this Declaration is the Debtor's thirteen (13) week cash flow forecast for the period commencing with the Petition Date through the week ending on

August 18, 2023, which sets forth all of the Debtor's projected cash receipts and cash disbursements during this period ("Initial Budget"; and as modified from time to time in accordance with the DIP Agreement, the "Budget").  I took a lead role in preparing and oversaw the preparation of, the Initial Budget, in conjunction with the finance team led by Thomas Kim, as well as with the input and guidance of the Debtor's financial advisor B. Riley Securities, Inc. We prepared the Initial Budget based upon our analysis of the Debtor's financial situation and outlook.  This included evaluating the Debtor's current performance as well as future outlook.

44.    As the Initial Budget shows, the Debtor is unable to stay in business without use of Cash Collateral and/or DIP financing.  While the Initial Budget provides that the payment of operating expenses will not commence until approximately week 3 of the Initial Budget period, the Debtor will nevertheless incur expenses by continuing to operate and is requesting emergency relief in order to be able to incur approved expenses, and provide assurances to vendors that it has received approval to pay for services provided to the Debtor post-petition. The Debtor will need cash in the amount of approximately $7 million (including restructuring expenses) over the next thirteen (13) weeks to pay the expenses set forth in the Initial Budget.

45.    The Initial Budget contains an itemization of those expenses that the Debtor must be able to pay, including within the first approximately thirty (30) days of this bankruptcy case, in order for the Debtor to avoid immediate and irreparable harm to the Debtor's estate.  As set forth therein and the 30-day disbursements schedule attached thereto, the Debtor needs to borrow and/or gain access to its cash collateral in the total *minimum* amount of approximately $2,160,019 during the first approximately 30 days of this bankruptcy case in order for the Debtor to avoid immediate and irreparable harm to the Debtor's estate.  This figure does not include any Permitted Variance (defined below) amounts or budgeted professionals' fees and expenses, but it does include projected quarterly fees to the United States Trustee.  This figure is for critical expenses to maintaining the ongoing operations of the facility, including utilities and proposed deposits to utility companies so that essential utility services are not shut off, permitting costs, transport & disposal, and maintenance and other costs.  The total amount of minimum cash needed for the approximate thrity (30) day period after the Petition Date when including

budgeted professional fees and expenses is $2,725,019 (not including any Permitted Variance). Moreover, the total amount of cash needed for the approximate thirty (30) day period after the Petition Date when including budgeted professional fees and expenses and a contingency in for the minimum Permitted Variance of 16.25% is at least $3,167,835.[6]  This figure would need to be adjusted (up or down) depending upon when the Court schedules the final hearing on the Motion.

46.    By the Motion, the Debtor is seeking Court authorization to use Cash Collateral to pay all of its projected expenses set forth in the Budget, and to deviate from the Budget, without the need for any further Court order, to an allowed cumulative variance of up to 16.25% of the aggregate Budget ("Permitted Variance")[7].

47.    For all of the reasons explained above, we believe that what makes the most economic sense for this estate and the least disruptive option is for the Debtor (1) first to gain access to its checking account at HomeStreet Bank and the Revenue Funds because there is no required wait period, (2) second to gain access to the funds in the Debt Service Reserve Fund, and (3) third to obtain DIP Financing.[8]

48.    Attached as **Exhibit 1** to this Declaration is the proposed interim order ("Interim Order") granting the Motion prepared by the Debtor's proposed bankruptcy counsel with the input and approval of the Debtor.

49.    As indicated above, the Debtor believes that the least expensive and least disruptive path for the Debtor to proceed under is laid out in the Motion and above, which would involve the Debtor delaying obtaining DIP financing until all of the cash in its possession, the

---

[6] The 30-day disbursement schedule attached to the Initial budget contains a "Contingency" line item that is calculated as 25% of the total of the listed 30-day disbursements, which is why that schedule shows total 30-day disbursements of $3,406,274.

[7] Additionally, with respect to the DIP Loan, I understand the DIP Lender has agreed to include as a Permitted Variance increased variable related payments that increase with an increase in the Debtor's revenue.  The Debtor requests that the Court approve such an allowance as a Permitted Variance from the Budget.

[8] This is all in addition to the Debtor's use of its limited cash balance existing on the Petition Date and the Debtor's limited post-petition revenue from its business operations.

Revenue Funds and all of the funds in the Debt Service Reserve Fund have been fully exhausted. The Debtor estimates that proceeding in this manner would enable the Debtor to continue operating for approximately six (6) months before the Debtor would need DIP financing.  If the Court disagrees and does not permit the Debtor to use Cash Collateral in this manner, the Debtor would need to obtain immediate DIP financing in order to avoid immediate and irreparable harm. The amount the Debtor is requesting be approved on an interim, emergency basis is $3,500,000.

50.     Attached as **<u>Exhibit 4</u>** to this Declaration are monthly forecasts through the end of 2024 ("<u>23-24 Forecasts</u>").  As these show, the Debtor will ultimately need to obtain DIP financing even if the Debtor is provided access to all of its Cash Collateral but delaying the DIP financing for as long as possible would enable the Debtor to minimize the costs to this estate from the DIP financing while the Debtor gets to the point of profitability.

51.     Pre-petition, the Debtor, with the assistance of B Riley, undertook significant efforts to actively pursue and explore DIP financing options with a large number of potential lenders with the goal to allow the Debtor to continue to operate for a period of approximately 12-18 months, which is the time period the Debtor believes it will have to continue to operate before it can achieve profitability.  As the bankruptcy filing date approached, and as detailed in the Declaration of Perry M. Mandarino, Mr. Mandarino and the B. Riley team engaged in extensive negotiations and discussions with a number of potential lenders.  Following these negotiations and discussions, Legalist, Inc. ("<u>DIP Lender</u>") emerged as the lender that offered the best financing terms under the current circumstances faced by the Debtor.

52.     The Debtor and the DIP Lender executed a Term Sheet prepetition, and have negotiated a Credit Agreement post-petition.  The Credit Agreement is attached as **<u>Exhibit 3</u>** to this Declaration.  The Debtor will file any additional loan documents required by the Credit Agreement with the Court and provide copies to UMB as soon as the Debtor receives them from the DIP Lender.

53.     I understand that the DIP Lender has agreed with the Debtor's condition that the "DIP Collateral" will not include "the debt service reserve fund and all other accounts, subaccounts, and funds maintained in accordance with the documents governing Debtor's

outstanding bonds secured by Existing Liens, and all other deposit accounts, cash, and investments subject to Existing Liens in respect of such bonds, and all Avoidance Actions and proceeds recovered therefrom."

54.     The Debtor is unable to obtain sufficient interim and/or long-term financing from sources other than the DIP Lender on terms and subject to conditions more favorable than under the DIP Agreement with the DIP Lender, and are not able to obtain unsecured credit allowable as an administrative expense.  The Debtor is also unable to obtain secured credit on a junior lien basis.  The DIP Lender (and every other potential lender) has indicated that it is unwilling to provide the Debtor with the DIP Loan without a first priority lien upon the Debtor's facility and other assets. After considering all of the alternatives, the Debtor has concluded that the DIP Loan to be provided by the DIP Lender offers the best terms possible under the current circumstances, and, combined with use of cash collateral, represents the best options to effectuate a restructuring.

55.     In order for the Debtor to be able to maintain the going concern value of its enterprise and operate its business, the Debtor for now requires either immediate access to its Cash Collateral or the DIP Loan with the DIP Lender in order for the Debtor to be able to pay for the Debtor's post-petition operating and reorganization expenses and operate until the Debtor reaches profitability.  Without the immediate use of either Cash Collateral or the DIP Loan, there is the risk that the Debtor will risk facing an immediate shutdown, close its business, and shutter its facility.  Such events would likely eviscerate the Debtor's value as a going concern and there would be no doubt that doing so would be a disastrous result for the Debtor's creditors and other stakeholders, including the State of California and various governmental entities that support the Debtor's enterprise and are heavily invested in its success economically, environmentally, socially and politically.

56.     In addition to the Motion, the Debtor has filed the *Debtor's Emergency First Day Motion For Entry Of An Order Authorizing Debtor To Provide Adequate Assurance Of Future Payment To Utility Companies Pursuant To 11 U.S.C. § 366* (the "Utilities Deposits Motion").

57.    The Debtor's facility requires water, natural gas and electricity service to operate. Absent such utilities, the Debtor would be unable to operate the equipment, machinery, lighting, and other infrastructure such as the Debtor's anaerobic digestors, needed for the Debtor's facility to function.

58.    The Debtor receives the required utility services from a number of utility companies (each a "<u>Utility Company</u>" and collectively, the "<u>Utility Company</u>").    Given the importance of the services provided by the Utility Companies to the Debtor's operation of its facility, it is crucial that the means of providing adequate assurance to the Utility Companies that provide utility services be determined promptly so that there is no interruption in the services provided.

59.    The Debtor is proposing to provide each Utility Company with a cash deposit ("Cash Deposits" in an amount equal to the average monthly payment based on payments historically made on the utility account(s) (as determined by the last three payments made on such utility accounts). The total amount of Cash Deposits proposed to be provided is $150,247.11.

60.    The source of funds to pay the Cash Deposits is described in the Motion.

61.    Attached as **<u>Exhibit 7</u>** to this Declaration is a list of the Utility Companies and a calculation of the proposed Cash Deposits proposed to be provided to the Utility Companies.

I declare under penalty of perjury that the foregoing is true and correct.    Executed this 2nd day of June, 2023, at Carlsbad, California.

DR. YANIV SCHERSON

# EXHIBIT "1"

RON BENDER (SBN 143364)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Ave.
Los Angeles, California 90034
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: RB@LNBYG.COM, MYK@LNBYG.COM, KJM@LNBYG.COM

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>RIALTO BIOENERGY FACILITY, LLC, a Delaware limited liability company,<br><br>        Debtor and Debtor-in-Possession | Case No.: 23-01467-CL11<br><br>Chapter 11 Case<br><br>**INTERIM ORDER: (I) AUTHORIZING THE DEBTOR TO (A) USE CASH COLLATERAL AND (B) OBTAIN POST-PETITION FINANCING ON A SENIOR LIEN BASIS, (II) GRANTING ADEQUATE PROTECTION; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF**<br><br>DATE:<br>TIME:<br>PLACE:    Courtroom<br>               325 West F St., San Diego, CA |

1

An interim hearing ("Interim Hearing") was held on May  [      ], 2023, at [              ].m. before the Honorable Christopher B. Latham in Dept. 5 located at 325 West F St., San Diego, CA, for the Court to consider the motion ("Motion"), brought on an emergency basis by Rialto Bioenergy Facility, LLC, a Delaware limited liability company, the debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case ("Debtor") which commenced its chapter 11 bankruptcy case with the filing of a voluntary chapter 11 bankruptcy petition on May 25, 2023 (the "Petition Date"), pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, and 364, and Appendix D1 of the Local Bankruptcy Rules, for the entry of an interim order ("Interim Order") and for the entry of a final order ("Final Order" and with the Interim Order, the "Financing Orders") following a final hearing on the Motion, which provides for, among other things:

(1)    authorization for the Debtor's use of cash collateral, as such term is defined in 11 U.S.C. § 363(a), in accordance with the Debtor's thirteen (13) week cash flow forecast for the period commencing on the Petition Date through the week ending on August 18, 2023, which sets forth all projected cash receipts and cash disbursements during this period ("Initial Budget"; and as modified from time to time in accordance with the DIP Agreement, the "Budget"), a true and correct copy of which is attached as **Exhibit 2** to the Declaration of Yaniv Scherson ("Scherson Declaration") filed in support of the Motion, and all future budgets, and in accordance with the terms and conditions set forth in the Financing Orders, as applicable;

(2)    the grant of adequate protection to the Debtor's sole secured creditor, UMB Bank, N.A., as trustee ("Bond Trustee" or "UMB") under that certain Indenture, dated as of January 1, 2019, by and between the California Pollution Control Financing Authority ("Authority") and the Bond Trustee, relating to the issuance and delivery of $117,200,000 aggregate principal amount of California Pollution Control Financing Authority Solid Waste Disposal Revenue Bonds (Rialto Bioenergy Facility, LLC Project) Series 2019 (AMT) (Green Bonds) (the "Bonds"), on account of the Debtor's use of cash collateral, in the form of (x) valid, enforceable, non-avoidable and fully perfected replacement liens on, and security interests in, all assets of the Debtor other than avoidance action claims under Chapter 5 of the Bankruptcy Code and any recoveries thereon ("Avoidance Actions") with the same extent, validity and priority as UMB's

pre-petition liens on pre-petition collateral and all post-petition proceeds obtained by the Debtor from such pre-petition collateral (unless otherwise ordered by the Court in connection with the Debtor's request to obtain DIP Loans as described herein), and (y) super-priority administrative expense priority claims against the Debtor with priority over any and all administrative expenses and claims asserted against the Debtor or its bankruptcy estate pursuant to Section 507(b) of the Bankruptcy Code to the extent of any post-petition diminution in value in UMB's interests in the Debtor's pre-petition collateral (the "Adequate Protection Liens");

(3)      in addition to use of cash collateral, approval of and authorization for the Debtor to obtain term loans (such term loans, the "DIP Loans") pursuant to that certain Debtor-in-Possession Term Loan Credit Agreement ("DIP Agreement") attached as **Exhibit 3** to the Scherson Declaration, as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, from certain fund(s) for which Legalist, Inc. acts as investment adviser (such fund(s), the "DIP Lender"), which, among other things, (x) provides the Debtor with DIP Loans in an aggregate maximum amount of $35 million (the "DIP Commitment") pursuant to the terms of the DIP Agreement and the Financing Orders; and (y) pursuant to 11 U.S.C. § 364(d)(1) requires the granting of a senior, "priming" lien on substantially all assets of the estate which are otherwise subject to the lien of UMB (but excluding the Debt Service Reserve, the Revenue Funds, and all other accounts, subaccounts, and funds maintained in accordance with the documents governing the Debtor's outstanding bonds secured by existing liens, and all other deposit accounts, cash, and investments subject to existing liens in respect of such Bonds, and all Avoidance Actions and proceeds recovered therefrom).

(4)      pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), the scheduling of an interim hearing (the "Interim Hearing") on the Motion as soon as this Court's calendar permits for this Court to consider entry of the Interim Order, which, among other things, (x) authorizes the Debtor's use of the cash collateral and grants the Adequate Protection Liens in favor of UMB; and (x) authorizes the Debtor to obtain

the DIP Loans on an interim basis, and grants to the DIP Lender senior, "priming" liens provided for in the DIP Agreement in favor of the DIP Lender (subject to that set forth above);

(5)     the scheduling of a final hearing (the "Final Hearing") on the Motion no earlier than 14 days after the service of the Motion to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

(6)     waiver of any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of the Interim Order.

Due and appropriate notice of the Motion and the Interim Hearing under the circumstances and the relief requested therein having been given and an Interim Hearing on the Motion having been held; and upon the entire record made at the Interim Hearing; and this Court having found good and sufficient cause appearing therefor;

**IT IS HEREBY FOUND:**

A.     The Debtor had requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent granting the interim relief set forth in this Order, the Debtor's estate will be immediately and irreparably harmed.  Good cause has been shown for the entry of this Order.

B.     On May 25, 2023, the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.

C.     This Court has jurisdiction over this case and the Motion under 28 U.S.C. §§ 157(b) and 1334, this matter is a core proceeding under 28 U.S.C. § 157(b)(2), venue is proper under 28 U.S.C. §§ 1408 and 1409, and the Court has authority to enter this Interim Order consistent with Article III of the United States Constitution.

D.     An immediate and ongoing need exists for the Debtor to obtain use of cash collateral and obtain postpetition financing in the manner and sequence set forth in the Motion to operate its business and reorganize under chapter 11 of the Bankruptcy Code.

E.     The Debtor is unable to obtain unsecured credit under Bankruptcy Code section 503 or other postpetition financing in the amount of $3,500,000 on terms more favorable than those provided by the DIP Lender.

F.      Sufficient and adequate notice of the Motion and entry of this Interim Order has been given under Bankruptcy Code section 364 and Bankruptcy Rules 2002 and 4001, such that no other or further notice of the Motion or entry of this Interim Order is needed.

G.      The terms of the DIP Agreement have been negotiated in good faith and at arm's length between the Debtor and DIP Lender, and the DIP Lender is entitled to the protections of Bankruptcy Code section 364(e) with respect to the DIP Commitment approved by this Order on an interim basis and all rights and remedies conferred upon the DIP Lender with respect thereto.

D.      The terms of the DIP Agreement are fair and reasonable and reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and the DIP Lender has provided fair, adequate, and sufficient consideration that constitutes reasonably equivalent value for all of the rights, protections, and benefits obtained by it under the DIP Agreement and this Interim Order;

E.      Entry of this Interim Order is in the best interests of the Debtor's estate and its various stakeholders because it will, *inter alia*, allow the Debtor to continue to operate and reorganize under chapter 11 of the Bankruptcy Code chapter 11.

F.      The DIP Lender is willing to permit the Debtor to draw up to $3,500,000 of the DIP Commitment, but only on the terms set forth in this Interim Order.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Hearing, and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED, DETERMINED AND DECREED that:**

A.      Motion Granted On Interim Basis.

1.      The Motion is granted on the terms and conditions set forth in this Interim Order, with all findings made by the Court as set forth herein and/or on the record at the Interim Hearing incorporated herein by reference. Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled. This Interim Order shall be valid and binding on all parties-in-interest and fully effective immediately upon entry. All capitalized terms used herein which are not otherwise defined shall have the meanings given in the Motion.

B.      Use of Cash Collateral/Adequate Protection.

1.     Subject to the Budget, including the Permitted Variances, the Debtor, on behalf of its estate, is hereby authorized to use Cash Collateral in accordance with the terms of this Interim Order through and including June 30, 2023, in the manner set forth in the Motion. The cash collateral authorized to be used by the Debtor pursuant to this Interim Order shall include all of the Debtor's cash including in its checking account maintained at HomeState Bank, and the funds in the Debt Service Reserve and Revenue Funds held with UMB (account numbers and designations set forth below) (collectively, the "Cash Collateral")

| Account # | Designation |
|---|---|
| ****92.1 | Revenue Fund |
| ****92.2 | Bond Fund Interest |
| ****92.3 | Bond Fund Principal |
| ****92.4 | Debt Service Reserve Fund |

2.     UMB is hereby authorized, ordered and instructed to deliver all of the Cash Collateral comprised of the Debtor Service Reserve and Revenue Funds to the Debtor immediately, and, in the case of the Debt Service Reserve, shall immediately take all actions and steps necessary to liquidate all assets in such fund into cash which shall then be turned over to the Debtor to be used by the Debtor pursuant to the terms of this Interim Order.

3.     The Debtor is authorized to pay all of its projected expenses set forth in the Budget, and to deviate from the Budget, without the need for any further Court order, to the Permitted Variances defined in the DIP Agreement.

4.     As adequate protection for the Debtor's use of cash collateral, UMB, as trustee for the bondholders shall be granted the Adequate Protection Liens, as defined and described above.

C.     Authorization To Obtain A DIP Loan In The Amount Of Up to $3,500,000 of The DIP Commitment.

1.     Upon the entry of this Interim Order, the Debtor is hereby immediately authorized to receive a post-petition DIP Draw (as defined in the DIP Agreement) from the DIP Lender in the initial credit amount of $3,500,000 on the terms and conditions set forth in this Interim

Order, and in furtherance of the foregoing and without further approval of this Court, the Debtor is immediately authorized to perform all acts and to execute and deliver all instruments and documents that are required by the terms of the DIP Agreement for the Debtor's performance of its obligations authorized hereunder.

2.      The proceeds of the DIP Draw and DIP Commitment approved pursuant to this Order shall be used by the Debtor solely to pay expenses as set forth on the Budget, subject to the Permitted Variances.

3.      The outstanding principal amount of the DIP Commitment approved pursuant to this Order shall accrue interest at the rate of "Prime Rate" plus 8.25% per annum. Any undrawn portion of the DIP Commitment shall accrue an "Undrawn Line Fee" from the date hereof at 3.00% per annum as and solely to the extent set forth in the DIP Agreement. All such interest and fees shall accrue and be compounded and capitalized monthly and be due and payable in cash upon the Maturity Date (as defined in the DIP Agreement).

4.      A Commitment Fee of 1.00% of the DIP Commitment and Underwriting Fee of 1.00% shall be fully and irrevocably earned upon the date of the DIP Draw authorized by this Order.  In addition, a Monitoring Fee of 1.00% of the DIP Commitment per year shall accrue and be compounded and capitalized monthly. All such fees shall be due and payable in cash upon the Maturity Date.

5.      The Debtor shall pay, no later than the Maturity Date, all reasonable documented out-of-pocket costs and expenses of the DIP Lender incurred in connection with the DIP Commitment ("DIP Lender Expenses") such as legal costs, cost of collection and annual site visit(s), which together with all principal of, and interest and fees on the DIP Commitment, together with any other amounts owed by the Debtor in connection therewith shall constitute the "DIP Obligations" secured by the "DIP Liens" (as defined below).

6.      Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Commitment approved pursuant to this Order shall constitute allowed senior administrative expense claims against the Debtor (the "DIP Superpriority Claims") with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtor,

now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.

7.    As security for the DIP Obligations the Court has authorized the Debtor to incur pursuant to this Order, and pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Lender is granted a lien, senior to all pre-petition or post-petition liens, on all assets of the Debtor, excluding the Cash Collateral, all other cash or cash equivalents in the possession of the Debtor, MassMutual or UMB, the debt service reserve fund and all other accounts, subaccounts, and funds maintained in accordance with the documents governing the Debtor's outstanding bond secured by Existing Liens, and all other deposit accounts, cash, and investments subject to Existing Liens (as defined in Schedule 2 of the Dip Agreement) in respect of such bonds, and all Avoidance Actions and proceeds recovered therefrom.  Such lien shall be deemed to be effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtor or recordation or other filing of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Lender of any property.

8.    All unpaid DIP Obligations approved pursuant to this Order shall be due and payable on the "Maturity Date" as defined in the DIP Agreement. All such DIP Obligations may be repaid in whole or in part at any time prior to the Maturity Date, provided that, voluntary repayments made within 360 days of the Effective Date (as defined in the DIP Agreement) shall be subject to a "Makewhole Fee" equal to 3.00% of the amount required to be repaid.

9.    The Debtor has established with respect to the DIP Commitment approved and authorized by this Order that: (i) the proposed financing is an exercise of the Debtor's sound and

reasonable business judgment; (ii) the DIP Agreement was negotiated in good faith and at arm's length and no alternative financing is available on equal or better terms; (iii) the financing is necessary, essential, and appropriate for the continued operation of the Debtor's business and/or the preservation of its estate and is in the best interests of the estate and its creditors.

D.   <u>Miscellaneous</u>.

1.   Each stipulation, admission and agreement contained in this Interim Order shall be binding upon the Debtor, and any successor thereto (including, without limitation, any chapter 7 trustee or any chapter 11 trustee appointed or elected for the Debtor) under all circumstances and for all purposes existing as of the date hereof.

2.   This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, the Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of the Interim Financing Order.

3.   To the extent any provisions in this Interim Order conflict with any provisions of the Motion, the provisions of this Interim Order shall control.

E.   <u>Final Hearing</u>.

1.   The Final Hearing on the Motion to consider entry of a Final Order authorizing the DIP Loan and Debtor's use of Cash Collateral on a final basis shall be held on June [    ], 2023 at [        ].m. (Pacific Standard Time) before this Court.

2.   Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (i) counsel to the Debtor, Levene, Neale, Bender, Yoo & Golubchik L.L.P., 2818 La Cienega Ave., Los Angeles, CA 90034, Attn: Ron Bender, Esq., (ii) the DIP Lender (dip@legalist.com), (iii) counsel to any committee of unsecured creditors appointed in the chapter 11 case, (iv) the Office of the U.S. Trustee for the Southern District of California, and (v) parties required by Bankruptcy Rule 2002(a) and shall be filed with the Clerk of the United States Bankruptcy Court, Southern

10

District of California, in each case to allow actual receipt by the foregoing no later than June [   ], 2023 at 4:00 p.m., prevailing Pacific Standard time.

"IT IS SO ORDERED."

###

# EXHIBIT "2"

**Rialto Bioenergy Facility, LLC - Cash Flows**

**13 Week Expenditure Forecast**

| Week Ending: | Fcst Week 1 Jun 2 1 | Fcst Week 2 Jun 9 2 | Fcst Week 3 Jun 16 3 | Fcst Week 4 Jun 23 4 | Fcst Week 5 Jun 30 5 | Fcst Week 6 Jul 6 6 |
|---|---|---|---|---|---|---|
| **Receipts** | | | | | | |
| Tipping Fees | $ 10,716 | $ 16,391 | $ 16,391 | $ 16,391 | $ 16,391 | $ 12,690 |
| Offtake | $ 44,644 | $ - | $ - | $ - | $ 119,888 | $ - |
| **Total Receipts** | **$ 55,360** | **$ 16,391** | **$ 16,391** | **$ 16,391** | **$ 136,279** | **$ 12,690** |
| | | | | | | |
| **Operating Disbursements** | | | | | | |
| Transport & Disposal | $ - | $ - | $ 26,961 | $ - | $ 26,961 | $ - |
| Host Fees | $ - | $ - | $ 911 | $ - | $ 911 | $ - |
| Utilities, Permits, & Discharge | $ - | $ - | $ 40,457 | $ - | $ 423,828 | $ - |
| Consumables | $ - | $ - | $ 12,026 | $ - | $ 12,026 | $ - |
| Maintenance & Operations | $ - | $ - | $ 149,113 | $ - | $ 149,113 | $ - |
| Maintenance Wear Parts | $ - | $ - | $ 20,073 | $ - | $ 20,073 | $ - |
| Intercompany Labor (a) | $ - | $ - | $ - | $ - | $ 240,343 | $ - |
| Intercompany Operations and Maintenance Fee and Leases (b) | $ - | $ - | $ - | $ - | $ 42,691 | $ - |
| Intercompany Credit Card Expenses (c) | $ - | $ - | $ - | $ - | $ 20,700 | $ - |
| Adequate Assurance of Payment Deposits to Utilities | $ - | $ 150,247 | $ - | $ - | $ - | $ - |
| OPEX Contingency | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Operating Disbursements** | **$ -** | **$ 150,247** | **$ 249,541** | **$ -** | **$ 936,645** | **$ -** |
| | | | | | | |
| **Total Operating Cash Flow** | **$ 55,360** | **$ (133,856)** | **$ (233,149)** | **$ 16,391** | **$ (800,366)** | **$ 12,690** |
| | | | | | | |
| **Non-Operating Disbursements** | | | | | | |
| CIP Upgrades | $ - | $ - | $ 276,779 | $ - | $ 276,779 | $ - |
| Inventory Spare Parts | $ - | $ - | $ 58,404 | $ - | $ 58,404 | $ - |
| Intercompany Insurance (d) | $ - | $ - | $ - | $ - | $ 94,657 | $ - |
| General Administration | $ - | $ - | $ 24,921 | $ - | $ 24,921 | $ - |
| | | | | | | |
| **Restructuring Expenditures** | | | | | | |
| Deposits & Cures | | | | | | |
| Debtor Legal | | | | | $ 100,000 | |
| Other legal (indenture, trustee, etc) | | | | | $ 50,000 | |
| B. Riley Closing Fee | | | | $ 350,000 | | |
| B. Riley Retainer / Monthly Fee | | | | $ 40,000 | | |
| Unsecured Creditors Committee | | | | $ 25,000 | | |
| Prelim Professional Fees | $ - | $ - | $ - | $ 415,000 | $ 150,000 | $ - |
| U.S. Trustee Fees | | | | | $ 8,720 | |
| **Total Disbursements** | **$ -** | **$ 150,247** | **$ 609,645** | **$ 415,000** | **$ 1,550,127** | **$ -** |
| | | | | | | |
| **Net Cash Flow Prior to Financing** | **$ 55,360** | **$ (133,856)** | **$ (593,254)** | **$ (398,609)** | **$ (1,413,848)** | **$ 12,690** |
| | | | | | | |
| **DIP Financing** | | | | | | |
| **Starting Cash** | $ 3,000 | $ 3,558,360 | $ 3,424,504 | $ 2,831,251 | $ 2,432,642 | $ 1,018,794 |
| Net Cash Flow Prior to Financing | $ 55,360 | $ (133,856) | $ (593,254) | $ (398,609) | $ (1,413,848) | $ 12,690 |
| DIP Draws (e) | $ 3,500,000 | | | | | $ 5,750,000 |
| DIP Payments | | | | | | |
| **Ending Cash** | **$ 3,558,360** | **$ 3,424,504** | **$ 2,831,251** | **$ 2,432,642** | **$ 1,018,794** | **$ 6,781,484** |
| | | | | | | |
| *DIP Balance* | *4,207,500* | *4,251,475* | *4,295,451* | *4,339,426* | *4,383,401* | *10,169,065* |

**FOOTNOTES:**

(a) **Intercompany Labor:** Rialto staff is employed with Anaergia Services. Rialto pays monthly to Anaergia Services for the cost of their pay and benefits.

(b) **Intercompany Operations and Maintenance Fee and Leases:** Rialto pays a fixed fee to Anaergia Services monthly. Additionally, Rialto pays Anaergia Services monthly for a telehandler, yard dog, plant truck, and forklift lease.

(c) **Intercompany Credit Card Expenses:** Several Rialto Operators have Company credit cards for operational expenses related to the Facility. Rialto pays Anaergia Inc. monthly for the credit card charges.

(d) **Intercompany Insurance:** Rialto pays insurance expenses to Anaergia Inc. monthly. Insurance premiums are expensed at Anaergia Inc. and allocated down to Rialto.

(e) **DIP Draws:** The budget assumes that potential additional variable expense related draws (as per section 5.01 of the Credit Agreement) will be absorbed by the DIP loan capacity in excess of the draws included in the budget.

**Rialto Bioenergy Facility, LLC - Cash Flows**

**13 Week Expenditure Forecast**

| Week Ending: | | Fcst Week 7 Jul 14 7 | | Fcst Week 8 Jul 21 8 | | Fcst Week 9 Jul 28 9 | | Fcst Week 10 Aug 4 10 | | Fcst Week 11 Aug 11 11 | | Fcst Week 12 Aug 18 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | |
| Tipping Fees | $ | 12,690 | $ | 12,690 | $ | 12,690 | $ | 12,690 | $ | 16,391 | $ | 16,391 |
| Offtake | $ | - | $ | - | $ | 161,660 | $ | - | $ | - | $ | - |
| **Total Receipts** | **$** | **12,690** | **$** | **12,690** | **$** | **174,350** | **$** | **12,690** | **$** | **16,391** | **$** | **16,391** |
| | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | |
| Transport & Disposal | $ | 43,761 | $ | - | $ | 43,761 | $ | - | $ | 43,761 | $ | - |
| Host Fees | $ | 911 | $ | - | $ | 911 | $ | - | $ | 911 | $ | - |
| Utilities, Permits, & Discharge | $ | 46,918 | $ | - | $ | 423,985 | $ | - | $ | 53,378 | $ | - |
| Consumables | $ | 12,026 | $ | - | $ | 12,026 | $ | - | $ | 12,026 | $ | - |
| Maintenance & Operations | $ | 136,591 | $ | - | $ | 136,591 | $ | - | $ | 117,991 | $ | - |
| Maintenance Wear Parts | $ | 20,073 | $ | - | $ | 20,073 | $ | - | $ | 20,073 | $ | - |
| Intercompany Labor (a) | $ | - | $ | - | $ | 240,343 | $ | - | $ | - | $ | - |
| Intercompany Operations and Maintenance Fee and Leases (b) | $ | - | $ | - | $ | 42,691 | $ | - | $ | - | $ | - |
| Intercompany Credit Card Expenses (c) | $ | - | $ | - | $ | 20,700 | $ | - | $ | - | $ | - |
| Adequate Assurance of Payment Deposits to Utilities | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - |
| OPEX Contingency | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - |
| **Total Operating Disbursements** | **$** | **260,280** | **$** | **-** | **$** | **941,081** | **$** | **-** | **$** | **248,141** | **$** | **-** |
| | | | | | | | | | | | | |
| **Total Operating Cash Flow** | **$** | **(247,590)** | **$** | **12,690** | **$** | **(766,731)** | **$** | **12,690** | **$** | **(231,750)** | **$** | **16,391** |
| | | | | | | | | | | | | |
| **Non-Operating Disbursements** | | | | | | | | | | | | |
| CIP Upgrades | $ | 359,872 | $ | - | $ | 359,872 | $ | - | $ | 333,500 | $ | - |
| Inventory Spare Parts | $ | 58,404 | $ | - | $ | 58,404 | $ | - | $ | 58,404 | $ | - |
| Intercompany Insurance (d) | $ | - | $ | - | $ | 94,657 | $ | - | $ | - | $ | - |
| General Administration | $ | 105,171 | $ | - | $ | 105,171 | $ | - | $ | 24,521 | $ | - |
| | | | | | | | | | | | | |
| **Restructuring Expenditures** | | | | | | | | | | | | |
| Deposits & Cures | | | | | | | | | | | | |
| Debtor Legal | | | | | $ | 100,000 | | | | | | |
| Other legal (indenture, trustee, etc) | | | | | $ | 50,000 | | | | | | |
| B. Riley Closing Fee | | | | | | | | | | | | |
| B. Riley Retainer / Monthly Fee | | | | | $ | 40,000 | | | | | | |
| Unsecured Creditors Committee | | | | | | | | | | | | |
| Prelim Professional Fees | $ | - | $ | - | $ | 190,000 | $ | - | $ | - | $ | - |
| U.S. Trustee Fees | | | | | | | | | | | | |
| **Total Disbursements** | **$** | **783,727** | **$** | **-** | **$** | **1,749,185** | **$** | **-** | **$** | **664,566** | **$** | **-** |
| | | | | | | | | | | | | |
| **Net Cash Flow Prior to Financing** | **$** | **(771,037)** | **$** | **12,690** | **$** | **(1,574,836)** | **$** | **12,690** | **$** | **(648,175)** | **$** | **16,391** |
| | | | | | | | | | | | | |
| **DIP Financing** | | | | | | | | | | | | |
| **Starting Cash** | $ | 6,781,484 | $ | 6,010,446 | $ | 6,023,136 | $ | 4,448,301 | $ | 4,460,991 | $ | 3,812,816 |
| Net Cash Flow Prior to Financing | $ | (771,037) | $ | 12,690 | $ | (1,574,836) | $ | 12,690 | $ | (648,175) | $ | 16,391 |
| DIP Draws (e) | | | | | | | | | | | | |
| DIP Payments | | | | | | | | | | | | |
| **Ending Cash** | **$** | **6,010,446** | **$** | **6,023,136** | **$** | **4,448,301** | **$** | **4,460,991** | **$** | **3,812,816** | **$** | **3,829,207** |
| | | | | | | | | | | | | |
| *DIP Balance* | | *10,204,729* | | *10,240,393* | | *10,311,721* | | *10,360,813* | | *10,409,905* | | *10,458,997* |

**FOOTNOTES:**

**(a) Intercompany Labor:** Rialto staff is employed with Anaergia Ser

**(b) Intercompany Operations and Maintenance Fee and Leases:** R
Services monthly for a telehandler, yard dog, plant truck, and forkl

**(c) Intercompany Credit Card Expenses:** Several Rialto Operators l
Anaergia Inc. monthly for the credit card charges.

**(d) Intercompany Insurance:** Rialto pays insurance expenses to Ana
to Rialto.

**(e) DIP Draws:** The budget assumes that potential additional variable
the DIP loan capacity in excess of the draws included in the budget

**Rialto Bioenergy Facility, LLC - Cash Flows**

**13 Week Expenditure Forecast**

|  | Fcst Week 13 Aug 25 13 | 0 - 13 |
|---|---|---|
| **Week Ending:** | | |
| **Receipts** | | |
| Tipping Fees | $ 16,391 | $ 188,905 |
| Offtake | $ 141,972 | $ 468,164 |
| **Total Receipts** | **$ 158,364** | **$ 657,069** |
| | | |
| **Operating Disbursements** | | |
| Transport & Disposal | $ 43,761 | $ 228,966 |
| Host Fees | $ 911 | $ 5,468 |
| Utilities, Permits, & Discharge | $ 417,682 | $ 1,406,248 |
| Consumables | $ 12,026 | $ 72,158 |
| Maintenance & Operations | $ 117,991 | $ 807,391 |
| Maintenance Wear Parts | $ 20,073 | $ 120,435 |
| Intercompany Labor **(a)** | $ - | $ 480,685 |
| Intercompany Operations and Maintenance Fee and Leases **(b)** | $ - | $ 85,382 |
| Intercompany Credit Card Expenses **(c)** | $ - | $ 41,400 |
| Adequate Assurance of Payment Deposits to Utilities | $ - | $ 150,247 |
| OPEX Contingency | $ - | $ - |
| **Total Operating Disbursements** | **$ 612,444** | **$ 3,398,379** |
| | | |
| **Total Operating Cash Flow** | **$ (454,081)** | **$ (2,741,311)** |
| | | |
| **Non-Operating Disbursements** | | |
| CIP Upgrades | $ 333,500 | $ 1,940,303 |
| Inventory Spare Parts | $ 58,404 | $ 350,424 |
| Intercompany Insurance **(d)** | $ - | $ 189,315 |
| General Administration | $ 24,521 | $ 309,226 |
| | | |
| **Restructuring Expenditures** | | |
| Deposits & Cures | | |
| Debtor Legal | | $ 200,000 |
| Other legal (indenture, trustee, etc) | | $ 100,000 |
| B. Riley Closing Fee | | $ 350,000 |
| B. Riley Retainer / Monthly Fee | | $ 80,000 |
| Unsecured Creditors Committee | | $ 25,000 |
| Prelim Professional Fees | $ - | $ 755,000 |
| U.S. Trustee Fees | | $ 8,720 |
| **Total Disbursements** | **$ 1,028,869** | **$ 6,951,367** |
| | | |
| **Net Cash Flow Prior to Financing** | **$ (870,506)** | **$ (6,294,298)** |
| | | |
| **DIP Financing** | | |
| **Starting Cash** | $ 3,829,207 | $ 3,000 |
| Net Cash Flow Prior to Financing | $ (870,506) | $ (6,294,298) |
| DIP Draws **(e)** | | $ 9,250,000 |
| DIP Payments | | $ - |
| **Ending Cash** | **$ 2,958,702** | **$ 2,958,702** |
| | | |
| *DIP Balance* | *10,508,089* | |

**FOOTNOTES:**

**(a) Intercompany Labor:** Rialto staff is employed with Anaergia Ser

**(b) Intercompany Operations and Maintenance Fee and Leases:** R
Services monthly for a telehandler, yard dog, plant truck, and forkl

**(c) Intercompany Credit Card Expenses:** Several Rialto Operators l
Anaergia Inc. monthly for the credit card charges.

**(d) Intercompany Insurance:** Rialto pays insurance expenses to Ana
to Rialto.

**(e) DIP Draws:** The budget assumes that potential additional variable
the DIP loan capacity in excess of the draws included in the budget

## RBF 30-Day Disbursement Schedule

| Line Items | | Total |
|---|---|---|
| *Operating Disbursements* | | |
| Transport & Disposal | $ | 53,922 |
| Host Fees | $ | 1,823 |
| Utilities, Permits, & Discharge | $ | 464,285 |
| Consumables | $ | 24,053 |
| Maintenance & Operations | $ | 298,225 |
| Maintenance Wear Parts | $ | 40,145 |
| Intercompany Labor | $ | 240,343 |
| Intercompany Operations and Maintenance Fee and Leases | $ | 42,691 |
| Intercompany Credit Card Expenses | $ | 20,700 |
| Adequate Assurance of Payment Deposits to Utilities | $ | 150,247 |
| Contingency | $ | 681,255 |
| *Non-Operating Disbursements* | | |
| CIP Upgrades | $ | 553,559 |
| Inventory Spare Parts | $ | 116,808 |
| Intercompany Insurance | $ | 94,657 |
| General Administration | $ | 49,842 |
| *Restructuring Expenses* | | |
| Professional Fees | $ | 565,000 |
| US Trustee Fee | $ | 8,720 |
| **Total Disbursements** | **$** | **3,406,274** |
| | | |
| *Less: Receipts* | $ | 240,813 |
| | | |
| **Net Funding Requirement (assumes ability to use receipts)** | **$** | **3,165,461** |
| **Funding Requirement (assumes no ability to use receipts)** | **$** | **3,406,274** |
| | | |
| *Draw* | *$* | *3,500,000* |

EXHIBIT "3"

**DEBTOR-IN-POSSESSION
TERM LOAN CREDIT AGREEMENT**

**among**

**RIALTO BIOENERGY FACILITY, LLC,
as Debtor,**

**and**

**Certain Investment Fund(s) for Which
LEGALIST, INC.
Serves as Investment Adviser,
as DIP Lender**

This DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT (the "**Agreement**"), dated as of _____, is entered into among Rialto Bioenergy Facility, LLC (the "**Debtor**") and certain investment fund(s) for which Legalist, Inc. serves as investment adviser, as lender, agent, and collateral agent (such fund(s), the "**DIP Lender**").

## RECITALS

WHEREAS, on May 25, 2023 (the "**Petition Date**"), the Debtor filed a voluntary petition in the United States Bankruptcy Court for the Southern District of California (the "**Bankruptcy Court**") for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and its chapter 11 case is being administered under the caption *In re Rialto Bioenergy Facility, LLC 23-01467-11* (the "**Case**");

WHEREAS, the Debtor has continued in possession of its assets and management of its business pursuant to Bankruptcy Code sections 1107 and 1108;

WHEREAS, an immediate and ongoing need exists for the Debtor to obtain funds in order to fund the Case and work toward a successful exit from chapter 11 and, accordingly, the Debtor requested that the DIP Lender extend the DIP Loans;

WHEREAS, the DIP Lender is willing to extend DIP Loans (each a "**DIP Draw**") on the terms hereof in an aggregate maximum amount of $35,000,000 (the "**DIP Commitment**") in accordance with the allocation on Addendum 1;

NOW THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto (the "**Parties**") agree as follows:

## ARTICLE I
## DEFINED TERMS

**Section 1.01** <u>Definitions</u>. As used in this Agreement:

"**Affiliate**" has the meaning given to it in the Bankruptcy Code.

"**Agreement**" has the meaning given to it in the preamble hereto.

"**Approved Form**" means in form and substance acceptable to (as evidenced by the prior written consent of) the DIP Lender or otherwise approved by the Bankruptcy Court after notice and a hearing.

"**Avoidance Actions**" means all claims and causes of action described in Bankruptcy Code chapter 5, or any non-bankruptcy law referenced therein, and all proceeds thereof.

"**Bankruptcy Code**" has the meaning given to it in the Recitals.

"**Bankruptcy Court**" has the meaning given to it in the Recitals.

"**Borrowing Request**" means an executed borrowing request substantially in the form attached hereto as <u>Exhibit A</u> and otherwise in Approved Form.

"**Budget**" means a budget encompassing, on a monthly basis, the period from the date hereof through the satisfaction of the final Milestone and containing detailed line items of the Debtor's projected receipts and disbursements, in Approved Form, including as the same may be revised by the Debtor from time to time in Approved Form and which may be modified at any time by the Debtor with the prior written consent of the DIP Lender or approval by the Bankruptcy Court after notice and a hearing. The Budget as of the date hereof is attached hereto as <u>Exhibit B</u>. As used herein, the term "Budget" includes the effect of Permitted Variances and of increased variable related expenses permitted under Section 5.01(b).

"**Business Day**" means every day that is not a Saturday, Sunday, or Legal Holiday (as defined in Federal Rule of Bankruptcy Procedure 9006(a)(6)).

"**Case**" has the meaning given to it in the Recitals.

"**Commitment Fee**" has the meaning given to it in Section 2.05(i).

"**Debt**" has the meaning given to it in the Bankruptcy Code.

"**Debtor**" has the meaning given to it in the preamble hereto.

"**DIP Claims**" means "superpriority" administrative-expense claims with priority over (x) all other administrative-expense claims, expenses, and costs permitted by, described in, or entitled to priority under the Bankruptcy Code (subject to the Carveout (as defined in the DIP Orders)) and (y) all other unsecured claims against the Debtor.

"**DIP Collateral**" means all assets and properties, whether real, personal, intellectual, or otherwise, whether tangible or intangible, whether domestic, foreign, or international, that the Debtor now owns or hereafter acquires, or to or in which the Debtor, now or in the future, holds any right, title, or interest (whether fixed, contingent, inchoate, or otherwise); provided that the DIP Collateral shall not include Excluded Collateral.

"**DIP Commitment**" has the meaning given to it in the Recitals.

"**DIP Draw**" has the meaning given to it in the Recitals.

"**DIP Lender**" has the meaning given to it in the preamble hereto.

"**DIP Lender Expenses**" has the meaning given to it in Section 11.03.

"**DIP Liens**" has the meaning given to it in Section 10.02.

"**DIP Loan Documents**" means this Agreement, all Borrowing Requests, the DIP Orders, the Budget and related reporting, and all other agreements, documents, and instruments in any way arising from, related to, or connected with the DIP Commitment, DIP Loans, DIP Claims, and/or DIP Liens, together with all schedules, exhibits, and other addenda thereto, all of which shall be in Approved Form.

"**DIP Loans**" has the meaning given to it in Section 2.01(a).

"**DIP Obligations**" means DIP Lender Expenses, together with all principal of, and interest and fees on (including, without

limitation, any applicable Undrawn Line Fee, the Monitoring Fee, Commitment Fee, Underwriting Fee, and any applicable Makewhole Fee) the DIP Loans, any amount owed to any Indemnified Person, and any other amount owed by the Debtor under any DIP Loan Document.

"**DIP Orders**" means the Interim DIP Order and/or Final DIP Order, as applicable.

"**Effective Date**" has the meaning given to it in Section 3.02.

"**Event of Default**" has the meaning given to it in Section 8.01.

"**Excluded Collateral**" means the assets and properties set forth on Schedule 4.

"**Existing Liens**" means the Liens set forth on Schedule 2.

"**Final DIP Order**" means an order of the Bankruptcy Court approving the DIP Loans following the occurrence of a final hearing as such term is used in Bankruptcy Rule 4001(c)(2), with such order in Approved Form.

"**Indemnified Liabilities**" has the meaning set forth in Section 7.01.

"**Indemnified Persons**" has the meaning set forth in Section 7.01.

"**Interim DIP Order**" means an interim order of the Bankruptcy Court approving the DIP Loans in Approved Form.

"**Lien**" has the meaning given to it in the Bankruptcy Code.

"**Makewhole Fee**" has the meaning given to it in Section 2.07(c).

"**Maturity Date**" means the earliest to occur of (u) 18 months after the Effective Date, subject to two three-month extensions so long as no Event of Default is then continuing with an additional 2.00% per year interest accruing during such extensions, (w) the Debtor's exit from bankruptcy, (w) repayment in full of all outstanding DIP Loans, (x) the acceleration of the DIP Loans following an Event of Default, and (z) Debtor's termination of the DIP Commitment pursuant to Section 2.09.

"**Milestones**" means, collectively, the events and corresponding deadlines set forth on Schedule 1.

"**Monitoring Fee**" has the meaning given to it in Section 2.05(iii).

"**Permitted Senior Liens**" means the Liens in the DIP Collateral set forth on Schedule 3.

"**Permitted Variances**" has the meaning given to it in Section 5.01(b).

"**Person**" has the meaning given to it in the Bankruptcy Code.

"**Petition Date**" has the meaning given to it in the Recitals.

"**Underwriting Fee**" has the meaning given to it in Section 2.05(ii).

"**Undrawn Line Fee**" has the meaning given to it in Section 2.04(c).

"**Uniform Commercial Code**" has the meaning given to it in Section 11.08. [1]

## ARTICLE II
## DIP LOANS

**Section 2.01 In General.**

(a)  Subject to the terms hereof, the DIP Lender agrees, upon the Effective Date, to make available to the Debtor, in one or more DIP Draws, term loans in the full amount of the DIP Commitment (such term loans, the "**DIP Loans**").

(b)  Subject to Section 2.7, all amounts owed hereunder with respect to the DIP Loans shall be paid in full no later than the Maturity Date. Any principal amount of the DIP Loans repaid or prepaid may not be reborrowed.

**Section 2.02 Use of Proceeds.** The proceeds of the DIP Loans shall be used by the Debtor solely to:

(i)  Pay DIP Lender Expenses;

(ii)  Pay all other DIP Obligations; and

(iii)  Pay other amounts permitted under the Budget.

In no event shall any portion of the DIP Loans be used for payment of fees, costs, or expenses incurred by any party in (x) investigating or pursuing any claim or cause of action against the DIP Lender, any Affiliate thereof, or any other Indemnified Person or (y) questioning or challenging, or taking any other action that could reasonably be expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender.

**Section 2.03 [Omitted].**

**Section 2.04 Interest; Undrawn Line Fee.**

(a)  Interest Rate. The outstanding principal amount of the DIP Loans (together with all other due and payable DIP Obligations) shall accrue interest at the U.S. prime rate plus 8.25% per year, which shall accrue and be compounded and capitalized monthly; provided that, if the Debtor failed to move for approval of the Interim DIP Order by June 10, 2023, such interest rate shall include an additional 1.00%.

(b)  Default Interest. While an Event of Default has occurred and is continuing, the outstanding principal amount of the DIP Loans (together with all other due and payable DIP Obligations) shall accrue an additional 4.75% in interest per year, which shall accrue and be compounded and capitalized monthly. Payment or acceptance of the increased rates of interest provided for in this Section 2.4(c) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the DIP Lender.

(c)  Undrawn Line Fee. Any undrawn portion of the amount of the DIP Commitment shall accrue a fee (the "**Undrawn Line Fee**") from entry of the Interim DIP Order at 3.00% per year, which shall accrue and be compounded and capitalized monthly.

(d)  Payment Terms. All interest (including default interest) and any applicable Undrawn Line Fee (which shall be DIP Obligations for all purposes), together with the fees described in Section 2.05, shall be compounded and capitalized in arrears on

---

[1] Capitalized terms used but not defined herein have the meanings given to them in the DIP Order.

the first Business Day of each month and due and payable upon the Maturity Date.

**Section 2.05 Fees.** The following fees shall be deemed fully and irrevocably earned upon entry of the Interim DIP Order and shall be DIP Obligations for all purposes:

(i)   A onetime "**Commitment Fee**" of 1.00% of the amount of the DIP Commitment, due and payable in cash upon the Maturity Date;

(ii)   A onetime "**Underwriting Fee**" of 1.00% of the amount of the DIP Commitment, due and payable in cash upon the Maturity Date; and

(iii) A "**Monitoring Fee**" of 1.00% per year of the amount of the DIP Commitment, payable in kind monthly as provided in Section 2.04(d).

**Section 2.06 Repayment.** Subject to Sections 2.07, the DIP Loans shall be due and payable, and the Debtor unconditionally agrees and promises to repay to the DIP Lender all other outstanding DIP Obligations, in cash on the Maturity Date.

**Section 2.07 Prepayments.**

(a)   Voluntary Prepayments. The DIP Loans may be voluntarily repaid in whole or in part at any time prior to the Maturity Date, after the Effective Date, subject (during the following 360 days) to the contemporaneous payment of the applicable Makewhole Fee.

(b)   Mandatory Repayments. The DIP Loans shall be mandatorily repaid to the extent of, and within 10 Business Days of the Debtor's receipt of, any net proceeds from the sale or other disposition of any DIP Collateral other than the sale of inventory (e.g., renewable natural gas and fertilizer) in the ordinary course of business; provided that no such sale or disposition outside the ordinary course of business shall occur without the DIP Lender's prior written consent and any such sale or disposition shall be conducted solely in Approved Form; provided further that any such repayment required to be made prior to 360 days after the Effective Date shall be subject to the contemporaneous payment of the applicable Makewhole Fee.

(c)   As used in this Section 2.07, "**Makewhole Fee**" means an additional fee of 3.0% of the amount that is voluntarily or required to be repaid, which fee shall be a DIP Obligation for all purposes.

**Section 2.08 General Provisions Regarding Payments.**

(a)   Payments. All payments by or on behalf of the Debtor of principal, interest, fees, or other DIP Obligations shall be made in U.S. dollars in same-day funds, without defense, setoff, or counterclaim of any kind, free of any restriction or condition, and delivered to DIP Lender so as to be actually received by it no later than 1:00 PM New York time. All funds actually received by the DIP Lender after that time shall be deemed to have been paid on the next Business Day.

(b)   Non-Conforming Payments. Any payment not conforming to the foregoing Clause (a) shall be deemed a non-conforming payment and shall not be deemed to have been actually received by the DIP Lender until the later of (x) the time such funds become available funds and (y) the next Business Day. Interest and fees shall continue to accrue on any principal (together with all other due and payable DIP Obligations) until such funds become available funds.

(c)   Payments to Include Accrued Interest. All payments in respect of the principal amount of the DIP Loans shall include payment of accrued interest on the principal amount being repaid or prepaid, and all such payments shall be applied in accordance with Section 8.03.

(d)   Business Days. Whenever a payment hereunder is due on a day that is not a Business Day, such payment shall be made on the next Business Day.

**Section 2.09 Termination of Commitments**. The DIP Commitment of the DIP Lender shall be automatically and permanently reduced (x) by the principal amount of each DIP Loan made by the DIP Lender pursuant to Section 2.01(b) and (y) in full, upon (i) acceleration of the DIP Loans under Section 8.02(a)(i) or (ii) the election of the DIP Lender while an Event of Default has occurred and is continuing. The Debtor may, by written notice to the DIP Lender, terminate the DIP Commitment.

## ARTICLE III
## CONDITIONS PRECEDENT

**Section 3.01 Conditions Precedent to DIP Draws.** The obligation of the DIP Lender to make DIP Draws available to the Debtor, in accordance with the Budget, in the aggregate amount of the DIP Commitment (provided no Event of Default shall (x) have occurred and be continuing or (y) be reasonably likely to result therefrom), is subject to the occurrence (with respect to each such DIP Draw) of all of:

(i)   The Bankruptcy Court's entry of the applicable DIP Order, which remains in full force and effect as so entered; provided that, upon entry of the Interim DIP Order but prior to entry of the Final DIP Order, the Debtor shall be permitted to draw up to $3,500,000 of the DIP Commitment in the aggregate;

(ii)   Following entry of the Final DIP Order, the Debtor's satisfaction of all applicable Milestones;

(iii) The Debtor's delivery of such security documents as the DIP Lender may request under Section 10.04;

(iv) The Debtor's delivery of an executed Borrowing Request in the amount of such DIP Draw; and

(v)   Each of the representations and warranties set forth in this Agreement and in each other DIP Loan Document shall be true and correct in all material respects as of the Effective Date, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and warranty shall have been true and correct in all material respects as of such earlier date.

**Section 3.02 Effective Date.** With respect to any DIP Draw, the date on which all of the conditions precedent described in Section 3.01 have been met shall be the "**Effective Date**."

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF DEBTOR

To induce the DIP Lender to provide the DIP Loans, the Debtor makes to the DIP Lender all of following representations and warranties, which representations and warranties shall (x) be deemed to have been made and remade as of each Effective Date and (y) survive the execution and delivery of this Agreement:

**Section 4.01 Corporate Status; Corporate Authorization.**

(a)  The Debtor is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and is duly qualified and in good standing in every other jurisdiction where it is doing business, and the execution, delivery, and performance by the Debtor of this Agreement (x) are within its authority provided the DIP Loans have been approved by the Bankruptcy Court, (y) have been duly authorized, provided the DIP Loans have been approved by the Bankruptcy Court, and (z) do not conflict with or contravene its corporate-governance or organizational documents.

(b)  Subject to the approval of the Bankruptcy Court, the execution, delivery, and performance of obligations under this Agreement by the Debtor (x) do not require any consent that has not been obtained and (y) are not and will not be in conflict with or prohibited or prevented by any (i) law, rule, or regulation, (ii) corporate-governance or organizational document of the Debtor or (iii) other instrument or agreement, in each case binding on the Debtor or affecting its property.

**Section 4.02 Execution and Binding Effect.** Upon execution and delivery hereof and approval by the Bankruptcy Court, this Agreement shall constitute the legal, valid, and binding obligation of the Debtor, enforceable in accordance with its terms.

**Section 4.03 DIP Collateral.** The Debtor has good and marketable title to all DIP Collateral, free of all Liens, security interests, pledges, and other encumbrances, other than the DIP Liens and Existing Liens.

**Section 4.04 Absence of Material Adverse Effect.** There has been no act, condition, or event that has had, or may reasonably be expected to have, a material adverse effect on the Debtor or its operations since the Petition Date; provided that the commencement of the Case and the effects thereof shall not be considered to be a material adverse effect.

**Section 4.05 Governmental Approvals and Filings.** Except as has already been obtained and for the approval of the Bankruptcy Court, no approval, authorization, or other action by, or filing, recording, or registration with, any governmental body is or will be necessary in connection with the execution, delivery, or performance of this Agreement.

**Section 4.06 Misstatements and Omissions.** Since the Petition Date, no material financial or operational information furnished or made available by the Debtor (directly or indirectly) to the DIP Lender (including all information contained in the Case's docket) (x) contains any material misstatement of fact or (y) omits any material fact necessary to make such information not misleading.

## ARTICLE V
## AFFIRMATIVE COVENANTS

So long as any DIP Obligation remains outstanding, the Debtor shall perform all of the following covenants:

**Section 5.01 Budget Reporting and Compliance.**

(a)  No later than the fifth day of each month, the Debtor shall provide the DIP Lender (each in Approved Form):

  (i)  A variance report (certified by an appropriate officer of the Debtor) comparing, on a line-item basis, actual cash receipts and disbursements to those contained in the Budget, for both the preceding month and cumulatively

from the date hereof, together with detailed explanations of all variances (if any); and

  (ii)  A rolling 13-week cashflow forecast for the Debtor.

(b)  In no event shall cumulative cash disbursements vary upward, from the Budget (on a cumulative basis) by more than 16.25% (the "**Permitted Variances**") without the prior approval of the DIP Lender or the Bankruptcy Court.  Notwithstanding the foregoing, the Debtor shall be authorized to increase the payment of variable related expenses that increase with an increase in the Debtor's revenue without any further approval of the DIP Lender or the Bankruptcy Court.

**Section 5.02 Accounting; Financial Statements.** The Debtor shall keep true and accurate books of record and account in accordance with past practice and the requirements of the Bankruptcy Court and sufficient to permit the preparation of financial statements in accordance with generally accepted accounting principles.

**Section 5.03 Maintenance of Existence.** The Debtor shall do all things necessary to maintain (x) its corporate or other existence in accordance with its organizational documents (which shall not be amended without the prior written consent of the DIP Lender) and (y) all rights, licenses, and franchises necessary to the conduct of its business.

**Section 5.04 Preservation of Assets.** The Debtor shall maintain its assets (including all DIP Collateral) in good operating conditions (ordinary wear and tear excepted) and shall make such commercially reasonable repairs and replacements as are required, in accordance with the Budget; provided that, in no event shall the DIP Lender be surcharged with respect to such maintenance of the DIP Collateral.

**Section 5.05 Notice of Material Events.** The Debtor shall notify the DIP Lender promptly in writing of:

(i)  The occurrence of any default or Event of Default; and

(ii)  Any other development that results in, or could reasonably be expected to result in, a material adverse effect on the Debtor or its operations.

**Section 5.06 Use of Proceeds.** The Debtor shall use the proceeds of the DIP Loans only as permitted by Section II.02.

**Section 5.07 [Omitted].**

**Section 5.08 Taxes.** The Debtor will pay its tax liabilities accruing after the Petition Date before the same shall become delinquent or in default, except where the validity or amount thereof is being contested in good faith by appropriate proceedings and the Debtor has set aside on its books adequate reserves in accordance with generally accepted accounting principles.

**Section 5.09 Milestones.** The Debtor shall comply with all applicable Milestones.

**Section 5.10 Compliance with Laws.** The Debtor shall comply all applicable laws, rules, and regulations except as would not reasonably be expected to result in a material adverse effect and except to the extent compliance, or enforcement thereof, is not stayed or relieved during the Case.

**Section 5.11 [Omitted].**

4

**Section 5.12 <u>Full Access to Information</u>.** The Debtor shall promptly provide the DIP Lender with all reasonably requested information and, during normal business hours upon reasonable prior notice, access to all executives, directors, and advisors of the Debtor, together with access to inspect any DIP Collateral, when requested by the DIP Lender; <u>provided</u> that, without any prior request from the DIP Lender, the Debtor shall deliver to the DIP Lender in real time, subject to necessary confidentiality conditions or a non-disclosure agreement, copies of all offers (whether formal or informal, firm or contingent, but excluding sales of inventory in the ordinary course) to acquire the Debtor, the DIP Collateral, or any part thereof, together with all related correspondence, and all other materials regarding the Debtor's progress on the Milestones.

**Section 5.13 <u>Stay, Extension, and Usury Laws</u>.** The Debtor expressly waives the benefit of all such laws with respect to this Agreement.

**Section 5.14 <u>Timely Payment of DIP Lender Expenses, Other DIP Obligations</u>.** The Debtor shall, in addition to repaying all other DIP Obligations when due and payable hereunder, timely pay all DIP Lender Expenses payable hereunder out of DIP Draws.

**Section 5.15 <u>Further Assurances</u>.** The Debtor shall fully cooperate with the DIP Lender, and take such actions and execute such documents and instruments as the DIP Lender may reasonably request, in furtherance of this Agreement and the transactions contemplated hereby, expressly including all steps necessary or desirable to maintain the priority, validity, and enforceability of the DIP Claims and DIP Liens on the DIP Collateral.

**ARTICLE VI**
**NEGATIVE COVENANTS**

So long as any DIP Obligation remains outstanding, the Debtor shall perform all of the following covenants:

**Section 6.01 <u>Indebtedness</u>.** The Debtor shall not (directly or indirectly) incur, create, or permit to exist any Debt, other than (w) Debt existing as of the Petition Date, (x) the DIP Obligations, (y) Debt expressly contemplated by the Budget (subject to Permitted Variances) or as otherwise incurred by the Debtor after the Petition Date from the operation of the Debtor's business and the costs of the Case, including professional fees and expenses incurred by professionals employed by order of the Bankruptcy Court and the fees owing to the United States Trustee, subject in each instance to the Budget (subject to Permitted Variances), and (z) any additional borrowings as the Debtor deems necessary and appropriate that are approved in advance in writing by the DIP Lender or that are unsecured or are secured by liens that are junior in priority to the DIP Liens.

**Section 6.02 <u>Liens</u>.** The Debtor shall not (directly or indirectly) incur, create, or permit to exist any Lien in the DIP Collateral other than (v) liens that are junior in priority to the DIP Liens, (w) Existing Liens, (x) statutory liens, (y) the DIP Liens or (z) any adequate protection liens granted by the Bankruptcy Court, provided such adequate protection liens are (i) junior in priority to the DIP Liens on the DIP Collateral or (ii) on estate assets other than the DIP Collateral.

**Section 6.03 <u>Superpriority Claims</u>.** The Debtor shall not (directly or indirectly) incur, create, or permit to exist any

administrative-expense claim, expense, or cost (x) with priority senior or equal to the DIP Claims or (y) not expressly contemplated by the Budget (subject to Permitted Variances) unless incurred by the Debtor after the Petition Date from the operation of the Debtor's business and the costs of the Case, including professional fees and expenses incurred by professionals employed by order of the Bankruptcy Court and the fees owing to the United States Trustee, subject in each instance to the Budget (subject to Permitted Variances).

**Section 6.04 <u>Payments</u>.** The Debtor shall not make any payment (other than in respect of the DIP Obligations) not expressly contemplated by the Budget subject to the Permitted Variances or as otherwise approved by the Bankruptcy Court after notice and a hearing.

**Section 6.05 <u>Merger or Sale</u>.** The Debtor shall not (directly or indirectly) (x) merge or consolidate with another Person or (y) sell any DIP Collateral (other than inventory in the ordinary course of business) unless the net proceeds thereof are applied to repay the DIP Obligations (subject to Section 2.07) in full.

**Section 6.06 <u>Business</u>.** The Debtor shall not engage in any business other than its line of business as of the Petition Date.

**Section 6.07 <u>Amendments to Organizational Documents</u>.** The Debtor shall not amend any corporate-governance or organizational document in a manner that would materially impair DIP Lender's rights, except with DIP Lender's prior written approval.

**ARTICLE VII**
**INDEMNIFICATION**

**Section 7.01 <u>Indemnification by the Debtor</u>.** The Debtor shall indemnify the DIP Lender and its Affiliates (expressly including Legalist, Inc.), together with their respective partners, directors, officers, managers, members, partners, investors, employees, contractors, agents, administrators, advisors (including attorneys), and representatives, against, and hold each such Person (each an "**Indemnified Person**") harmless from, all liabilities, obligations, losses, damages, penalties, claims, actions, causes of action, judgments, suits, costs, expenses, fees, and disbursements, of any kind or nature whatsoever, whether direct, indirect, special, exemplary, or consequential and whether based on federal, state, foreign, or international laws, statutes, rules, or regulations, that may be imposed on, incurred by, or asserted against such Indemnified Person, in any way arising from, in connection with, or relating to any DIP Loan Document, the transactions contemplated thereby, or any action taken or not taken in connection therewith (collectively, the "**Indemnified Liabilities**"); <u>provided</u> that such indemnity shall not be available to an Indemnified Person to the extent that any Indemnified Liability was a direct result, as determined by a court of competent jurisdiction, in a final and non-appealable order, of the gross negligence or willful misconduct of such Indemnified Person. The Debtor's payment obligations with respect to any Indemnified Liability shall constitute DIP Obligations for all purposes, and each Indemnified Person not a Party shall be a third-party beneficiary of this Agreement for purposes enforcing such obligations.

5

### ARTICLE VIII
### EVENTS OF DEFAULT

**Section 8.01 Events of Default.** The occurrence and continuation of each of the following shall constitute an "**Event of Default**":

(i)   The Debtor shall:

(A)   Fail to timely pay any DIP Lender Expense or other DIP Obligation when due;

(B)   Grant or permit to exist any Lien on any DIP Collateral, other than the DIP Liens and Existing Liens or otherwise permitted under Section 6.02;

(C)   Fail to satisfy any Milestone, within 2 business days of its stated deadline; or

(D)   Make any payment not expressly contemplated by, or otherwise fail to comply with, the Budget (subject to Permitted Variances) unless such payment has been approved by the Bankruptcy Court after notice and a hearing;

(ii)   Any representation, warranty, certification, or other statement made, or deemed made in or delivered pursuant to any DIP Loan Document, by the Debtor shall be false in any material respect as of the date so made, deemed made, or delivered;

(iii)   The Bankruptcy Court or another court of competent jurisdiction shall enter an order, without the prior written consent of the DIP Lender if such order is expected to have a materially negative impact upon the rights of the DIP Lender:

(A)   Granting adequate protection, under Bankruptcy Code section 361, 362, 363, or 364 or otherwise, to any party (other than the DIP Lender), except as set forth herein, in the Budget or as otherwise approved by the Bankruptcy Court after notice and a hearing provided that no such adequate protection may involve the granting of any lien in favor of any party on the DIP Collateral that is equal in priority to or senior to the DIP Lien;

(B)   Granting relief from the automatic stay, under Bankruptcy Code section 362 or otherwise, to any party, other than the DIP Lender, with respect to any DIP Collateral;

(C)   Surcharging, under Bankruptcy Code section 506(c) or otherwise, any DIP Collateral in any amount, or subjecting the DIP Lender or DIP Collateral to the equitable principle of marshaling;

(D)   Approving new credit or debt (other than the DIP Loans) secured by a Lien, under Bankruptcy Code section 364 or otherwise, on any DIP Collateral except as permitted under Section 6.02;

(E)   Approving any administrative-expense claim, expense, or cost against the Debtor (other than the DIP Claims), under Bankruptcy Code section 364, 502, 507, or otherwise, with priority of payment senior or equal to the DIP Claims;

(F)   Modifying, staying, vacating, or rescinding any part of any DIP Order, except with the prior written consent of the DIP Lender;

(G)   Holding, adjudicating, or declaring any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender to be invalid or unenforceable;

(H)   Enjoining, restraining, or in any other way preventing the Debtor from conducting any material part its business affairs;

(I)   Appointing an examiner or trustee with expanded powers to operate or manage the business of the Debtor in the Debtor's Case;

(J)   Confirming any chapter 11 plan that does not provide for repayment in full in cash on the effective date of such plan of all outstanding DIP Obligations;

(K)   Converting the Debtor's Case to a case under Bankruptcy Code chapter 7; or

(L)   Dismissing or closing the Debtor's Case;

(iv)   The Debtor shall commence any action in, file any motion or application with, or make any other submission to the Bankruptcy Court or another court of competent jurisdiction (or join in or otherwise support the same) (x) seeking entry of any order described in the foregoing Clause (iii) or (y) questioning or challenging, or that could be reasonably expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender;

(v)   Any party (other than the Debtor) shall commence any action in, file any motion or application with, or make any other submission to the Bankruptcy Court or another court of competent jurisdiction (x) seeking entry of any order described in the foregoing Clause (iii) which is not opposed by the Debtor or (y) challenging, or that could be reasonably expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender which is not opposed by the Debtor; and

(vi)   The Debtor shall fail to perform or comply with any other agreement, covenant, term, or condition in any DIP Loan Document, other than those listed in the preceding Clauses (i)-(v); provided such failure has not been remedied (if capable of remedy) within 21 days of the earlier of (x) the Debtor's becoming aware of such failure or (ii) the Debtor's receipt of written notice from the DIP Lender of such failure.

**Section 8.02 Remedies.**

(a)   Subject only to the DIP Orders, and notwithstanding Bankruptcy Code section 362, while any Event of Default has occurred and is continuing, the DIP Lender may immediately, following two days of prior written notice provided by the DIP Lender to the Debtor without a timely cure by the Debtor, without further order of, or application to, the Bankruptcy Court:

(i)   Declare the DIP Commitment terminated; and

(ii)   Declare all DIP Obligations immediately due and payable, without the requirement of presentment, demand, protest, or any other notice, all of which are waived by the Debtor.

6

(b)   While any Event of Default has occurred and is continuing, the DIP Lender may apply to the Bankruptcy Court for entry of an order:

    (i)   Terminating the automatic stay with respect to any DIP Collateral;

    (ii)   Appointing an examiner or chapter 11 trustee; and

    (iii)   Converting the Debtor's Case to chapter 7.

(c)   In addition to the rights and remedies enumerated in the foregoing Clauses (a) and (b), the DIP Lender shall be entitled, while any Event of Default has occurred and is continuing, to pursue all rights and remedies available to it under the Bankruptcy Code (whether as a creditor, party in interest, or otherwise) or as a secured party under the Uniform Commercial Code.

(d)   For the avoidance of doubt, all costs incurred by the DIP Lender in connection with this Section 8.02 shall constitute DIP Lender Expenses and DIP Obligations for all purposes.

**Section 8.03 <u>Application of Funds</u>.** If the DIP Lender receives any payment from or on behalf of the Debtor, or collects any money or property pursuant to this Article VIII, it shall pay out the money or property as follows:

(i)   <u>First</u>: To the DIP Lender, for accrued and unpaid DIP Lender Expenses payable hereunder;

(ii)   <u>Second</u>: To the DIP Lender, for accrued and unpaid interest (including default interest) and applicable fees payable hereunder;

(iii)   <u>Third</u>: To the DIP Lender, for unpaid principal outstanding on the DIP Loans;

(iv)   <u>Fourth</u>: To the DIP Lender, for all other unpaid DIP Obligations (including reasonable reserves for Indemnified Liabilities and other contingent DIP Obligations); and

(v)   <u>Fifth</u>: After all DIP Obligations have been paid in full in cash and the DIP Commitment has terminated, the DIP Lender shall distribute any surplus in accordance with a final, non-appealable Bankruptcy Court order.

For the avoidance of doubt, the Debtor shall remain liable for any deficiency.

### ARTICLE IX
### [OMITTED]

### ARTICLE X
### COLLATERAL, SECURITY, AND PRIORITY

**Section 10.01 <u>DIP Claims</u>.** The Debtor covenants, represents, and warrants that, upon entry of the Interim DIP Order, all DIP Obligations shall, pursuant to Bankruptcy Code section 364(c)(1), constitute DIP Claims, payable from and having recourse to all property of the Debtor's estate (expressly including all DIP Collateral).

**Section 10.02 <u>Grant of Security Interest</u>.** Subject to the priorities set forth in Section 10.03, as to all DIP Collateral, the Debtor assigns and conveys as security, grants a security interest in and Lien on, hypothecates, mortgages, pledges, and sets over and unto the DIP Lender all right, title, and interest of the Debtor in the DIP Collateral (collectively, the "**DIP Liens**"). The Debtor acknowledges that, pursuant to the Interim DIP Order, the DIP Liens granted to the DIP Lender in all DIP Collateral shall be automatically perfected without reference to any notice or recordation requirements of non-bankruptcy law.

**Section 10.03 <u>DIP Liens</u>.** The Debtor covenants, represents, and warrants that, upon entry of the Interim DIP Order, the DIP Liens shall be an automatically perfected, senior DIP Lien on all DIP Collateral.

**Section 10.04 <u>Further Assurances</u>.** The Debtor further agrees that, if requested by the DIP Lender, it shall enter into any separate security agreement, control agreement, pledge agreement, or other similar documentation or instrument with respect to any DIP Collateral that the DIP Lender may request, all expenses of which incurred by the DIP Lender shall constitute DIP Lender Expenses.

### ARTICLE XI
### MISCELLANEOUS

**Section 11.01 <u>Amendments and Waivers</u>.** No amendment, modification, termination, or waiver of any provision hereof, or consent to any departure by the Debtor therefrom, shall be effective without the express written consent of the DIP Lender and, in the case of any amendment, modification or termination, the Debtor. Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on the Debtor in any given instance shall entitle the Debtor to any other or further notice or demand in similar or other circumstances.

**Section 11.02 <u>Notices</u>.** All notices, requests, demands, and other communications under any DIP Loan Document shall be in writing, delivered by electronic mail as follows, and deemed effective upon delivery:

(i)   If to the Debtor:

    Attn: Yaniv Scherson (yaniv.scherson@anaergia.com)

    With a copy (which shall not constitute notice) to:

    Levene, Neale, Bender, Yoo & Golubchik L.L.P. Attn: Ron Bender, Esq. (RB@LNBYG.com); Monica Y. Kim (MYK@LNBYG.com); and Krikor J. Meshefejian (KJM@LNBYG.com)

(ii)   If to the DIP Lender:

    c/o Legalist, Inc. (dip@legalist.com).

**Section 11.03 <u>DIP Lender Expenses</u>.** Whether or not the transactions contemplated hereby are consummated or any DIP Loan is made, the Debtor agrees to pay promptly all documented out-of-pocket costs and expenses of the DIP Lender incurred in connection with, arising from, or relating to the Debtor or its Case, the DIP Loan Documents, and any exercise of rights or remedies thereunder, whether before or after the date hereof and irrespective of the occurrence of any default or Event of Default, including (without limitation) all costs of advisers, and consultants of DIP Lender, together all fees, expenses, and disbursements of outside counsel or other advisers and consultants retained by the DIP Lender with respect thereto (collectively, the "**DIP Lender Expenses**"), which shall constitute DIP Obligations for all purposes hereunder. The foregoing shall be in addition to, and shall not limit, any other provision of the DIP Loan Documents regarding DIP Obligations to be paid by the Debtor.

**Section 11.04 Enforceability; Successors and Assigns.** This Agreement shall be binding on and inure to the benefit of, and shall be enforceable by, the respective successors and permitted assigns of the Parties (including allocation of the DIP Commitment by the DIP Lender as contemplated by Addendum 1). The Debtor may not assign any DIP Loan Document without the DIP Lender's prior written consent. Any such alleged assignment shall be void *ab initio* and shall not relieve the Debtor of any obligation thereunder.

**Section 11.05 Integration.** The DIP Loan Documents contain and constitute the entire agreement of the Parties with respect to the subject matter thereof and supersede all prior negotiations, agreements, and understandings, whether written or oral.

**Section 11.06 No Waiver; Remedies Cumulative.** No failure or delay by the DIP Lender in exercising any right, power, or privilege hereunder shall operate as a waiver thereof. A single or partial exercise of any right, power, or privilege shall not preclude any other or further exercise of the same or another right, power, or privilege. The rights and remedies provided in the DIP Loan Documents shall be cumulative and not exclusive of any right or remedy provided by law or equity or otherwise available.

**Section 11.07 Submission to Jurisdiction.** Each Party agrees that any action with respect to any DIP Loan Document shall be brought exclusively in the Bankruptcy Court and unconditionally submits to the Bankruptcy Court's jurisdiction regarding the same.

**Section 11.08 Governing Law.** The DIP Loan Documents, and any dispute arising therefrom, shall be governed by the Bankruptcy Code and, to the extent not preempted thereby, New York state law. Any reference herein to the "**Uniform Commercial Code**" refers to the New York Uniform Commercial Code as in effect from time to time.

**Section 11.09 WAIVER OF JURY TRIAL.** EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY IN ANY DISPUTE ARISING FROM THIS AGREEMENT.

**Section 11.10 Severability.** If any term of any DIP Loan Document is held invalid, illegal, or incapable of being enforced by any rule of law or public policy, all terms of such DIP Loan Document shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated thereby is not affected in any manner adverse to any party thereto. Upon such holding, the Parties shall negotiate in good faith to modify the same such that the transactions contemplated thereby are fulfilled to the maximum extent possible.

**Section 11.11 Survival.** All representations, warranties, covenants, and agreements made by the Debtor in any DIP Loan Document shall survive until full and indefeasible payment of all DIP Obligations, irrespective of any earlier default, Event of Default, acceleration, or termination thereunder; provided that Article VII and Section 11.3 shall survive such full and indefeasible payment of all DIP Obligations.

**Section 11.12 Maximum Lawful Interest.** Notwithstanding anything to the contrary herein, in no event shall the amount of interest and other charges for the use of money payable under this Agreement exceed the maximum amounts permissible under any law that a court of competent jurisdiction shall, in a final and non-appealable order, deem applicable. The Debtor and the DIP Lender, in executing and delivering this Agreement, intend legally to agree on the rate or rates of interest and other charges for the use of money and manner of payment permitted by such law; provided that, if such amount exceeds such maximum allowable amount, then the Debtor is and shall be liable only for the payment of such maximum as allowed by law, and payment received from the Debtor in excess of such legal maximum shall be applied to reduce the principal balance of the DIP Loans to the extent of any such excess.

**Section 11.13 Foreseeable Circumstances.** The Parties acknowledge that (x) the COVID-19 pandemic any/or other instances of pandemic or widespread virus or infection and (y) ongoing riots, insurrections, terrorist acts, and/or other domestic unrest and uncertainty shall not be considered unforeseeable circumstances for purposes of this Agreement. The Parties agree that any claim of unenforceability, force majeure, or other claim and/or defense related to the foregoing (including with respect to any court closure) is expressly waived.

**Section 11.14 Execution in Counterparts.** Each DIP Loan Document may be executed, including electronically, in any number of counterparts and by different Parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same DIP Loan Document.

\*        \*        \*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized signatories as of the date first written above.

**DEBTOR:**

RIALTO BIOENERGY FACILITY, LLC

By: _____
Name: Yaniv Scherson
Title: Vice President

**DIP LENDER:**

THOSE INVESTMENT FUND(S) LISTED ON ADDENDUM 1

By: Legalist, Inc., as investment adviser

By: _____
Name: Brian T. Rice
Title: Chief Operating Officer

**Schedule 1**

**(Milestones)**

**Schedule 2**

**(Existing Liens)**

The Debtor shall either: (1) not later than either (a) three months prior to the then-scheduled Maturity Date or (b) such later date as may be approved by the Bankruptcy Court in a motion to extend exclusivity, file a plan of reorganization and related disclosure statement with the Bankruptcy Court that provides for repayment of the DIP Loans in full, or (2) not later than thirty days prior to the then-scheduled Maturity Date, file a motion with the Bankruptcy Court seeking the Bankruptcy Court's approval of any transaction that would result in repayment of the DIP Loans in full by the time of the occurrence of the Maturity Date.

Not later than the Maturity Date, the Debtor must have repaid the DIP Loans in full.

Security interests in and liens on all of the Debtor's personal property and its leasehold interest in the real property on which the Debtor's facility sits, securing the $117,200,000 CALIFORNIA POLLUTION CONTROL FINANCING AUTHORITY SOLID WASTE DISPOSAL REVENUE BONDS (RIALTO BIOENERGY FACILITY, LLC PROJECT) SERIES 2019 (AMT) (GREEN BONDS) (the "Bonds"), issued pursuant to an Indenture of Trust dated January 1, 1019, between UMB Bank, N.A., as trustee (the "Trustee"), and the California Pollution Control Financing Authority.

| **Schedule 3** | **Schedule 4** |
| --- | --- |
| **(Permitted Senior Liens)** | **(Excluded Collateral)** |
| None. | The debt service reserve fund and all other accounts, subaccounts, and funds maintained in accordance with the documents governing Debtor's outstanding bonds secured by Existing Liens, and all other deposit accounts, cash, and investments subject to Existing Liens in respect of such bonds, and all Avoidance Actions and proceeds recovered therefrom. |

29319987

**Exhibit A**
**(Borrowing Request)**

Legalist DIP Fund I, LP
Legalist DIP Fund II, LP
c/o Legalist, Inc. (dip@legalist.com)


RE: *In re Rialto Bioenergy Facility, LLC,* Case No. 23-01467-11

Ladies and Gentlemen:

This Borrowing Request is delivered to you pursuant to Article III of the Debtor-in-Possession Term Loan Credit Agreement, dated as of _____ (as in effect from time to time, the "Credit Agreement"), among Rialto Bioenergy Facility, LLC (the "Debtor") and certain investment fund(s) for which Legalist, Inc. serves as investment adviser, as lender, agent, and collateral agent (such funds, the "DIP Lender"). The Debtor acknowledges that this Borrowing Request is a DIP Loan Document for all purposes. Capitalized terms used but not defined herein have the meanings given to them in the Credit Agreement

The Debtor hereby requests that a DIP Loan be made to it in the aggregate principal amount of $_____ (the "DIP Draw").

The Debtor hereby acknowledges that, pursuant to Credit Agreement Section 3.01(v), each of the representations and warranties set forth in the Credit Agreement and in each other DIP Loan Document shall be true and correct in all material respects as of the date hereof, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and/or warranty shall have been true and correct in all material respects as of such earlier date. The Debtor agrees that if, at any time prior to the time the DIP Draw is funded by the DIP Lender, any matter certified to herein by it will not be true and correct in all material respects at such time as if then made, it will immediately so notify the DIP Lender.

Please wire transfer the proceeds of the DIP Draw as follows:

Account Name: _____
Bank: _____
ABA (for wires): _____
Account No.: _____

Beneficiary Address: _____
_____

Phone No. (Debtor): _____


Very truly yours,

RIALTO BIOENERGY FACILITY, LLC

By: _____
Name: Yaniv Scherson
Title: Vice President

**Exhibit B**
(Budget)

**<u>Addendum 1</u>**
**(Allocation of DIP Commitment)**

- Legalist DIP Fund I, LP: 17.50%

- Legalist DIP Fund II, LP: 82.50%*

  * As may be modified from time to time by DIP Lender upon written notice to Debtor.

# EXHIBIT "4"

**RBF Monthly 2023 Budget**

| | | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|
| | | **May-23** | **Jun-23** | **Jul-23** | **Aug-23** |
| | | **5** | **6** | **7** | **8** |
| **Receipts** | | | | | |
| Tipping Fees | $ | 53,580 | $ 65,565 | $ 63,450 | $ 65,565 |
| Offtake | $ | 44,644 | $ 119,888 | $ 161,660 | $ 141,972 |
| **Total Receipts** | **$** | **98,224** | **$ 185,453** | **$ 225,110** | **$ 207,537** |
| | | | | | |
| **Operating Disbursements** | | | | | |
| Transport & Disposal | $ | - | $ 53,922 | $ 87,522 | $ 87,522 |
| Host Fees | $ | - | $ 1,823 | $ 1,823 | $ 1,823 |
| Utilities, Permits, & Discharge | $ | - | $ 464,285 | $ 470,903 | $ 471,060 |
| Consumables | $ | - | $ 24,053 | $ 24,053 | $ 24,053 |
| Maintenance & Operations | $ | - | $ 298,225 | $ 273,183 | $ 235,983 |
| Maintenance Wear Parts | $ | - | $ 40,145 | $ 40,145 | $ 40,145 |
| Intercompany Labor **(a)** | $ | - | $ 240,343 | $ 240,343 | $ 236,849 |
| Intercompany Operations and Maintenance Fee and Leases **(b)** | $ | - | $ 42,691 | $ 42,691 | $ 42,691 |
| Intercompany Credit Card Expenses **(c)** | $ | - | $ 20,700 | $ 20,700 | $ 20,700 |
| Adequate Assurance of Payment Deposits to Utilities | $ | - | $ 150,247 | $ - | $ - |
| OPEX Contingency | $ | - | $ - | $ - | $ - |
| **Total Operating Disbursements** | **$** | **-** | **$ 1,336,433** | **$ 1,201,361** | **$ 1,160,825** |
| | | | | | |
| **Total Operating Cash Flow** | **$** | **98,224** | **$ (1,150,980)** | **$ (976,252)** | **$ (953,288)** |
| | | | | | |
| **Non-Operating Disbursements** | | | | | |
| CIP Upgrades | $ | - | $ 553,559 | $ 719,744 | $ 667,000 |
| Inventory Spare Parts | $ | - | $ 116,808 | $ 116,808 | $ 116,808 |
| Intercompany Insurance **(c)** | $ | - | $ 94,657 | $ 94,657 | $ 100,438 |
| General Administration | $ | - | $ 49,842 | $ 210,342 | $ 49,042 |
| | | | | | |
| **Restructuring Expenditures** | | | | | |
| Deposits & Cures | | | | | |
| Debtor Legal | | | $ 100,000 | $ 100,000 | $ 100,000 |
| Other legal (indenture, trustee, etc) | | | $ 50,000 | $ 50,000 | $ 50,000 |
| B. Riley Closing Fee | | | $ 350,000 | | |
| B. Riley Retainer / Monthly Fee | | | $ 40,000 | $ 40,000 | $ 40,000 |
| Unsecured Creditors Committee | | | $ 25,000 | $ 25,000 | $ 25,000 |
| Professional Fees | $ | - | $ 565,000 | $ 215,000 | $ 215,000 |
| U.S. Trustee Fees | | | $ 8,720 | | |
| **Total Disbursements** | **$** | **-** | **$ 2,725,019** | **$ 2,557,913** | **$ 2,309,113** |
| | | | | | |
| **Net Cash Flow Prior to Financing** | **$** | **98,224** | **$ (2,539,566)** | **$ (2,332,803)** | **$ (2,101,576)** |
| | | | | | |
| **DIP Financing** | | | | | |
| **Starting Cash** | $ | 3,000 | $ 3,601,224 | $ 1,061,658 | $ 4,478,855 |
| Net Cash Flow Prior to Financing | $ | 98,224 | $ (2,539,566) | $ (2,332,803) | $ (2,101,576) |
| DIP Draws **(e)** | $ | 3,500,000 | $ - | $ 5,750,000 | $ - |
| DIP Payments | | | | | |
| **Ending Cash** | **$** | **3,601,224** | **$ 1,061,658** | **$ 4,478,855** | **$ 2,377,279** |
| | | | | | |
| *DIP Balance* | | *4,207,500* | *4,383,401* | *10,311,721* | *10,557,181* |

**FOOTNOTES:**

**(a) Intercompany Labor:** Rialto staff is employed with Anaergia Services. Rialto pays monthly to Anaergia Services for the cost of their pay and benefits.

**(b) Intercompany Operations and Maintenance Fee and Leases:** Rialto pays a fixed fee to Anaergia Services monthly. Additionally, Rialto pays Anaergia Services monthly for a telehandler, yard dog, plant truck, and forklift lease.

**(c) Intercompany Credit Card Expenses:** Several Rialto Operators have Company credit cards for operational expenses related to the Facility. Rialto pays Anaergia Inc. monthly for the credit card charges.

**(d) Intercompany Insurance:** Rialto pays insurance expenses to Anaergia Inc. monthly. Insurance premiums are expensed at Anaergia Inc. and allocated down to Rialto.

**(e) DIP Draws:** The budget assumes that potential additional variable expense related draws (as per section 5.01 of the Credit Agreement) will be absorbed by the DIP loan capacity in excess of the draws included in the budget.

**RBF Monthly 2023 Budget**

| | *Fcst* | *Fcst* | *Fcst* | *Fcst* | **Months** |
|---|---|---|---|---|---|
| | **Sep-23** | **Oct-23** | **Nov-23** | **Dec-23** | **5 - 8** |
| | **9** | **10** | **11** | **12** | |
| **Receipts** | | | | | |
| Tipping Fees | $ 69,499 | $ 71,292 | $ 78,089 | $ 102,664 | $ 569,704 |
| Offtake | $ 141,972 | $ 239,468 | $ 159,520 | $ 169,091 | $ 1,178,215 |
| **Total Receipts** | **$ 211,471** | **$ 310,760** | **$ 237,609** | **$ 271,755** | **$ 1,747,920** |
| | | | | | |
| **Operating Disbursements** | | | | | |
| Transport & Disposal | $ 56,797 | $ 59,845 | $ 63,076 | $ 83,539 | $ 492,223 |
| Host Fees | $ 1,932 | $ 2,048 | $ 2,171 | $ 2,949 | $ 14,567 |
| Utilities, Permits, & Discharge | $ 464,778 | $ 464,974 | $ 358,588 | $ 358,925 | $ 3,053,512 |
| Consumables | $ 24,554 | $ 25,085 | $ 25,648 | $ 29,215 | $ 176,659 |
| Maintenance & Operations | $ 243,968 | $ 243,183 | $ 1,066,983 | $ 985,983 | $ 3,347,507 |
| Maintenance Wear Parts | $ 40,145 | $ 40,145 | $ 40,145 | $ 40,145 | $ 281,015 |
| Intercompany Labor **(a)** | $ 236,849 | $ 236,849 | $ 236,849 | $ 236,849 | $ 1,664,930 |
| Intercompany Operations and Maintenance Fee and Leases **(b)** | $ 42,691 | $ 42,691 | $ 42,691 | $ 42,691 | $ 298,837 |
| Intercompany Credit Card Expenses **(c)** | $ 20,700 | $ 20,700 | $ 20,700 | $ 20,700 | $ 144,900 |
| Adequate Assurance of Payment Deposits to Utilities | $ - | $ - | $ - | $ - | $ 150,247 |
| OPEX Contingency | $ - | $ - | $ - | $ - | $ - |
| **Total Operating Disbursements** | **$ 1,132,414** | **$ 1,135,519** | **$ 1,856,850** | **$ 1,800,995** | **$ 9,624,398** |
| | | | | | |
| **Total Operating Cash Flow** | **$ (920,943)** | **$ (824,759)** | **$ (1,619,241)** | **$ (1,529,240)** | **$ (7,876,478)** |
| | | | | | |
| **Non-Operating Disbursements** | | | | | |
| CIP Upgrades | $ 32,200 | $ - | $ 150,000 | $ - | $ 2,122,503 |
| Inventory Spare Parts | $ 116,808 | $ 116,808 | $ 116,808 | $ 116,808 | $ 817,656 |
| Intercompany Insurance **(c)** | $ 100,438 | $ 100,438 | $ 100,438 | $ 100,438 | $ 691,504 |
| General Administration | $ 54,067 | $ 59,093 | $ 45,920 | $ 46,095 | $ 514,401 |
| | | | | | |
| **Restructuring Expenditures** | | | | | |
| Deposits & Cures | | | | | $ - |
| Debtor Legal | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 700,000 |
| Other legal (indenture, trustee, etc) | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 350,000 |
| B. Riley Closing Fee | | | | | $ 350,000 |
| B. Riley Retainer / Monthly Fee | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 280,000 |
| Unsecured Creditors Committee | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 175,000 |
| Professional Fees | $ 215,000 | $ 215,000 | $ 215,000 | $ 215,000 | $ 1,855,000 |
| U.S. Trustee Fees | $ 52,564 | | | $ 51,542 | $ 112,826 |
| **Total Disbursements** | **$ 1,703,490** | **$ 1,626,858** | **$ 2,485,016** | **$ 2,330,878** | **$ 15,738,287** |
| | | | | | |
| **Net Cash Flow Prior to Financing** | **$ (1,492,019)** | **$ (1,316,097)** | **$ (2,247,407)** | **$ (2,059,123)** | **$ (13,990,367)** |
| | | | | | |
| **DIP Financing** | | | | | |
| **Starting Cash** | $ 2,377,279 | $ 885,260 | $ 5,069,162 | $ 2,821,755 | $ 3,000 |
| Net Cash Flow Prior to Financing | $ (1,492,019) | $ (1,316,097) | $ (2,247,407) | $ (2,059,123) | $ (13,990,367) |
| DIP Draws **(e)** | $ - | $ 5,500,000 | $ - | $ - | $ 14,750,000 |
| DIP Payments | | | | | $ - |
| **Ending Cash** | **$ 885,260** | **$ 5,069,162** | **$ 2,821,755** | **$ 762,633** | **$ 762,633** |
| | | | | | |
| *DIP Balance* | *10,806,015* | *16,558,271* | *16,875,871* | *17,197,837* | |

**FOOTNOTES:**

**(a) Intercompany Labor:** Rialto staff is employed with Anaergia Se_
and benefits.

**(b) Intercompany Operations and Maintenance Fee and Leases:** I_
pays Anaergia Services monthly for a telehandler, yard dog, plant_

**(c) Intercompany Credit Card Expenses:** Several Rialto Operators_
Rialto pays Anaergia Inc. monthly for the credit card charges.

**(d) Intercompany Insurance:** Rialto pays insurance expenses to Ana_
allocated down to Rialto.

**(e) DIP Draws:** The budget assumes that potential additional variable_
be absorbed by the DIP loan capacity in excess of the draws inclu_

RBF Monthly 2024 Budget

| | Fcst Jan-24 1 | Fcst Feb-24 2 | Fcst Mar-24 3 | Fcst Apr-24 4 |
|---|---|---|---|---|
| **Receipts** | | | | |
| Tipping Fees | $ 132,908 | $ 172,329 | $ 189,868 | $ 229,439 |
| Offtake | $ 329,302 | $ 287,794 | $ 430,649 | $ 677,629 |
| **Total Receipts** | **$ 462,210** | **$ 460,123** | **$ 620,517** | **$ 907,068** |
| | | | | |
| **Operating Disbursements** | | | | |
| Transport & Disposal | $ 103,143 | $ 131,703 | $ 160,884 | $ 169,092 |
| Host Fees | $ 3,694 | $ 4,739 | $ 5,792 | $ 6,278 |
| Utilities, Permits, & Discharge | $ 359,265 | $ 384,556 | $ 384,913 | $ 385,172 |
| Consumables | $ 32,632 | $ 37,417 | $ 42,243 | $ 44,470 |
| Maintenance & Operations | $ 235,983 | $ 231,025 | $ 224,210 | $ 223,425 |
| Maintenance Wear Parts | $ 40,145 | $ 43,156 | $ 43,156 | $ 43,156 |
| Intercompany Labor **(a)** | $ 236,849 | $ 311,567 | $ 284,333 | $ 381,461 |
| Intercompany Operations and Maintenance Fee and Leases **(b)** | $ 42,691 | $ 42,691 | $ 42,691 | $ 42,691 |
| Intercompany Credit Card Expenses **(c)** | $ 20,700 | $ 20,700 | $ 20,700 | $ 20,700 |
| Adequate Assurance of Payment Deposits to Utilities | $ - | $ - | $ - | $ - |
| OPEX Contingency | $ - | $ 131,206 | $ 131,206 | $ 131,206 |
| **Total Operating Disbursements** | **$ 1,075,102** | **$ 1,338,760** | **$ 1,340,127** | **$ 1,447,651** |
| | | | | |
| **Total Operating Cash Flow** | **$ (612,892)** | **$ (878,637)** | **$ (719,610)** | **$ (540,583)** |
| | | | | |
| **Non-Operating Disbursements** | | | | |
| CIP Upgrades | $ - | $ 400,000 | $ 625,000 | $ 750,000 |
| Inventory Spare Parts | $ 116,808 | $ 46,723 | $ 46,723 | $ 46,723 |
| Intercompany Insurance **(c)** | $ 100,438 | $ 71,330 | $ 71,330 | $ 71,330 |
| General Administration | $ 56,262 | $ 38,247 | $ 38,483 | $ 298,592 |
| | | | | |
| **Restructuring Expenditures** | | | | |
| Deposits & Cures | | | | |
| Debtor Legal | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 |
| Other legal (indenture, trustee, etc) | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 |
| B. Riley Closing Fee | | | | |
| B. Riley Retainer / Monthly Fee | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 |
| Unsecured Creditors Committee | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 |
| Professional Fees | $ 215,000 | $ 215,000 | $ 215,000 | $ 215,000 |
| U.S. Trustee Fees | | | $ 48,470 | |
| **Total Disbursements** | **$ 1,563,610** | **$ 2,110,059** | **$ 2,385,134** | **$ 2,829,296** |
| | | | | |
| **Net Cash Flow Prior to Financing** | **$ (1,101,400)** | **$ (1,649,936)** | **$ (1,764,616)** | **$ (1,922,228)** |
| | | | | |
| **DIP Financing** | | | | |
| **Starting Cash** | $ 762,633 | $ 4,661,232 | $ 3,011,296 | $ 1,246,680 |
| Net Cash Flow Prior to Financing | $ (1,101,400) | $ (1,649,936) | $ (1,764,616) | $ (1,922,228) |
| DIP Draws **(e)** | $ 5,000,000 | $ - | $ - | $ 5,000,000 |
| DIP Payments | | | | |
| **Ending Cash** | **$ 4,661,232** | **$ 3,011,296** | **$ 1,246,680** | **$ 4,324,451** |
| | | | | |
| *DIP Balances* | *22,524,231* | *22,911,362* | *23,303,817* | *28,701,667* |

**FOOTNOTES:**

**(a)** **Intercompany Labor:** Rialto staff is employed with Anaergia Services. Rialto pays monthly to Anaergia Services for the cost of their pay and benefits.

**(b)** **Intercompany Operations and Maintenance Fee and Leases:** Rialto pays a fixed fee to Anaergia Services monthly. Additionally, Rialto pays Anaergia Services monthly for a telehandler, yard dog, plant truck, and forklift lease.

**(c)** **Intercompany Credit Card Expenses:** Several Rialto Operators have Company credit cards for operational expenses related to the Facility. Rialto pays Anaergia Inc. monthly for the credit card charges.

**(d)** **Intercompany Insurance:** Rialto pays insurance expenses to Anaergia Inc. monthly. Insurance premiums are expensed at Anaergia Inc. and allocated down to Rialto.

**(e)** **DIP Draws:** The budget assumes that potential additional variable expense related draws (as per section 5.01 of the Credit Agreement) will be absorbed by the DIP loan capacity in excess of the draws included in the budget.

**RBF Monthly 2024 Budget**

| | | Fcst | | Fcst | | Fcst | | Fcst |
|---|---|---|---|---|---|---|---|---|
| | | May-24 | | Jun-24 | | Jul-24 | | Aug-24 |
| | | 5 | | 6 | | 7 | | 8 |
| **Receipts** | | | | | | | | |
| Tipping Fees | $ | 269,978 | $ | 371,171 | $ | 404,318 | $ | 511,446 |
| Offtake | $ | 570,518 | $ | 695,664 | $ | 1,260,433 | $ | 1,041,656 |
| **Total Receipts** | $ | **840,496** | $ | **1,066,835** | $ | **1,664,750** | $ | **1,553,102** |
| | | | | | | | | |
| **Operating Disbursements** | | | | | | | | |
| Transport & Disposal | $ | 207,252 | $ | 271,226 | $ | 307,141 | $ | 372,238 |
| Host Fees | $ | 7,655 | $ | 10,166 | $ | 11,462 | $ | 14,013 |
| Utilities, Permits, & Discharge | $ | 385,606 | $ | 554,856 | $ | 555,293 | $ | 555,974 |
| Consumables | $ | 50,781 | $ | 62,289 | $ | 68,228 | $ | 79,922 |
| Maintenance & Operations | $ | 216,225 | $ | 223,468 | $ | 221,940 | $ | 214,740 |
| Maintenance Wear Parts | $ | 43,156 | $ | 43,156 | $ | 43,156 | $ | 43,156 |
| Intercompany Labor **(a)** | $ | 223,175 | $ | 223,175 | $ | 223,175 | $ | 221,819 |
| Intercompany Operations and Maintenance Fee and Leases **(b)** | $ | 42,691 | $ | 42,691 | $ | 42,691 | $ | 42,691 |
| Intercompany Credit Card Expenses **(c)** | $ | 20,700 | $ | 20,700 | $ | 20,700 | $ | 20,700 |
| Adequate Assurance of Payment Deposits to Utilities | $ | - | $ | - | $ | - | $ | - |
| OPEX Contingency | $ | 131,206 | $ | 131,206 | $ | 131,206 | $ | 131,206 |
| **Total Operating Disbursements** | $ | **1,328,447** | $ | **1,582,933** | $ | **1,624,993** | $ | **1,696,460** |
| | | | | | | | | |
| **Total Operating Cash Flow** | $ | **(487,951)** | $ | **(516,098)** | $ | **39,757** | $ | **(143,358)** |
| | | | | | | | | |
| **Non-Operating Disbursements** | | | | | | | | |
| CIP Upgrades | $ | 850,000 | $ | 850,000 | $ | 775,000 | $ | 567,000 |
| Inventory Spare Parts | $ | 46,723 | $ | 46,723 | $ | 46,723 | $ | 46,723 |
| Intercompany Insurance **(c)** | $ | 94,657 | $ | 94,657 | $ | 94,657 | $ | 100,438 |
| General Administration | $ | 46,701 | $ | 39,465 | $ | 304,256 | $ | 43,528 |
| | | | | | | | | |
| **Restructuring Expenditures** | | | | | | | | |
| Deposits & Cures | | | | | | | | |
| Debtor Legal | $ | 100,000 | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Other legal (indenture, trustee, etc) | $ | 50,000 | $ | 50,000 | $ | 50,000 | $ | 50,000 |
| B. Riley Closing Fee | | | | | | | | |
| B. Riley Retainer / Monthly Fee | $ | 40,000 | $ | 40,000 | $ | 40,000 | $ | 40,000 |
| Unsecured Creditors Committee | $ | 25,000 | $ | 25,000 | $ | 25,000 | $ | 25,000 |
| Professional Fees | $ | 215,000 | $ | 215,000 | $ | 215,000 | $ | 215,000 |
| U.S. Trustee Fees | | | $ | 66,448 | | | | |
| **Total Disbursements** | $ | **2,581,528** | $ | **2,895,227** | $ | **3,060,629** | $ | **2,669,150** |
| | | | | | | | | |
| **Net Cash Flow Prior to Financing** | $ | **(1,741,033)** | $ | **(1,828,392)** | $ | **(1,395,879)** | $ | **(1,116,048)** |
| | | | | | | | | |
| **DIP Financing** | | | | | | | | |
| **Starting Cash** | $ | 4,324,451 | $ | 2,583,419 | $ | 755,027 | $ | 3,609,148 |
| Net Cash Flow Prior to Financing | $ | (1,741,033) | $ | (1,828,392) | $ | (1,395,879) | $ | (1,116,048) |
| DIP Draws **(e)** | $ | - | $ | - | $ | 4,250,000 | $ | - |
| DIP Payments | | | | | | | | |
| **Ending Cash** | $ | **2,583,419** | $ | **755,027** | $ | **3,609,148** | $ | **2,493,100** |
| | | | | | | | | |
| *DIP Balances* | | *29,161,238* | | *29,627,129* | | *34,349,425* | | *34,876,028* |

**FOOTNOTES:**

**(a)** **Intercompany Labor:** Rialto staff is employed with Anaergia Ser
benefits.

**(b)** **Intercompany Operations and Maintenance Fee and Leases:** R
pays Anaergia Services monthly for a telehandler, yard dog, plant

**(c)** **Intercompany Credit Card Expenses:** Several Rialto Operators
Rialto pays Anaergia Inc. monthly for the credit card charges.

**(d)** **Intercompany Insurance:** Rialto pays insurance expenses to Ana
allocated down to Rialto.

**(e)** **DIP Draws:** The budget assumes that potential additional variable
absorbed by the DIP loan capacity in excess of the draws included

**RBF Monthly 2024 Budget**

| | | *Fcst* | | *Fcst* | | *Fcst* | | *Fcst* |
|---|---|---|---|---|---|---|---|---|
| | | **Sep-24** | | **Oct-24** | | **Nov-24** | | **Dec-24** |
| | | **9** | | **10** | | **11** | | **12** |
| **Receipts** | | | | | | | | |
| Tipping Fees | $ | 521,645 | $ | 582,368 | $ | 651,264 | $ | 693,758 |
| Offtake | $ | 1,273,544 | $ | 1,885,655 | $ | 1,501,751 | $ | 1,730,409 |
| **Total Receipts** | **$** | **1,795,189** | **$** | **2,468,023** | **$** | **2,153,015** | **$** | **2,424,167** |
| | | | | | | | | |
| **Operating Disbursements** | | | | | | | | |
| Transport & Disposal | $ | 380,095 | $ | 441,823 | $ | 485,663 | $ | 530,487 |
| Host Fees | $ | 14,297 | $ | 16,524 | $ | 17,942 | $ | 19,724 |
| Utilities, Permits, & Discharge | $ | 556,242 | $ | 556,884 | $ | 388,790 | $ | 389,372 |
| Consumables | $ | 81,221 | $ | 91,430 | $ | 97,927 | $ | 106,094 |
| Maintenance & Operations | $ | 222,725 | $ | 221,940 | $ | 295,740 | $ | 214,740 |
| Maintenance Wear Parts | $ | 43,156 | $ | 43,156 | $ | 43,156 | $ | 43,156 |
| Intercompany Labor **(a)** | $ | 221,819 | $ | 221,819 | $ | 221,819 | $ | 221,819 |
| Intercompany Operations and Maintenance Fee and Leases **(b)** | $ | 42,691 | $ | 42,691 | $ | 42,691 | $ | 42,691 |
| Intercompany Credit Card Expenses **(c)** | $ | 20,700 | $ | 20,700 | $ | 20,700 | $ | 20,700 |
| Adequate Assurance of Payment Deposits to Utilities | $ | - | $ | - | $ | - | $ | - |
| OPEX Contingency | $ | 131,206 | $ | 131,206 | $ | 131,206 | $ | 131,206 |
| **Total Operating Disbursements** | **$** | **1,714,152** | **$** | **1,788,173** | **$** | **1,745,633** | **$** | **1,719,989** |
| | | | | | | | | |
| **Total Operating Cash Flow** | **$** | **81,037** | **$** | **679,850** | **$** | **407,381** | **$** | **704,178** |
| | | | | | | | | |
| **Non-Operating Disbursements** | | | | | | | | |
| CIP Upgrades | $ | 500,000 | $ | 500,000 | $ | 300,000 | $ | 100,000 |
| Inventory Spare Parts | $ | 46,723 | $ | 46,723 | $ | 46,723 | $ | 46,723 |
| Intercompany Insurance **(c)** | $ | 100,438 | $ | 100,438 | $ | 100,438 | $ | 100,438 |
| General Administration | $ | 48,592 | $ | 314,092 | $ | 41,210 | $ | 41,610 |
| | | | | | | | | |
| **Restructuring Expenditures** | | | | | | | | |
| Deposits & Cures | | | | | | | | |
| Debtor Legal | $ | 100,000 | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Other legal (indenture, trustee, etc) | $ | 50,000 | $ | 50,000 | $ | 50,000 | $ | 50,000 |
| B. Riley Closing Fee | | | | | | | | |
| B. Riley Retainer / Monthly Fee | $ | 40,000 | $ | 40,000 | $ | 40,000 | $ | 40,000 |
| Unsecured Creditors Committee | $ | 25,000 | $ | 25,000 | $ | 25,000 | $ | 25,000 |
| Professional Fees | $ | 215,000 | $ | 215,000 | $ | 215,000 | $ | 215,000 |
| U.S. Trustee Fees | $ | 67,376 | $ | | $ | | $ | 61,590 |
| **Total Disbursements** | **$** | **2,692,281** | **$** | **2,964,426** | **$** | **2,449,005** | **$** | **2,285,350** |
| | | | | | | | | |
| **Net Cash Flow Prior to Financing** | **$** | **(897,093)** | **$** | **(496,403)** | **$** | **(295,990)** | **$** | **138,817** |
| | | | | | | | | |
| **DIP Financing** | | | | | | | | |
| **Starting Cash** | $ | 2,493,100 | $ | 1,596,008 | $ | 1,099,604 | $ | 803,614 |
| Net Cash Flow Prior to Financing | $ | (897,093) | $ | (496,403) | $ | (295,990) | $ | 138,817 |
| DIP Draws **(e)** | $ | - | $ | - | $ | - | $ | - |
| DIP Payments | | | | | | | | |
| **Ending Cash** | **$** | **1,596,008** | **$** | **1,099,604** | **$** | **803,614** | **$** | **942,431** |
| | | | | | | | | |
| *DIP Balances* | | *35,409,871* | | *35,951,055* | | *36,499,681* | | *37,116,682* |

**FOOTNOTES:**

**(a)** **Intercompany Labor:** Rialto staff is employed with Anaergia Ser...
benefits.

**(b)** **Intercompany Operations and Maintenance Fee and Leases:** F...
pays Anaergia Services monthly for a telehandler, yard dog, plant t...

**(c)** **Intercompany Credit Card Expenses:** Several Rialto Operators...
Rialto pays Anaergia Inc. monthly for the credit card charges.

**(d)** **Intercompany Insurance:** Rialto pays insurance expenses to Ana...
allocated down to Rialto.

**(e)** **DIP Draws:** The budget assumes that potential additional variable...
absorbed by the DIP loan capacity in excess of the draws included...

**RBF Monthly 2024 Budget**

|  | | Months 1 - 12 |
|---|---|---|
| **Receipts** | | |
| Tipping Fees | $ | 4,730,488 |
| Offtake | $ | 11,685,006 |
| **Total Receipts** | **$** | **16,415,494** |
| | | |
| **Operating Disbursements** | | |
| Transport & Disposal | $ | 3,560,748 |
| Host Fees | $ | 132,282 |
| Utilities, Permits, & Discharge | $ | 5,456,922 |
| Consumables | $ | 794,653 |
| Maintenance & Operations | $ | 2,746,164 |
| Maintenance Wear Parts | $ | 514,860 |
| Intercompany Labor **(a)** | $ | 2,992,829 |
| Intercompany Operations and Maintenance Fee and Leases **(b)** | $ | 512,292 |
| Intercompany Credit Card Expenses **(c)** | $ | 248,400 |
| Adequate Assurance of Payment Deposits to Utilities | $ | - |
| OPEX Contingency | $ | 1,443,270 |
| **Total Operating Disbursements** | **$** | **18,402,420** |
| | | |
| **Total Operating Cash Flow** | **$** | **(1,986,926)** |
| | | |
| **Non-Operating Disbursements** | | |
| CIP Upgrades | $ | 6,217,000 |
| Inventory Spare Parts | $ | 630,763 |
| Intercompany Insurance **(c)** | $ | 1,100,588 |
| General Administration | $ | 1,311,039 |
| | | |
| **Restructuring Expenditures** | | |
| Deposits & Cures | $ | - |
| Debtor Legal | $ | 1,200,000 |
| Other legal (indenture, trustee, etc) | $ | 600,000 |
| B. Riley Closing Fee | $ | - |
| B. Riley Retainer / Monthly Fee | $ | 480,000 |
| Unsecured Creditors Committee | $ | 300,000 |
| Professional Fees | $ | 2,580,000 |
| U.S. Trustee Fees | $ | 243,886 |
| **Total Disbursements** | **$** | **30,485,695** |
| | | |
| **Net Cash Flow Prior to Financing** | **$** | **(14,070,202)** |
| | | |
| **DIP Financing** | | |
| **Starting Cash** | $ | 762,633 |
| Net Cash Flow Prior to Financing | $ | (14,070,202) |
| DIP Draws **(e)** | $ | 14,250,000 |
| DIP Payments | $ | - |
| **Ending Cash** | **$** | **942,431** |
| | | |
| *DIP Balances* | | |

**FOOTNOTES:**

**(a) Intercompany Labor:** Rialto staff is employed with Anaergia Ser benefits.

**(b) Intercompany Operations and Maintenance Fee and Leases:** R pays Anaergia Services monthly for a telehandler, yard dog, plant

**(c) Intercompany Credit Card Expenses:** Several Rialto Operators Rialto pays Anaergia Inc. monthly for the credit card charges.

**(d) Intercompany Insurance:** Rialto pays insurance expenses to Ana allocated down to Rialto.

**(e) DIP Draws:** The budget assumes that potential additional variable absorbed by the DIP loan capacity in excess of the draws included

| Legalist | 6/1/2023 Closing | 6/30/2023 1 | 7/31/2023 2 | 8/31/2023 3 |
|---|---|---|---|---|
| Commitment | $ 35,000,000 | $ 35,000,000 | $ 35,000,000 | $ 35,000,000 |
| Initial Draw | 3,500,000 | | | |
| Second Draw | | | 5,750,000 | |
| Third Draw | | | | |
| Fourth Draw | | | | |
| Fifth Draw | | | | |
| Sixth Draw | | | | |
| Seventh Draw | | | | |
| Initial Fee | 700,000 | | | |
| PIK Interest | | 57,853 | 60,272 | 141,786 |
| Monitoring Fee | | 29,167 | 29,167 | 29,167 |
| Undrawn Line Fee | | 78,750 | 78,750 | 64,375 |
| Undrawn Balance | 31,500,000 | 31,500,000 | 25,750,000 | 25,750,000 |
| Expenses | 7,500 | 10,132 | 10,132 | 10,132 |
| Loan Balance | $ 4,207,500 | $ 4,383,401 | $ 10,311,721 | $ 10,557,181 |

| Legalist | 9/30/2023 4 | 10/31/2023 5 | 11/30/2023 6 | 12/31/2023 7 |
|---|---|---|---|---|
| Commitment | $ 35,000,000 | $ 35,000,000 | $ 35,000,000 | $ 35,000,000 |
| Initial Draw | | | | |
| Second Draw | | | | |
| Third Draw | | 5,500,000 | | |
| Fourth Draw | | | | |
| Fifth Draw | | | | |
| Sixth Draw | | | | |
| Seventh Draw | | | | |
| Initial Fee | | | | |
| PIK Interest | 145,161 | 148,583 | 227,676 | 232,043 |
| Monitoring Fee | 29,167 | 29,167 | 29,167 | 29,167 |
| Undrawn Line Fee | 64,375 | 64,375 | 50,625 | 50,625 |
| Undrawn Balance | 25,750,000 | 20,250,000 | 20,250,000 | 20,250,000 |
| Expenses | 10,132 | 10,132 | 10,132 | 10,132 |
| Loan Balance | $ 10,806,015 | $ 16,558,271 | $ 16,875,871 | $ 17,197,837 |

| Legalist | 1/31/2024 8 | 2/29/2024 9 | 3/31/2024 10 | 4/30/2024 11 |
|---|---|---|---|---|
| Commitment | $ 35,000,000 | $ 35,000,000 | $ 35,000,000 | $ 35,000,000 |
| Initial Draw | | | | |
| Second Draw | | | | |
| Third Draw | | | | |
| Fourth Draw | 5,000,000 | | | |
| Fifth Draw | | | | 5,000,000 |
| Sixth Draw | | | | |
| Seventh Draw | | | | |
| Initial Fee | | | | |
| PIK Interest | 236,470 | 309,708 | 315,031 | 320,427 |
| Monitoring Fee | 29,167 | 29,167 | 29,167 | 29,167 |
| Undrawn Line Fee | 50,625 | 38,125 | 38,125 | 38,125 |
| Undrawn Balance | 15,250,000 | 15,250,000 | 15,250,000 | 10,250,000 |
| Expenses | 10,132 | 10,132 | 10,132 | 10,132 |
| Loan Balance | $ 22,524,231 | $ 22,911,362 | $ 23,303,817 | $ 28,701,667 |

| Legalist | 5/31/2024 12 | 6/30/2024 13 | 7/31/2024 14 | 8/31/2024 15 |
|---|---|---|---|---|
| Commitment | $ 35,000,000 | $ 35,000,000 | $ 35,000,000 | $ 35,000,000 |
| Initial Draw | | | | |
| Second Draw | | | | |
| Third Draw | | | | |
| Fourth Draw | | | | |
| Fifth Draw | | | | |
| Sixth Draw | | | 4,250,000 | |
| Seventh Draw | | | | |
| Initial Fee | | | | |
| PIK Interest | 394,648 | 400,967 | 407,373 | 472,305 |
| Monitoring Fee | 29,167 | 29,167 | 29,167 | 29,167 |
| Undrawn Line Fee | 25,625 | 25,625 | 25,625 | 15,000 |
| Undrawn Balance | 10,250,000 | 10,250,000 | 6,000,000 | 6,000,000 |
| Expenses | 10,132 | 10,132 | 10,132 | 10,132 |
| Loan Balance | $ 29,161,238 | $ 29,627,129 | $ 34,349,425 | $ 34,876,028 |

| Legalist | 9/30/2024 16 | 10/31/2024 17 | 11/30/2024 18 | 12/31/2024 19 |
|---|---|---|---|---|
| Commitment | $ 35,000,000 | $ 35,000,000 | $ 35,000,000 | $ 35,000,000 |
| Initial Draw | | | | |
| Second Draw | | | | |
| Third Draw | | | | |
| Fourth Draw | | | | |
| Fifth Draw | | | | |
| Sixth Draw | | | | |
| Seventh Draw | | | | |
| Initial Fee | | | | |
| PIK Interest | 479,545 | 486,886 | 494,327 | 562,703 |
| Monitoring Fee | 29,167 | 29,167 | 29,167 | 29,167 |
| Undrawn Line Fee | 15,000 | 15,000 | 15,000 | 15,000 |
| Undrawn Balance | 6,000,000 | 6,000,000 | 6,000,000 | 6,000,000 |
| Expenses | 10,132 | 10,132 | 10,132 | 10,132 |
| Loan Balance | $ 35,409,871 | $ 35,951,055 | $ 36,499,681 | $ 37,116,682 |

# EXHIBIT "5"

EXECUTION VERSION

LOAN AGREEMENT

between

CALIFORNIA POLLUTION CONTROL FINANCING AUTHORITY

and

RIALTO BIOENERGY FACILITY, LLC

Dated as of January 1, 2019

RELATING TO

$117,200,000

CALIFORNIA POLLUTION CONTROL FINANCING AUTHORITY
SOLID WASTE DISPOSAL REVENUE BONDS
(RIALTO BIOENERGY FACILITY, LLC PROJECT)
SERIES 2019 (AMT) (GREEN BONDS)

106764766v18

# TABLE OF CONTENTS

**Page**

ARTICLE I          DEFINITIONS ....................................................................1

    SECTION 1.1.    Definition of Terms ............................................1

    SECTION 1.2.    Number and Gender ...........................................2

    SECTION 1.3.    Articles, Sections, Etc. ......................................2

ARTICLE II         REPRESENTATIONS ....................................................2

    SECTION 2.1.    Findings of the Authority ...................................2

    SECTION 2.2.    Representations of the Authority ........................2

    SECTION 2.3.    Representations and Warranties of the Borrower ........................................3

ARTICLE III        CONSTRUCTION OF THE PROJECT; ISSUANCE OF THE BONDS ................9

    SECTION 3.1.    Agreement to Construct the Project; Modifications of the Project; Disbursements From the Project Fund; Disbursements From the Costs of Issuance Fund ............9

    SECTION 3.2.    Establishment of Completion Date; Obligation of Borrower to Complete ............11

    SECTION 3.3.    Investment of Moneys in Fund ............11

    SECTION 3.4.    Construction Monitor .........................12

    SECTION 3.5.    Change Orders ..................................12

ARTICLE IV         LOANS OF PROCEEDS; REPAYMENT PROVISIONS ....................12

    SECTION 4.1.    Loan of Bond Proceeds; Issuance of Bonds ................12

    SECTION 4.2.    Repayment and Payment of Other Amounts Payable ................13

    SECTION 4.3.    Unconditional Obligation ..................14

    SECTION 4.4.    Assignment of Authority's Rights ................15

    SECTION 4.5.    Amounts Remaining in Funds ............15

    SECTION 4.6.    Pledge of Gross Revenue Fund and Security Documents ................15

ARTICLE V          SPECIAL COVENANTS AND AGREEMENTS ................16

    SECTION 5.1.    Right of Access to the Project ............16

    SECTION 5.2.    The Borrower's Maintenance of Its Existence; Assignments; Permitted Transfers of the Project ................16

    SECTION 5.3.    Records and Financial Statements of Borrower ................19

    SECTION 5.4.    Insurance ..........................................20

    SECTION 5.5.    Maintenance and Repair; Taxes; Utility and Other Charges ................20

    SECTION 5.6.    Qualification in California ..................20

    SECTION 5.7.    Maintenance of Permits .....................21

    SECTION 5.8.    Payment of Obligations; Compliance with Liens ................21

# TABLE OF CONTENTS
(continued)

**Page**

SECTION 5.9.        General Tax Covenants ...................................................................21

SECTION 5.10.        Special Arbitrage Certifications; Rebate ........................................21

SECTION 5.11.        Notice and Certificates to Authority, Trustee and CDLAC ........................21

SECTION 5.12.        Establishing and Preserving the Lien on Collateral; Continuation Statements ...........................................................................22

SECTION 5.13.        Capital Replacement Fund ...................................................................23

SECTION 5.14.        Continuing Disclosure .........................................................................23

SECTION 5.15.        Gross Revenue Fund ............................................................................24

SECTION 5.16.        Changes to the Project ........................................................................25

SECTION 5.17.        Restrictions on Creation of Liens; Disposition of Gross Revenues ...........25

SECTION 5.18.        Financial Covenants ............................................................................25

SECTION 5.19.        ERISA ..................................................................................................30

SECTION 5.20.        Financial Product Agreements ...........................................................31

SECTION 5.21.        Competition ..........................................................................................31

SECTION 5.22.        Green Bonds ........................................................................................31

SECTION 5.23.        Project Documents and Project Revenue Generating Agreements .............31

SECTION 5.24.        Grant Revenues ...................................................................................32

SECTION 5.25.        Data Availability ..................................................................................32

ARTICLE VI        DAMAGE, DESTRUCTION AND CONDEMNATION; USE OF PROCEEDS ...........................................................................................32

SECTION 6.1.        Obligation to Continue Payments......................................................32

SECTION 6.2.        Application of Net Proceeds ...............................................................33

SECTION 6.3.        Insufficiency of Net Proceeds ............................................................33

SECTION 6.4.        Damage to or Condemnation of Other Property................................33

ARTICLE VII        LOAN DEFAULT EVENTS AND REMEDIES......................................34

SECTION 7.1.        Loan Default Events............................................................................34

SECTION 7.2.        Remedies on Default ...........................................................................35

SECTION 7.3.        Agreement to Pay Attorneys' Fees and Expenses.............................36

SECTION 7.4.        No Remedy Exclusive .........................................................................36

SECTION 7.5.        No Additional Waiver Implied by One Waiver ..................................37

ARTICLE VIII        PREPAYMENT ..................................................................................37

SECTION 8.1.        Redemption of Bonds With Prepayment Moneys ..............................37

SECTION 8.2.        Options to Prepay Installments...........................................................37

# TABLE OF CONTENTS
(continued)

**Page**

SECTION 8.3.    Mandatory Prepayment ....................................................................37

SECTION 8.4.    Amount of Prepayment ......................................................................38

SECTION 8.5.    Notice of Prepayment .......................................................................38

ARTICLE IX          NON-LIABILITY OF AUTHORITY; EXPENSES; INDEMNIFICATION ...........39

SECTION 9.1.    Non-Liability of Authority ...............................................................39

SECTION 9.2.    Expenses.............................................................................................39

SECTION 9.3.    Indemnification ................................................................................39

ARTICLE X          MISCELLANEOUS ...............................................................................40

SECTION 10.1.    Notices...............................................................................................40

SECTION 10.2.    Severability........................................................................................41

SECTION 10.3.    Execution of Counterparts ...............................................................41

SECTION 10.4.    Amendments, Changes and Modifications........................................41

SECTION 10.5.    Governing Law; Venue .....................................................................41

SECTION 10.6.    Authorized Representative ................................................................41

SECTION 10.7.    Term of the Agreement .....................................................................41

SECTION 10.8.    Binding Effect ...................................................................................41

SECTION 10.9.    Third Party Beneficiary.....................................................................41

SECTION 10.10.    Survival of Fee Obligation ...............................................................42

SECTION 10.11.    Purchase of Bonds .............................................................................42

SECTION 10.12.    Liability of Authority Limited to Revenues .................................42

SECTION 10.13.    Waiver of Personal Liability ..............................................................42

SECTION 10.14.    Electronic Storage .............................................................................42

SECTION 10.15.    No Prevailing Party ...........................................................................43

SECTION 10.16.    Complete Agreement.........................................................................43

## TABLE OF CONTENTS

**Page**

EXHIBIT A DESCRIPTION OF THE PROJECT...................................................................A-1

EXHIBIT B FINAL PROJECT ACCOUNT DISBURSEMENT CERTIFICATE ..................................B-1

EXHIBIT C FORM OF ANNUAL BORROWER CERTIFICATE.........................................................C-1

EXHIBIT D PERMITTED LIENS ....................................................................................D-1

EXHIBIT E LEASES RELATING TO THE PROJECT .......................................................... E-1

LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of January 1, 2019 (this "Agreement" or "Loan Agreement") is made between CALIFORNIA POLLUTION CONTROL FINANCING AUTHORITY, a public instrumentality and political subdivision of the State of California (the "Authority"), and RIALTO BIOENERGY FACILITY, LLC, a Delaware limited liability company (the "Borrower").

W I T N E S E T H :

WHEREAS, the Authority is a public instrumentality and political subdivision of the State of California, created by the California Pollution Control Financing Authority Act (Chapter 1 (commencing with Section 44500) of Division 27 of the California Health and Safety Code) as now in effect and as it may from time to time hereafter be amended or supplemented (the "Act") and authorized to finance certain capital projects consisting of solid waste pollution control facilities; and

WHEREAS, the Authority is further authorized to issue its revenue bonds for the purposes of paying all or any part of the costs of a "project" as defined in the Act and for any other authorized purposes, including refunding of its outstanding bonds;

WHEREAS, the Borrower duly caused an application to be filed with the Authority for financial assistance to finance the acquisition, construction, rehabilitation, renovation, installation, improvement and/or equipping of solid waste treatment, disposal and recycling facilities, more particularly described in Exhibit A (the "Project"); and

WHEREAS, Borrower has requested that the Authority issue bonds to (i) finance the Project, (ii) fund any reserve requirements for the Bonds and the Project, (iii) fund capitalized interest on the Bonds and (iv) pay Costs of Issuance; and

WHEREAS, the Authority has adopted its resolution authorizing the making of a loan to the Borrower for the purpose of acquiring, constructing, rehabilitating, renovating, installing, improving and/or equipping the Project; and

WHEREAS, the Authority proposes to issue its California Pollution Control Financing Authority Solid Waste Disposal Revenue Bonds (Rialto Bioenergy Facility, LLC Project) Series 2019 (AMT) (Green Bonds) (the "Bonds"), in the aggregate principal amount of $117,200,000; and

WHEREAS, the Authority will enter into an Indenture, dated as of the date hereof (the "Indenture"), with UMB Bank, N.A., as trustee (the "Trustee"), pursuant to which the Bonds will be issued;

WHEREAS, payment of the Bonds is enhanced by a limited guaranty in favor of the Trustee by Anaergia Services LLC (the "Guarantor");

NOW, THEREFORE, for and in consideration of the premises and the material covenants hereinafter contained, the parties hereto hereby formally covenant, agree and bind themselves as follows:

**ARTICLE I**
**DEFINITIONS**

SECTION 1.1.  Definition of Terms. Unless the context otherwise requires, the terms used in this Loan Agreement shall have the meanings specified in Section 1.01 of the Indenture, as originally executed or as it may from time to time be supplemented or amended as provided therein.

SECTION 1.2.  <u>Number and Gender</u>. The singular form of any word used herein, including the terms defined in Section 1.01 of the Indenture, shall include the plural, and vice versa. The use herein of a word of any gender shall include all genders.

SECTION 1.3.  <u>Articles, Sections, Etc</u>. Unless otherwise specified, references to Articles, Sections and other subdivisions of this Loan Agreement are to the designated Articles, Sections and other subdivisions of this Loan Agreement as amended from time to time. The words "hereof," "herein," "hereby," "hereunder" and words of similar import refer to this Loan Agreement as a whole. The headings or titles of the several articles and sections, and the table of contents appended to copies hereof, shall be solely for convenience of reference and shall not affect the meaning, construction or effect of the provisions hereof.

Unless stated otherwise, where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation, combination or other accounting computation is required to be made for the purposes of this Loan Agreement or any agreement, document or certificate executed and delivered in connection with or pursuant to this Loan Agreement, such determination or computation shall be made in accordance with GAAP, consistently applied, as in effect on the date such determination or computation is made for any purpose of this Loan Agreement.

## ARTICLE II
## REPRESENTATIONS

SECTION 2.1.  <u>Findings of the Authority</u>. The Authority makes the following findings:

(a)    On July 13, 2018, the Executive Director of the Authority approved an initial resolution approving the Project.

(b)    On September 13, 2018, a public hearing with respect to the Bonds and the Project was held in accordance with the provisions of the Code. On October 17, 2018, the Authority adopted its resolution approving the financing of the Project.

(c)    (i) The Borrower, together with its Participating Affiliates, is a "participating party" as such term is defined in the Act; (ii) the Project is a "project" as such term is defined in the Act; (iii) the loan to be made hereunder with the proceeds of the Bonds will promote the purposes of the Act by providing funds to finance the acquisition, construction, rehabilitation, renovation, installation, improvement and/or equipping of the Project; (iv) said loan is in the public interest, serves the public purposes and meets the requirements of the Act; and (v) the portion of such loan allocable to the Costs of the Project does not exceed the total cost thereof as determined by the Borrower and approved by the Authority.

(d)    No member of the Authority, or any officer or employee of the Authority who participated in the making of this Loan Agreement, is financially interested (within the meaning of Government Code Section 1090) in the Borrower or in this Loan Agreement or the Indenture.

SECTION 2.2.  <u>Representations of the Authority</u>. The Authority makes the following representations as the basis for its undertakings herein contained:

(a)    The Authority is a public instrumentality and political subdivision of the State of California. Under the provisions of the Act, the Authority has the power to enter into the transactions contemplated by this Loan Agreement and the Indenture and to carry out its obligations hereunder. By

proper action, the Authority has duly authorized the execution and delivery of this Loan Agreement and the Indenture and the performance of its obligations thereunder.

(b)     The representations of the Authority in the Tax Certificate are true and correct as of the date hereof (subject to the qualifications set forth, and in reliance upon the sources of information described, in the Tax Certificate).

(c)     The Authority will issue the Bonds under, and the Bonds will be secured by, the Indenture, pursuant to which the Authority's interest in this Loan Agreement (except for Retained Rights) will be pledged to the Trustee as security for payment of the principal of, and premium, if any, and interest on the Bonds, as provided in the Indenture.

(d)     The Authority has not pledged and will not pledge its interest in this Loan Agreement for any purpose other than as provided in the Indenture.

(e)     The Authority is not in default under any of the provisions of the laws of the State of California, which default would affect its existence or its powers referred to in subsection (a) of this Section.

SECTION 2.3.  <u>Representations and Warranties of the Borrower</u>. The Borrower makes the following representations and warranties as the basis for its undertakings herein contained:

(a)     The Borrower is a limited liability company duly organized and existing under the laws of the State of Delaware, is in good standing in the State of California and has full legal right, power and authority to own and operate its properties and to carry on its business as now conducted and as proposed to be conducted and to enter into each of the Loan Documents to which it is a party, each of the Project Documents, the Tax Certificate, the Continuing Disclosure Agreement, the Purchase Contract (as hereinafter defined) and all other documents, agreements, UCC financing statements and instruments contemplated hereby to be executed by the Borrower (collectively, the "Borrower Documents").  The Borrower has duly authorized, by proper action, the execution and delivery of the Borrower Documents and the performance of the Borrower's obligations thereunder, and no other proceedings on the part of Borrower, or any member thereof, are necessary to authorize the execution and delivery of, and performance by the Borrower under, this Loan Agreement and the other Borrower Documents or to consummate the transactions contemplated herein or therein.  This Loan Agreement, upon assignment to the Trustee pursuant to the Indenture, and the other Borrower Documents constitute the legal, valid and binding obligations of the Borrower enforceable against the Borrower by the Trustee in accordance with their respective terms for the benefit of the Holders of the Bonds, to the extent of its interests therein, and any rights of the Authority and obligations of the Borrower not so assigned to the Trustee constitute the legal, valid, and binding agreements of the Borrower enforceable against the Borrower by the Authority in accordance with their terms; except in each case as enforcement may be limited by bankruptcy, insolvency or other laws affecting the enforcement of creditors' rights generally, by the application of equitable principles regardless of whether enforcement is sought in a proceeding at law or in equity and by public policy.

(b)     None of the execution and delivery of the Borrower Documents, the consummation of the transactions contemplated thereby, or the fulfillment of or compliance with the terms and conditions thereof, conflicts with or results in a breach of any of the terms, conditions or provisions of the Borrower's organizational documents or of any material agreement, instrument or judicial order or decree to which the Borrower is now a party or by which it is bound, or constitutes a default (with due notice or the passage of time or both) under any of the foregoing.

3

(c)     The execution and delivery of this Loan Agreement and the other Borrower Documents, the consummation of the transactions herein and therein contemplated and the fulfillment of or compliance with the terms and conditions hereof and thereof will not conflict with or constitute a violation or breach of or default (with due notice or the passage of time or both) under the Borrower's Certificate of Formation or the Limited Liability Company Agreement of the Borrower or any applicable law or administrative rule or regulation, or any applicable court or administrative decree or order, or under any indenture, mortgage, deed of trust, loan agreement, or Project Documents by which it or its properties are subject or bound, or result in the creation or imposition of any prohibited Lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of the Borrower, which conflict, violation, breach, default, Lien, charge or encumbrance would reasonably be expected to have a Material Adverse Effect.

(d)     There is no action, suit, proceeding, inquiry or investigation, before or by any court or federal, state, municipal or other governmental authority, pending, or to the Knowledge of the Borrower, after reasonable investigation, threatened against or affecting the Borrower or the assets, properties or operations of the Borrower which, if determined adversely to the Borrower or its interests, would have a material adverse effect upon the consummation of the transactions contemplated by or the validity of the Borrower Documents, the Guaranty Agreement or the Pledge Agreement, and the Borrower, to its Knowledge after reasonable inquiry, is not in default (and no event has occurred and is continuing which with the giving of notice or the passage of time or both could constitute a default) with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or other governmental authority, which default might have consequences that would materially and adversely affect the consummation of the transactions contemplated by the Borrower Documents.  The Borrower or its Participating Affiliate enjoys the peaceful and undisturbed possession of all of the premises upon which it is operating the Project.

(e)     The Costs of the Project, as set forth in the Tax Certificate, have been determined in accordance with commercially acceptable engineering/construction and accounting principles. All the information and representations in the Tax Certificate are true and correct as of the date thereof.

(f)     Upon completion, the Project will consist of land (or a leasehold interest therein), buildings, equipment and facilities described in Exhibit A.

(g)     The Borrower and/or one or more of its Participating Affiliates has or will have title to or the right to use the Project Site and the real and personal property comprising the Project sufficient to carry out the purposes of this Loan Agreement.  Leases of the Project Site and the real and personal property comprising the Project are listed in Exhibit E.

(h)     No consent or approval of any trustee or holder of any indebtedness of the Borrower is necessary in connection with the execution and delivery of this Loan Agreement or the other Borrower Documents or the consummation of any transactions contemplated herein or therein.

(i)     The Borrower has obtained all authorizations, approvals, licenses, permits, consents and orders of any governmental authority, legislative body, court, agency or commission having jurisdiction of the matter that are required to have been obtained by the Borrower (except (A) where any failure to obtain the same could not be expected to result in a Material Adverse Effect, (B) for those permits not yet necessary and are obtainable in the ordinary course of business or that are required to be obtained by the related contractor pursuant to the Project Documents and (C) for such approvals or filings as are required in connection or compliance with the provisions of the securities or "Blue Sky" laws of any jurisdiction)  in connection with (1) the execution and delivery of, and performance by the Borrower of its respective obligations, and the exercise of its rights, under this Loan Agreement and the other Borrower

4

Documents and the consummation of any transactions contemplated herein or therein, (2) the ownership, construction or operation of the Project in accordance, and in compliance in all material respects, with all material governmental rules and applicable law (including all applicable material environmental laws), (3) the validity and enforceability of the Project Documents and (4) the issuance of the Bonds, and all such permits and approvals (excluding those excepted above) are in full force and effect.

(j)        No event has occurred and no condition exists which would constitute a Loan Default Event or which, with the passing of time or with the giving of notice or both, would become such a Loan Default Event.

(k)        To the Knowledge of the Borrower after reasonable inquiry, no member, officer, or other official of the Authority has any financial, ownership or managerial interest in the Borrower, any affiliate of the Borrower, this Loan Agreement or the Indenture or in the transactions contemplated by this Loan Agreement or the Indenture.

(l)        The Borrower and all Persons anticipated by the Borrower to be an owner or operator of the Project or a portion thereof are engaged in operations within California that require financing pursuant to this Loan Agreement and the Act to aid and assist in the control, remediation or elimination of pollution of the environment of the State of California.

(m)        The Project constitutes a "project" and the Borrower together with its Participating Affiliates is a "participating party," as such terms are defined in the Act.

(n)        The Borrower (i) is a "Small Business" as classified pursuant to Title 13 Code of Federal Regulations, Part 121, Subpart A (1994 Edition) or (ii) together with any affiliates (as such term is used in 4 California Code of Regulations Section 8020(l)) employs no more than 500 employees.

(o)        No disbursement to be paid or reimbursed from proceeds of the Bonds shall have been previously paid or reimbursed from the proceeds of any other Governmental Obligations, whether issued by the Authority or any other party.

(p)        All information provided by the Borrower and all representations made by the Borrower in its applications to the Authority are true and correct in all material respects.

(q)        All financial and other information that will be delivered to the Authority or the Trustee will correctly and fairly present the financial condition of Borrower (subject to year-end adjustments in the case of any interim financials), shall be prepared in accordance with GAAP, consistently applied, and shall include all material contingent liabilities as of said dates and the results of the operations of the Borrower for such period. The Borrower does not have any asset, liability, liability for taxes, long-term lease or unusual forward or long-term commitment material to the financial condition of the Borrower which has not previously been disclosed to the Authority.

(r)        Except as has been disclosed in writing to the Authority, to the extent that the Borrower is subject to taxation as a separate entity, all material tax returns (federal, state and local) required to be filed by or on behalf of the Borrower have been timely filed, and all taxes shown thereunder to be due, including interest and penalties, except such, if any, as are being actively contested by the Borrower in good faith, have been paid or adequate reserves have been made for the payment thereof.

(s)        The information provided by the Borrower in writing and used in the preparation of or contained in (i) the Loan Documents to which the Borrower is a party, as applicable, (ii) the Tax Certificate, (iii) any other Borrower Document and (iv) any certificate, document, written statement or other

5

instrument furnished to the Trustee or any Bondholder by or on behalf of the Borrower (other than, in each case, projections and other pro forma or forward-looking information, including the Construction Budget, each Operating Report and the Financial Model), when taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein or herein not misleading.

(t)    The information provided by the Borrower in writing and used in the preparation of, contained in, or incorporated by reference in, the Limited Offering Memorandum (other than, in each case, projections and other pro forma or forward-looking information, including the Construction Budget, each Operating Report and the Financial Model), when taken as a whole, does not contain any untrue statement of a material fact relating to the Borrower or the Project and does not omit to state a material fact relating to the Borrower or the Project necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading.

(u)    The Borrower has prepared, or caused to be prepared, the Construction Budget and the Financial Model in good faith and consistent with applicable provisions of the Borrower Documents in all material respects.  The Construction Budget and the Financial Model are based on assumptions as to all legal and factual matters material to the estimates, projections and forward-looking statements set forth therein believed by the Borrower to be reasonable in light of conditions existing at the time of delivery, provided that such information as relates to future events, projections and estimates is not to be viewed as fact and that actual results during the period or periods covered by such information may differ from the projected results as set forth therein by a material amount.

(v)    All statements of facts or other information furnished by the Borrower in writing to the Authority or Bond Counsel in connection with Bond Counsel's opinion relating to the Bonds, including the Tax Certificate, when taken as a whole, were true and correct when made and nothing has come to the Borrower's attention that would change the truth or correctness of such statements of facts or other information furnished to Bond Counsel.

(w)    Since its formation, (1) the Borrower has not engaged in any business unrelated to the acquisition, construction, ownership and operation of the Project and related facilities and the activities related or incident thereto; and (2) the Borrower has not owned any assets, liabilities or obligations other than those related to the Project and related facilities.

(x)    Each of the financial statements of the Borrower, if any, delivered pursuant hereto has been prepared in accordance with GAAP, and fairly presents in all material respects the financial condition of the Borrower as at the dates thereof and the results of its operations for the period then ended (subject, in the case of unaudited financial statements, to changes resulting from audit and normal year-end adjustments and the absence of footnotes).

(y)    On the basis of the Borrower's review of the Project Documents, its conversations with the Construction Contractor and its review of other information which it reasonably believes to be material to its expression of judgment, the Borrower reasonably believes that the Completion Date of the Project should occur on or before twenty-one (21) months following the Date of Delivery and that the cost to complete the Project will not exceed the funds available to the Borrower.

(z)    No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.

6

(aa)    The Borrower has as of the Date of Delivery a valid leasehold title in the real property constituting part of the Project, including the Project Site, and owns all other property it purports to own free and clear of any Liens, subject to Permitted Liens.

(bb)    (i) The Borrower and its Environmental Affiliates are in compliance in all material respects with all applicable Environmental Regulations, (ii) the Borrower and its Environmental Affiliates have all Environmental Approvals required to operate their businesses as presently conducted or (subject to Section 2.3(i)) as reasonably anticipated to be conducted and are in compliance in all material respects with the terms and conditions thereof, (iii) neither the Borrower nor any of its Environmental Affiliates has received any written communication from a Governmental Authority that alleges that the Borrower or any Environmental Affiliate is not in compliance in all material respects with all Environmental Regulations and Environmental Approvals, and (iv) to the Knowledge of the Borrower after reasonable inquiry, there are no circumstances that may prevent or interfere in the future with the Borrower's compliance in all material respects with all applicable Environmental Regulations and Environmental Approvals.

(cc)    There is no Environmental Claim pending or, to the Knowledge of the Borrower after reasonable inquiry, threatened against the Borrower or the Project.  There is no Environmental Claim pending or, to the Knowledge of the Borrower, threatened against any Environmental Affiliate.

(dd)    To the Knowledge of the Borrower after reasonable inquiry, there are no present or past actions, activities, circumstances, conditions, events or incidents, including the release, emission, discharge, presence or disposal of any Materials of Environmental Concern, that could reasonably be expected to form the basis of any Environmental Claim against the Borrower or any Environmental Affiliate or could otherwise reasonably be expected to interfere with the construction or operation of the Project.

(ee)    Without in any way limiting the generality of the foregoing, (i) there are no on-site or off-site locations in which the Borrower or, to the Knowledge of Borrower after reasonable inquiry, any Environmental Affiliate has stored, disposed or arranged for the disposal of Materials of Environmental Concern that could reasonably be expected to form the basis of an Environmental Claim, (ii) there are no underground storage tanks located or to be located on property owned or leased by the Borrower, (iii) to the Knowledge of the Borrower, there is no asbestos or lead paint contained in or forming part of any building, building component, structure or office space owned or leased by the Borrower, and (iv) no polychlorinated biphenyls (PCBs) are or will be used or stored at any property owned or leased by the Borrower, except in such form, condition and quantity as could not reasonably be expected to result in an Environmental Claim.

(ff)    The Borrower has not received any letter or request for information under Section 104 of the CERCLA, or comparable state laws, and to the Knowledge of the Borrower, none of the operations of the Borrower is the subject of any investigation by a Governmental Authority evaluating whether any remedial action is needed to respond to a release or threatened release of any Materials of Environmental Concern at the Project or at any other location, including any location to which the Borrower has transported, or arranged for the transportation of, any Materials of Environmental Concern with respect to the Project.

(gg)    Except as previously disclosed by the Borrower to the Authority, no default, Loan Default Event or Event of Default has occurred and is continuing under any of the Loan Documents or Project Documents, and no event has occurred and no condition exists with respect to the Borrower that, with the passage of time or with the giving of notice or both, would constitute a default, Loan Default Event or Event of Default under any of the Loan Documents or Project Documents.

(hh)    The Borrower has not filed an election pursuant to Treasury Regulation 301.7701-3(c) to be treated as an association taxable as a corporation and has never been taxed as a corporation.

(ii)    All insurance policies required to be maintained by the Borrower under the Loan Documents or Project Documents have been obtained and are in full force and effect, and all premiums for such insurance have been paid, other than those insurance policies not reasonably required to be obtained at the current stage of the Project, and the Borrower has no reason to believe that it will be unable to obtain such policies when required.

(jj)    As of the Date of Delivery, other than the Project Documents and agreements governing grants in respect of the Project, there are no other agreements entered into by the Borrower related to the design, development, construction, operation or maintenance of the Project with a contract value in excess of $500,000 annually.

(kk)    The Borrower owns or possesses sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and similar proprietary rights ("Intellectual Property") used to conduct the Business, and the Intellectual Property owned by or licensed to or from the Borrower (the "Borrower IP") constitutes all of the Intellectual Property necessary, without violation of any rights of any Person, for the conduct of the Business.

(ll)    To the Knowledge of the Borrower after reasonable inquiry, the operation of the Business, including the exploitation of the Borrower IP, has not violated and is not currently violating any Intellectual Property of any other Person.  The Borrower has not received any written communication alleging that the Borrower has violated any of the Intellectual Property of any other Person.

(mm)    No royalties, commissions, fees, or other payments are or will become payable by the Borrower or any successor or assignee thereof to any Person by reason of the exploitation of Borrower IP in the conduct of the Business.

(nn)    The Project Documents executed as of the date hereof are in full force and effect on the Date of Delivery and there are no defaults thereunder on the part of Borrower or, to the Knowledge of Borrower, on the part of any other party thereto.

(oo)    Except as disclosed on or before the Date of Delivery, there have been no change orders under the Construction Contract ("Change Orders").

(pp)    To the Knowledge of the Borrower after reasonable inquiry, it is not aware of any conditions precedent to the obligations of the respective parties under the Project Documents which have been executed as of the date this representation is made or deemed repeated that have not been satisfied or waived by the parties thereto, except for such conditions precedent that do not and cannot be satisfied until a later stage of development of the Project.

(qq)    Except for Permitted Liens, neither the Project, nor any of the payments or amounts to be received by the Borrower thereunder have been or will be mortgaged, pledged, or hypothecated by the Borrower in any manner or for any purpose or have been or will be the subject of a grant of a security interest by the Borrower other than as security for the payment of the Bonds, as provided in the Indenture, the Leasehold Deed of Trust and the other Security Documents.

# ARTICLE III
## CONSTRUCTION OF THE PROJECT; ISSUANCE OF THE BONDS

SECTION 3.1. <u>Agreement to Construct the Project; Modifications of the Project; Disbursements From the Project Fund; Disbursements From the Costs of Issuance Fund</u>.

(a)    To provide funds to finance the Project, the Authority agrees that it will issue under the Indenture, sell and cause to be delivered to the purchasers thereof, the Bonds. The Authority will thereupon apply the proceeds received from the sale of the Bonds as provided in the Indenture. The Borrower agrees that it or one or more of its Participating Affiliates has or will acquire, construct, rehabilitate, renovate, install, improve and equip, or complete the acquisition, construction, rehabilitation, renovation, installation, improvement and equipping of, the Project, and will acquire, construct, rehabilitate, renovate, install, improve and equip all other facilities and real and personal property deemed necessary for the operation of the Project, in accordance with the description of the Project prepared by the Borrower and approved by the Authority, including any and all supplements, amendments and additions or deletions thereto or therefrom. The Borrower further agrees to proceed with due diligence to complete the Project, and reasonably expects to do so within three (3) years. Except as otherwise permitted pursuant to this Section or Section 5.2(a)(iv), 5.2(d) or 5.2(e), the Borrower also agrees that it or a Participating Affiliate will own the Project during the term of this Loan Agreement or, if shorter, the useful life of any component of the Project. The Borrower also agrees that it or a Participating Affiliate will operate the Project (except such portion that is transferred to a Person other than a Participating Affiliate in accordance with Section 5.2) during the term of this Loan Agreement or, if shorter, the useful life of any component of the Project.

In the event that the Borrower desires to materially alter or change the Project, the Borrower must first notify the Authority, the Trustee and CDLAC and obtain the consent of the Authority and the Holders of a majority in aggregate principal amount of the Bonds then Outstanding. The Authority agrees it will not unreasonably withhold consent to such changes if the revised elements of the Project are qualified under the Act, are consistent with the Borrower's representations in Section 2.3 and meet all other legal requirements of the Authority as if they were included in the description of the Project approved by the Authority. If the Authority and the Holders of a majority in aggregate principal amount of the Bonds then Outstanding consent to the proposed amendment or supplement, the Authority will instruct the Trustee in writing to consent to such amendment or supplement to <u>Exhibit A</u> as shall be required to reflect such alteration or change to the Project upon receipt of (i) a Certificate of the Borrower describing in detail the proposed changes and stating that they will not have the effect of disqualifying the Project as facilities that may be financed pursuant to the Act, (ii) a copy of the form of amended or supplemented <u>Exhibit A</u> hereto approved by the Authority and (iii) an Approving Opinion with respect to such proposed changes. The Holders of a majority in aggregate principal amount of the Bonds then Outstanding may withhold their consent under this paragraph in their sole and absolute discretion.

The Borrower covenants that it shall exercise all available lease renewal rights to ensure that its leasehold interest in the Project Site will remain in effect so long as any Bonds remain Outstanding. The Borrower further agrees that if it or one of its Participating Affiliates no longer leases the Project Site or a portion thereof during the term of this Loan Agreement it will either (i) purchase the Project Site or such portion thereof, (ii) relocate any component of the Project that is not yet fully depreciated to another portion of the Project Site that is still leased by the Borrower (if applicable) or (iii) prepay the portion of this loan pursuant to Section 8.2, and direct the Trustee to prepay the portion of the Bonds, that was used to finance any component of the Project that (A) is not yet fully depreciated and (B) is no longer located on a portion of the Project Site leased by the Borrower. The Borrower shall send written notice to the Authority and the Trustee at least thirty (30) days prior to the end of any lease relating to the Project Site explaining how it will comply with the requirements of this paragraph.

(b)     The Borrower will authorize and direct the Trustee upon compliance with Section 3.03 of the Indenture, to disburse the moneys in the Project Fund to or on behalf of the Borrower for only the following purposes (and not for Costs of Issuance), subject to the provisions of Section 3.2 hereof:

(i)     Payment to the Borrower of such amounts, if any, as shall be necessary to reimburse the Borrower or a Participating Affiliate in full for all advances and payments made by the Borrower or a Participating Affiliate, at any time prior to or after the delivery of the Bonds, in connection with (A) the preparation of plans and specifications for the Project (including any preliminary study or planning of the Project or any aspect thereof) and (B) to the extent permitted by the Tax Certificate and the Act, the design, permitting, acquisition, construction, rehabilitation, renovation, installation, improvement and/or equipping of the Project.

(ii)     If the Project includes the construction or rehabilitation of a building, payment for labor, services, materials and supplies used by or furnished to the Borrower or one or more of its Participating Affiliates to improve the Project Site and to design, obtain permits for, acquire, construct, rehabilitate, renovate, install, improve and/or equip the Project on the Project Site, as provided in the plans, specifications and work orders therefor; payment of the costs of acquiring, constructing, installing, and/or equipping utility services or other related facilities; payment of the costs of acquiring all real and personal property deemed necessary to construct the Project; insurance during the construction period; and payment of the miscellaneous expenses incidental to any of the foregoing items.

(iii)     Payment of the fees, if any, of architects, engineers, legal counsel and supervisors expended in connection with the design, permitting, acquisition, construction, rehabilitation, renovation, installation, improvement and/or equipping of the Project.

(iv)     If the Project includes the construction or rehabilitation of a building, payment of taxes including property taxes, assessments and other charges, if any, that may become payable during the construction period with respect to the Project, or reimbursement thereof, if paid by the Borrower.

(v)     Payment of expenses incurred in seeking to enforce any remedy against any contractor or subcontractor in respect of any default under a contract relating to the design, permitting, acquisition, construction, rehabilitation, renovation, installation, improvement and/or equipping of the Project.

(vi)     Payment of any other Costs of the Project permitted by the Tax Certificate and the Act (including, without limitation, interest accruing on the Bonds during the construction period of the Project and reimbursement to the Borrower of costs of financing the Costs of the Project, but not including any Costs of Issuance).

(vii)     With respect to the Taxable Subaccount, payment of operating and working capital costs relating to the Project ("Operating and Working Capital Costs").

(viii)     With respect to the Grant Subaccount, for any payments contemplated in items (i) through (vi) above or, following the Completion Date, for Operating and Working Capital Costs or, to the extent permitted by Section 5.18(c), for distributions to members of the Borrower.

All moneys remaining in the Project Fund after the Completion Date and after payment or provision for payment of all other items provided for in the preceding subsections (i) to (vi), inclusive, of this Section, shall be used in accordance with Section 3.03 of the Indenture.

Each of the payments referred to in this Section 3.1(b) shall be made upon receipt by the Trustee of a written requisition in the form prescribed by Section 3.03 of the Indenture, signed by an Authorized Representative of the Borrower.

(c)       The Borrower acknowledges that it shall not submit any requisitions to the Trustee for the payment of Project Costs from the Project Fund or any account therein, unless it attaches to such requisition invoices evidencing each item requested for payment therein. In any instance where the requisition is for payment to the Borrower for reimbursement of costs previously paid, the Borrower shall attach the original invoices and other documentation to describe the original expenditures which were paid.

(d)       The Borrower will authorize and direct the Trustee, upon compliance with Section 3.04 of the Indenture, to disburse the moneys in the Costs of Issuance Fund to or on behalf of the Borrower only for Costs of Issuance. Each of the payments referred to in this Section 3.1(d) shall be made upon receipt by the Trustee of a written requisition in the form prescribed by Section 3.04 of the Indenture, signed by an Authorized Representative of the Borrower.

(e)       Prior to the Completion Date, the Borrower may deliver a Request to the Authority to consent to the removal of a component of the Project that is no longer necessary for inclusion within the Project and the reasons therefor. If the Authority does not act within thirty (30) days after such Request is received, such consent shall be deemed to have been given, after which the Borrower shall instruct the Trustee to apply a proportionate amount of moneys in the Project Fund as provided in Section 3.03 of the Indenture.

SECTION 3.2.  Establishment of Completion Date; Obligation of Borrower to Complete. Upon the final disbursement from the Project Fund, an Authorized Representative of the Borrower, on behalf of the Borrower, shall evidence the Completion Date by providing a Final Project Account Disbursement Certificate, substantially in the form attached hereto as Exhibit B, to the Trustee and the Authority.

At the time such certificate is delivered to the Trustee, moneys remaining in the Project Fund, including any earnings resulting from the investment of such moneys, shall be used as provided in Section 3.03 of the Indenture.

In the event the moneys in the Project Fund available for payment of the Costs of the Project should be insufficient to pay the costs thereof in full, the Borrower agrees to pay any costs of completing the Project in excess of the moneys available for such purpose in such Project Fund. The Authority makes no express or implied warranty that the moneys deposited in the Project Fund and available for payment of the Costs of the Project, under the provisions of this Loan Agreement, will be sufficient to pay all the amounts which may be incurred for such Costs of the Project. The Borrower agrees that if, after exhaustion of the moneys in the Project Fund, the Borrower should pay any portion of the Costs of the Project pursuant to the provisions of this Section, it shall not be entitled to any reimbursement therefor from the Authority, the Trustee, or the Holders of any of the Bonds, nor shall it be entitled to any diminution of the amounts payable under Section 4.2 hereof.

SECTION 3.3.  Investment of Moneys in Fund. Any moneys in any fund or account held by the Trustee shall, at the written request of an Authorized Representative of the Borrower, be invested or reinvested by the Trustee as provided in the Indenture. Such investments shall be held by the Trustee and shall be deemed at all times a part of the fund or account from which such investments were made, and the interest accruing thereon, and any profit or loss realized therefrom, shall be credited or charged to such fund or account.

SECTION 3.4. <u>Construction Monitor</u>. Until the Project is completed and the Final Project Account Disbursement Certificate is delivered in accordance with Section 3.2, the Borrower shall engage a Construction Monitor to provide an initial cost and draw review, to monitor Project construction, to sign-off on requisitions from the Project Fund in excess of $100,000 and to provide to the Trustee monthly construction updates on all, aspects of construction, as specified in the Continuing Disclosure Agreement. The Trustee and the Authority shall have no duty or obligation to review such construction updates. Such monthly construction updates shall include, at a minimum: (i) current draw down information, (ii) comparison of actual Project Costs with the Construction Budget, (iii) assessment of the overall construction progress of the Project since the date of the last report and setting forth a reasonable estimate as to the completion date for the Project, (iv) description of any material problems (including material cost overruns, if any) encountered or anticipated in connection with such works, (v) description of any Change Orders including the total cost thereof, (vi) a discussion of sufficiency of funds, and (vii) the currently estimated Completion Date. The Construction Monitor shall have access to all documents and personnel as may be reasonably necessary (as determined by the Construction Monitor) and available to perform the scope of work set forth in the Construction Monitor Contract.

SECTION 3.5. <u>Change Orders</u>. The Borrower shall not enter into or approve any Change Orders without the approval of the Construction Monitor, unless (1) the Change Order is necessary for compliance with applicable law and such Change Order is not reasonably anticipated to result in a Material Adverse Effect, (2) the Change Order is necessitated by a casualty or condemnation and such Change Order is not reasonably anticipated to result in a Material Adverse Effect or (3) each of the following conditions is satisfied:

(a)     The amount of such Change Order does not exceed (1) $1,000,000 individually, or (2) $5,000,000 together with all prior Change Orders that have not been approved by the Construction Monitor;

(b)     Such Change Order could not reasonably be expected to delay the Completion Date beyond the anticipated Completion Date;

(c)     Such Change Order could not reasonably be expected to permit or result in any Material Adverse Effect or impair the enforceability of any warranty under any Project Document;

(d)     Such Change Order could not reasonably be expected to cause the Borrower to fail to satisfy the Coverage Requirement under Section 5.18(b)(i);

(e)     Such Change Order could not reasonably be expected to cause the Borrower or the Project not to comply with any applicable law; and

(f)     Such Change Order shall be accompanied by an updated Construction Budget to the extent there shall be an increase the Project Costs and satisfactory evidence that there exists sufficient funds in the Project Fund necessary to complete the Project or evidence that the Borrower has provided additional funds to the Trustee for the completion of the Project.

**ARTICLE IV**
**LOANS OF PROCEEDS; REPAYMENT PROVISIONS**

SECTION 4.1. <u>Loan of Bond Proceeds; Issuance of Bonds</u>. The Authority covenants and agrees, upon the terms and conditions in this Loan Agreement, to make a loan to the Borrower of the proceeds of the Bonds conditioned on the receipt thereof by the Authority for the purpose of financing (i) Costs of the Project, (ii) Costs of Issuance and (iii) capitalized interest and certain reserves as provided for

in the Indenture. The Authority further covenants and agrees that it shall take all actions within its authority to keep this Loan Agreement in effect in accordance with its terms. Pursuant to said covenants and agreements, the Authority will issue the Bonds upon the terms and conditions contained in this Loan Agreement and the Indenture and will cause the Bond proceeds to be applied as provided in Article III of the Indenture.

SECTION 4.2.  Repayment and Payment of Other Amounts Payable.

(a)     On the 25th day of each month, until the principal of, premium, if any, and interest on, the Bonds shall have been fully paid or provision for such payment shall have been made as provided in the Indenture, the Borrower covenants and agrees to pay to the Trustee as a repayment on the loan made to the Borrower from Bond proceeds pursuant to Section 4.1 hereof, a sum equal to one-sixth (1/6) of the total amount of interest and principal (whether at maturity or upon scheduled mandatory redemption) becoming due and payable on the Bonds on the next Bond Payment Date (as hereinafter defined), as provided in the Indenture ("Loan Repayments"); provided that the Borrower shall receive a credit against amounts due on the 25th day of each month equal to the amounts then on deposit with the Trustee in the Interest Account, the Principal Account, the Redemption Account and the Capitalized Interest Account to the extent such amounts have not previously been credited against the Loan Repayments then due.

Each Loan Repayment shall at all times be sufficient to pay one-sixth (1/6) of the total amount of interest and principal (whether at maturity or upon scheduled mandatory redemption) becoming due and payable on the Bonds on the next Bond Payment Date; provided that if at any time the amounts held by the Trustee in the Revenue Fund are sufficient to pay all of the principal of and interest and premium, if any, on the Bonds as such payments become due, the Borrower shall be relieved of any obligation to make any further payments under the provisions of this Section. Notwithstanding the foregoing, if on any date the amount held by the Trustee in the Revenue Fund is insufficient to make any required payments of principal of (whether at maturity or upon redemption (including without limitation sinking fund redemption) or acceleration) and interest and premium, if any, on the Bonds as such payments become due, the Borrower shall forthwith pay such deficiency as a Loan Repayment hereunder.

All Loan Repayments shall be made in federal funds or other funds immediately available at the Corporate Trust Office of the Trustee.  If a Loan Default Event shall occur with respect to the payment of any Loan Repayment payable under this Section 4.2(a), then interest shall accrue on the amount overdue at the Post-Default Rate in accordance with Section 7.2. In accordance with Section 6.07(A) of the Indenture, if the Borrower fails to make a Loan Repayment by the due date thereof, the Trustee shall promptly notify the Authority, such notice to be given by telephone or facsimile followed by written notice.

(b)     The Borrower also agrees to pay (i) the annual fee of the Trustee for its ordinary services rendered as trustee and its ordinary expenses incurred under the Indenture, as and when the same become due, (ii) the reasonable fees, charges and expenses (including reasonable legal fees and expenses) of the Trustee, as bond registrar and paying agent, the reasonable fees of any other paying agent on the Bonds as provided in the Indenture, as and when the same become due, (iii) the reasonable fees, charges and expenses of the Trustee for the necessary extraordinary services rendered by it and extraordinary expenses (including, but not limited to reasonable attorneys' fees and expenses) incurred by it under the Indenture, as and when the same become due, (iv) the cost of printing any Bonds required to be furnished by the Authority at the expense of the Authority, (v) the cost of printing and typesetting any preliminary official statement, official statement or other offering circular utilized in connection with the sale or remarketing of any Bonds and any amendment or supplement thereto, (vi) the Authority's Administrative Fee at the Date of Delivery and (vii) any amounts required to be deposited in the Rebate Fund to comply with the provisions of Section 5.10 hereof and Section 6.06 of the Indenture and the payment of any rebate

analyst. The Trustee's compensation shall not be limited by any provision of law regarding the compensation of a Trustee of an express trust.

(c)     The Borrower also agrees to pay (i) as soon as practicable after receipt of request for payment thereof, all expenses required to be paid by the Borrower under the terms of the Bond Purchase Contract relating to the sale of the Bonds, executed by the Treasurer of the State of California, the Authority, Westhoff, Cone & Holmstedt, as underwriter for the Bonds, and the Borrower (the "Purchase Contract"), which shall include all Costs of Issuance of the Bonds; and (ii) all reasonable expenses of the Authority related to the Project which are not otherwise required to be paid by the Borrower under the terms of this Loan Agreement; including, but not limited to, all Costs of Issuance, provided that the Authority shall have obtained the prior written approval of an Authorized Representative of the Borrower for any expenditures other than those provided for herein or in the Purchase Contract.

(d)     The Borrower also agrees to pay fees and expenses of independent Accountants necessary for the preparation of annual or other audits, reports or summaries thereof required by the Indenture or by the Authority, including a report of an independent Accountant with respect to any fund established under the Indenture; and reasonable expenses of the Authority pursuant to Sections 44525 and 44548 of the California Health and Safety Code, and any agency of the State of California or any other counsel selected by the Authority to act on its behalf in connection with the Bonds.

(e)     In the event the Borrower should fail to make any of the payments required by this Section, the amount of such payment shall continue as an obligation of the Borrower until such amount has been fully paid. With respect to payments required by subsections (b) through (d) of this Section that are payable to the Authority or the Trustee, the Borrower agrees to pay interest at the Post-Default Rate on any amount of such payments that is overdue by more than thirty (30) days.

(f)     The Borrower also agrees to pay to the Trustee, for deposit in the Capital Replacement Fund, such amounts on such dates as required by Section 5.13 hereof.

SECTION 4.3. <u>Unconditional Obligation</u>. The obligations of the Borrower to make the payments required by Section 4.2 hereof and to perform and observe the other agreements on its part contained herein shall be absolute and unconditional, irrespective of any defense or any rights of set-off, recoupment or counterclaim it might otherwise have against the Authority, and during the term of this Loan Agreement, the Borrower shall pay all payments required to be made on account of the loan (which payments shall be net of any other obligations of the Borrower) as prescribed in Section 4.2 and all other payments required hereunder, free of any deductions and without abatement, diminution or set-off. Until such time as the principal of, premium, if any, sinking fund installments, if any, and interest on the Bonds shall have been fully paid, or provision for the payment thereof shall have been made as required by the Indenture, the Borrower (i) will not suspend or discontinue any payments provided for in Section 4.2 hereof; (ii) will perform and observe all of its other covenants contained in this Loan Agreement; and (iii) except as expressly provided for in this Loan Agreement, will not terminate this Loan Agreement for any cause, including, without limitation, the occurrence of any act or circumstances that may constitute failure of consideration, destruction of or damage to all or a portion of those facilities or equipment comprising the Project, commercial frustration of purpose, any change in the tax or other laws of the United States of America or of the State of California or any political subdivision of either of these, or any failure of the Authority or the Trustee to perform and observe any covenant, whether express or implied, or any duty, liability or obligation arising out of or connected with this Loan Agreement or the Indenture, except to the extent permitted by this Loan Agreement.

SECTION 4.4.  Assignment of Authority's Rights. As security for the payment of the Bonds, the Authority will assign to the Trustee the Authority's rights under this Loan Agreement, including the right to receive payments hereunder (except the Retained Rights), and the Authority hereby directs the Borrower to make the payments required hereunder (except such payments for expenses and indemnification) directly to the Trustee. The Borrower hereby assents to such assignment and agrees to make payments directly to the Trustee without defense or set-off by reason of any dispute between the Borrower and the Authority or the Trustee.

SECTION 4.5.  Amounts Remaining in Funds. It is agreed by the parties hereto that after payment in full of (i) the Bonds, or after provision for such payment shall have been made as provided in the Indenture, (ii) the fees, charges and expenses of the Trustee and paying agents in accordance with the Indenture, and (iii) all other amounts required to be paid under this Loan Agreement and the Indenture, any amounts remaining in any fund held by the Trustee under the Indenture (excepting the Rebate Fund) shall be paid as provided in Section 10.01 of the Indenture.

SECTION 4.6.  Pledge of Gross Revenue Fund and Security Documents.

(a)    The Borrower agrees that, as long as any Loan Repayments remain unpaid, all of the Gross Revenues shall be deposited as soon as practicable upon receipt in a bank account or fund designated as the "Gross Revenue Fund" which the Borrower shall establish and maintain subject to the provisions of Section 5.15 of this Agreement, in an account or accounts at such banking institution or institutions as the Borrower shall from time to time designate in writing to the Trustee for such purpose (collectively, the "Depository Bank"). The Borrower hereby pledges and assigns to the Trustee and grants to the Trustee a security interest in all right, title and interest, whether now owned or hereafter acquired, of the Borrower in, to, and under the Gross Revenue Fund, all of the Gross Revenues, all investment property, instruments, money and other property on deposit in or credited to the Gross Revenue Fund, and all proceeds of the foregoing, to secure the payment of the Loan Repayments and the performance by the Borrower of its other obligations under this Agreement and the payment and performance of all obligations of the Borrower under any agreement securing Parity Debt.

(b)    To secure the payment of Loan Repayments, the performance by the Borrower of its other obligations under this Agreement and the payment and performance of all obligations of the Borrower under any Parity Debt, the Borrower has entered into the Security Documents. The Borrower agrees to supplement the Security Documents or to execute and deliver such other documents, agreements, instruments and certificates as may be necessary from time to time to grant the Trustee a first priority lien on the property of the Borrower encumbered thereunder, subject to Permitted Liens. The Borrower shall obtain, at its own cost and expense, an ALTA extended coverage loan policy of title insurance issued by a title insurance company qualified to do business in the State of California insuring the priority of the Leasehold Deed of Trust, or an endorsement to such policy at the time of and dated as of the date of issuance of the Bonds or Parity Debt, in an aggregate amount not less than the aggregate principal amount of the Bonds and Parity Debt to be outstanding after the issuance of such Bonds or Parity Debt, naming the Trustee as the insured party, insuring the title of the Borrower to such Property encumbered thereunder and the validity and priority of the lien of the Leasehold Deed of Trust, subject only to Permitted Liens.

(c)    The Borrower or Anaergia Services, as applicable, shall execute and deliver to the Trustee each of the Security Documents.

(d)    The Borrower shall cause the Depository Bank to enter into the Account Control Agreement in order to perfect the security interest granted hereunder, shall authorize and cause to be filed Uniform Commercial Code financing statements, and shall authorize, execute and deliver such other documents (including, but not limited to, amendments to financing statements and continuation statements)

as may be necessary or reasonably requested by the Authority or the Trustee, in order to perfect or maintain the perfection and priority of such security interest; provided that the Borrower shall not cause the Depository Bank to enter into any control agreement with any person or entity in order to perfect security interests in the Borrower's accounts other than in order to perfect any security interest as granted or permitted hereunder.

# ARTICLE V
## SPECIAL COVENANTS AND AGREEMENTS

SECTION 5.1.  Right of Access to the Project. The Borrower agrees that during the term of this Loan Agreement, the Authority, the Trustee and the duly authorized agents of any of them shall have the right at all reasonable times during normal business hours to enter upon the site of the Project to examine and inspect the Project; provided, however, that reasonable notice shall be given to the Borrower prior to such examination or inspection. Except as may otherwise be set forth herein, nothing contained in this Section or in any other provision of this Loan Agreement shall be construed to entitle the Authority and the Trustee to any information or inspection involving the confidential trade or proprietary knowledge, expertise or know-how of the Borrower and any such proprietary knowledge, expertise, or know-how obtained by the Authority, the Trustee or the Holders shall not be disclosed to any third party.

SECTION 5.2.  The Borrower's Maintenance of Its Existence; Assignments; Permitted Transfers of the Project.

(a)     The Borrower covenants and agrees that during the term of this Loan Agreement it shall:

(i)     maintain its existence as a limited liability company, and require in its operating agreement that each member thereof, and any Person who may from time to time become a member thereof, shall pledge its full membership interest, including all economic interests and control rights, to the Trustee as security for the Bonds, and the Borrower may admit members who comply with that requirement,

(ii)     continue to maintain its status in good standing in the State of California,

(iii)     not dissolve, sell or otherwise dispose of all or substantially all of its assets, combine or consolidate with or merge into another entity, or permit one or more other entities to consolidate with or merge into it so that the Borrower is not the resulting or surviving entity, except if:

(A)     either (1) such resulting or surviving entity or transferee, as the case may be, is a Participating Affiliate or (2) five years shall have elapsed since the issuance of the Bonds;

(B)     such resulting or surviving entity or transferee, as the case may be, has executed and delivered to the Authority and the Trustee an assignment and assumption agreement which provides: (1) certifications and evidence that such resulting or surviving entity or transferee qualifies to do business in the State of California and is in good legal standing, (2) an agreement by the surviving or resulting entity or transferee to pay and perform all of the obligations of the Borrower hereunder and under the Tax Certificate, and (3) representations by the surviving or resulting entity or transferee identical to the representations set forth in Section 2.3 hereof;

(C)     the combined net worth of the surviving entity and any guarantor of the Bonds shall be not less than ninety-five percent (95%) of the combined net worth of the Borrower and any

16

guarantor of the Bonds immediately preceding the transaction, as measured by generally accepted accounting principles;

(D)    the Borrower has received the consent of the Holders of a majority in aggregate principal amount of the Bonds then Outstanding; and

(E)    the Authority shall have received an Approving Opinion with respect to such dissolution, sale, disposition, combination, merger or consolidation and an Opinion of Counsel to the effect that the surviving, resulting, or transferee Person is a "participating party" as defined in the Act;

(iv)    not sell, transfer, lease or otherwise dispose of (including operating arrangements), or permit the sale, transfer, lease or disposal (including operating arrangements), of the Project or portion of the Project, except in accordance with any of the following subsections:

(A)    The Borrower may sell, transfer, lease or otherwise dispose of (including operating arrangements) any portion of the Project to a Participating Affiliate if the purchaser, transferee, lessee, operator or other recipient, as the case may be, has covenanted in a written instrument for the benefit of the Authority and the Borrower to comply with the instructions of the Borrower issued for the purpose of assuring that the Project be operated in conformance with this Loan Agreement, the Act, the Tax Certificate and federal tax law; provided that nothing in the foregoing shall diminish the Borrower's obligation to cause the Project to be operated in conformance with this Loan Agreement, the Act, the Tax Certificate and federal tax law, including without limitation, the operation of the sold, transferred, disposed or leased portion of the Project. Any lease pursuant to the foregoing shall not permit sublease or assignment by the lessee unless such sublease or assignment would otherwise satisfy the requirements of this subsection.

(B)    The Borrower may sell, transfer or otherwise dispose of any portion of the Project that constitutes equipment if (1) such sale, transfer or disposition is to or with a Participating Affiliate or (2) such equipment is replaced by the Borrower or a Participating Affiliate with equipment of equal or greater value and utility that is used in the same manner and for the same purposes as the equipment so sold, transferred or otherwise disposed of, has a useful life at least equal to the remaining useful life of the equipment so sold, transferred or otherwise disposed of and is in the same location as the equipment so sold, transferred or disposed of (to the extent identified in Exhibit A hereto) and the Authority shall have received an Approving Opinion with respect to such replacement.

(C)    The Borrower may sell, transfer, lease or otherwise dispose of (including operating arrangements) any portion of the Project to a Person other than a Participating Affiliate, if,

(1)    the purchaser, transferee, lessee, operator or other recipient, as the case may be, has covenanted in a written instrument for the benefit of the Authority and the Borrower to comply with the instructions of the Borrower issued for the purpose of assuring that the Project be completed and operated in conformance with this Loan Agreement, the Act, the Tax Certificate and federal tax law; provided that nothing in the foregoing shall diminish the Borrower's obligation to cause the Project to be completed and operated in conformance with this Loan Agreement, the Act, the Tax Certificate and federal tax law;

(2)    the Borrower has received the consent of the Holders of a majority in aggregate principal amount of the Bonds then Outstanding, or, in the event such transaction involves entry by such Person into any arrangement regarding operation of the Project

17

(whether or not an amendment or supplement to any operation and maintenance agreement), the proposed operator shall be a Qualified Operator; and

(3)    the Authority shall have received a certificate of good standing of the purchaser, transferee, lessee or operator, as the case may be, from the California Secretary of State and Franchise Tax Board, a copy of the document evidencing such sale, transfer, lease or disposition, an Approving Opinion with respect to such sale, transfer, lease or disposition and an Opinion of Counsel to the effect that the surviving, resulting, or transferee Person is a "participating party" as defined in the Act.

For purposes of this Section 5.2(a)(iv)(C), the term "Qualified Operator" shall mean an entity in good standing with the State of California having material experience in operating projects similar to the Project and/or wastewater treatment plants with anaerobic digestion.

(D)    The Borrower may sell, transfer, lease or otherwise dispose of any equipment that has reached the end of its useful life or is no longer useful in the operation of the Project, as determined in good faith by the Borrower, if the sale, transfer, lease or disposition is made for consideration in an amount not less than fair market value of the equipment so disposed of, including without limitation a purchase or sale of assets that is not made in the ordinary course of business.

(b)    Notwithstanding any provision of Section 5.2(a), the Borrower need not comply with Section 5.2(a) if, at the time of such merger, combination, sale or transfer of assets, dissolution or reorganization: (i) all of the Bonds Outstanding will be defeased as provided in Article X of the Indenture and, in the event of dissolution of the Borrower, an officer or member of the Borrower, as approved by the Authority, executes and delivers to the Authority an agreement assuming the surviving obligations of the Borrower under this Agreement and the Tax Certificate, or (ii) in the case of a sale of less than all of the assets acquired or constructed with proceeds of the Bonds, the Bonds will be defeased or retired in an amount proportional to the percentage of the original cost of such assets to the original net proceeds of the Bonds, and the Borrower provides to the Authority a certificate of the Borrower setting forth the calculations evidencing that the amount of Bonds defeased or retired is proportional to the percentage of the original cost of such assets to the original net proceeds of the Bonds.  Nothing in this Section limits the Authority's remedies against the Borrower under California Corporations Code Sections 2011 and 17707.07.

(c)    Within ten (10) days after the consummation of the merger, combination, sale or transfer of assets, dissolution, reorganization, or other transaction described in Section 5.2(a)(iii) or (a)(iv), the Borrower shall provide the Authority and the Trustee with (i) counterpart copies of the documents constituting the transaction, and, if applicable, (ii) the items set forth in Section 5.2(a)(iii) or (a)(iv) and (iii) a certificate of the Borrower stating that such transaction complies with the provisions of Section 5.2(a)(iii) or (a)(iv). The Borrower shall give the Authority and Trustee at least thirty (30) days written notice prior to the effective date of any merger, combination, sale or transfer of assets, dissolution, reorganization, or other transaction described above, together with drafts of the documents of assumption and such other instruments (other than good standing certificates) as would be required to be delivered in connection therewith. The Borrower agrees to provide such other information as the Authority or Trustee may reasonably request.

(d)    Except as provided above in this Section, the rights and obligations of the Borrower under this Loan Agreement may be assigned by the Borrower to any Person in whole or in part, subject, however, to each of the following conditions:

(i)    No assignment other than pursuant to paragraph (a) of this Section shall relieve the Borrower from primary liability for any of its obligations hereunder and, in the event of any

18

assignment not pursuant to paragraph (a) of this Section, the Borrower shall continue to remain primarily liable for all payments required by this Loan Agreement and for performance and observance of the other agreements herein provided to be performed and observed by it.

(ii)     Any assignment from the Borrower under this subsection (d) shall retain for the Borrower such rights and interests as will permit it to perform its obligations under this Loan Agreement, and any assignee of the Borrower shall assume in writing the obligations of the Borrower hereunder to the extent of the interest assigned.

(iii)     The Borrower shall give the Authority forty-five (45) days prior written notice of any assignment under this subsection (d), and shall, within fifteen (15) days after delivery of such notice, furnish or cause to be furnished to the Authority and the Trustee a true and complete copy of each such assignment together with an instrument of assumption and an Opinion of Counsel satisfactory to the Authority that the provisions of this Section 5.2(d) have been complied with.

(iv)     The consent of the Holders of a majority in aggregate principal amount of the Bonds then Outstanding shall have been obtained.

(e)     The Borrower may undertake any transaction of the type referenced in Section 5.2(a) or 5.2(d) not expressly permitted by Section 5.2(a) or 5.2(d) only if the Authority, the Trustee and the Holders of a majority in aggregate principal amount of the Bonds then Outstanding consent to such transaction in writing. The Borrower must request any such written consent prior to undertaking any such transaction and provide to the Authority, the Trustee and the Holders of a majority in aggregate principal amount of the Bonds then Outstanding such information, reports and documents relating to the transaction as they may reasonably request. The Authority may respond to the Borrower's request for consent at any time within forty-five (45) days of such request. If the Authority has not responded to such request within the 45-day period, the Authority will be deemed to have consented to such transaction. Other required consent shall not be deemed received until actually received in writing.

(f)     If a merger, consolidation, sale or other transfer is effected as provided in this Section, all provisions of this Section shall continue in full force and effect and no further merger, consolidation, sale or transfer shall be effected except in accordance with the provisions of this Section.

(g)     Notwithstanding any provision hereof to the contrary, either of the Trustee or the Holders of a majority in aggregate principal amount of the Bonds then Outstanding may withhold any consent required by this Section 5.2 in their sole and absolute discretion.

SECTION 5.3.   Records and Financial Statements of Borrower.

(a)     The Borrower covenants and agrees at all times to keep, or cause to be kept, proper books of record and account, prepared in accordance with GAAP, consistently applied, in which complete and accurate entries shall be made of all material transactions of or in relation to the business, properties and operations of the Borrower. Such books of record and account shall be available for inspection by the Authority, the Trustee and the duly authorized agents of any of them during normal business hours, under reasonable circumstances and after reasonable prior notice to the Borrower, and the Trustee and its duly authorized agents may take such memoranda from and in regard thereto as may be desired.

(b)     The Borrower further covenants and agrees, within one hundred fifty (150) days after the end of each Fiscal Year, commencing with the Fiscal Year ending December 31, 2019, to furnish to the Authority and the Trustee a Certificate of the Borrower stating that its financial statements have been completed and that no event which constitutes a Loan Default Event or which with the giving of notice or

19

the passage of time or both would constitute a Loan Default Event has occurred and is continuing as of the end of such Fiscal Year, or specifying the nature of such event and the actions taken and proposed to be taken by the Borrower to cure such default.

SECTION 5.4.  Insurance. The Borrower agrees to insure the Project or cause the Project to be insured throughout the term of this Loan Agreement for such amounts and for such occurrences as are customary for similar facilities within the State of California, by means of policies issued by reputable insurance companies qualified to do business in the State of California, which policies shall name the Trustee as an additional insured and loss payee, including without limitation, a business interruption insurance policy payable after any period during which the Project remains inoperable for sixty (60) consecutive days and which provides coverage for twelve (12) consecutive months of covered business interruption.  The Borrower agrees to deliver, as a condition precedent to the initial delivery of the Bonds and thereafter upon request, to the Authority and the Trustee memorandum copies of the insurance policies or certificates of insurance covering the Project and report and certification by an independent insurance consultant that the insurance on the Project meets the above requirements and provides commercially reasonable coverage given the Borrower's operations, assets, liabilities and risks.  Such policies or certificates of insurance shall provide that the insurer will endeavor to mail not less than thirty (30) nor more than sixty (60) days' prior written notice to the Trustee and the Authority of any amendment, cancellation or expiration of such policy.

SECTION 5.5.  Maintenance and Repair; Taxes; Utility and Other Charges. The Borrower agrees to maintain the Project, or cause the Project to be maintained, during the term of this Loan Agreement (i) in as reasonably safe condition as its operations shall permit, (ii) in good repair and in good operating condition, ordinary wear and tear excepted, making from time to time all necessary repairs thereto and renewals and replacements thereof and (iii) in a manner consistent with State law, including, without limitation, the Act and all environmental laws.

The Borrower agrees to pay or cause to be paid during the term of this Loan Agreement all taxes, governmental charges of any kind lawfully assessed or levied upon the Project or any part thereof, including any taxes levied against any portion of the Project which, if not paid, will become a charge on the revenues or other receipts from the Project prior to or on a parity with the charge thereon and the pledge or assignment thereof to be created therefrom or under this Loan Agreement, all utility and other charges incurred in the operation, maintenance, use, occupancy and upkeep of any portion of the Project and all assessments and charges lawfully made by any governmental body for public improvements that may be secured by a lien on the Project; provided that with respect to special assessments or other governmental charges that may lawfully be paid in installments over a period of years, the Borrower shall be obligated to pay only such installments as are required to be paid during the term of this Loan Agreement. The Borrower may, at the Borrower's expense and in the Borrower's name, in good faith, contest any such taxes, assessments and other charges and, in the event of any such contest, may permit the taxes, assessments or other charges so contested to remain unpaid during that period of such contest and any appeal therefrom unless by such nonpayment the Project or any part thereof will be subject to seizure, tax sale, loss, forfeiture or similar taking. The Borrower shall provide in its annual operating budget for monthly payment, or if not due and payable on a monthly basis, then monthly set asides in the Gross Revenue Fund for payment when due and payable of all rent due under the Lease Agreement and all taxes and other impositions, including any special assessments imposed on the Project Site.

SECTION 5.6.  Qualification in California. The Borrower agrees that throughout the term of this Loan Agreement it, or any successor or assignee as permitted by Section 5.2, will be qualified to do business in the State of California.

20

SECTION 5.7.  <u>Maintenance of Permits</u>. The Borrower agrees to maintain all certificates, approvals, permits, licenses and authorizations described in Section 2.3(i) necessary for the construction, as applicable, use or operation of the Project.

SECTION 5.8.  <u>Payment of Obligations; Compliance with Liens</u>. The Borrower agrees to promptly pay or otherwise satisfy and discharge all obligations, indebtedness, demands and claims as and when the same become due and payable, other than any thereof whose validity, amount or collectability is being contested in good faith by appropriate proceedings and shall at all times comply with all terms, covenants and provisions contained in any mortgages, deeds of trust, security agreements or instruments evidencing any Liens at any time existing upon its properties or any part thereof securing any indebtedness incurred or assumed by it and pay or cause to be paid, or to be renewed, refunded or extended or to be taken up, by it, all bonds, notes or other evidences of indebtedness secured by any such mortgage or other Lien, as and when the same shall become due and payable.

SECTION 5.9.  <u>General Tax Covenants</u>. It is the intention of the parties hereto that interest on the Bonds shall be and remain Tax-exempt and, to that end, the Borrower and the Authority covenant to comply with all of their respective requirements in the Tax Certificate and in Section 5.10 which are for the benefit of the Trustee and each and every Holder of the Bonds.

SECTION 5.10.  <u>Special Arbitrage Certifications; Rebate</u>. The Borrower acknowledges that it has read Sections 5.06 and 6.06 of the Indenture and that it will comply with the requirements of those sections as if they were set forth in full in this Loan Agreement. The Borrower shall calculate, or cause to be calculated, its rebate liability at such times as are required by Section 148(f) of the Code and any temporary, proposed or final Regulations as may be applicable to the Bonds from time to time. The Borrower shall provide to the Authority and the Trustee a copy of each calculation of rebate liability prepared by or on behalf of the Borrower.

SECTION 5.11.  <u>Notice and Certificates to Authority, Trustee and CDLAC</u>.

(a)    The Borrower hereby agrees to provide the Authority and the Trustee with the following:

(i)    On or before June 15 and December 15 of each year during which any of the Bonds are Outstanding, commencing June 15, 2019, a Certificate of the Borrower that all payments required under this Loan Agreement have been made;

(ii)    Within one hundred fifty (150) days of the end of each Fiscal Year, beginning with the Fiscal Year ending on December 31, 2019, a Certificate of the Borrower that it has complied with the requirements to make reports, including the reports concerning financial statements pursuant to Section 5.3(b) and pursuant to the Continuing Disclosure Agreement;

(iii)    Promptly upon knowledge of a Loan Default Event or an Event of Default, a written notice of such Loan Default Event or Event of Default, as applicable, such notice to include a description of the nature of such event and what steps are being taken to remedy such Loan Default Event or Event of Default, as applicable; and

(iv)    On or before December 15 of each year during which any of the Bonds are Outstanding, (i) a written disclosure of any significant change known to the Borrower which would adversely impact the Trustee's ability to perform its duties under the Indenture, or of any conflicts which may result because of other business dealings between the Trustee and the Borrower, and (ii) a representation of the Borrower that all certificates, approvals, permits and authorizations described in

21

Section 2.3(i) that are necessary for the construction, as applicable, use or operation of the Project continue in full force and effect, provided that with respect to any such certificate, approval, permit or authorization that must issue without discretion on the part of the issuer thereof, the Borrower need only disclose the absence of such certificate, approval, permit or authorization and the Borrower's plan to acquire it.

(b)    The Borrower agrees to provide the Authority and the Trustee the certificate set forth in Exhibit C hereto on each June 15, commencing June 15, 2019.

(c)    The Borrower agrees to provide to the Authority (i) on February 1 of each year an annual Certificate of Compliance II (certificate found at http://www.treasurer.ca.gov/cdlac/applications/exempt/index.asp) until such time as the Borrower has filed the Final Project Account Disbursement Certificate required by Section 3.2 hereof, and (ii) thereafter, a Certificate of Completion (certificate found at http://www.treasurer.ca.gov/cdlac/applications/exempt/index.asp), all as required by the Allocation Resolution.

(d)    Notwithstanding any other provision of this Agreement, the Borrower and the Authority may without consent of any other party agree to modify the provisions of this Section and/or Exhibit C hereafter and/or the dates for delivery of any such certificates; provided, however, that in such event, the Borrower and/or the Authority shall notify the Trustee of such amendment.

(e)    The Borrower agrees to provide CDLAC with written notice of any change in use of the Project as provided in Section 3.1(a) hereof, or any material default under the Indenture and this Agreement, including, but not limited to, such defaults associated with the Tax-exempt status of the Bonds.

(f)    Within sixty (60) days of the Authority's request, which request is to be made on or about July 1 of each year (commencing July 1, 2021), the Borrower shall provide information to the Authority needed for the Authority to comply with the reporting requirements contained in California Government Code Section 8855(k)(1). The covenant contained in this Section 5.11(f) shall remain in effect until the later of the date (i) the Bonds are no longer Outstanding or (ii) the proceeds of the Bonds have been fully spent.

SECTION 5.12.  Establishing and Preserving the Lien on Collateral; Continuation Statements. The Borrower hereby represents and warrants that:

(a)    This Agreement creates a valid and enforceable Lien on the Gross Revenues. No filing or recording of any document is required in order to establish, perfect and preserve the Lien of this Agreement other than filing in the office of the Secretary of State of the State of California (the "UCC Filing Office") of the UCC financing statements delivered by the Borrower in connection with the delivery of this Agreement. Such financing statements have been duly filed for record in the UCC Filing Office.

(b)    The Leasehold Deed of Trust creates a valid and enforceable Lien on the Borrower's leasehold interest in the Project Site and the other assets covered thereby. No filing or recording of any document is required in order to establish, perfect and preserve the Lien of the Leasehold Deed of Trust other than (i) filing of the Leasehold Deed of Trust in the Office of the Recorder of San Bernardino County, California (the "Land Records Office") and (ii) the filing in the Land Records Office and the UCC Filing Office of the UCC financing statements delivered by the Borrower in connection with the delivery of the Leasehold Deed of Trust. The Leasehold Deed of Trust has been duly filed for record in the Land Records Office, and such UCC financing statements have been duly filed for record in the Land Records Office and the UCC Filing Office.

(c)       Each of the Security Documents creates a valid and enforceable Lien on the assets covered thereby. Except as provided in Section 5.12(b) in respect of the Leasehold Deed of Trust, no filing or recording of any document is required in order to establish, perfect and preserve the Liens of such Security Documents other than filing in the UCC Filing Office of the UCC financing statements delivered by the Borrower in connection with the delivery of the Security Documents. Such financing statements have been duly filed for record in the UCC Filing Office.

(d)       As of the date of delivery of each of the Loan Documents, there is no Lien on the Gross Revenues, the Project or the Borrower's leasehold interest in the Project Site other than Permitted Liens.

(e)       The Borrower hereby agrees to file or cause to be filed all financing and continuation statements required to be filed relating to the Bonds and their security and provide copies of such filings to the Trustee. In addition, the Borrower, on demand, will execute and deliver and hereby authorizes the Trustee to execute in the name of the Borrower or without the signature of the Borrower to the extent the Trustee may lawfully do so, one or more financing statements, continuation statements, chattel mortgages, deeds of trust or other instruments, to evidence more effectively the security interest of Trustee and the Bondholders in the property subject to the lien of the Indenture.

SECTION 5.13.  Capital Replacement Fund. By May 25th and November 25th of each year, commencing with November 25, 2021, the Borrower agrees to pay to the Trustee, for deposit into the Capital Replacement Fund, an amount equal to the greater of (i) $190,000 or (ii) such amount as the Independent Consultant may determine, in a physical needs assessment of the Project conducted within ninety (90) days of each of the fifth (5th) and tenth (10th)  anniversaries of the Date of Delivery, to be necessary to fund adequately all budgeted capital repairs and replacements for the Facility.

SECTION 5.14.  Continuing Disclosure.

(a)       The Borrower hereby covenants and agrees to execute, deliver and comply with the Continuing Disclosure Agreement. In addition to any remedies which may be provided under Section 7.2 for failure to comply with this Section, the Trustee may, and at the written request of the Holders of at least twenty-five percent (25%) in aggregate principal amount of the Bonds then Outstanding, shall, but only to the extent indemnified to its satisfaction as provided in the Indenture, or any Bondholder or Beneficial Owner of the Bonds may, take such actions as may be necessary and appropriate, including seeking mandamus or specific performance by court order, to cause the Borrower to comply with its respective obligations under the Continuing Disclosure Agreement. The Borrower acknowledges and agrees that the Authority shall have no liability with respect to these obligations.

(b)       The Borrower further agrees to send a copy to the Authority and the Trustee within seven (7) days of any disclosure (e.g., report, financial statement or reporting of significant event) made to the Municipal Securities Rulemaking Board under S.E.C. Rule 15c2-12, as it may from time to time hereafter be amended or supplemented.  Notwithstanding any other provision of this Loan Agreement, failure of the Borrower to comply with this Section 5.14 shall not be considered a Loan Default Event; however, the Authority or the Trustee may take such action as may be necessary or appropriate, including seeking mandamus or specific performance by court order, to compel the Borrower to comply with its obligation pursuant to this Section 5.14(b).

SECTION 5.15.  <u>Gross Revenue Fund</u>.

(a)    The Gross Revenue Fund shall at all times be subject to the Account Control Agreement.

(b)    Gross Revenues and amounts in the Gross Revenue Fund may be used and withdrawn by the Borrower at any time for any lawful purpose, except as hereinafter provided. In the event that

(i)    the Borrower is delinquent for more than one Business Day in the payment or required prepayment of any Loan Repayment or any similar payment with respect to Parity Debt, or

(ii)    any other Loan Default Event occurs and is continuing; then

the Trustee may notify the Authority, the Borrower and the Depository Bank of such event, and may cause the Depository Bank to transfer control of any Gross Revenue Fund to the name and credit of the Trustee in accordance with the terms of the Account Control Agreement.

(c)    Notwithstanding the transfer of control over a Gross Revenues Fund to the Trustee, the Borrower shall continue to deposit all Gross Revenues into the Gross Revenue Fund as provided in Section 4.6(a) of this Agreement until the amounts on deposit in said fund are sufficient to pay in full (or have been used to pay in full) all Loan Repayments in default and payments required with respect to Parity Debt in default and until all other Loan Default Events or events of default with respect to Parity Debt known to the Trustee shall have been cured to the satisfaction of the Trustee or provision deemed by the Trustee to be adequate shall have been made therefor, whereupon the Gross Revenue Fund (except for the Gross Revenues required to make such payments or cure such defaults) shall be transferred by the Trustee back to the name and credit of the Borrower within ten (10) Business Days.

(d)    During any period that the Gross Revenue Fund is held in the name and to the credit of the Trustee, the Trustee shall use and withdraw from time to time amounts in said fund to make Loan Repayments and the other payments required of the Borrower under this Agreement or with respect to any Parity Debt as such payments become due (whether by maturity, prepayment, acceleration or otherwise), and, if such amounts shall not be sufficient to pay in full all such payments due on any date, then to the payment of Loan Repayments and debt service on such Parity Debt, ratably, according to the amounts due respectively for Loan Repayments and such debt service, without any discrimination or preference, and to such other payments in the order which the Trustee, in its sole discretion, shall determine to be in the best interests of the holders of the Bonds and such Parity Debt, without discrimination or preference.

(e)    During any period that the Gross Revenue Fund is held in the name and to the credit of the Trustee, the Borrower shall not be entitled to use or withdraw any of the Gross Revenues unless (and then only to the extent that) the Trustee, in its sole discretion, so directs for the payment of current or past due operating expenses of the Borrower. The Borrower shall execute and deliver all instruments as may be required to implement this Section.

(f)    The Borrower further agrees that a failure to comply with the terms of this Section shall cause irreparable harm to the holders from time to time of the Bonds and of Parity Debt, and shall entitle the Trustee, with or without notice to the Borrower, to take immediate action to compel the specific performance of the obligations of the Borrower as provided in this Section.

SECTION 5.16.  Changes to the Project. The Borrower shall not make any changes to the Project or to the operation thereof which would affect the qualification of the Project under the Act or impair the exemption from federal income taxation of the interest on the Bonds.

SECTION 5.17.  Restrictions on Creation of Liens; Disposition of Gross Revenues. The Borrower covenants that it will not create, assume, incur or suffer to be created, assumed or incurred any liens on the Facility or any of its revenues (other than Permitted Liens). The Borrower will not sell, factor or otherwise dispose of more than $5,000,000 in accounts receivable or similar contract rights constituting part of the Gross Revenues in any Fiscal Year.

SECTION 5.18.  Financial Covenants

(a)    Days Cash on Hand.

(i)    The Borrower shall manage its business such that Days Cash on Hand, commencing with the Fiscal Year ending December 31, 2021, will not be less than thirty (30) Days Cash on Hand for such Fiscal Year and, commencing with the Fiscal Year ending December 31, 2022 (and for each Fiscal Year thereafter), will not be less than sixty (60) Days Cash on Hand for such Fiscal Year (the "Days Cash on Hand Requirement").

(ii)    The determination of each component of the Days Cash on Hand calculation, including operating expenses, shall be made by the Borrower's independent certified public accountant utilizing the last audited annual financial statements of the Borrower and a detailed summary of such calculation shall be included as supplementary information in the Borrower's Audited Financial Statements.

(iii)    If, as of the end of any Fiscal Year, commencing with the Fiscal Year ending December 31, 2021, Days Cash on Hand is less than the Days Cash on Hand Requirement applicable to such concluded Fiscal Year, the Borrower shall, within thirty (30) calendar days of the receipt of the Borrower's Audited Financial Statements for such concluded Fiscal Year, propose the retention of an Independent Consultant to provide to the Borrower, the Authority, the Trustee and the Holders a report that shall contain recommendations to increase Days Cash on Hand for the current Fiscal Year to the level required to meet the Days Cash on Hand Requirement for such current Fiscal Year or, if in the opinion of the Independent Consultant the attainment of such level is impracticable for such current Fiscal Year, the report shall contain recommendations to increase Days Cash on Hand to the highest level attainable for such current Fiscal Year and an estimate of the number of Fiscal Years required to return Days Cash on Hand to a level that meets the Days Cash on Hand Requirement.

The Borrower shall provide notice of the proposed retention of an Independent Consultant to the Authority and the Trustee (and the Trustee shall notify the Bondholders) at least forty-five (45) calendar days prior to formal engagement, which notice shall specify the identity of the Independent Consultant proposed to be retained by the Borrower.  If within forty-five (45) calendar days of the provision of such notice the Holders of a majority in aggregate principal amount of the Bonds then Outstanding notify the Trustee in writing that they object to the retention of such Independent Consultant, then such Independent Consultant shall not be retained by the Borrower and the Borrower shall provide notice of the proposed retention of a different Independent Consultant in the same manner.  The process shall continue until the Borrower has proposed retention of an Independent Consultant that is not objected to by the Holders of a majority in aggregate principal amount of the Bonds then Outstanding.

Notwithstanding the foregoing, if either (A) the Borrower complies with each of the recommendations set forth in the report of the Independent Consultant but is nonetheless unable to increase

25

Days Cash on Hand to the levels anticipated in the report, or (B) the Days Cash on Hand for the next Fiscal Year falls below thirty (30), then the Holders of a majority in aggregate principal amount of the Bonds then Outstanding shall have the right to (1) appoint their own Independent Consultant to replace the Independent Consultant chosen by the Borrower, (2) remove any entity engaged by the Borrower to provide services relating to management of the Project (including any counterparty of the Borrower under the Technical Services Agreement or the O&M Agreement) (a "Project Manager") if the Independent Consultant's report identifies such Project Manager as a material cause of the Borrower's failure to comply with the Days Cash on Hand Requirement, or (3) notwithstanding the provisions of Section 5.18(c), direct the Borrower to suspend payment of any fees to any Project Manager that are in excess of the fair market value of the services provided by such Project Manager (if and to the extent such fair market value is identified in the Independent Consultant's report) until such time as the Borrower demonstrates compliance with the Days Cash on Hand Requirement. In the event that a Project Manager is either (i) removed pursuant to subclause (2) above or (ii) the agreement between such Project Manager and the Borrower is terminated following the application of subclause (3) above, the replacement Project Manager shall be subject to the prior consent of the Holders of a majority in aggregate principal amount of the Bonds then Outstanding.

(iv)     The Borrower agrees to transmit a copy of the report of the Independent Consultant to the Authority, the Trustee and the Bondholders within five (5) days of the Borrower's receipt thereof. The Borrower shall, promptly upon its receipt of such report, take such action as shall be in substantial conformity with the recommendations contained therein.

(v)     If the Borrower retains and substantially complies with the recommendations of the Independent Consultant, the Borrower will be deemed to have complied with the covenants set forth in this Section 5.18(a) for the concluded Fiscal Year tested pursuant to 5.18(a)(iii), notwithstanding that Days Cash on Hand was less than the Days Cash on Hand Requirement for such concluded Fiscal Year. Notwithstanding the foregoing, the Borrower shall not be excused from taking any action or performing any duty required under this Agreement and no other Loan Default Event shall be waived by the operation of the provisions of this subsection (a)(v).

(vi)     Notwithstanding the other provisions of this Section 5.18(a), a Loan Default Event shall exist and be continuing if the Borrower's Days Cash on Hand is less than thirty (30) Days Cash on Hand.

(b)     <u>Debt Service Coverage</u>.

(i)     The Borrower shall produce sufficient annual Gross Revenues in order to provide a Debt Service Coverage Ratio for each Fiscal Year equal to at least: (i) for the Fiscal Year ended December 31, 2021, one hundred ten percent (110%) with respect to the Bonds and all Parity Debt, and, commencing with the Fiscal Year ended December 31, 2022 and for each Fiscal Year thereafter, one hundred twenty-five percent (125%) with respect to the Bonds and all Parity Debt (the "Parity Coverage Requirement"); and (ii) for the Fiscal Year ended December 31, 2021, one hundred five percent (105%) with respect to all Indebtedness of the Borrower, and, commencing with the Fiscal Year ended December 31, 2022 and for each Fiscal Year thereafter, one hundred fifteen percent (115%) with respect to all Indebtedness of the Borrower (the "Overall Coverage Requirement" and, together with the Parity Coverage Requirement, the "Coverage Requirement"), which ratio shall be calculated as of the end of such Fiscal Year, based upon the Borrower's Audited Financial Statements for such Fiscal Year. Solely for purposes of determining compliance with Section 5.18(b), the calculation of EBITDA shall include capital contributions to Borrower by its members, if any, so long as any such contributions are clearly identified in such Borrower's Audited Financial Statements.

(ii)     If for any Fiscal Year commencing with the Fiscal Year ended December 31, 2021, the Borrower fails to comply with the Coverage Requirement applicable to such concluded Fiscal Year, the Borrower shall, within thirty (30) calendar days of the receipt of the Borrower's Audited Financial Statements for such concluded Fiscal Year, propose the retention of an Independent Consultant to provide to the Borrower, the Authority, the Trustee and the Holders a report that shall contain recommendations to increase EBITDA for the current Fiscal Year to the level required to meet the Coverage Requirement for the current Fiscal Year or, if in the opinion of the Independent Consultant the attainment of such level is impracticable for the current Fiscal Year, the report shall contain recommendations increase EBITDA to the highest level attainable for such current Fiscal Year and an estimate of the number of Fiscal Years required to return the Borrower to compliance with the Coverage Requirement.

The Borrower shall provide notice of the proposed retention of an Independent Consultant to the Authority and the Trustee (and the Trustee shall notify the Bondholders) at least forty-five (45) calendar days prior to formal engagement, which notice shall specify the identity of the Independent Consultant proposed to be retained by the Borrower.  If within forty-five (45) calendar days of the provision of such notice the Holders of a majority in aggregate principal amount of the Bonds then Outstanding notify the Trustee in writing that they object to the retention of such Independent Consultant, then such Independent Consultant shall not be retained by the Borrower and the Borrower shall provide notice of the proposed retention of a different Independent Consultant in the same manner.  The process shall continue until the Borrower has proposed retention of an Independent Consultant that is not objected to by the Holders of a majority in aggregate principal amount of the Bonds then Outstanding.

Notwithstanding the foregoing, if either (A) the Borrower complies with each of the recommendations set forth in the report of the Independent Consultant but is nonetheless unable to increase EBITDA to the levels anticipated in the report, or (B) the Debt Service Coverage Ratio for the next Fiscal Year falls below 1.15 with respect to the Bonds and all Parity Debt, then the Holders of a majority in aggregate principal amount of the Bonds then Outstanding shall have the right to (1) appoint their own Independent Consultant to replace the Independent Consultant chosen by the Borrower, (2) remove any Project Manager if the Independent Consultant's report identifies such Project Manager as a material cause of the Borrower's failure to comply with the Coverage Requirement, or (3) notwithstanding the provisions of Section 5.18(c), direct the Borrower to suspend payment of any fees to any Project Manager that are in excess of the fair market value of the services provided by such Project Manager (if and to the extent such fair market value is identified in the Independent Consultant's report) until such time as the Borrower demonstrates compliance with the Coverage Requirement. In the event that either (i) a Project Manager is removed pursuant to subclause (2) above or (ii) the agreement between such Project Manager and the Borrower is terminated following the application of subclause (3) above, the replacement Project Manager shall be subject to the prior consent of the Holders of a majority in aggregate principal amount of the Bonds then Outstanding.

(iii)     The Borrower agrees to transmit a copy of the report of the Independent Consultant to the Authority, the Trustee and the Bondholders within five (5) days of the Borrower's receipt thereof. The Borrower shall, promptly upon its receipt of such report, take such action as shall be in substantial conformity with the recommendations contained therein.

(iv)     If the Borrower retains and substantially complies with the recommendations of the Independent Consultant, the Borrower will be deemed to have complied with the covenants set forth in this Section 5.18(b) for the concluded Fiscal Year tested pursuant to Section 5.18(b)(ii), notwithstanding that the Coverage Requirement was not met for such concluded Fiscal Year. Notwithstanding the foregoing, the Borrower shall not be excused from taking any action or performing any duty required under this Agreement or the Indenture and no other Loan Default Event shall be waived by the operation of the provisions of this subsection (b)(iv).

(v)    Notwithstanding the other provisions of this Section 5.18(b), a Loan Default Event shall exist if the Debt Service Coverage Ratio for any Fiscal Year, commencing with the Fiscal Year ending December 31, 2021, is less than (i) one hundred five percent (105%) with respect to the Bonds and all Parity Debt or (ii) one hundred percent (100%) with respect to all Indebtedness of the Borrower.

(c)    <u>Distributions</u>. Prior to and during the Fiscal Year ending December 31, 2022, the Borrower shall not make distributions on any of its membership interests, with the exception of tax distributions to equity members of the Borrower to pay federal, state and local income taxes attributable to such equity members as a result of his, her or its direct or indirect ownership of the Borrower, which shall be calculated by an independent certified public accountant, for such Fiscal Year, nor make any Additional Debt Payments (as defined in Section 5.18(e) below).  Thereafter, the Borrower shall not make distributions on any of its membership interests, with the exception of tax distributions thereon, nor any Additional Debt Payments, unless all of the following are met:

(i)    with respect to the Fiscal Year prior to the date on which distributions and/or Additional Debt Payments are to be made, the Borrower has met or exceeded the Days Cash on Hand Requirement and (without including any capital contributions to Borrower from its members for purposes of calculating EBITDA) each component of the Coverage Requirement applicable to such prior Fiscal Year;

(ii)    no event has occurred and no condition exists which would constitute a Loan Default Event under this Agreement or which, with the passing of time or with the giving of notice or both, would become such a Loan Default Event;

(iii)    the Borrower has made the required deposits under Section 5.13;

(iv)    there shall remain, following any such distributions and/or Additional Debt Payments, no less than sixty (60) Days Cash on Hand (to be calculated using the applicable Borrower Expenses (as defined in Section 5.18(f) below) reflected in the Borrower's annual budget for the current Fiscal Year); and

(v)    Borrower Expenses have not exceeded and are not projected to exceed the total amount reflected in the Borrower's annual budget for the current Fiscal Year.

Notwithstanding anything to the contrary contained in this subsection 5.18(c), the Borrower shall be permitted to pay and/or reimburse any of its members and affiliates for development, service and operation and maintenance fees payable to such member or affiliate and/or current operating expenses incurred or to be incurred by such member or affiliate on the Borrower's behalf, including, without limitation, management and services fees to cover administrative salaries and benefits for personnel working for the Borrower, and sales, marketing, legal and accounting expenses relating to the Project, provided that (i) such payments and reimbursements are reflected in the Borrower's annual budget for the current Fiscal Year and (ii) no such payment or reimbursement shall exceed the amount specified therefor in such budget.

(d)    <u>Additional Parity Indebtedness</u>. The Borrower shall not issue or incur additional Indebtedness on a parity with the obligations of the Borrower under this Agreement unless the Borrower satisfies all of the following conditions:

(i)    the Borrower shall file with the Authority and the Trustee:

(A) a certificate of an Authorized Representative of the Borrower demonstrating that, based on the Borrower's last audited Fiscal Year, the Borrower can meet or exceed (without including any capital contributions to Borrower from its members for purposes of calculating EBITDA) the Parity Coverage Requirement when taking into account the debt service on the proposed parity debt, or

(B) a certificate of an Independent Consultant that the Borrower's Debt Service Coverage Ratio for each of the next five (5) Fiscal Years following the earlier of (A) the end of the period during which interest on the proposed parity debt is to be capitalized or, if no interest is capitalized, the Fiscal Year in which the proposed parity debt is to be incurred, or (B) the date on which substantially all projects financed with the proposed parity debt and all projects financed with existing Parity Debt are expected to commence operations, will be at least equal to one hundred fifty percent (150%) with respect to the Bonds, all existing Parity Debt and all proposed parity debt for such period; provided, that for the purpose of providing this Independent Consultant's report, the Independent Consultant may adjust the foregoing estimated Debt Service Coverage Ratio to reflect: (1) an allowance for EBITDA that is estimated to be derived from any increase in the rates, fees and charges for contracts in effect and being charged or from any increase in the rates, fees and charges that are expected to be charged; and (2) an allowance for revenues that are estimated to be derived from customers anticipated to be served by the additions, betterments or improvements to be financed by the proposed parity debt;

(ii) a Certificate by an officer of the Borrower that the project to be acquired and constructed with the proceeds of such proposed parity debt is technically feasible and the estimated cost of the acquisition and construction thereof is reasonable, and (after giving effect to the completion of all uncompleted projects) the rates, fees and charges estimated to be fixed and prescribed for the operation of the Project for each Fiscal Year from the Fiscal Year in which such proposed parity debt is to be incurred to and including the first complete Fiscal Year after the latest commencement date of operation of any uncompleted project are economically feasible and reasonably considered necessary based on projected operations for such period, and stating that, to the best of such officer's knowledge, the assumptions contained in the forecast/projection of the Independent Consultant are reasonable;

(iii) At the time of such incurrence of the proposed parity debt, no Event of Default or Loan Default Event shall have occurred and be continuing; and

(iv) Upon the issuance of such proposed parity debt, a reserve account shall be established for such proposed parity debt and funded in an amount that, together with the amount then held in the Debt Service Reserve Fund and the amounts then held in any reserve funds for existing Parity Debt, is sufficient to satisfy the Reserve Requirement.

(e) <u>Other Indebtedness</u>.  Notwithstanding the provisions of Section 5.18(d), (i) the Borrower may incur additional Short-Term Indebtedness, Subordinate Debt and Contingent Debt Liabilities for working capital purposes as in its judgment is deemed expedient, provided that in no event will the Borrower incur such additional Indebtedness to the extent that such incurrence would cause the Borrower to fail to comply with the Overall Coverage Requirement, when taking into consideration EBITDA (without including any capital contributions to Borrower from its members for purposes of calculating EBITDA) and debt service on existing Indebtedness for the Fiscal Year prior to the date such additional Indebtedness will be incurred, and (ii) the Borrower may incur Nonrecourse Indebtedness and additional Subordinate Debt not otherwise permitted by subclause (i) of this paragraph, provided that payments of debt service in respect of such Nonrecourse Indebtedness or additional Subordinate Debt (collectively, "Additional Debt Payments") shall be made solely as permitted by Section 5.18(c).

The Borrower covenants that, except as specifically permitted by this Agreement, it will not (A) incur additional Indebtedness or (B) create, assume, incur or suffer to be created, assumed or incurred any liens on the Facility or any of its revenues (other than Permitted Liens).

(f)    _Annual Budgets_. By the 15th day of the last month of each Fiscal Year, commencing with December 15, 2020, the Borrower shall submit to the Trustee an annual budget for the Project for the next Fiscal Year, in each case showing estimated revenues, operating expenses (including maintenance requirements), debt service (including Additional Debt Payments) and capital requirements (collectively, "Borrower Expenses") for such next Fiscal Year.

SECTION 5.19.  _ERISA_.

(a)    The Borrower will not, with respect to any ERISA Plan:

(1)    incur any "accumulated funding deficiency," as such term is defined in Section 412 of the Code, whether or not waived, if the amount of such accumulated funding deficiency, plus any accumulated funding deficiencies previously incurred with respect to such ERISA Plan and not eliminated, would aggregate more than $100,000; provided that the incurring of such an accumulated funding deficiency will not be a Loan Default Event under Section 7.1 hereof if it is reduced below $100,000 or eliminated within ninety (90) days after the date upon which the Borrower becomes aware of such accumulated funding deficiency; or

(2)    terminate any such ERISA Plan in a manner which could result in the imposition of a material lien on the property of the Borrower pursuant to Section 4068 of ERISA and which could materially adversely affect the business, earnings, properties or financial condition of the Borrower; or

(3)    withdraw from a Multiemployer Plan in a "complete withdrawal" or a "partial withdrawal" as defined in Sections 4203(a) and 4205(a), respectively, of ERISA, if such withdrawal could materially adversely affect the Borrower's ability to comply at any time with any of the provisions of this Agreement.

(b)    The Borrower will:

(1)    fund all current and past service pension liabilities under the provisions of all ERISA Plans such that if all such ERISA Plans were terminated at the same time by the Borrower any liens imposed on the Borrower under Section 4068 of ERISA would not be in an amount in the aggregate which would materially affect the Borrower's ability to comply at any time with any of the provisions of this Agreement; and

(2)    otherwise comply in all material respects with the provisions applicable to its ERISA Plans contained in ERISA, the Code and the regulations published thereunder; and

(3)    notify the Authority and the Trustee promptly after the Borrower knows or has reason to know (i) of the happening of any material Reportable Event with respect to any ERISA Plan and, in any event, at least five (5) days prior to any notification of such material Reportable Event given to the PBGC pursuant to the terms of Section 4043 of ERISA or (ii) of an assessment against the Borrower or any Common Control Entity of any withdrawal liability to a Multiemployer Plan. Notwithstanding anything herein to the

30

contrary, the Borrower need not notify the Authority or the Trustee of such material Reportable Event or withdrawal liability unless it might materially adversely affect the business, prospects, earnings, properties or condition (financial or otherwise) of the Borrower.

SECTION 5.20.  Financial Product Agreements. The Borrower represents and warrants that it shall only enter into a Financial Product Agreement with the consent of the Holders of a majority in aggregate principal amount of the Bonds then Outstanding. The Holders may withhold any consent under this Section in their sole and absolute discretion.

SECTION 5.21.  Competition. The Borrower will not acquire, construct, maintain or operate any facilities competitive with the Project until such time as the Project meets its commercial acceptance tests under its applicable construction contracts.

SECTION 5.22. Green Bonds. The Borrower hereby represents and certifies that the Project is consistent with California's environmental objectives and the Green Bond Principles developed by the International Capital Market Association (the "Green Bond Principles"), as set forth in the Green Bond Opinion Letter prepared by Harris Group Inc. On an annual basis, prior to or concurrently with the delivery of the certificate required under Section 5.11(a)(ii), the Borrower shall deliver a written report to the Authority, with a copy to the Trustee and the Bondholders, that provides an overview of the Project, including (i) identification of Bond proceeds allocated to portions of the Project that constitute an eligible green project under the Green Bond Principles, until such time as the Borrower has filed the Final Project Account Disbursement Certificate required by Section 3.2 hereof, (ii) identification of the amount and use of Bond proceeds not so allocated, until such time as the Borrower has filed the Final Project Account Disbursement Certificate required by Section 3.2 hereof, and (iii) environmental impact reporting using quantitative and qualitative performance indicators, which indicators shall include, at a minimum, (A) renewable electricity produced by the Project, (B) renewable natural gas produced by the Project and (C) tons of organics diverted from landfills due to operation of the Project.  The Final Project Account Disbursement Certificate filed by the Borrower pursuant to Section 3.2 shall report the amount of Bond proceeds spent on eligible green projects under the Green Bond Principles, and the amount and use of Bond proceeds that were not spent on such projects.

SECTION 5.23. Project Documents and Project Revenue Generating Agreements.

(a)    Without limiting the requirements of Section 5.2, the Borrower shall not terminate, assign (other than the collateral assignments under the Security Documents or as otherwise expressly permitted by the Loan Documents), or materially amend or modify, or waive timely performance by the other party of material covenants under, any of the Material Project Documents or any Material Project Revenue Generating Agreements, unless: (i) in the case of a termination, either (A) such termination is not expected to have a Material Adverse Effect, as determined by the Borrower, or (B) a binding replacement contract is entered into within a reasonable time prior to such termination that provides for substantially similar terms to those of the contract being replaced or terms that are reasonably available to the Borrower at the time of such replacement and are not expected to have a Material Adverse Effect, as determined by the Borrower; or (ii) in the case of an amendment, modification or waiver, if such amendment, modification or waiver could not reasonably be expected to result in a Material Adverse Effect, as determined by the Borrower, and is in compliance with Sections 5.23(c) or (d), as applicable.

(b)    With respect to each Material Project Document and Material Project Revenue Generating Agreement entered into subsequent to the execution hereof, the Borrower covenants and agrees that it shall cause to be executed a collateral assignment in a form and

substance substantially similar to the Collateral Assignments of Offtake Agreements or the Collateral Assignments of Feedstock Agreements (in each case including the respective consent to assignment exhibits).

(c)    Without the consent of or notice to the Holders, but subject to any other specific limitations set forth in the Loan Documents, the Borrower (and the other parties thereto) may modify, alter, amend, or supplement a Project Document or Project Revenue Generating Agreement, and the Trustee, subject to the provisions of the Indenture, may consent thereto, solely (a) as may be required by the provisions of the Project Document or the Project Revenue Generating Agreement, as applicable, and the Loan Documents, (b) for the purpose of curing any formal defect, omission, inconsistency or ambiguity therein, or (c) in connection with any other change therein that is not reasonably expected to have a Material Adverse Effect, as determined by the Borrower.

(d)    Except in the case of modifications, alterations, amendments or supplements referred to in Subsection 5.23(c) hereof, the Borrower shall not permit or enter into any amendment, change, modification or supplement, and the Trustee shall not consent to any amendment, change, modification or supplement, of any Material Project Document or any Material Project Revenue Generating Agreement without the prior written consent of the Holders of a majority in aggregate principal amount of the Bonds then Outstanding, not to be unreasonably withheld, conditioned, or delayed.  If at any time the Borrower shall request the consent of the Trustee to any such proposed modification, alteration, amendment or supplement, the Trustee shall cause notice thereof to be given to the Holders.  Such notice shall briefly set forth the nature of such proposed modification, alteration, amendment or supplement and shall state that copies of the instrument embodying the same are on file at the Corporate Trust Office of the Trustee for inspection by all Holders.

SECTION 5.24. Grant Revenues. Upon receipt of any grant funds, the Borrower agrees to promptly pay such funds over to the Trustee for deposit into the Grant Subaccount of the Project Fund.

SECTION 5.25. Data Availability. The Borrower shall maintain the Data Room while and so long as the Bonds remain Outstanding.  The Borrower shall provide access to the Data Room to the Trustee and, upon request, any Holder, Beneficial Owner and prospective Holder or Beneficial Owner, provided that the Borrower shall not be obligated to provide such access to any Person unless such Person (A) has executed a nondisclosure agreement in a form and substance acceptable to Borrower in its reasonable discretion and (B) is not a competitor in respect of the Borrower or the Project, as determined by the Borrower in its reasonable discretion. Additionally, the Borrower shall be under no obligation to update or supplement the Data Room after the Date of Delivery. For purposes of this Section 5.25, the term "Data Room" shall mean the agreements, reports, projections and other information compiled by the Borrower and made available to prospective purchasers of the Bonds pursuant to a centralized electronic database as of the Date of Delivery, and following the Date of Delivery, made available at such other location and/or in such other format (electronic or otherwise) or manner that the Borrower may determine from time to time.

## ARTICLE VI
## DAMAGE, DESTRUCTION AND CONDEMNATION; USE OF PROCEEDS

SECTION 6.1.  Obligation to Continue Payments.  If prior to full payment of the Bonds (or provision for payment thereof in accordance with the provisions of the Indenture) (a) the Project or any portion thereof is damaged or destroyed by fire or other casualty, or (b) title to, or the temporary use of, the Project or any portion thereof shall be condemned or taken under the exercise of the power of eminent domain by any governmental body or by any Person acting under governmental authority, the Borrower

shall nevertheless be obligated to continue to pay the amounts specified in this Agreement, to the extent not prepaid in accordance with this Agreement.

SECTION 6.2.  Application of Net Proceeds.  The Borrower shall be entitled to the Net Proceeds, if any, of any insurance or condemnation awards resulting from the damage, destruction, condemnation or taking of the Project or any portion thereof.  All Net Proceeds shall be deposited by the Borrower in an escrow account administered by the Trustee and shall be applied, with written notice provided to the Authority and the Trustee, in one or more of the following ways at the election of the Borrower:

(a)    The prompt repair, restoration, relocation, modification or improvement of the stage of completion of construction of the damaged, destroyed, condemned or taken portion of the Project to enable (i) such portion of the Project to accomplish at least the same function as such portion of the Project was designed to accomplish prior to such damage or destruction or exercise of such power of eminent domain and (ii) the Project as a whole to generate Gross Revenues and EBITDA, respectively, in amounts equal to or exceeding the lesser of (A) the amounts of Gross Revenues and EBITDA generated by the Project prior to such damage, destruction or condemnation or (B) the amounts of Gross Revenues and EBITDA required to reasonably assure ongoing compliance with the Coverage Requirement and the Days Cash on Hand Requirement. Any balance of the Net Proceeds remaining after such work has been completed shall be deposited in the Revenue Fund to be applied to the payment of principal of and premium, if any, and interest on the Bonds, or, if the Bonds have been fully paid (or provision for payment thereof has been made in accordance with the provisions of the Indenture), any balance remaining in the Revenue Fund to be applied as provided in Section 10.01 of the Indenture.

(b)    Prepayment of all or a portion of the amounts payable hereunder, in accordance with Article VIII hereof, to cause the redemption of Bonds in accordance with Section 4.01(5) of the Indenture; provided, however, that Net Proceeds shall not be applied for such purpose unless:  (1) all of the amounts payable under this Loan Agreement are so prepaid and all Outstanding Bonds are to be redeemed in accordance with the Indenture, or (2) in the event that less than all of the amounts payable hereunder are so prepaid, the Borrower shall furnish to the Authority and the Trustee a Certificate of the Borrower acceptable to the Authority and the Trustee providing that (i) the property forming part of the portion of the Project that was so damaged or destroyed by casualty or was taken or condemned is not essential to the Borrower's use or possession of such portion of the Project, or (ii) the property forming part of the portion of the Project that was so damaged or destroyed by casualty or was taken or condemned has been repaired, replaced, restored, relocated, modified or improved to enable such portion of the Project to accomplish at least the same function as such portion of the Project was designed to accomplish prior to such damage or destruction or such taking or condemnation.

SECTION 6.3.  Insufficiency of Net Proceeds.  If (a) the Project or a portion thereof is to be repaired, replaced, restored, relocated, modified or improved under this article, and (b) the Net Proceeds are insufficient to pay in full the cost of such repair, restoration, replacement, relocation, modification or improvement, then the Borrower shall nonetheless complete the work to repair, replace, restore, relocate, modify or improve the Project or such portion thereof, or cause such work to be completed, and shall pay or cause to be paid any cost in connection therewith in excess of the amount of the Net Proceeds held in escrow.

SECTION 6.4.  Damage to or Condemnation of Other Property.  The Borrower shall be entitled to the net proceeds of any insurance or condemnation award or portion thereof made for damages to or takings of its property not included in or part of the Project and the use by the Borrower of such net proceeds shall not be subject to the Borrower's obligations under this Loan Agreement.

## ARTICLE VII
## LOAN DEFAULT EVENTS AND REMEDIES

SECTION 7.1.  <u>Loan Default Events</u>. Any one of the following which occurs and continues shall constitute a Loan Default Event:

(a)      failure of the Borrower to make any payment required by Section 4.2(a) hereof when due, unless such payment is paid by the Guarantor before payment is due; or

(b)      failure of the Borrower to comply with the covenants contained in Section 5.2, Section 5.8, Section 5.12, Section 5.13, Section 5.15, Section 5.17, Section 5.18 or Section 5.20; or

(c)      failure of the Borrower to observe and perform any covenant, condition or agreement on its part required to be observed or performed by this Loan Agreement, other than as provided in subsections (a) or (b) of this Section, which continues for a period of thirty (30) days after written notice delivered to the Borrower by the Authority or the Trustee and which notice shall specify such failure and request that it be remedied, unless the Authority and the Trustee shall agree in writing to an extension of such time; provided, however, that if the failure stated in the notice cannot be corrected within such period, the Authority and the Trustee will not unreasonably withhold their consent to an extension of such time if corrective action is instituted within such period and diligently pursued until the default is corrected; or

(d)      existence of an Event of Default under the Indenture or a default or event of default under any of the Loan Documents (including, without limitation, the Guaranty Agreement) or the Project Documents; or

(e)      existence of a default or event of default under any Project Revenue Generating Agreement, the termination or cancellation of which would have a material adverse effect on the Borrower's ability to satisfy the financial covenants set forth in Section 5.18; or

(f)      any representation or warranty of the Borrower set forth in Section 2.3 of this Loan Agreement at the time made or deemed made is false in any material respect; or

(g)      an Act of Bankruptcy of the Borrower or (so long as the Guaranty Agreement is in effect) the Guarantor; or

(h)      payment of any installment of interest or principal, or any premium, on any Parity Debt shall not be made when the same shall become due and payable; or

(i)      the existence of any additional Event of Default specified in a Supplemental Indenture; or

(j)      any judgment, writ or warrant of attachment or of any similar process shall be entered or filed against the Borrower or (so long as the Guaranty Agreement is in effect) the Guarantor or against any property of the Borrower or (so long as the Guaranty Agreement is in effect) the Guarantor and remains unvacated, unpaid, unbonded, unstayed or uncontested in good faith for a period of thirty (30) days; provided, however, that none of the foregoing shall constitute a Loan Default Event unless the amount of such judgment, writ, warrant of attachment or similar process, together with the amount of all other such judgments, writs, warrants or similar processes so unvacated, unpaid, unbonded, unstayed or uncontested, exceeds $1,000,000.

The provisions of subsection (c) of this Section are subject to the limitation that the Borrower shall not be deemed in default if, and so long as, the Borrower is unable to carry out its agreements hereunder by reason of strikes, lockouts or other industrial disturbances; acts of public enemies; orders of any kind of the government of the United States or of the State of California or any of their departments, agencies, or officials, or any civil or military authority; insurrections, riots, epidemics, landslides; lightning; earthquake; fire; hurricanes; storms; floods; washouts; droughts; arrests; restraint of government and people; civil disturbances; wars; acts of terrorism; explosions; breakage or accident to machinery, transmission pipes or canals; partial or entire failure of utilities; or any other cause or event not reasonably within the control of the Borrower; it being agreed that the settlement of strikes, lockouts and other industrial disturbances shall be entirely within the discretion of the Borrower and the Borrower shall not be required to make settlement of strikes, lockouts and other industrial disturbances by acceding to the demands of the opposing party or parties when such course is, in the judgment of the Borrower, unfavorable to the Borrower. This limitation shall not apply to any default under subsections (a), (b), (d), (e), (f), (g), (h), (i) or (j) of this Section.

SECTION 7.2.  <u>Remedies on Default</u>. Subject to Section 7.1(c) hereof (if applicable), whenever any Loan Default Event shall have occurred and shall be continuing,

(a)     The Trustee, by written notice to the Authority and the Borrower and (so long as the Guaranty Agreement is in effect) the Guarantor, may declare the unpaid balance of the loan payable under Section 4.2(a) of this Loan Agreement to be due and payable immediately, provided that concurrently with or prior to such notice the unpaid principal amount of the Bonds shall have been declared to be due and payable under the Indenture. Upon any such declaration, such amount shall become and shall be immediately due and payable as determined in accordance with Section 7.01 of the Indenture.

(b)     The Trustee may exercise any right or remedy with respect to the Project or any collateral therefor provided in the Loan Documents, including without limitation the rights and remedies provided in this Agreement, in the Indenture or the rights and remedies conferred or reserved to the Trustee by the Security Documents or any other documents securing the Project Site or Facilities for the benefit of the Authority or Trustee or subjecting the Project, the Facilities or the Gross Revenues to the Lien of this Agreement.

(c)     The Trustee may have access to and may inspect, examine and make copies of the books and records and any and all accounts, data and federal income tax and other tax returns of the Borrower; provided that the Trustee shall be obligated to protect the confidentiality of such information to the extent provided by State and federal law and prevent its disclosure to the public, except to the Authority and Bondholders.

(d)     The Authority or the Trustee may take whatever other action at law or in equity as may be necessary or desirable to collect the payments and other amounts then due and thereafter to become due or to enforce performance and observance of any obligation, agreement or covenant of the Borrower under this Loan Agreement, including without limitation, appointment of a receiver of the Borrower; provided, however, that acceleration of the unpaid balance of the loan payments is not a remedy available to the Authority.

Upon the occurrence of a Loan Default Event, and upon the filing of a suit or other commencement of judicial proceedings to enforce the rights of the Authority or Trustee under this Loan Agreement, the Authority or the Trustee shall be entitled, as a matter of right, to the appointment of a receiver or receivers of the rights and properties pledged hereunder and of the revenues, issues, payments and profits thereof, pending such proceedings, with such powers as the court making such appointment shall confer. The Borrower agrees not to contest such proceedings.

In case the Trustee or the Authority shall have proceeded to enforce its rights under this Loan Agreement and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee or the Authority, then, and in every such case, the Borrower, the Trustee and the Authority shall be restored respectively to their several positions and rights hereunder, and all rights, remedies and powers of the Borrower, the Trustee and the Authority shall continue as though no such action had been taken.

The Borrower covenants that, in case a Loan Default Event shall occur with respect to the payment of any Loan Repayment payable under Section 4.2(a) hereof, then, upon demand of the Trustee, the Borrower will pay to the Trustee the whole amount that then shall have become due and payable under said Section, with interest on the amount then overdue at the Post-Default Rate. Such overdue rate shall remain in effect until such overdue amount has been paid.

In case the Borrower shall fail forthwith to pay such amounts upon such demand, the Trustee shall be entitled and empowered to institute any action or proceeding at law or in equity for the collection of the sums so due and unpaid, and may prosecute any such action or proceeding to judgment or final decree, and may enforce any such judgment or final decree against the Borrower and collect in the manner provided by law the moneys adjudged or decreed to be payable.

In case proceedings shall be pending for the bankruptcy or for the reorganization of the Borrower under the federal bankruptcy laws or any other applicable law, or in case a receiver or trustee shall have been appointed for the property of the Borrower or in the case of any other similar judicial proceedings relative to the Borrower, the creditors or property of the Borrower, then the Trustee shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount owing and unpaid pursuant to this Loan Agreement and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee allowed in such judicial proceedings relative to the Borrower, its creditors or its property, and to collect and receive any moneys or other property payable or deliverable on any such claims, and to distribute such amounts as provided in the Indenture after the deduction of its reasonable charges and expenses to the extent permitted by the Indenture. Any receiver, assignee or trustee in bankruptcy or reorganization is hereby authorized to make such payments to the Trustee and to pay to the Trustee any amount due for reasonable compensation and expenses, including reasonable expenses and fees of counsel incurred by the Trustee up to the date of such distribution.

SECTION 7.3.  Agreement to Pay Attorneys' Fees and Expenses. In the event the Borrower should default under any of the provisions of this Loan Agreement and the Trustee should employ outside attorneys or incur other expenses for the collection of the payments due under this Loan Agreement or the enforcement of performance or observance of any obligation or agreement on the part of the Borrower herein contained (other than litigation of disputes between the Authority and the Borrower hereto), the Borrower agrees to pay and indemnify the Trustee for the reasonable fees of such outside attorneys and such other reasonable expenses so incurred by the Trustee, with interest on unpaid amounts at the Post-Default Rate.

SECTION 7.4.  No Remedy Exclusive. No remedy herein conferred upon or reserved to the Authority or the Trustee is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Loan Agreement or now or hereafter existing at law or in equity or by statute. No delay or omission to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. In order to entitle the Authority or the Trustee to exercise any remedy reserved to it in this Article, it shall not be necessary to give any notice, other than such notice as may be

herein expressly required. The Trustee and the Holders of the Bonds shall be considered third party beneficiaries for the purposes of enforcing the rights of the Authority and their own respective rights.

SECTION 7.5.  <u>No Additional Waiver Implied by One Waiver</u>. In the event any agreement or covenant contained in this Loan Agreement should be breached by the Borrower and thereafter waived by the Authority or the Trustee, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder.

# ARTICLE VIII
# PREPAYMENT

SECTION 8.1.  <u>Redemption of Bonds With Prepayment Moneys</u>. By virtue of the assignment of the rights of the Authority under this Loan Agreement to the Trustee as is provided in Section 4.4 hereof, the Borrower agrees to and shall pay directly to the Trustee any amount permitted or required to be paid by it under this Article. The Trustee shall use the moneys so paid to it by the Borrower to redeem the Bonds on the date set for such redemption pursuant to Section 8.5 hereof. The Authority shall call Bonds for redemption as required by Article IV of the Indenture or as requested by the Borrower pursuant to the Indenture or this Loan Agreement.

SECTION 8.2.  <u>Options to Prepay Installments</u>. The Borrower shall have the option to prepay the amounts payable under Section 4.2(a) hereof by paying to the Trustee, for deposit in the Revenue Fund, the amount set forth in Section 8.4 hereof, under the following circumstances:

(a)      The Borrower may prepay such amounts in whole, or in part, and cause the Bonds to be redeemed in whole, or in part, at the price and time and under the conditions set forth in Sections 4.01(5) through 4.01(7) of the Indenture; or

(b)      The Borrower may prepay all or any part of the Loan Repayments and cause all or any part of the Bonds to be redeemed at the times and at the prices set forth in any Supplemental Indenture.

SECTION 8.3.  <u>Mandatory Prepayment</u>. The Borrower shall have and hereby accepts the obligation to prepay the Loan Repayments required by Section 4.2(a) of this Loan Agreement, together with interest accrued, but unpaid, thereon, to be used to redeem all or a part of the Outstanding Bonds under any of the following circumstances and in accordance with the terms of the Indenture:

(a)      the Borrower shall prepay the Loan Repayments in an amount sufficient to redeem all Bonds then Outstanding in whole in accordance with Section 4.01(2) of the Indenture if and when as a result of any changes in the Constitution of the United States of America or the California Constitution or as a result of any legislative, judicial or administrative action, this Loan Agreement shall have become void or unenforceable or impossible to perform in accordance with the intention and purposes of the parties hereto, or shall have been declared unlawful;

(b)      the Borrower shall prepay the Loan Repayments in an amount sufficient to redeem the Bonds then Outstanding in whole or in part as required by this paragraph if interest on the Bonds, or any of them, is determined not to be Tax-exempt to the Holders thereof (other than a Holder who is a "substantial user" of the Project or a "related person" within the meaning of Section 147(a) of the Code); provided, however, that the Bonds shall be redeemed (by virtue of this paragraph) in whole or in part, as applicable, solely to the extent (i) that an opinion of Bond Counsel, requested by Borrower or the Authority and addressed to the Authority and the Trustee, states that interest on the Bonds, or any of them, is not Tax-exempt or would not be Tax-exempt unless all or part of the Bonds are redeemed, (ii) that a final administrative determination of the Internal Revenue Service states that interest on the Bonds, or any of

them, is not Tax-exempt or would not be Tax-exempt unless all or part of the Bonds are redeemed, (iii) that a judicial decision of a court of competent jurisdiction, in a proceeding of which the Borrower received notice and was afforded an opportunity to participate in to the full extent permitted by law, states that interest on the Bonds, or any of them, is not Tax-exempt or would not be Tax-exempt unless all or part of the Bonds are redeemed or (iv) required under the terms of a closing agreement or other similar agreement with the Internal Revenue Service settling an issue raised in connection with an audit of the Bonds (a "Determination of Taxability");

(c)    the Borrower shall prepay Loan Repayments if and to the extent mandatory redemption is required by any Supplemental Indenture; or

(d)    upon and during the continuance of an Offtake Expiration Event, then if, as of the end of any calendar month, the Borrower has generated Excess Cash, the Borrower shall forthwith transfer from the Gross Revenue Fund, or cause the Trustee to so transfer, an amount equal to the amount of such Excess Cash to the Trustee for deposit into the Redemption Account for further application or transfer in accordance with Section 4.01(4) of the Indenture, and any and all amounts used to redeem Bonds pursuant to such Section 4.01(4) shall be credited as payments of the Loan Repayments hereunder.

The amount payable by the Borrower in the event of a prepayment required by this Section shall be determined as set forth in Section 8.4 and shall be deposited in the Revenue Fund; provided, however, that amounts transferred pursuant to Section 8.3(d) shall be deposited in the Redemption Account, as set forth above.

SECTION 8.4.  Amount of Prepayment. In the case of a prepayment of the entire amount due hereunder pursuant to Section 8.2 or 8.3 hereof, the amount to be paid shall be a sum sufficient, together with other funds and the yield on any securities deposited with the Trustee and available for such purpose, to pay (1) the principal of all Bonds Outstanding on the redemption date specified in the notice of redemption, plus interest accrued and to accrue to the payment or redemption date of the Bonds, plus premium, if any, pursuant to the Indenture, (2) all reasonable and necessary fees and expenses of the Authority, the Trustee and any paying agent accrued and to accrue through final payment of the Bonds and (3) all other liabilities of the Borrower accrued and to accrue under this Loan Agreement.

In the case of partial prepayment of the Loan Repayments, the amount payable shall be a sum sufficient, together with other funds deposited with the Trustee and available for such purpose, to pay the principal amount of and premium, if any, and accrued interest on the Bonds to be redeemed, as provided in the Indenture, and to pay expenses of redemption of such Bonds. All partial prepayments of the Loan Repayments shall be applied in inverse order of the due dates thereof.

SECTION 8.5.  Notice of Prepayment. To exercise an option granted in or to perform an obligation required by this Article, the Borrower shall give written notice, at least fifteen (15) days prior to the last day by which the Trustee is permitted to give notice of redemption pursuant to Section 4.03 of the Indenture, to the Authority and the Trustee specifying the amount to be prepaid and the date upon which any prepayment will be made. If the Borrower fails to give such notice of a prepayment in connection with a mandatory redemption under this Loan Agreement, such notice may be given by the Authority, by the Trustee or by any Holder or Holders of ten percent (10%) or more in aggregate principal amount of each Series of the Bonds Outstanding. The Authority and the Trustee, at the request of the Borrower or any such Bondholder, shall forthwith take all steps necessary under the applicable provisions of the Indenture (except that the Authority shall not be required to make payment of any money required for such redemption) to effect redemption of all or part of the then Outstanding Bonds, as the case may be, on the earliest practicable date thereafter on which such redemption may be made under applicable provisions of the Indenture.

## ARTICLE IX
## NON-LIABILITY OF AUTHORITY; EXPENSES; INDEMNIFICATION

SECTION 9.1.  <u>Non-Liability of Authority</u>. The Authority shall not be obligated to pay the principal of, or premium, if any, or interest on the Bonds, except from Revenues. The Borrower hereby acknowledges that the Authority's sole source of moneys to repay the Bonds will be provided by the payments made by the Borrower pursuant to this Loan Agreement and payments made by the Guarantor pursuant to the Guaranty Agreement, together with other Revenues, including investment income on certain funds and accounts held by the Trustee under the Indenture, and hereby agrees that if the payments to be made hereunder shall ever prove insufficient to pay all principal of, and premium, if any, and interest on the Bonds as the same shall become due (whether by maturity, redemption, acceleration or otherwise), then upon notice from the Trustee, the Borrower shall pay such amounts as are required from time to time to prevent any deficiency or default in the payment of such principal, premium or interest, including, but not limited to, any deficiency caused by acts, omissions, nonfeasance or malfeasance on the part of the Trustee, the Borrower, the Authority or any third party.

SECTION 9.2.  <u>Expenses</u>. The Borrower covenants and agrees to pay and to indemnify the Authority and the Trustee against all costs and charges, including reasonable fees and disbursements of attorneys, accountants, consultants and other experts, incurred in good faith in connection with the Loan Documents, the Bonds or the Indenture.

SECTION 9.3.  <u>Indemnification</u>. The Borrower releases the Authority, the Treasurer of the State of California (the "Treasurer") and the Trustee from, and covenants and agrees that none of the Authority, the Treasurer and the Trustee shall be liable for, and covenants and agrees, to the extent permitted by law, to indemnify and hold harmless the Authority, the Treasurer and the Trustee and their members, officers, employees and agents from and against, any and all losses, claims, damages, liabilities or expenses (including, without limitation, reasonable attorneys' fees, litigation and court costs, amounts paid in settlement and amounts paid to discharge judgments), of every conceivable kind, character and nature whatsoever (including, without limitation, federal and state securities laws) arising out of, resulting from or in any way connected with (1) the Project, or the conditions, occupancy, use, possession, conduct or management of, or work done in or about the Project or the other facilities of the Borrower or its affiliates, or from the acquisition, construction, rehabilitation, renovation, installation, improvement and/or equipping of the Project or any part thereof; (2) the issuance, sale or resale of any Bonds or any certifications or representations made in connection therewith, the execution and delivery of the Indenture, the Borrower Documents, the Loan Documents or any amendment to the foregoing or the carrying out of any of the transactions contemplated by the Bonds, the Indenture, the Borrower Documents or the Loan Documents; (3) the Trustee's acceptance or administration of the trusts under the Indenture, or the exercise or performance of any of their powers or duties under the Indenture or any of the Borrower Documents or Loan Documents; (4) any untrue or misleading statement or alleged untrue or misleading statement of any material fact or omission or alleged omission to state a material fact required to be stated or necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in any official statement or other offering circular utilized by the Authority or any underwriter or placement agent in connection with the sale or remarketing of any Bonds or in any disclosure made by Borrower to comply with the requirements of S.E.C. Rule 15c2-12; (5) any violation of any Environmental Regulations or the release of any Hazardous Substance from, on or near the Project or any other facilities of the Borrower or its affiliates; (6) the defeasance and/or redemption, in whole or in part, of the Bonds; or (7) any declaration of taxability of interest on the Bonds, or allegations that interest on the Bonds is taxable or any regulatory audit or inquiry regarding whether interest in the Bonds is taxable, for federal or state income tax purposes; provided that with respect to indemnification of the Authority, the Treasurer and their respective members, officers, employees and agents, such indemnity shall not be required for damages that result from the gross negligence or willful misconduct on the part of the party seeking such indemnity and

with respect to any other indemnified party, such indemnity shall not be required for damages that result from the negligence or willful misconduct on the part of the party seeking such indemnity. The Borrower further covenants and agrees, to the extent permitted by law, to pay or to reimburse the Authority, the Treasurer and the Trustee and their members, officers, employees and agents for any and all costs, reasonable attorneys fees and expenses, liabilities or other expenses incurred in connection with investigating, defending against or otherwise in connection with any such losses, claims, damages, liabilities, expenses or actions, except to the extent that the same arise out of the gross negligence or willful misconduct of the Authority, the Treasurer and their respective members, officers, employees and agents claiming such payment or reimbursement or out of the negligence or willful misconduct of the Trustee and their members, officers, employees and agents claiming such payment or reimbursement. The provisions of this Section and Section 4.2(b) shall survive any resignation or removal of the Trustee, the retirement of the Bonds and the termination of this Loan Agreement.

# ARTICLE X
## MISCELLANEOUS

SECTION 10.1.  <u>Notices</u>. All notices, certificates or other communications shall be deemed sufficiently given on the second day following the day on which the same have been mailed by certified mail, postage prepaid, addressed to the Authority, the Borrower, or the Trustee, as the case may be, as follows, and such communications shall also be deemed sufficiently given to the Trustee if sent by facsimile with confirmed receipt:

| | |
|---|---|
| To the Authority: | California Pollution Control Financing Authority P.O. Box 942809 Sacramento, CA 94209 Attn: Executive Director |
| To CDLAC: | California Debt Limit Allocation Committee 915 Capitol Mall, Room 311 Sacramento, CA 95814 Attn: Executive Director |
| To the Borrower: | Rialto Bioenergy Facility, LLC 5780 Fleet Street, Suite 310 Carlsbad, California 92008 Attn: President |
| To the Guarantor: | Anaergia Services LLC 5780 Fleet Street, Suite 310 Carlsbad, California 92008 Attn: Managing Director |
| To the Trustee: | UMB Bank, N.A. Corporate Trust & Escrow Services 120 South Sixth Street, Suite 1400 Minneapolis, MN 55402 Attn:  Katie Carlson Facsimile No.: 612-337-7039 |

Any notice given to the Borrower as provided above shall be deemed to have been given to any affiliate of the Borrower affected by such notice.

A duplicate copy of each notice, certificate or other communication given hereunder by either the Authority or the Borrower to the other shall also be given to the Trustee. The Authority, the Borrower and the Trustee may, by notice given hereunder, designate any different addresses to which subsequent notices, certificates or other communications shall be sent.

SECTION 10.2.  <u>Severability</u>. If any provision of this Loan Agreement shall be held or deemed to be, or shall in fact be, illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions herein contained or render the same invalid, inoperative, or unenforceable to any extent whatever.

SECTION 10.3.  <u>Execution of Counterparts</u>. This Loan Agreement may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument; provided, however, that for purposes of perfecting a security interest in this Loan Agreement by the Trustee under Article 9 of the California Uniform Commercial Code, only the counterpart delivered, pledged, and assigned to the Trustee shall be deemed the original.

SECTION 10.4.  <u>Amendments, Changes and Modifications</u>. Except as otherwise provided in this Loan Agreement or the Indenture, subsequent to the initial issuance of Bonds and prior to their payment in full, or provision for such payment having been made as provided in the Indenture, this Loan Agreement may not be effectively amended, changed, modified, altered or terminated without the written consent of the Trustee, given in accordance with Section 6.07(b) of the Indenture.

SECTION 10.5.  <u>Governing Law; Venue</u>. This Loan Agreement shall be construed in accordance with and governed by the Constitution and laws of the State of California applicable to contracts made and performed in the State of California. This Loan Agreement shall be enforceable in the State of California and any action arising out of this Loan Agreement shall be filed and maintained in the Sacramento County Superior Court, Sacramento, California, unless the Authority waives this requirement.

SECTION 10.6.  <u>Authorized Representative</u>. Whenever under the provisions of this Loan Agreement the approval of the Borrower is required or the Borrower is required to take some action at the request of the Authority, such approval or such request shall be given on behalf of the Borrower by an Authorized Representative. The Authority and the Trustee shall be authorized to act on any such approval or request and neither party hereto shall have any complaint against the other or against the Trustee as a result of any such action taken.

SECTION 10.7.  <u>Term of the Agreement</u>. This Loan Agreement shall be in full force and effect from the date hereof and shall continue in effect as long as any of the Bonds is outstanding or the Trustee holds any moneys under the Indenture, whichever is later. All representations and certifications by the Borrower as to all matters affecting the Tax-exempt status of the Bonds shall survive the termination of this Loan Agreement.

SECTION 10.8.  <u>Binding Effect</u>. This Loan Agreement shall inure to the benefit of and shall be binding upon the Authority, the Borrower and their respective successors and assigns; subject, however, to the limitations contained in Section 5.2 hereof.

SECTION 10.9.  <u>Third Party Beneficiary</u>. The parties agree that CDLAC is a third party beneficiary of this Loan Agreement for the purpose of enforcing the terms and conditions set forth in the Allocation Resolution.

SECTION 10.10.  <u>Survival of Fee Obligation</u>. The right of the Authority and the Trustee to receive any fees or to be reimbursed for any expenses incurred pursuant to this Loan Agreement, and the right of the Authority and the Trustee to be protected from any liability as provided in this Loan Agreement, shall survive the retirement of the Bonds and the termination of this Loan Agreement.

SECTION 10.11.  <u>Purchase of Bonds</u>. The Borrower agrees that it (i) shall not use its own funds to purchase Bonds from any Person in a manner that could affect the Tax-exempt status of any Bonds for any holder thereof pursuant to Section 147(a) of the Code (or otherwise) and (ii) shall cause any Participating Affiliate and any shareholder, member or other owner of the Borrower not to use its own funds to purchase Bonds from any Person in a manner that could affect the Tax-exempt status of any Bonds for any holder thereof pursuant to Section 147(a) of the Code (or otherwise).

SECTION 10.12.  <u>Liability of Authority Limited to Revenues</u>. Notwithstanding anything in this Loan Agreement or in the Bonds contained, the Authority shall not be required to advance any moneys derived from any source other than the Revenues and other assets pledged under the Indenture for any of the purposes mentioned in the Indenture, whether for the payment of the principal of or interest on the Bonds or for any other purpose of the Indenture. Nevertheless, the Authority may, but shall not be required to, advance for any of the purposes hereof any funds of the Authority which may be made available to it for such purposes. NEITHER THE FULL FAITH AND CREDIT NOR THE TAXING POWER OF THE STATE OF CALIFORNIA OR ANY POLITICAL SUBDIVISION THEREOF OR ANY LOCAL AGENCY IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON THE BONDS. The Authority shall not be liable for any costs, expenses, losses, damages, claims or actions, of any conceivable kind on any conceivable theory, under or by reason of or in connection with this Loan Agreement, the other Loan Documents, the Bonds or the Indenture, except only to the extent amounts are received for the payment thereof from the Borrower under this Loan Agreement; provided, however, that the Borrower shall not be required to pay the fees and expenses of the Authority's counsel incurred in connection with the issuance of the Bonds.

The Borrower hereby acknowledges that the Authority's sole source of moneys to repay the Bonds will be provided by the payments made by the Borrower to the Trustee pursuant to this Loan Agreement and payments made by the Guarantor pursuant to the Guaranty Agreement, together with investment income on certain funds and accounts held by the Trustee under the Indenture, and hereby agrees that if the payments to be made hereunder shall ever prove insufficient to pay all principal (or redemption price) and interest on the Bonds as the same shall become due (whether by maturity, redemption, acceleration or otherwise), then upon notice from the Trustee, the Borrower shall pay such amounts as are required from time to time to prevent any deficiency or default in the payment of such principal (or redemption price) or interest, including, but not limited to, any deficiency caused by acts, omissions, nonfeasance or malfeasance on the part of the Trustee, the Borrower, the Authority or any third party, subject to any right of reimbursement from the Trustee, the Authority or any such third party, as the case may be, therefor.

SECTION 10.13.  <u>Waiver of Personal Liability</u>. No member, officer, agent or employee of the Authority or any director, officer, shareholder, agent or employee of the Borrower shall be individually or personally liable for the payment of any principal of (or redemption price) or interest on the Bonds or any sum hereunder or under the Indenture be subject to any personal liability or accountability by reason of the execution and delivery of this Loan Agreement; but nothing herein contained shall relieve any such member, director, officer, shareholder, agent or employee from the performance of any official duty provided by law or by this Loan Agreement.

SECTION 10.14.  <u>Electronic Storage</u>. The parties hereto agree that the transaction described herein may be conducted and related documents may be stored by electronic means. Copies,

telecopies, facsimiles, electronic files and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

SECTION 10.15.  No Prevailing Party.  Nothing in this Loan Agreement shall be construed to provide for the award of attorney's fees and costs to the Authority or the Borrower for the enforcement of this Loan Agreement, as described in Section 1717 of the California Civil Code. Nothing in this Section affects the rights of the Trustee as provided herein or in the Indenture.

SECTION 10.16.  Complete Agreement. The parties agree that the terms and conditions of this Loan Agreement supersede those of all previous agreements between the parties relative to the Bonds, and that this Loan Agreement, together with the documents referred to in this Loan Agreement, contains the entire agreement relative to the Bonds between the parties hereto.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the California Pollution Control Financing Authority has caused this Loan Agreement to be executed in its name and its seal to be hereunto affixed by its duly authorized representatives, and the Borrower has caused this Loan Agreement to be executed in its name all as of the date first above written.

CALIFORNIA POLLUTION CONTROL
FINANCING AUTHORITY

By: Fiona Ma, CPA, Chair

By: _____
                    Deputy Treasurer

By: _____
                    Executive Director

(SEAL)
March 7, 1973

RIALTO BIOENERGY FACILITY, LLC,
a Delaware limited liability company

_____
        Arun Sharma, President

[Signature page to Loan Agreement relating to Solid Waste Disposal Revenue Bonds (Rialto Bioenergy Facility, LLC Project) Series 2019 (AMT) (Green Bonds)]

IN WITNESS WHEREOF, the California Pollution Control Financing Authority has caused this Loan Agreement to be executed in its name and its seal to be hereunto affixed by its duly authorized representatives, and the Borrower has caused this Loan Agreement to be executed in its name all as of the date first above written.

CALIFORNIA POLLUTION CONTROL
FINANCING AUTHORITY

By: Fiona Ma, CPA, Chair

By: _____
                    Deputy Treasurer

By: _____
                    Executive Director

(SEAL)

RIALTO BIOENERGY FACILITY, LLC,
a Delaware limited liability company

_____
                    Arun Sharma, President

[Signature page to Loan Agreement relating to Solid Waste Disposal Revenue Bonds (Rialto Bioenergy Facility, LLC Project) Series 2019 (AMT) (Green Bonds)]

**EXHIBIT A**

**DESCRIPTION OF THE PROJECT**

The Project consists of the acquisition, construction and equipping of solid waste treatment, disposal and recycling facilities to include the processing of solid food waste and biosolids to produce fertilizer, renewable electricity and renewable natural gas, to be located at 503 East Santa Ana Avenue, Rialto, California (also sometimes found in certain records and databases (online or otherwise) with the street number identified as "501" and/or the city identified as "Bloomington").

The Project Site is situated in the City of Rialto, County of San Bernardino, State of California, as further described in Exhibit A attached to the Leasehold Deed of Trust.

**EXHIBIT B**

**FINAL PROJECT ACCOUNT DISBURSEMENT CERTIFICATE**

To:    UMB Bank, N.A.                 California Pollution Control Financing
        Corporate Trust & Escrow Services     Authority (the "Authority")
        120 South Sixth Street, Suite 1400     P.O. Box 942809
        Minneapolis, MN 55402             Sacramento, CA 94209
        Attn: Katie Carlson               Attn: Executive Director

RE:    Final Project Account Disbursement Certification

        This Final Project Account Disbursement Certificate is being provided to you pursuant to the requirements of the Loan Agreement between the Authority and the Borrower (as defined below) with respect to the Bonds (as defined below), whereon upon the final disbursement from the Project Fund relating to the below-referenced bonds, the Borrower shall have an Authorized Representative of the Borrower, on behalf of the Borrower, evidence the Completion Date of the project by providing a certificate to the Trustee and the Authority stating the Costs of the Project to the date of this Final Project Account Disbursement Certificate and the components of the Project as described in <u>Exhibit A</u> of the Loan Agreement (see attached). Such information is provided below.

**BOND INFORMATION**

Borrower Name (the "Borrower"): Rialto Bioenergy Facility, LLC

Bond Name and Series: California Pollution Control Financing Authority Solid Waste Disposal Revenue Bonds (Rialto Bioenergy Facility, LLC Project) Series 2019 (AMT) (Green Bonds) (the "Bonds")

Bond Closing Date: January 30, 2019

Bond Amount Issued: $117,200,000

**PROJECT INFORMATION**

Project Address:               (*From Exhibit A of the Loan Agreement*)

Project Commencement Date:

Project Completion Deadline:       (*Contemplated*)

Completion Date:              (*Actual*)

**GREEN BOND STATUS**

Amount of Bond Proceeds Spent on Eligible Green Projects: $

Amount and Use of Bond Proceeds Not Spent on Eligible Green Projects: $

|  | BREAKDOWN OF EXPENDITURES OF BOND PROCEEDS | BREAKDOWN OF EXPENDITURES OF NON-BOND PROCEEDS |
|---|---|---|
| **Project Cost by Item** (From the Tax Certificate and Agreement) | **Amount** | **Amount** |
| **TOTAL:** | $_____ | $_____ |
| **Amount of Bond Proceeds remaining in the Project Fund** | $_____ | |

       To the date hereof, the acquisition, construction, installation and equipping have been conducted substantially in accordance with the plans, specifications and work orders therefor, and all labor, services, materials and supplies used in the acquisition, construction, installation and equipping have been paid or provided for. To the date hereof, all other facilities necessary in connection with the Project have been acquired, constructed, installed and equipped in accordance with the plans and specifications and work orders therefor and all costs and expenses incurred in connection therewith have been paid or provided for.

       The Borrower certifies that all proceeds of the Bonds (excluding any Costs of Issuance and amounts applied to capitalized interest or reserves pursuant to the Indenture) were expended on the Project. The Project as described in <u>Exhibit A</u> included certain initial specifications, but contemplated variances of certain terms within specified parameters. Any such variances to the date hereof are described below:

**PROJECT VARIANCES (If Any):**

_____
_____
_____
_____

B-2

This certificate is given without prejudice to any rights of the Borrower against third parties for any claims or for the payment of any amount not then due and payable which obligation has been incurred at the date of this certificate or which may subsequently be incurred.

I represent and warrant that I have full authority to execute this Final Project Account Disbursement Certificate on behalf of the Borrower. I certify that the foregoing certification is true and correct.

_____

_____

Borrower's Authorized Representative(s)

Attachments [Photos of completed project(s)]

APPROVED as to completion of construction of the Project as provided herein:

[NAME OF CONSTRUCTION MONITOR]

By: _____

Authorized Representative

**EXHIBIT C**

**FORM OF ANNUAL BORROWER CERTIFICATE**

UMB Bank, N.A.
Corporate Trust & Escrow Services
120 South Sixth Street, Suite 1400
Minneapolis, MN 55402
Attn: Katie Carlson

Westhoff, Cone & Holmstedt
1777 Botelho Drive, Suite 345
Walnut Creek, CA 94596
Attn: Mark Holmstedt, Principal

California Pollution Control Financing Authority
P.O. Box 942809
Sacramento, CA 94209
Attn: Executive Director

| Description of Bond Issue | Principal Amount Issued |
|---|---|
| California Pollution Control Financing Authority Solid Waste Disposal Revenue Bonds (Rialto Bioenergy Facility, LLC Project) Series 2019 (AMT) (Green Bonds) | $117,200,000 |

Borrower – Rialto Bioenergy Facility, LLC

The following lists of items are required per the Loan Agreement for the above-referenced financing. Please signify compliance and send this notice to the above-referenced participants.

1.      Per section 5.10 of the Loan Agreement, Borrower is required to calculate rebate liability. Section 5.10 reads, in part, as follows:

"...The Borrower shall calculate, or cause to be calculated, its rebate liability at such times as are required by Section 148(f) of the Code and any temporary, proposed or final Regulations as may be applicable to the Bonds from time to time. The Borrower shall provide to the Authority and the Trustee a copy of each calculation of rebate liability prepared by or on behalf of the Borrower."

Borrower ❏ has complied ❏ has not complied ❏ is not yet required to comply ❏ is no longer required to comply with this requirement.

2.      Per section 5.11(a) of the Loan Agreement, the Borrower is required to send a Certificate of the Borrower to the Authority and the Trustee. Section 5.11(a) reads, in part, as follows:

"...On or before June 15 and December 15 of each year during which any of the Bonds are Outstanding, commencing June 15, 2019, a Certificate of the Borrower that all payments required under this Loan Agreement have been made"

Borrower ❏ has ❏ has not complied with this requirement.

3.      Per section 5.3(b) of the Loan Agreement, Borrower agrees to keep financial statements, provide notice to the Authority and the Trustee certification they are completed and that no event which constitutes a loan default has occurred. Section 5.3(b) reads, in part, as follows:

"...The Borrower further covenants and agrees, within one hundred fifty (150) days after the end of each Fiscal Year, to furnish to the Authority and the Trustee a Certificate of the Borrower stating that its financial statements have been completed and that no event which constitutes a Loan Default Event or which with the giving of notice or the passage of time or both would constitute a Loan Default Event has occurred and is continuing as of the end of such Fiscal Year, or specifying the nature of such event and the actions taken and proposed to be taken by the Borrower to cure such default."

Borrower ❏ has ❏ has not complied with this requirement.

4.      Per section 5.11(a)(iv) of the Loan Agreement, the Borrower is required to send a Certificate of the Borrower to the Authority and the Trustee. Section 5.11(a)(iv) reads, in part, as follows:

"...On or before December 15 of each year during which any of the Bonds are Outstanding, (i) a written disclosure of any significant change known to the Borrower which would adversely impact the Trustee's ability to perform its duties under the Indenture, or of any conflicts which may result because of other business dealings between the Trustee and the Borrower, and (ii) a representation of the Borrower that all certificates, approvals, permits and authorizations described in Section 2.3(i) that are necessary for the construction, as applicable, use or operation of the Project continue in full force and effect, provided that with respect to any such certificate, approval, permit or authorization that must issue without discretion on the part of the issuer thereof, the Borrower need only disclose the absence of such certificate, approval, permit or authorization and the Borrower's plan to acquire it."

Borrower ❏ has ❏ has not complied with this requirement.

5.      Per Section 5.11(c) of the Loan Agreement, the Borrower is required to provide a Certificate of Compliance II until the Borrower has filed the Final Tax-Exempt Project Completion Certificate and thereafter, a Certificate of Completion.  Section 5.11(c) reads as follows:

"The Borrower agrees to provide to the Authority (i) on February 1 of each year an annual Certificate of Compliance II (certificate found at http://www.treasurer.ca.gov/cdlac/applications/exempt/index.asp) until such time as the Borrower has filed the Final Project Account Disbursement Certificate required by Section 3.2 hereof, and (ii) thereafter, a Certificate of Completion (certificate found at http://www.treasurer.ca.gov/cdlac/applications/exempt/index.asp), all as required by the Allocation Resolution."

Borrower ❏ has ❏ has not complied with this requirement.

6.      Per section 5.14(b) of the Loan Agreement, the Borrower is required to provide to the Authority within seven (7) days a copy of any disclosure made to MSRB under Rule 15c2-12. Section 5.14(b) reads, in part, as follows:

"The Borrower further agrees to send a copy to the Authority within seven (7) days of any disclosure (e.g., report, financial statement or reporting of significant event) made to the Municipal

Securities Rulemaking Board under S.E.C. Rule 15c2-12, as it may from time to time hereafter be amended or supplemented."

Borrower ❏ has ❏ has not complied with this requirement.

7.      Per section 5.22 of the Loan Agreement, the Borrower is required to provide an annual report to the Authority concerning its green bond status. Section 5.22 reads, in part, as follows:

On an annual basis, prior to or concurrently with the delivery of the certificate required under Section 5.11(a)(ii), the Borrower shall deliver a written report to the Authority, with a copy to the Trustee and the Bondholders, that provides an overview of the Project, including (i) identification of Bond proceeds allocated to portions of the Project that constitute an eligible green project under the Green Bond Principles, until such time as the Borrower has filed the Final Project Account Disbursement Certificate required by Section 3.2 hereof, (ii) identification of the amount and use of Bond proceeds not so allocated, until such time as the Borrower has filed the Final Project Account Disbursement Certificate required by Section 3.2 hereof, and (iii) environmental impact reporting using quantitative and qualitative performance indicators, which indicators shall include, at a minimum, (A) renewable electricity produced by the Project, (B) renewable natural gas produced by the Project and (C) tons of organics diverted from landfills due to operation of the Project.

---

| **If you answered "has not" to any of the above, please explain on a separate paper.** |
| --- |

---

I represent and warrant that I have full authority to execute this certificate on behalf of the Borrower. I certify that the foregoing certificate for the above-referenced financing is true and correct.

By _____      Date _____
Authorized Borrower Representative

Title _____      Phone No. _____

**EXHIBIT D**

**PERMITTED LIENS**

1.      Any lien in respect of property taxes that are not yet delinquent, including any assessments collected with taxes to be levied for the current fiscal year.

2.      The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2, Chapter 3, Articles 3 and 4, respectively, of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the Borrower or as a result of changes in ownership or new construction occurring prior to Date of Policy.

3.      Water rights, claims or title to water, whether or not disclosed by the public records.

4.      Any lien(s) in respect of Nonrecourse Indebtedness, Short-Term Indebtedness or Subordinate Debt that, in each case, is incurred in compliance with the provisions of this Agreement and the Indenture.

5.      Any lien(s) of a depository bank under the Account Control Agreement.

**EXHIBIT E**

**LEASES RELATING TO THE PROJECT**

As of the execution of the Loan Agreement to which this Exhibit E is attached, the leases (copies of which have been provided to the Authority to its satisfaction) in effect for the different portions of the Project or the Project Site, and the names of the lessors, are identified below:

1.  Ground Sublease made as of April 1, 2016, by and between Rialto Utility Authority and the Borrower.

# EXHIBIT "6"

EXECUTION VERSION

---

CALIFORNIA POLLUTION CONTROL
FINANCING AUTHORITY


and


UMB BANK, N.A.,
as TRUSTEE


INDENTURE


Dated as of January 1, 2019


RELATING TO


$117,200,000
CALIFORNIA POLLUTION CONTROL FINANCING AUTHORITY
SOLID WASTE DISPOSAL REVENUE BONDS
(RIALTO BIOENERGY FACILITY, LLC PROJECT)
SERIES 2019 (AMT) (GREEN BONDS)

---

106764718v17

# TABLE OF CONTENTS

**Page**

ARTICLE I      DEFINITIONS; CONTENT OF CERTIFICATES AND OPINIONS .......................2

    Section 1.01      Definitions ................................................................................2

    Section 1.02      Content of Certificates and Opinions ...........................................27

    Section 1.03      Interpretation ...........................................................................28

ARTICLE II      THE BONDS..........................................................................................28

    Section 2.01      Authorization of Bonds ..............................................................28

    Section 2.02      Form of the Bonds ....................................................................28

    Section 2.03      Interest Rates; Maturities ...........................................................28

    Section 2.04      Reserved .................................................................................29

    Section 2.05      Execution of Bonds ...................................................................29

    Section 2.06      Registration of Transfer of Bonds ................................................30

    Section 2.07      Exchange of Bonds ...................................................................30

    Section 2.08      Bond Register ..........................................................................30

    Section 2.09      Temporary Bonds .....................................................................30

    Section 2.10      Bonds Mutilated, Lost, Destroyed or Stolen ..................................31

    Section 2.11      Book-Entry Only System ...........................................................31

ARTICLE III      ISSUANCE OF BONDS; APPLICATION OF PROCEEDS ...................................33

    Section 3.01      Issuance of the Bonds.................................................................33

    Section 3.02      Application of Proceeds of Bonds and Other Amounts .....................33

    Section 3.03      Project Fund ............................................................................33

    Section 3.04      Costs of Issuance Fund ..............................................................36

    Section 3.05      Validity of Bonds .....................................................................36

ARTICLE IV      REDEMPTION AND PURCHASE OF BONDS .............................................36

    Section 4.01      Terms of Redemption of Bonds ...................................................36

    Section 4.02      Selection of Bonds for Redemption ..............................................40

    Section 4.03      Notice of Redemption ................................................................40

    Section 4.04      Partial Redemption of Bonds ......................................................40

    Section 4.05      Effect of Redemption ................................................................41

ARTICLE V      REVENUES; FUNDS AND ACCOUNTS; PAYMENT OF PRINCIPAL AND INTEREST ....................................................................................41

    Section 5.01      Pledge and Assignment; Revenue Fund.........................................41

    Section 5.02      Deposits to Revenue Fund; Allocation of Revenues.........................42

    Section 5.03      Priority of Moneys in Revenue Fund ............................................43

    Section 5.04      Reserved .................................................................................43

i

## TABLE OF CONTENTS
(continued)

|  |  |  | Page |
|---|---|---|---|
| Section 5.05 | Investment of Moneys | 43 |
| Section 5.06 | Rebate Fund | 44 |
| Section 5.07 | Debt Service Reserve Fund | 45 |
| Section 5.08 | Capital Replacement Fund | 47 |
| ARTICLE VI | PARTICULAR COVENANTS | 47 |
| Section 6.01 | Punctual Payment | 47 |
| Section 6.02 | Extension of Payment of Bonds | 47 |
| Section 6.03 | Against Encumbrances | 47 |
| Section 6.04 | Power to Issue Bonds and Make Pledge and Assignment | 47 |
| Section 6.05 | Accounting Records and Reports | 48 |
| Section 6.06 | Arbitrage Covenants | 48 |
| Section 6.07 | Other Covenants | 48 |
| Section 6.08 | Waiver of Laws | 49 |
| Section 6.09 | Further Assurances | 49 |
| Section 6.10 | Continuing Disclosure | 49 |
| ARTICLE VII | EVENTS OF DEFAULT AND REMEDIES OF BONDHOLDERS | 49 |
| Section 7.01 | Events of Default; Acceleration; Waiver of Default | 49 |
| Section 7.02 | Institution of Legal Proceedings by Trustee | 50 |
| Section 7.03 | Application of Revenues and Other Funds After Default | 51 |
| Section 7.04 | Trustee to Represent Bondholders | 52 |
| Section 7.05 | Bondholders' Direction of Proceedings | 52 |
| Section 7.06 | Limitation on Bondholders' Right to Sue | 52 |
| Section 7.07 | Absolute Obligation of Authority | 53 |
| Section 7.08 | Termination of Proceedings | 53 |
| Section 7.09 | Remedies Not Exclusive | 53 |
| Section 7.10 | No Waiver of Default | 53 |
| ARTICLE VIII | THE TRUSTEE, THE PAYING AGENT AND THE BOND REGISTRAR | 53 |
| Section 8.01 | Duties, Immunities and Liabilities of Trustee | 53 |
| Section 8.02 | Merger or Consolidation | 57 |
| Section 8.03 | Liability of Trustee | 57 |
| Section 8.04 | Right of Trustee to Rely on Documents | 58 |
| Section 8.05 | Preservation and Inspection of Documents | 59 |
| Section 8.06 | Compensation and Indemnification | 59 |
| Section 8.07 | Paying Agent | 59 |

## TABLE OF CONTENTS
(continued)

|  |  | **Page** |
|---|---|---|
| Section 8.08 | Notices to the Authority | 59 |
| Section 8.09 | Appointment and Duties of Bond Registrar | 60 |
| Section 8.10 | Bond Registrar's Performance of Duties | 60 |
| ARTICLE IX | MODIFICATION OR AMENDMENT OF THE INDENTURE | 60 |
| Section 9.01 | Amendments Permitted | 60 |
| Section 9.02 | Effect of Supplemental Indenture | 61 |
| Section 9.03 | Endorsement of Bonds; Preparation of New Bonds | 62 |
| Section 9.04 | Amendment of Particular Bonds | 62 |
| Section 9.05 | Opinion for Supplement | 62 |
| ARTICLE X | DEFEASANCE | 62 |
| Section 10.01 | Discharge of Indenture | 62 |
| Section 10.02 | Discharge of Liability on Bonds | 63 |
| Section 10.03 | Deposit of Money or Securities With Trustee | 63 |
| Section 10.04 | Payment of Bonds After Discharge of Indenture Obligation | 64 |
| ARTICLE XI | MISCELLANEOUS | 64 |
| Section 11.01 | Liability of Authority Limited to Revenues | 64 |
| Section 11.02 | Successor Is Deemed Included in All References to Predecessor | 64 |
| Section 11.03 | Limitation of Rights to Parties and Bondholders | 65 |
| Section 11.04 | Waiver of Notice | 65 |
| Section 11.05 | Destruction of Bonds | 65 |
| Section 11.06 | Severability of Invalid Provisions | 65 |
| Section 11.07 | Governing Law; Venue | 65 |
| Section 11.08 | Notices | 65 |
| Section 11.09 | Evidence of Rights of Bondholders | 66 |
| Section 11.10 | Disqualified Bonds | 67 |
| Section 11.11 | Money Held for Particular Bonds | 67 |
| Section 11.12 | Funds and Accounts; Business Day | 67 |
| Section 11.13 | Waiver of Personal Liability | 67 |
| Section 11.14 | Complete Agreement | 68 |
| Section 11.15 | Execution in Several Counterparts | 68 |
| Section 11.16 | Third Party Beneficiary | 68 |

## TABLE OF CONTENTS
(continued)

**Page**

EXHIBIT A FORM OF BOND ........................................................................................... A-1

EXHIBIT B FORM OF TRUSTEE AUDIT LETTER ........................................................ B-1

EXHIBIT C FORM OF PROJECT FUND REQUISITION.................................................. C-1

EXHIBIT D FORM OF COSTS OF ISSUANCE FUND REQUISITION ............................ D-1

EXHIBIT E FORM OF REQUISITION FROM THE CAPITAL REPLACEMENT FUND ................. E-1

THIS INDENTURE (as further defined herein, this "Indenture") is made and entered into as of January 1, 2019, by and between the CALIFORNIA POLLUTION CONTROL FINANCING AUTHORITY, a public instrumentality and political subdivision of the State of California (as further defined herein, the "Authority"), and UMB BANK, N.A., a national banking association organized and existing under and by virtue of the laws of the United States of America, having a Corporate Trust Office in Minneapolis, Minnesota, and being qualified to accept and administer the trusts hereby created (as further defined herein, the "Trustee").

W I T N E S S E T H :

WHEREAS, the Authority is a public instrumentality and political subdivision of the State of California, created by the California Pollution Control Financing Authority Act (Chapter 1 (commencing with Section 44500) of Division 27 of the California Health and Safety Code), as supplemented and amended (as further defined herein, the "Act"), and authorized to finance the acquisition, construction, rehabilitation, renovation, installation, improvement and equipping of solid waste pollution control facilities constituting a "project" within the meaning of the Act; and

WHEREAS, Rialto Bioenergy Facility, LLC, a Delaware limited liability company (as further defined herein, the "Borrower"), has duly caused an application to be filed with the Authority for financial assistance to acquire, construct, rehabilitate, renovate, install, improve and/or equip certain solid waste treatment, disposal and recycling facilities in the State of California, more particularly described in Exhibit A to the hereinafter defined Loan Agreement (as further defined herein, the "Project"); and

WHEREAS, the Authority, has adopted a resolution approving the issuance of bonds to finance the Project (a portion of the proceeds of which may go toward reimbursing the Borrower's prior expenditures); and

WHEREAS, the Authority has authorized the issuance of its Solid Waste Disposal Revenue Bonds (Rialto Bioenergy Facility, LLC Project) Series 2019 (AMT) (Green Bonds) (the "Bonds") pursuant to this Indenture to (i) finance the Project, (ii) fund any reserve requirements for the Bonds and the Project, (iii) fund capitalized interest on the Bonds and (iv) pay Costs of Issuance (as hereinafter defined); and

WHEREAS, the Authority has authorized the execution and delivery of this Indenture to provide for the authentication and delivery of the Bonds, to establish and declare the terms and conditions upon which the Bonds are to be issued and secured and to secure the payment of the principal thereof, premium, if any and interest thereon; and

WHEREAS, the Authority is financing the Project by loaning the proceeds derived from the sale of the Bonds to the Borrower pursuant to the Loan Agreement, which requires the Borrower to make loan payments sufficient to pay the principal of, premium, if any, and interest on, the Bonds and related expenses; and

WHEREAS, it has been determined that the estimated amount necessary to (i) finance the Project, (ii) fund any reserve requirements for the Bonds and the Project, (iii) fund capitalized interest on the Bonds and (iv) pay Costs of Issuance, requires the issuance, sale and delivery of the Bonds in the aggregate amount of $117,200,000 as hereinafter provided; and

WHEREAS, payment of the Bonds is enhanced by a limited guaranty in favor of the Trustee by Anaergia Services LLC, a Delaware limited liability company (the "Guarantor"); and

WHEREAS, all acts and proceedings required by law necessary to make the Bonds, when executed by the Authority, authenticated and delivered by the Trustee and duly issued, the valid, binding and legal limited obligations of the Authority, and to constitute this Indenture a valid and binding agreement for the uses and purposes herein set forth in accordance with its terms, have been done and taken, and the execution and delivery of this Indenture have been in all respects duly authorized; and

WHEREAS, Bonds issued under this Indenture will be secured by a pledge and assignment of certain rights under the Loan Agreement;

NOW, THEREFORE, THIS INDENTURE WITNESSETH, that in order to secure the payment of the principal of, premium, if any, and the interest on, all Bonds at any time issued and outstanding under this Indenture, according to their tenor, to secure the performance and observance of all the covenants and conditions therein and herein set forth and to declare the terms and conditions upon and subject to which the Bonds are to be issued and received, and in consideration of the premises and of the mutual covenants herein contained and of the purchase and acceptance of the Bonds by the Holders (as defined herein) thereof, and for other valuable consideration, the receipt whereof is hereby acknowledged, the Authority does hereby covenant and agree with the Trustee, for the equal and proportionate benefit of the respective Holders from time to time of the Bonds, as follows:

## ARTICLE I
## DEFINITIONS; CONTENT OF CERTIFICATES AND OPINIONS

SECTION 1.01    Definitions.  Unless the context otherwise requires, the terms defined in this Article shall, for all purposes of this Indenture and of any indenture supplemental hereto and of any certificate, opinion or other document herein mentioned, have the meanings herein specified, to be equally applicable to both the singular and plural forms of any of the terms herein defined.  Unless otherwise defined in this Indenture, all terms used herein shall have the meanings assigned to such terms in the Act.

Access Agreement

"Access Agreement" means that certain Side Letter Access Agreement, made as of April 1, 2016, by and between Rialto Water Services, LLC and the Borrower, as may be amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

Account Control Agreement

"Account Control Agreement" means, collectively, (i) that certain Blocked Account Control Agreement ("Shifting Control"), dated January 30, 2019, among the Borrower, the Trustee and Silvergate Bank, as depository bank, and (ii) any other similar agreement between a depository institution, the Borrower and the Trustee whereby the Trustee is granted the right of control over funds or bank accounts of the Borrower, as each of the same may be amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

Accountant

"Accountant" means any firm of nationally-recognized independent certified public accountants selected by the Borrower.

Act

       "Act" means the California Pollution Control Financing Authority Act (Chapter 1 (commencing with Section 44500) of Division 27 of the California Health and Safety Code), as now in effect and as it may from time to time hereafter be amended or supplemented.

Act of Bankruptcy

       "Act of Bankruptcy" means with respect to any Person (i) the entry of an order or decree, by a court of competent jurisdiction (A) for relief against such Person in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect which remains not discharged, bonded or stayed for at least ninety (90) days, (B) appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) for a substantial part of such Person's property which remains not discharged, bonded or stayed for at least ninety (90) days or (C) ordering the winding up or liquidation of such Person's affairs; (ii) the institution or commencement by such Person of a voluntary case under any applicable bankruptcy, insolvency, reorganization or other similar law now or hereafter in effect; (iii) the consent by such Person to (A) the entry of an order for relief against such Person in any involuntary case under any such law or (B) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) for a substantial part of such Person's property; (iv) the making by such Person of a general assignment of substantially all of its assets for the benefit of creditors; or (v) the failure of such Person generally to pay its debts as they become due, or the admission by it in writing of such failure, within the meaning of the Bankruptcy Code of 1978, as amended, and judicial interpretations thereof.

Additional Payments

       "Additional Payments" means the payments required to be made by the Borrower pursuant to Sections 4.2(b), (c) and (d) of the Agreement (including any interest required to be paid by the Borrower on such payments pursuant to Section 4.2(e) of the Agreement) and Sections 7.2 (excluding payments in respect of 4.2(a) of the Agreement), 7.3, 9.2 and 9.3 of the Agreement.

Administrative Fees and Expenses

       "Administrative Fees and Expenses" means the reasonable and necessary expenses incurred by the Authority pursuant to the Agreement or this Indenture and the compensation and expenses paid to or incurred by the Trustee, any Bond Registrar, and/or any Paying Agent under the Agreement or this Indenture, which include but are not limited to printing of Bonds, accomplishing transfers or new registration of Bonds, or other charges and other disbursements including those of their respective officers, directors, members, attorneys, agents and employees incurred in and about the administration and execution of the Agreement and this Indenture.

Administrative Memorandum

       "Administrative Memorandum" means that certain Administrative Memorandum to Ground Sublease, made as of October 20, 2016, by and between RUA and the Borrower, as may be amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

Agreement or Loan Agreement

"Agreement" or "Loan Agreement" means that certain Loan Agreement by and between the Authority and the Borrower, dated as of the date hereof, as originally executed and as it may from time to time be supplemented, modified or amended in accordance with the terms thereof and of this Indenture.

Allocation Resolution

"Allocation Resolution" means Resolution No. 18-127, adopted by CDLAC on December 12, 2018, transferring a portion of the 2018 State Ceiling on Qualified Private Activity Bonds.

Anaergia Services

"Anaergia Services" means Anaergia Services LLC, a Delaware limited liability company.

Approving Opinion

"Approving Opinion" means an opinion of Bond Counsel (addressed and delivered to the Authority and the Trustee) that an action being taken (i) is authorized by the Act and this Indenture and complies with the terms of the Agreement, if applicable, and (ii) will not, in and of itself, adversely affect the Tax-exempt status of the Bonds.

Attornment Agreement

"Attornment Agreement" means that certain Recognition and Attornment Agreement, made as of March 22, 2016, by and among the City of Rialto, RUA and the Borrower, as may be amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

Authority

"Authority" means the California Pollution Control Financing Authority created pursuant to, and as defined in, the Act.

Authorized Denomination

"Authorized Denomination" means $250,000 or any integral multiple of $5,000 in excess thereof.

Authorized Representative

"Authorized Representative" means with respect to the Borrower, each individual at the time designated to act on behalf of the Borrower by a written certificate signed by the Borrower, furnished to the Trustee and the Authority, and containing the specimen signature of each such individual. With respect to the Authority, "Authorized Representative" shall mean the Executive Director of the Authority and any individual or individuals at the time designated to act on behalf of the Authority by a written certificate signed by the Executive Director of the Authority, furnished to the Trustee, the Borrower and containing the specimen signature of each such individual.

Beneficial Owners

"Beneficial Owners" means those individuals, partnerships, corporations or other entities for whom the Direct Participants have caused DTC to hold Book-Entry Bonds.

4

Bond Counsel

       "Bond Counsel" means any attorney at law or firm of attorneys of nationally recognized standing in matters pertaining to the federal tax exemption of interest on bonds issued by states and political subdivisions, duly admitted to practice law before the highest court of any state of the United States of America, and acceptable to the Authority, but shall not include counsel for the Borrower.

Bondholder

       See "Holder."

Bond Payment Date

       "Bond Payment Date" means any date upon which any principal, interest or premium payable with respect to the Bonds shall become due, whether upon redemption (including without limitation sinking fund redemption), acceleration, maturity or otherwise.

Bond Registrar or Registrar

       "Bond Registrar" or "Registrar" means the entity or entities performing the duties of the bond registrar pursuant to Section 2.08 hereof.

Bonds or Bond

       "Bonds" or "Bond" means all revenue bonds of the Authority authorized by and at any time Outstanding pursuant hereto and executed, issued and delivered in accordance with Section 2.02 hereof.

Book-Entry Bonds

       "Book-Entry Bonds" means the Bonds registered in the name of the nominee of DTC, or any successor securities depository for such Bonds, as the registered owner thereof pursuant to the terms and provisions of Section 2.11 hereof.

Borrower

       "Borrower" means Rialto Bioenergy Facility, LLC, a limited liability company organized and existing under the laws of the State of Delaware, or any entity which is the surviving, resulting or transferee entity in any merger, consolidation or transfer of assets permitted under Section 5.2 of the Agreement and also means, unless the context otherwise requires, an assignee of the Agreement as permitted by Section 5.2 of the Agreement, but does not mean any affiliate of the Borrower.

Borrower Documents

       "Borrower Documents" shall have the meaning set forth in Section 2.3(a) of the Agreement.

Borrower Subaccount

       "Borrower Subaccount" means the subaccount by that name established pursuant to Section 3.04 hereof.

Borrower's Audited Financial Statements

"Borrower's Audited Financial Statements" means the consolidated annual financial statements of the Borrower, prepared in accordance with GAAP, consistently applied, accompanied by an audit report of an independent certified public accountant and supplementary calculations verifying the Borrower's compliance with the Days Cash on Hand Requirement and the Coverage Requirement (as such terms are defined in Sections 5.18(a)(i) and 5.18(b)(i), respectively, of the Loan Agreement).

Business

"Business" means the business of the Borrower as presently conducted and as contemplated to be conducted as of and after the Date of Delivery, including, without limitation, the anaerobic digestion of organic waste for the production and sale of renewable natural gas, electricity and other byproducts.

Business Day

"Business Day" means any day other than (i) a Saturday, Sunday or legal holiday in the State of California, (ii) a day on which commercial banks in New York, New York, San Francisco, California, Minneapolis, Minnesota, or any other city or cities in which the Corporate Trust Office of the Trustee is located are closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which interbank wire transfers cannot be made on the Fedwire system.

Capital Replacement Fund

"Capital Replacement Fund" means the fund by that name created pursuant to Section 5.08 hereof.

Capitalized Interest Account

"Capitalized Interest Account" means the account by that name established within the Project Fund pursuant to Section 3.03 hereof.

CDLAC

"CDLAC" means the California Debt Limit Allocation Committee of the State of California created pursuant to Chapter 11.8 (commencing with Section 8869.80) of Division 1 of Title 2 of the California Government Code.

Certificate, Statement, Request, Requisition or Order of the Authority or the Borrower

"Certificate," "Statement," "Request," "Requisition" or "Order" of the Authority or the Borrower mean, respectively, a written certificate, statement, request, requisition or order signed in the name of the Authority by its Chair, Executive Director or Deputy Executive Director or such other individual as may be designated and authorized to sign for the Authority or in the name of the Borrower by an Authorized Representative of the Borrower.  Any such instrument and supporting opinions or representations, if any, may, but need not, be combined in a single instrument with any other instrument, opinion or representation and the two or more so combined shall be read and construed as a single instrument.  If and to the extent required by Section 1.02 hereof, each such instrument shall include the statements provided for in Section 1.02 hereof.

6

Change Orders

"Change Orders" shall have the meaning set forth in Section 2.3(oo) of the Agreement.

Code

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

Collateral Assignment

"Collateral Assignment" means the Collateral Assignment of Contracts, Permits, Licenses and Plans, dated as of the date hereof, executed by the Borrower in favor of the Trustee, as may be amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

Collateral Assignments of Feedstock Agreements

"Collateral Assignments of Feedstock Agreements" means, collectively, (i) the Collateral Assignment of Feedstock Supply Agreement, dated as of the date hereof, executed by the Borrower in favor of the Trustee with respect to the Borrower's Feedstock Agreement with Republic, and the related Consent to Collateral Assignment executed by Republic and acknowledged and agreed to by the Borrower and the Trustee, and (ii) each other collateral assignment of (and related consent to assignment) hereafter executed and delivered in connection with Borrower's entry into a Feedstock Agreement in accordance with the terms of the Loan Documents, in each case, as the same may be amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

Collateral Assignments of Offtake Agreements

"Collateral Assignments of Offtake Agreements" means, collectively, (i) the Collateral Assignment of Offtake Agreement, dated as of the date hereof, executed by the Borrower in favor of the Trustee with respect to the Southwest Gas Offtake Agreement, and the related Consent to Collateral Assignment executed by Southwest Gas Corporation, (ii) the Collateral Assignment of Offtake Agreement, dated as of the date hereof, executed by the Borrower in favor of the Trustee with respect to the Borrower's Offtake Agreement with the City of Anaheim, and the related Collateral Assignment Agreement executed by the City of Anaheim and the Trustee and acknowledged by the Borrower, and (iii) each other collateral assignment (and related consent to assignment) hereafter executed and delivered in connection with Borrower's entry into an Offtake Agreement in accordance with the terms of the Loan Documents, in each case, as the same may be amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

Common Control Entity.

"Common Control Entity" means any entity which is a member of a "controlled group of corporations" with, or is under "common control" with, the Borrower as defined in Section 414(b) or (c) of the Code.

Completion Date

"Completion Date" means the earlier of the date of completion of the Project or final disbursement from the Project Fund as that date shall be certified as provided in Section 3.2 of the Agreement.

Construction Budget

       "Construction Budget" means the detailed construction budget attached to the Construction Contract as Exhibit H, which sets forth all categories of Costs of the Project required in connection with the development, construction, construction, start-up and testing of the Project, including, without limitation, all construction costs, all interest, taxes and other carrying costs related to the Bonds, all costs related to the construction of the facilities described under the Project Documents and the costs of all real and personal property to be included in the Project, as updated from time to time.

Construction Contract

       "Construction Contract" means that certain Design-Build Contract, made as of June 26, 2018, by and between the Borrower and the Construction Contractor, as may be amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

Construction Contractor

       "Construction Contractor" means W.M. Lyles Co., together with its permitted successors and assigns.

Construction Monitor

       "Construction Monitor" means Harris Group Inc. and its successors and assigns, or such other consulting firm engaged by the Borrower to perform the functions of the Construction Monitor under the Construction Monitor Contract for the benefit of the Holders.

Construction Monitor Contract

       "Construction Monitor Contract" means that certain Proposal for Construction Monitoring Services dated December 17, 2018, by and between the Borrower and the Construction Monitor, or any other agreement with substantially the same terms and conditions with a replacement Construction Monitor.

Contingent Debt Liabilities

       "Contingent Debt Liabilities" means all guaranties, endorsements, assumptions and other contingent liabilities in respect of, or to purchase or otherwise acquire, Indebtedness of others; provided, however, that "Contingent Debt Liabilities" shall not include any other liability that does not constitute Indebtedness.

Continuing Disclosure Agreement

       "Continuing Disclosure Agreement" means that certain Continuing Disclosure Agreement by and between the Borrower and the Trustee, dated the Date of Delivery, as it may from time to time be supplemented or amended.

Corporate Trust Office

       "Corporate Trust Office" means with respect to the Trustee, the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date hereof is located in Minneapolis, Minnesota; provided, however, that with respect to presentation

of Bonds for payment or for registration of transfer and exchange such term shall mean the office or agency of the Trustee at which, at any particular time, its corporate trust agency business shall be conducted.

Costs of Issuance

"Costs of Issuance" means all items of expense directly or indirectly payable by or reimbursable to the Authority or the Borrower and related to the authorization, issuance, sale and delivery of the Bonds, including but not limited to costs of preparation and reproduction of documents, printing expenses, filing and recording fees, initial fees and charges of the Trustee, underwriting fees, legal fees and charges, fees and disbursements of consultants and professionals, fees and charges for preparation, execution and safekeeping of the Bonds and any other cost, charge or fee incurred in connection with the original issuance of the Bonds which constitutes a "cost of issuance" within the meaning of Section 147(g) of the Code.

Costs of Issuance Fund

"Costs of Issuance Fund" means the fund by that name established pursuant to Section 3.04 hereof.

Costs of the Project

"Costs of the Project" or "Project Costs" means the sum of the items, or any such item, authorized to be paid from the Project Fund pursuant to the provisions of Section 3.1 of the Agreement, but shall not include any Costs of Issuance.

Date of Delivery

"Date of Delivery" means January 30, 2019, the date of initial issuance and delivery of the Bonds.

Days Cash on Hand

"Days Cash on Hand" means, for the period tested, the sum of unrestricted and unencumbered (i) cash, (ii) cash equivalents and (iii) marketable debt and equity securities, divided by the quotient of (x) operating expenses (which shall include all scheduled debt service obligations payable during the period) less depreciation and amortization divided by (y) 365. Notwithstanding any of the foregoing to the contrary, Days Cash on Hand shall include proceeds of equity contributions from any member of the Borrower, but shall not include (A) self-insurance funds, (B) proceeds of any short-term borrowings including, without limitation, internal affiliate loans (including loans from any member of the Borrower) and draws on lines of credit regardless of the maturity date of the line of credit, (C) proceeds of accounts receivable financings or factoring, (D) proceeds of put debt not supported by a liquidity facility with term-out features, or (E) any collateral required pursuant to the terms of a Financial Product Agreement that has been posted.

Debt Service

"Debt Service" means, on a given date, the interest (including past due interest) and scheduled principal payments then due and owing on the Bonds that is scheduled to be paid to the Bondholders pursuant to the terms of the Indenture, including mandatory sinking fund installments.

Debt Service Coverage Ratio

"Debt Service Coverage Ratio" means, with respect to any Indebtedness or portion thereof to which this ratio shall be applied (the "Measured Indebtedness"), the ratio of (i) EBITDA for a given period to (ii) the total of all principal, interest, premium (if any), fees and other amounts due and payable (including past due amounts) during such period in respect of the Measured Indebtedness (collectively, the "Measured Debt Service"), all as determined in accordance with GAAP; provided, however, that if the final maturity date of any portion of the Measured Indebtedness will occur during such period, then, for purposes of this ratio, the Measured Debt Service shall be reduced by an amount equal to the amount then held in any reserve fund that is available to pay debt service on such portion of the Measured Indebtedness.

Debt Service Reserve Fund

"Debt Service Reserve Fund" means the trust fund so designated which is created and established pursuant to Section 5.07.

Determination of Taxability

"Determination of Taxability" means the occurrence or existence of any of the conditions or events more fully described in Section 8.3(b) of the Agreement.

Direct Participants

"Direct Participants" means those broker-dealers, banks and other financial institutions from time to time for which DTC holds the Bonds as securities depository.

DTC

"DTC" means The Depository Trust Company, New York, New York, a limited purpose trust company organized under the New York Banking Law, or any successor securities depository for the Bonds.

Easement Agreement

"Easement Agreement" means that certain Easement Agreement, made as of April 1, 2016, by and between the City of Rialto and the Borrower, as may be amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

EBITDA

"EBITDA" means, with respect to any period, Net Income for such period plus all amounts deducted in arriving at such Net Income amount in respect of (i) federal, state and local income taxes, (ii) interest expense, (iii) amortization expense and (iv) depreciation expense; provided, however, that the following items shall be excluded from the computation of "EBITDA": (A) extraordinary items of income or loss, (B) gains or losses from the extinguishment of Indebtedness, (C) unrealized gains and losses on investments or Financial Product Agreements, (D) any gain or loss from the disposition of assets not in the ordinary course of business, (E) any loss from impairment of the value of assets, (F) financing costs that are treated as a current expense, rather than amortized and (G) any other item that is nonrecurring and also a non-cash item.

EMMA

"EMMA" means the Electronic Municipal Market Access website of the Municipal Securities Rulemaking Board, currently located at http://emma.msrb.org.

Environmental Affiliate

"Environmental Affiliate" means any Person, only to the extent of, and only with respect to matters or actions of such Person for which, the Borrower could reasonably be expected to have liability as a result of the Borrower retaining, assuming, accepting or otherwise being subject to liability for Environmental Claims relating to such Person, whether the source of the Borrower's obligation is by contract or operation of law.

Environmental Approvals

"Environmental Approvals" means any Governmental Approvals required under applicable Environmental Regulations.

Environmental Claim

"Environmental Claim" means any written notice, claim, demand or similar written communication by any Person alleging potential liability or requiring or demanding remedial or responsive measures (including potential liability for investigatory costs, cleanup, remediation and mitigation costs, governmental response costs, natural resources damages, property damages, personal injuries, fines or penalties) in each such case (x) either (i) with respect to environmental contamination-related liabilities or obligations with respect to which the Borrower could reasonably be expected to be responsible that are, or could reasonably be expected to be, in excess of $2,000,000 in the aggregate, or (ii) that has or could reasonably be expected to result in a Material Adverse Effect and (y) arising out of, based on or resulting from (i) the presence, release or threatened release into the environment, of any Materials of Environmental Concern at any location, whether or not owned by such Person; (ii) circumstances forming the basis of any violation, or alleged violation, of any Environmental Regulations or Environmental Approvals; or (iii) exposure to Materials of Environmental Concern.

Environmental Regulations

"Environmental Regulations" means any federal, state or local law, statute, code, ordinance, regulation, requirement or rule relating to dangerous, toxic or hazardous pollutants, Hazardous Substances, chemical waste, materials or substances.

ERISA

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

ERISA Affiliate

"ERISA Affiliate" means any person treated as a single employer of the Borrower within the meaning of Section 414(b) or (c) of the Internal Revenue Code of 1986, as amended.

ERISA Event

"ERISA Event" means (a) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to a pension plan, (b) the existence with respect to any pension plan of an "accumulated funding deficiency" (within the meaning of Section 302 of ERISA or Section 412 of the Internal Revenue Code of 1986, as amended) and (c) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal by the Borrower or any such ERISA Affiliate from any pension plan or Multiemployer Plan (as defined in Section 5.19 of the Loan Agreement).

ERISA Plan

"ERISA Plan" means any employee pension benefit plan under ERISA, as such plan is defined in ERISA

Event of Default

"Event of Default" means any of the events specified in Section 7.01 hereof.

Excess Cash

"Excess Cash" means Gross Revenues less (i) Operation and Maintenance Expenses, (ii) Debt Service, (iii) Administrative Fees and Expenses and (iv) amounts required to be funded into any reserves required by this Indenture or the Loan Documents.

Facility

"Facility" means any location at which any portion of the Project exists.

Feedstock Agreements

"Feedstock Agreements" means, collectively, (i) that certain Feedstock Supply Agreement, dated as of November 28, 2017, by and between the Borrower and Waste Management Recycling and Disposal Services of California, Inc., (ii) that certain Feedstock Supply Agreement, dated as of July 30, 2018, by and between the Borrower and Republic, (iii) that certain Facility Operation Agreement, entered into as of July 26, 2016, by and among the City of Rialto, RUA and the Borrower, (iv) that certain Biosolids Hauling and Supply Agreement, executed September 10, 2018, by and between the Borrower and Denali Water Solutions, LLC, and (v) any and all other agreements, whether now existing or hereafter entered into, between the Borrower and one or more suppliers whereby the Borrower procures or obtains mixed organic food waste or Class B biosolids for processing at the Project, as each of the foregoing may be amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

Financial Model

"Financial Model" means the pro forma financial statements and projections of revenue and expense and cash flows with respect to the Borrower and the Project described and reviewed by Harris Group Inc. in Section 9 of the Independent Engineer's Report dated September 27, 2018 and attached to the Limited Offering Memorandum as Appendix B.

Financial Product Agreement

"Financial Product Agreement" means any interest rate exchange agreement, hedge or similar arrangement, including, inter alia, an interest rate swap, asset swap, a constant maturity swap, a forward or futures contract, cap, collar, option, floor, forward or other hedging agreement, arrangement or security, direct funding transaction or other derivative, however denominated and whether entered into on a current or forward basis, excluding however commodity (including power and natural gas) forward purchase agreements.

Fiscal Year

"Fiscal Year" means the period beginning on January 1 of each year and ending on the next succeeding December 31, or any other twelve-month, or fifty-two week, period hereafter selected and designated as the official fiscal year period of the Borrower.

Fitch

"Fitch" means Fitch, Inc. a corporation organized and existing under the laws of the State of Delaware, doing business as Fitch Ratings, its successors and their assigns, or, if such entity shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "Fitch" shall be deemed to refer to any other nationally recognized securities rating agency (other than S&P or Moody's).

GAAP

"GAAP" means generally accepted accounting principles in the United States.

Governmental Approval

"Governmental Approval" means any authorization, consent, approval, license, lease, ruling, permit, certification, exemption, filing for registration by or with any Governmental Authority.

Governmental Authority

"Governmental Authority" shall mean any federal, state, municipal, national, local or other governmental department, court, commission, board, bureau, agency or instrumentality or political subdivision thereof, or any entity or officer exercising executive, legislative or judicial, regulatory or administrative functions of or pertaining to any government or any court, whether of the United States or a state, territory or possession thereof, a foreign sovereign entity or country or jurisdiction or the State.

Governmental Obligation

"Governmental Obligation" means a bond, note or other evidence of indebtedness issued by the State of California or any agency or political subdivision of the State of California or any local agency, which is described by Sections 103 and 141-150 of the Code.

Grant Subaccount

"Grant Subaccount" means the subaccount by that name established pursuant to Section 3.03 hereof

13

Gross Revenues

"Gross Revenues" means all moneys, contributions, fees, rates, receipts, rentals, charges, issues and income received for, received by or derived from, as the case may be, the Borrower, the operation of the Borrower or the Project, the Facilities or any other source whatsoever, including, without limitation, Project Revenues, moneys received from the operation of the Borrower's business or the possession of its properties, insurance proceeds or condemnation awards and all rights to receive the foregoing, whether in the form of accounts, accounts receivable, general intangibles, chattel paper, instruments, documents, contract rights or other rights, and the proceeds of the same whether now owned or held or hereafter coming into being. Notwithstanding anything herein to the contrary, Gross Revenues shall not include any proceeds of insurance (other than business interruption insurance), sale proceeds or condemnation awards attributable to any property of any kind that is subject to or financed under a separate financing arrangement with respect to Nonrecourse Indebtedness permitted by the terms of the Agreement.

Guarantor

"Guarantor" means Anaergia Services in its capacity as guarantor under the Guaranty Agreement.

Guaranty Agreement

"Guaranty Agreement" means that certain Limited Payment Guaranty made as of the date hereof by Guarantor in favor of the Trustee, as may be amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

Hazardous Substances

"Hazardous Substances" means (a) any oil, flammable substance, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other wastes, materials or pollutants which (i) pose a hazard to the Project or to persons on or about the Project or (ii) cause the Project to be in violation of any Environmental Regulation; (b) asbestos in any form which is or could become friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls, or radon gas; (c) any chemical, material or substance defined as or included in the definition of "waste," "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," or "toxic substances" or words of similar import under any Environmental Regulation including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 USC §§ 9601 et seq.; the Resource Conservation and Recovery Act, 42 USC §§ 6901 et seq.; the Hazardous Materials Transportation Act, 49 USC §§ 1801 et seq.; the Federal Water Pollution Control Act, 33 USC §§ 1251 et seq.; the California Hazardous Waste Control Law, Cal. Health & Safety Code §§ 25100 et seq.; the Hazardous Substance Account Act, Cal. Health & Safety Code §§ 25300 et seq.; the Underground Storage of Hazardous Substances Act, Cal. Health & Safety Code §§ 25280 et seq.; the Porter-Cologne Water Quality Control Act, Cal. Water Code §§ 13000 et seq., the Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65); and Title 22 of the California Code of Regulations, Division 4, Chapter 30; (d) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any governmental authority or agency or may or could pose a hazard to the health and safety of the occupants of the Project or the owners and/or occupants of property adjacent to or surrounding the Project, or any other person coming upon the Project or adjacent property; or (e) any other chemical, materials or substance which may or could pose a hazard to the environment.

Holder or Bondholder or Owner

"Holder" or "Bondholder," or "Owner," whenever used herein with respect to a Bond, means the Person in whose name such Bond is registered.

Indebtedness

"Indebtedness" means (i) any guaranty and (ii) any indebtedness or obligation of the Borrower (other than accounts payable and accruals), as determined in accordance with GAAP, including obligations under conditional sales contracts or other title retention contracts and rental obligations under leases which are considered capital leases under GAAP.

Indenture

"Indenture" means this Indenture, as originally executed or as it may from time to time be supplemented, modified or amended by any Supplemental Indenture.

Independent Consultant

"Independent Consultant" means any professional consulting, accounting, engineering, financial advisory firm or commercial banking firm or individual selected by the Borrower or, as provided in Sections 5.18(a)(iii) or 5.18(b)(ii), by the Holders of a majority in aggregate principal amount of the Bonds then Outstanding, having the skill and experience necessary to render the particular report, advice, determination or consent required and having a favorable reputation for such skill and experience, and which firm or individual is licensed by, or permitted to practice in, the State of California, and which firm or individual does not control the Borrower and is not controlled by or under common control with the Borrower.

Information Services

"Information Services" means EMMA or, in accordance with then current guidelines of the Securities and Exchange Commission, such other services providing information with respect to called bonds, or no such services, as the Authority may indicate in a Certificate of the Authority delivered to the Trustee.

Interest Account

"Interest Account" means the account by that name in the Revenue Fund established pursuant to Section 5.02 hereof.

Interest Payment Date

"Interest Payment Date" means June 1 and December 1, commencing June 1, 2019.

Investment Securities

"Investment Securities" means any of the following securities (other than those issued by the Authority, the Borrower or the Guarantor):

(1)     Commercial paper issued by corporations that are organized and operating within the United States and that at the time of investment are rated by Moody's or S & P (a) "A 2" or "P 2" or

higher if such commercial paper has a maturity of seven (7) days or less, and (b) "A 1" or "P 1" if such commercial paper has a maturity of greater than seven (7) days;

(2)    United States Treasury notes, bonds, bills or certificates of indebtedness or those for which the faith and credit of the United States are pledged for the full and timely payment of principal and interest, not subject to prepayment or call;

(3)    Negotiable certificates of deposit issued by or deposit accounts with a nationally or state chartered bank, including the Trustee, its parent company and their affiliates, or by a state licensed branch of a foreign bank, provided that the senior debt issued by such bank and/or its holding company shall be rated "A" by Moody's and S&P, respectively, and the commercial paper issued by such holding company or branch of a foreign bank shall be rated "P 1" and "A 1" by Moody's and S&P, respectively;

(4)    Bonds, notes or other obligations of any state, municipality or political subdivision the interest on which is excluded from gross income for federal income tax purposes, which are rated "A" or higher by Moody's , S&P, or Fitch;

(5)    Investments in or shares of any "regulated investment company" within the meaning of Section 851(a) of the Code, the assets of which are securities or investments described in (1)-(4) above, including funds for which the Trustee or an affiliate receives and retains a fee for services provided to the fund, whether as a custodian, transfer agent, investment advisor or otherwise;

(6)    Repurchase agreements with any bank, trust company or national banking association insured by the Federal Deposit Insurance Corporation (including, but not limited to the Trustee or any of its affiliates), or with any government bond dealer recognized as a primary dealer by the Federal Reserve Bank of New York, which agreements are fully and continuously secured by a valid and perfected security interest in obligations described in paragraph (2) of this definition or obligations which are rated "Aaa" by Moody's or "AA+" by S&P;

(7)    Money market funds with a rating of at least "A" or which invest solely in securities rated at least "A", including funds for which the Trustee or an affiliate receives and retains a fee for services provided to the fund, whether as a custodian, transfer agent, investment advisor or otherwise; and

(8)    Collateralized or uncollateralized investment agreements or other contractual arrangements with domestic or foreign corporations, financial institutions or national associations, provided that the senior long term debt of such corporations, institutions or associations is rated continuously within the highest three rating categories by S&P, Moody's and Fitch, if rated by Fitch.

<u>Knowledge</u>

"Knowledge" means, with respect to the Borrower, the actual or constructive knowledge of any officer or director of the Borrower, including any Authorized Representative of the Borrower, after reasonable inquiry in the ordinary course of performance of such person's duties on behalf of the Borrower.

<u>Lease Agreement</u>

"Lease Agreement" means that certain Ground Sublease, made as of April 1, 2016, by and between RUA and the Borrower, as amended by the First Amendment thereto made as of January 9, 2018, and as may be further amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

Lease Documents

"Lease Documents" means, collectively, the Lease Agreement, the Attornment Agreement, the Lessor Estoppel, the Easement Agreement, the Administrative Memorandum and the Access Agreement.

Leasehold Deed of Trust

"Leasehold Deed of Trust" means that certain Leasehold Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents and Leases, dated as of the date hereof, executed by the Borrower, as trustor, in favor of UMB Bank, N.A., as trustee thereunder, creating a lien for the benefit of the Trustee (as assignee of the Authority), as trustee for the Holders of the Bonds, and for the benefit of the holders from time to time of Parity Debt.

Lessor Estoppel

"Lessor Estoppel" means that certain Lessor Estoppel Certificate and Agreement, dated January 1, 2019 and delivered by RUA to the Borrower, the Authority and the Trustee, which includes, without limitation, Schedule I thereto, pursuant to which RUA has made certain representations regarding the Lease Agreement and has granted certain rights and remedies to the Trustee in respect of the Lease Agreement.

Lien

"Lien" means any mortgage or pledge of, security interest in or lien or encumbrance on the Gross Revenues or any property or asset of the Borrower.

Limited Offering Memorandum

"Limited Offering Memorandum" means the Limited Offering Memorandum, dated January 16, 2019, relating to the Bonds.

Loan Default Event

"Loan Default Event" means any one or more of the events specified in Section 7.1 of the Agreement.

Loan Documents

"Loan Documents" means, collectively, the Agreement, the Guaranty Agreement and each of the Security Documents.

Loan Repayments

"Loan Repayments" means the payments so designated and required to be made by the Borrower pursuant to Section 4.2 of the Agreement.

Material Adverse Effect

"Material Adverse Effect" means any event, development or circumstance that has had or could reasonably be expected to have a material adverse effect on (a) the business, assets, property, condition (financial or otherwise) or operations of the Borrower or the Project, taken as a whole, (b) the

ability of the Borrower to perform its material obligations under (i) any Loan Document or (ii) Material Project Document or Material Project Revenue Generating Agreement to which it is a party, (c) creation, perfection or priority of the Liens granted, or purported to be granted, in favor, or for the benefit, of the Trustee pursuant to the Loan Documents or (d) the material rights or remedies of the Trustee or any Bondholder under any Loan Documents.

Materials of Environmental Concern

"Materials of Environmental Concern" means Hazardous Substances, chemicals, pollutants, contaminants, wastes and toxic substances, any toxic mold, radon gas or other naturally occurring toxic or hazardous substance or organism and any material that is regulated in any way, or for which liability is imposed, pursuant to an Environmental Regulation.

Material Project Document

"Material Project Document" means each of (i) the Lease Agreement, (ii) the O&M Agreement, and (ii) any Project Document that is projected to produce annual revenues in excess of ten percent (10%) of total Gross Revenues budgeted for the Fiscal Year during which such determination is made.

Material Project Revenue Generating Agreement

"Material Project Revenue Generating Agreement" means any Project Revenue Generating Agreement that is projected to produce annual revenues in excess of ten percent (10%) of total Gross Revenues budgeted for the Fiscal Year in which such determination is made.

Maximum Annual Debt Service

"Maximum Annual Debt Service" means, as of the date of calculation, an amount equal to the maximum annual debt service due on the Bonds and any Parity Debt during the then current or any succeeding calendar year, whether at maturity or upon mandatory sinking fund redemption, provided that solely for purposes of such calculation, the amount of debt service coming due on the Bonds during calendar year 2040 shall be deemed to be an amount equal to the amount of debt service coming due on the Bonds during calendar year 2039.

Moody's

"Moody's" means Moody's Investors Service, Inc., a corporation organized and existing under the laws of the State of Delaware, its successors and their assigns, or, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "Moody's" shall be deemed to refer to any other nationally recognized securities rating agency (other than S&P or Fitch).

Multiemployer Plan

"Multiemployer Plan" has the meaning set forth in Section 4001(a)(3) of ERISA and all rules and regulations promulgated from time to time thereunder.

Net Income

       "Net Income" means, with respect to any period, the sum of the excess of revenues over expenses of the Borrower for such period as determined by GAAP in the United States.

Net Proceeds

       "Net Proceeds" means the proceeds from insurance or from actual or threatened condemnation or eminent domain actions with respect to all or any portion of the Project, less any costs reasonably expended by the Borrower to receive such proceeds.

Nonrecourse Indebtedness

       "Nonrecourse Indebtedness" means any Indebtedness secured by a lien, which is not a general obligation of the Borrower and liability for which is effectively limited to any property (a "Nonrecourse Lien") subject to such lien with no recourse (except to such Nonrecourse Lien) to (other than carve outs typically imposed by lenders in commercial real estate transactions, including fraud, waste or environmental indemnity), or lien upon, directly or indirectly, the Gross Revenues or any other property then owned by the Borrower.

O&M Agreement

       "O&M Agreement" means that certain Operations and Maintenance Services Agreement, dated as of September 1, 2018, by and between the Borrower and Anaergia Services, and any replacement operations and maintenance agreement entered into in accordance with the terms of this Indenture and the Loan Documents, as each of the foregoing may be amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

Offtake Agreements

       "Offtake Agreements" means, collectively, (i) that certain Biomethane Purchase and Sale Agreement, dated as of January 11, 2018, by and between SoCal Biomethane and the City of Anaheim, as assigned from SoCal Biomethane to the Borrower pursuant to that certain Assignment and Assumption Agreement, dated as of November 13, 2018, by and among the City of Anaheim, SoCal Biomethane and the Borrower, (ii) the Southwest Gas Offtake Agreement and (iii) any and all other agreements, whether now existing or hereafter entered into, under which the Borrower is obligated to sell, and a purchaser is obligated to purchase, renewable natural gas, renewable electricity or fertilizer produced at the Project, as each of the foregoing may be amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

Offtake Expiration Event

       "Offtake Expiration Event" means the occurrence of the following: (i) the Borrower fails to either (A) exercise, at least two (2) years prior to the stated expiration date of the Southwest Gas Offtake Agreement, its rights to extend such agreement for a term of at least five (5) years or (B) enter into an agreement to replace the Southwest Gas Offtake Agreement on terms with similar or more advantageous prices for the sale of renewable natural gas than in the Southwest Gas Offtake Agreement and otherwise on commercially reasonable terms and for a term of at least five (5) years, and (ii) the Independent Consultant is unable to deliver a report to the Trustee that the Borrower is nonetheless expected to achieve the Days Cash on Hand Requirement set forth in Section 5.18(a)(i) of the Agreement and each component of the Coverage Requirement set forth in Section 5.18(b)(i) of the Agreement (without including any capital

contributions to the Borrower from its members for purposes of calculating EBITDA) after the expiration of the Southwest Gas Offtake Agreement without replacement. Once commenced, an Offtake Expiration Event shall be deemed to continue until such time, if any, as Borrower has so extended the Southwest Gas Offtake Agreement or entered into one or more Offtake Agreements, each having a term of at least five (5) years, on the basis of which the Independent Consultant is able to deliver a report to the Trustee that, taking such Offtake Agreements into account, the Borrower is expected to achieve the Days Cash on Hand Requirement set forth in Section 5.18(a)(i) of the Agreement and each component of the Coverage Requirement set forth in Section 5.18(b)(i) of the Agreement (without including any capital contributions to the Borrower from its members for purposes of calculating EBITDA).

Operating and Working Capital Costs

"Operating and Working Capital Costs" means the sum of the items, or any such item, authorized to be paid from the Taxable Subaccount of the Project Fund pursuant to the provisions of Section 3.1(b)(vii) of the Agreement.

Operating Report

"Operating Report" means the report described in Section 4(a)(3) of the Continuing Disclosure Agreement.

Operation and Maintenance Expenses

"Operation and Maintenance Expenses" means, for any period, the sum without duplication of all (a) reasonable and necessary expenses of administering, managing, operating the Project and maintaining it in good repair and operating condition, (b) salaries, wages and costs of benefits for the employees of Borrower, (c) costs associated with the supply and transportation of all feedstock, natural gas, electricity and other supplies and raw materials to the Project and distribution and sale of products from the Project that the Borrower is obligated to pay, including prepayments of the costs for any such feedstock, natural gas, electricity and other supplies and raw materials, (d) all reasonable and necessary insurance costs (other than insurance premiums that are paid as Costs of the Project), (e) property, sales and franchise taxes to the extent that the Borrower is liable to pay such taxes to the taxing authority (other than taxes imposed on or measured by income or receipts) to which the Project may be subject (or payment in lieu of such taxes to which the Project may be subject), (f) reasonable and necessary costs and fees incurred in connection with obtaining and maintaining in effect Project permits and other necessary governmental approvals for the Project, (g) reasonable and arm's-length legal, accounting and other professional fees attendant to any of the foregoing items during such period, (h) the reasonable costs of administration and enforcement of the this Agreement, the  Loan Documents, all Project Documents and all Project Revenue Generating Agreements, (i) amounts payable under Financial Product Agreements (other than termination payments) which are identified in the Borrower's annual budget, (j)  amounts payable by the Borrower under the Project Documents in the ordinary course of business and not as a result of a breach or default by the Borrower thereunder (k) the reasonable fees and expenses of the Construction Manager and each Independent Consultant, and (l) all other costs and expenses included in the then-current operating budget including, but not limited to, costs of salaries, wages and employee benefits, licensing fees and fees payable under the Technical Services Agreement and O&M Agreement.  In no event shall Costs of the Project be considered Operation and Maintenance Expenses.

Opinion of Counsel

"Opinion of Counsel" means a written opinion (addressed and delivered to the Authority and the Trustee) of counsel independent from the Borrower (who may be counsel for the Authority) selected

by the Authority and, with respect to Sections 6.07(B) and 9.02 hereof, reasonably acceptable to the Trustee. If and to the extent required by the provisions of Section 1.02 hereof, each Opinion of Counsel shall include the statements provided for in Section 1.02 hereof.

Outstanding

"Outstanding," when used as of any particular time with reference to Bonds, means (subject to the provisions of Section 11.10 hereof) all Bonds theretofore, or thereupon being, authenticated and delivered by the Trustee under this Indenture except (i) Bonds theretofore canceled by the Trustee or surrendered to the Trustee for cancellation; (ii) Bonds with respect to which liability of the Authority shall have been discharged in accordance with Section 10.02 hereof, including Bonds (or portions of Bonds) referred to in Section 11.10 hereof; and (iii) Bonds for the transfer or exchange of or in lieu of or in substitution for which other Bonds shall have been authenticated and delivered by the Trustee pursuant to this Indenture.

Owner

See "Holder."

Parity Debt

"Parity Debt" means any Indebtedness incurred by the Borrower that is issued in compliance with Section 5.18(d) of the Agreement and is secured equally and ratably with the obligations of the Borrower under the Agreement by (i) a Lien on and security interest in Gross Revenues and (ii) the Liens and security interests established by the Security Documents.

Participating Affiliate

"Participating Affiliate" means, with respect to the Borrower, each Person (i) that directly or indirectly, through one or more intermediaries or other Persons, controls, or is controlled by, or is under common control with, the Borrower, and (ii) that is itself, or with its affiliates described in clause (i), a "participating party" within the meaning of the Act. For purposes of this definition, a "Person" who is an individual includes the spouse, children or parents of such Person (collectively, "relatives"), and includes any trust of which such Person or his or her relatives is the trustee or a beneficiary. For the purpose of this definition, the "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of a majority of voting securities or membership interests, as trustee, by contract or otherwise.

Paying Agent

"Paying Agent" means the Paying Agent described in Section 8.07 hereof.

Permitted Liens

"Permitted Liens" means the liens described in Exhibit D of the Agreement and any other liens or encumbrances on the Project Site which do not materially adversely affect the value or operation of the Project Site.

Without limiting the generality of the foregoing, "Permitted Liens" includes the following: (i) undetermined or inchoate liens and charges incident to construction or maintenance, and liens and charges incident to construction or maintenance now or hereafter filed of record which are being contested

in good faith by the Borrower; (ii) the lien of taxes and assessments which are not delinquent; (iii) easements, exceptions or reservations, whether or not of record, for the purpose of pipelines, telephone lines, cellular telephone communications facilities, power lines, roads, streets, alleys, drainage and sewerage purposes, laterals, ditches, and other like purposes, or for the joint or common use of the Project Site, Facilities and equipment; (iv) rights reserved to or vested in any municipality or governmental or other public authority to control or regulate or use in any manner any portion of the Project Site; (v) any obligations or duties affecting any portion of the Project Site to any municipality or governmental or other public authority with respect to any right, power, franchise, grant, license or permit; (vi) present or future valid zoning laws and ordinances; (vii) liens securing Indebtedness for the payment, redemption, or satisfaction of which money (or evidences of Indebtedness) in the necessary amount to fully pay such Indebtedness shall have been deposited in trust with a trustee or other holder of such Indebtedness; (viii) the rights of the Trustee under the Indenture and/or the Loan Documents; (ix) statutory liens arising in the ordinary course of business which are not delinquent or are being contested in good faith by the Borrower; (x) leases, licenses or other rights to use portions of the Project Site, provided the same do not materially interfere with the operation of the Project Site; or (xi) any lien with respect to Parity Debt on a parity basis, including the Liens of the Security Documents and the Lien on Gross Revenues established pursuant to Section 4.6 of the Agreement.

Person

"Person" means an individual, corporation, firm, association, limited liability company, partnership, trust, or other legal entity or group of entities, including a governmental entity or any agency or political subdivision thereof.

Pledge Agreement

"Pledge Agreement" means the Membership Interest Pledge Agreement, dated as of the date hereof, executed by Anaergia Services in favor of the Trustee, and each other membership interest pledge agreement executed by a member of the Borrower in accordance with the Agreement, in each case as may be amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

Post-Default Rate

"Post-Default Rate" means (i) when used with respect to any payment of Debt Service on any Bonds or Parity Debt, the then-applicable interest rate plus four percent (4%), and (ii) when used with respect to all other payments due under this Indenture, a variable rate equal to the Trustee's prime rate plus four percent (4%), computed on the basis of a 365 or 366-day year, as the case may be, for actual days elapsed.

Principal Account

"Principal Account" means the account by that name in the Revenue Fund established pursuant to Section 5.02.

Proceeds Account

"Proceeds Account" means the account by that name established pursuant to Section 3.04 hereof.

Project

        "Project" shall mean the Project, as described in Exhibit A to the Agreement, as it may be amended pursuant to the terms of the Agreement.

Project Documents

        "Project Documents" means, collectively, the Lease Documents, the Construction Contract, the Construction Monitor Contract, the Technical Services Agreement, the O&M Agreement, the Offtake Agreements and the Feedstock Agreements.

Project Fund

        "Project Fund" means the fund by that name established pursuant to Section 3.03 hereof.

Project Revenue Generating Agreements

        "Project Revenue Generating Agreements" means, other than the Project Documents, any and all written contracts or agreements, whether now existing or hereafter entered into, to which the Borrower is a party and under which the Borrower derives revenues from the operation of the Project.

Project Revenues

        "Project Revenues" means any and all amounts payable to the Borrower under the Project Documents and the Project Revenue Generating Agreements.

Project Site

        "Project Site" shall have the meaning ascribed in Exhibit A to the Agreement.

Qualified Institutional Buyer

        "Qualified Institutional Buyer" shall have the meaning given to a "qualified institutional buyer" under Rule 144A of the Securities Act of 1933.

Qualified Newspaper

        "Qualified Newspaper" means The Wall Street Journal or The Bond Buyer or any other newspaper or journal containing financial news, printed in the English language and customarily published on each Business Day, of general circulation in New York, New York, and selected by the Trustee, whose decision shall be final and conclusive.

Rebate Fund

        "Rebate Fund" means the fund by that name created pursuant to Section 5.06 hereof.

Rebate Instructions

        Rebate Instructions" means those calculations and directions required to be delivered to the Trustee and, if requested, the Authority by the Borrower under the Tax Certificate.

Rebate Requirement

"Rebate Requirement" means the Rebate Requirement defined in the Tax Certificate.

Record Date

"Record Date" means, with respect to any Interest Payment Date for the Bonds, the fifteenth day of the calendar month immediately preceding such Interest Payment Date, whether or not such day is a Business Day.

Redemption Account

"Redemption Account" means the account by that name established in the Revenue Fund pursuant to Section 5.02 hereof.

Republic

"Republic" means Republic Waste Services of Southern California, LLC.

Required Equity Contribution

"Required Equity Contribution" means the equity contributions required to be made or deemed made by the Borrower to the funds and accounts hereof in the form of cash in connection with (i) the issuance of the Bonds on the Date of Delivery as provided in Section 3.02 or (ii) any repair, restoration or replacement plan pursuant to Section 6.3 of the Loan Agreement.

Reserve Requirement

"Reserve Requirement" means, as of the date of calculation, an amount equal to the least of (i) Maximum Annual Debt Service, (ii) one hundred twenty five percent (125%) of the average annual debt service on the Bonds and any Parity Debt, and (iii) ten percent (10%) of the original principal amount of the Bonds and any Parity Debt. Initially, the Reserve Requirement equals $11,084,937.50.

Retained Rights

"Retained Rights" means (i) the right to receive any Additional Payments and Administrative Fees and Expenses to the extent payable to the Authority, (ii) any rights of the Authority to be indemnified, held harmless and defended and rights to inspection and to receive notices, certificates and opinions, (iii) express rights to give approvals, consents or waivers, and (iv) the obligations of the Borrower to make deposits pursuant to the Tax Certificate.

Revenue Fund

"Revenue Fund" means the fund by that name established pursuant to Section 5.01.

Revenues

"Revenues" means all amounts received by the Authority or the Trustee for the account of the Authority pursuant or with respect to the Agreement or the Guaranty Agreement, including, without limiting the generality of the foregoing, Loan Repayments (including both timely and delinquent payments, any late charges, and paid from whatever source), prepayments, insurance proceeds, condemnation proceeds, and all interest, profits or other income derived from the investment of amounts in any fund or

account established pursuant to this Indenture (except as provided below), excluding (i) Additional Payments, including, without limitation, any Administrative Fees and Expenses and (ii) any moneys paid for deposit into the Rebate Fund or the Borrower Subaccount of the Costs of Issuance Fund and any investment earnings on moneys held in such funds or subaccounts.

RUA

       "RUA" means the Rialto Utility Authority, a joint powers authority duly organized under the laws of the State of California.

S&P

       "S&P" means S&P Global Ratings, a business unit of Standard & Poor's Financial Services LLC, its successors and their assigns, and, if such entity shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "S&P" shall be deemed to refer to any other nationally recognized securities rating agency (other than Moody's or Fitch).

Securities Depositories

       "Securities Depositories" means the following registered securities depositories: The Depository Trust Company, 55 Water Street, New York, New York 10041-0099 (for notices of redemption – Attn: Call Notification Department, Redemption Notice Enclosed, Fax (212) 855-7232, 7233, 7234 or 7235; for notices of tender – Attn: Put Bonds Unit, Put Notice Enclosed, Fax (212) 855-5235); or, in accordance with then-current guidelines of the Securities and Exchange Commission, such other securities depositories, or no such depositories, as the Authority may indicate in a Certificate of the Authority delivered to the Trustee.

Security Agreement

       "Security Agreement" means the Pledge and Security Agreement, dated as of the date hereof, executed by the Borrower in favor of the Trustee, as may be amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

Security Documents

       "Security Documents" means, collectively, the Account Control Agreement, the Security Agreement, the Leasehold Deed of Trust, the Pledge Agreement, the Collateral Assignment, the Collateral Assignments of Feedstock Agreements and the Collateral Assignments of Offtake Agreements.

Short-Term Indebtedness

       "Short-Term Indebtedness" means subordinate or parity Indebtedness having an original maturity of less than or equal to one year and not renewable at the option of the Borrower for a term greater than one year from the date of original incurrence or issuance unless, by the terms of such Indebtedness, no Indebtedness is permitted to be outstanding thereunder for a period of at least thirty (30) consecutive days during each year.

SoCal Biomethane

       "SoCal Biomethane" means SoCal Biomethane, LLC, a Delaware limited liability company.

Southwest Gas Offtake Agreement

"Southwest Gas Offtake Agreement" means that certain Base Contract for Sale and Purchase of Natural Gas, dated as of October 18, 2018, by and between the Borrower and Southwest Gas Corporation (including the Special Provisions thereto), together with that certain Transaction Confirmation #19-1-SCA, Pkg No. RNG3, dated November 6, 2018, by and among Southwest Gas Corporation, SoCal Biomethane and the Borrower (as assignee of SoCal Biomethane in respect of Transaction Confirmation #21-1-SCA, Pkg No. RNG1, dated August 20, 2018), as may be amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

Subordinate Debt

"Subordinate Debt" means any Indebtedness issued or incurred by the Borrower which is either (i) not secured by a pledge of or Lien upon the Gross Revenues or any assets or property of the Borrower; or (ii) secured by a pledge of or Lien upon the Gross Revenues or any asset or property of the Borrower that is subordinate to the pledge of and Lien upon the Gross Revenues and each Lien established by the Security Documents for the security of the Agreement and any Parity Debt.

Supplemental Indenture

"Supplemental Indenture" means any indenture hereafter duly authorized and entered into between the Authority and the Trustee, supplementing, modifying or amending this Indenture; but only if and to the extent that such Supplemental Indenture is specifically authorized hereunder.

Surplus Account

"Surplus Account" means the account established within the Revenue Fund pursuant to Section 3.03 hereof.

Tax Certificate

"Tax Certificate" means the Tax Certificate and Agreement of the Borrower and the Authority dated the Date of Delivery.

Taxable Subaccount

"Taxable Subaccount" means the subaccount by that name established pursuant to Section 3.03 hereof.

Tax-exempt

"Tax-exempt" means, with respect to interest on any obligations of a state or local government, including the Bonds, that such interest is excluded from gross income for federal income tax purposes (other than in the case of a Holder of any Bonds who is a substantial user of any component of the Project or a related Person within the meaning of Section 147(a) of the Code) whether or not such interest is includable as an item of tax preference or otherwise includable directly or indirectly for purposes of calculating tax liabilities, including any alternative minimum tax or environmental tax, under the Code.

Tax-Exempt Subaccount

"Tax-Exempt Subaccount" means the subaccount by that name established pursuant to Section 3.03 hereof.

Technical Services Agreement

"Technical Services Agreement" means that certain Amended and Restated Technical Consulting Services Agreement, dated as of June 26, 2018, by and between the Borrower and Anaergia Services, as may be amended from time to time in accordance with its terms and the terms of this Indenture and the Loan Documents.

Trustee

"Trustee" means UMB Bank, N.A., a national banking association organized and existing under and by virtue of the laws of the United States of America, having Corporate Trust Offices in Minneapolis, Minnesota or its successor as Trustee hereunder as provided in Section 8.01.

SECTION 1.02    Content of Certificates and Opinions.  Every certificate or opinion provided for in this Indenture with respect to compliance with any provision hereof shall include (1) a statement that the Person making or giving such certificate or opinion has read such provision and the definitions herein relating thereto; (2) a brief statement as to the nature and scope of the examination or investigation upon which the certificate or opinion is based; (3) a statement that, in the opinion of such Person, such Person has made or caused to be made such examination or investigation as is necessary to enable such Person to express an informed opinion with respect to the subject matter referred to in the instrument to which such Person's signature is affixed; (4) a statement of the assumptions upon which such certificate or opinion is based, and that such assumptions are reasonable; and (5) a statement as to whether, in the opinion of such Person, such provision has been complied with.

Any such certificate or opinion made or given by an officer or Authorized Representative of the Authority may be based, insofar as it relates to legal, accounting or business matters of either of them, upon a certificate or opinion of or representation by counsel, an Accountant or a management consultant, unless such officer or Authorized Representative knows, or in the exercise of reasonable care should have known, that the certificate, opinion or representation with respect to the matters upon which such certificate, opinion or representation may be based, as aforesaid, is erroneous.  Any such certificate, opinion or representation made or given by counsel, an Accountant or a management consultant may be based, insofar as it relates to factual matters (with respect to which information is in the possession of the Authority) upon a certificate or opinion of or representation by an officer or Authorized Representative of the Authority, unless such counsel, Accountant or management consultant knows, or in the exercise of reasonable care should have known, that the certificate or opinion or representation with respect to the matters upon which such Person's certificate or opinion may be based, as aforesaid, is erroneous.  The same officer or Authorized Representative of the Authority, or the same counsel or Accountant or management consultant, as the case may be, need not certify to all of the matters required to be certified under any provision of this Indenture, but different officers, Authorized Representatives, counsel, Accountants or management consultants may certify to different matters, respectively.

27

SECTION 1.03     Interpretation.

(A)  Unless the context otherwise indicates, words expressed in the singular shall include the plural and vice versa and the use of the neuter, masculine, or feminine gender is for convenience only and shall be deemed to mean and include the neuter, masculine or feminine gender, as appropriate.

(B)  Headings of articles and sections herein and the table of contents hereof are solely for convenience of reference, do not constitute a part hereof and shall not affect the meaning, construction or effect hereof.

(C)  All references herein to "Articles," "Sections" and other subdivisions are to the corresponding Articles, Sections or subdivisions of this Indenture; the words "herein," "hereof," "hereby," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or subdivision hereof.

(D)  Unless stated otherwise, where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation, combination or other accounting computation is required to be made for the purposes of this Indenture or any agreement, document or certificate executed and delivered in connection with or pursuant to this Indenture, such determination or computation shall be made in accordance with GAAP, consistently applied, in effect on the date such determination or computation is made for any purpose of this Indenture.

## ARTICLE II
## THE BONDS

SECTION 2.01     Authorization of Bonds.  Bonds shall be issued hereunder in order to obtain moneys to carry out the purposes of the Act for the benefit of the Authority and the Borrower. The Bonds are designated as "California Pollution Control Financing Authority Solid Waste Disposal Revenue Bonds (Rialto Bioenergy Facility, LLC Project), Series 2019 (AMT) (Green Bonds)." This Indenture constitutes a continuing agreement with the Holders from time to time of the Bonds to secure the full payment of the principal (or redemption price) of, premium if any, and interest on all such Bonds subject to the covenants, provisions and conditions herein contained.

SECTION 2.02     Form of the Bonds.  The Bonds shall be issued in the form of fully registered bonds and in the aggregate principal amount of $117,200,000, to be dated the Date of Delivery, and to mature (subject to prior redemption at the prices and dates and upon the terms and conditions hereinafter set forth) and bear interest as set forth in Section 2.03 hereof. The Bonds shall be issuable in Authorized Denominations. The Bonds shall be issued in substantially the form set forth in Exhibit A of this Indenture with such variations, insertions or omissions as are appropriate and not inconsistent therewith and shall conform generally to the rules and regulations of any governmental authority or usage or requirement of law with respect thereto. The Bonds shall be numbered and lettered from one upward preceded by the letter "R" prefixed to the number and may bear such additional letters, numbers, legends or designations as the Bond Registrar determines are desirable.

SECTION 2.03     Interest Rates; Maturities.

(A)  The Bonds shall bear interest from and including the date of first authentication and delivery thereof until payment of the principal or redemption price thereof shall have been made or provided for in accordance with the provisions hereof, whether at maturity, upon redemption or otherwise. Interest on the Bonds shall be paid as provided below, provided that if any Interest Payment Date is not a Business Day, such interest shall be mailed or wired pursuant to this Section on the next succeeding Business Day,

with the same effect as if made on the day such payment was due. Interest on the Bonds shall be computed upon the basis of a 360-day year, consisting of twelve 30-day months.

Payment of the interest on any Bond shall be made to the Person appearing on the bond registration books of the Bond Registrar as the Bondholder thereof on the Record Date, such interest to be paid by the Paying Agent to such Bondholder (i) by check mailed by first class mail on the Interest Payment Date, to such Bondholder's address as it appears on the registration books or at such other address as has been furnished to the Bond Registrar as provided below, in writing by such Bondholder not later than the Record Date, or (ii) upon written request at least three (3) Business Days prior to the applicable Record Date of the Bondholder of Bonds aggregating not less than $1,000,000 in principal amount of such Bonds, by wire transfer in immediately available funds at an account maintained in the United States at such wire address as such Bondholder shall specify in its written notice (any such written request shall remain in effect until rescinded in writing by such Bondholder); except, in each case, that if and to the extent that there shall be a default in the payment of the interest due on such Interest Payment Date, such defaulted interest rate shall be the rate on the Bonds on the day before such default occurred and such defaulted interest shall be paid to the Bondholder in whose name any such Bonds are registered at the close of business on the fifth Business Day next preceding the date of payment of such defaulted interest. Both the principal of and premium, if any, on the Bonds shall be payable upon surrender thereof in lawful money of the United States of America at the Corporate Trust Office of the Trustee.

(B)  The Bonds shall mature (subject to prior redemption at the prices and dates and upon the terms and conditions hereinafter set forth) on the dates and shall bear interest at the rates set forth below, provided that, on and after the occurrence of an Event of Default under Section 7.01, the Bonds shall bear interest at the Post-Default Rate during the continuation of such Event of Default:

| Maturity Date | Amount | Interest Rate |
| --- | --- | --- |
| December 1, 2028 | $25,805,000 | 6.75% |
| December 1, 2040 | $91,395,000 | 7.50% |

SECTION 2.04    Reserved.

SECTION 2.05    Execution of Bonds.  The Bonds shall be executed in the name and on behalf of the Authority with the manual or facsimile signature of its Chair, under the seal of the Authority. Such seal may be in the form of a facsimile of the Authority's seal and may be reproduced, imprinted or impressed on the Bonds.  The Bonds shall then be delivered to the Trustee for authentication by it.  In case the officer who shall have signed any of the Bonds shall cease to be such officer of the Authority before the Bonds so signed shall have been authenticated or delivered by the Trustee or issued by the Authority, such Bonds may nevertheless be authenticated, delivered and issued and, upon such authentication, delivery and issue, shall be as binding upon the Authority as though the officer who signed the same had continued to be such officer of the Authority.  Any Bonds signed on behalf of the Authority by such individual as at the actual date of execution of such Bonds shall be the proper officer of the Authority although at the nominal date of such Bonds any such individual shall not have been such officer of the Authority.

Only such of the Bonds as shall bear thereon a certificate of authentication substantially in the form set forth in Exhibit A, with the manual signature of the Trustee as authenticating agent, shall be valid or obligatory for any purpose or entitled to the benefits of this Indenture, and such certificate of the Trustee shall be conclusive evidence that the Bonds so authenticated have been duly executed, authenticated and delivered hereunder and are entitled to the benefits of this Indenture.

SECTION 2.06    Registration of Transfer of Bonds.

(A)  Subject to subparagraph (B), the transfer of any Bond may, in accordance with its terms, be registered, upon the books required to be kept pursuant to the provisions of Section 2.08 hereof, by the Person in whose name it is registered, in person or by its duly authorized attorney, upon surrender of such registered Bond for cancellation, accompanied by delivery of a written instrument of transfer, duly executed in a form acceptable to the Trustee.  No registration of transfer of a Bond shall be permitted by the Trustee during the period after Bonds are selected for redemption or after the Record Date prior to the next succeeding Interest Payment Date.

(B)  (1) No Bond shall be transferred except to a Qualified Institutional Buyer in an Authorized Denomination.  Each registered owner or beneficial owner of a Bond agrees by purchase of the Bond to abide by these limitations.  In addition, no underwriter or placement agent for the Bonds shall deposit the Bonds in any trust or account under its control and sell any shares, participatory interests or certificates in such trust or account, and any initial purchaser of the Bonds from an underwriter or a placement agent shall not deposit the Bonds in any trust or account under its control and sell any shares, participatory interests or certificates in such trust or account except to Qualified Institutional Buyers in Authorized Denominations.

(2)    Failure to comply with this Section shall cause any purported transfer to be null and void.

Whenever any Bond or Bonds shall be surrendered for transfer, the Authority shall execute and the Trustee shall authenticate and deliver a new Bond or Bonds for a like aggregate principal amount in Authorized Denominations.  The Trustee shall require the Bondholder requesting such transfer to pay any tax or other governmental charge required to be paid with respect to such transfer.  The cost of printing Bonds and any services rendered or expenses incurred by the Trustee in connection with any such transfer shall be paid by the Borrower.

SECTION 2.07    Exchange of Bonds.  Bonds may be exchanged at the Corporate Trust Office of the Trustee for a like aggregate principal amount of Bonds of other Authorized Denominations. The Trustee shall require the Bondholder requesting such exchange to pay any tax or other governmental charge required to be paid with respect to such exchange.  The cost of printing Bonds and any services rendered or expenses incurred by the Authority or the Trustee in connection with any such exchange shall be paid by the Borrower.

SECTION 2.08    Bond Register.  The Trustee shall be the Registrar for the Bonds and will keep or cause to be kept at its Corporate Trust Office sufficient books for the registration and transfer of the Bonds, which shall at all times be open to inspection during regular business hours by the Authority upon reasonable notice; and, upon presentation for such purpose, the Trustee shall, under such reasonable regulations as it may prescribe, register or transfer or cause to be registered or transferred, on such books, Bonds as hereinbefore provided.

SECTION 2.09    Temporary Bonds.  The Bonds may be issued in temporary form exchangeable for definitive Bonds when ready for delivery.  Any temporary Bond may be printed, lithographed or typewritten, shall be in an Authorized Denomination, shall be in fully registered form without coupons and may contain such reference to any of the provisions of this Indenture as may be appropriate.  Every temporary Bond shall be executed by the Authority and be authenticated by the Trustee upon the same conditions and in substantially the same manner as the definitive Bonds.  If the Authority issues temporary Bonds, it will execute and deliver definitive Bonds as promptly thereafter as practicable, and thereupon the temporary Bonds may be surrendered, for cancellation, in exchange therefor at the

Corporate Trust Office of the Trustee and the Trustee shall authenticate and deliver in exchange for such temporary Bonds an equal aggregate principal amount of definitive Bonds in Authorized Denominations. Until so exchanged, the temporary Bonds shall be entitled to the same benefits under this Indenture as definitive Bonds authenticated and delivered hereunder.

SECTION 2.10    Bonds Mutilated, Lost, Destroyed or Stolen.  If any Bond shall become mutilated, the Authority, at the expense of the Holder of said Bond, shall execute, and the Trustee shall thereupon authenticate and deliver, a new Bond of like tenor in exchange and substitution for the Bond so mutilated, but only upon surrender to the Trustee of the Bond so mutilated.  Every mutilated Bond so surrendered to the Trustee shall be canceled by it and, upon request, delivered to the Authority.  If any Bond shall be lost, destroyed or stolen, evidence of such loss, destruction or theft may be submitted to the Authority and the Trustee and, if such evidence be satisfactory to both and indemnity satisfactory to them shall be given, the Authority, at the expense of the Holder, shall execute, and the Trustee shall thereupon authenticate and deliver, a new Bond of like tenor in lieu of and in substitution for the Bond so lost, destroyed or stolen (or if any such Bond shall have matured, instead of issuing a substitute Bond, the Trustee may pay the same without surrender thereof upon receipt of indemnity satisfactory to the Trustee).  The Authority may require payment by the Holder of a sum not exceeding the actual cost of preparing each new Bond issued under this Section and of the expenses which may be incurred by the Authority and the Trustee in the premises.  If, after the delivery of such new Bond, a bona fide purchaser of the original Bond in lieu of which such new Bond was issued presents for payment or registration such original Bond, the Trustee shall be entitled to recover such new Bond from the person to whom it was delivered or any person taking therefrom, except a bona fide purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Trustee or the Authority in connection therewith.  Any Bond issued under the provisions of this Section in lieu of any Bond alleged to be lost, destroyed or stolen shall constitute an original additional contractual obligation on the part of the Authority whether or not the Bond so alleged to be lost, destroyed or stolen be at any time enforceable by anyone, and shall be entitled to the benefits of this Indenture with all other Bonds secured by this Indenture.

SECTION 2.11    Book-Entry Only System.

(A)  Except as otherwise provided in subsections (B) and (C) of this Section, the Bonds initially authenticated and delivered hereunder shall be registered in the name of Cede & Co., as nominee of DTC, or such other nominee as DTC shall request.  Payments of interest on, principal of and any premium on, the Bonds shall be made to the account of Cede & Co. on each payment date for principal or interest on the Bonds at the address indicated for Cede & Co. in the registration books maintained by the Bond Registrar by transfer of immediately available funds.  DTC has represented to the Authority that it will maintain a book-entry system in recording ownership interests of the Direct Participants and the ownership interests of Beneficial Owners will be recorded through book entries on the records of the Direct Participants.

(B)  The Bonds shall be initially issued in the form of a separate single authenticated fully registered Bond in the amount of each separate stated maturity.  With respect to Bonds so registered in the name of Cede & Co., the Authority, the Trustee shall have no responsibility or obligation to any Direct Participant or to any Beneficial Owner of such Bonds.  Without limiting the immediately preceding sentence, the Authority, the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of DTC, Cede & Co.  or any Direct Participant with respect to any beneficial ownership interest in the Bonds, (ii) the delivery to any Direct Participant, Beneficial Owner or other Person, other than DTC, of any notice with respect to the Bonds, including any notice of redemption, (iii) the payment to any Direct Participant, Beneficial Owner or other Person, other than DTC, of any amount with respect to the principal, redemption price of, or interest on, the Bonds or (iv) any consent given or other action taken by DTC as Holder of the Bonds.  The Authority, the Trustee may treat DTC as, and deem DTC to be, the

absolute Holder of each Bond for all purposes whatsoever including (but not limited to) (i) payment of the principal, redemption price of, and interest on, each such Bond, (ii) giving notices of conversion or redemption and other matters with respect to such Bonds and (iii) registering transfers with respect to such Bonds.  The Trustee shall pay the principal, redemption price (including premium, if any) of, and interest on, all Bonds only to or upon the order of DTC, and all such payments shall be valid and effective to fully satisfy and discharge the Authority's obligations with respect to such principal, redemption price, and interest, to the extent of the sum or sums so paid.  No Person other than DTC shall receive a Bond evidencing the obligation of the Authority to make payments of principal, redemption price of, and interest on, the Bonds pursuant to this Indenture.  Upon delivery by DTC to the Trustee of written notice to the effect that DTC has determined to substitute a new nominee in place of Cede & Co., and subject to the transfer provisions hereof, the word "Cede & Co." in this Indenture shall refer to such new nominee of DTC.

(C)  (1)  DTC may determine to discontinue providing its services with respect to the Bonds at any time by giving reasonable written notice to the Authority and the Trustee and discharging its responsibilities with respect thereto under applicable law.

(2)    The Authority, in its sole discretion and without the consent of any other Person, may terminate, upon provision of notice to the Trustee and the Borrower, the services of DTC with respect to the Bonds if the Authority determines that the continuation of the system of book-entry only transfers through DTC (or a successor securities depository) is not in the best interests of the Beneficial Owners of the Bonds or is burdensome to the Authority.

(3)    The Authority shall terminate the services of DTC with respect to the Bonds upon receipt by the Authority, the Trustee and the Borrower of written notice from DTC to the effect that DTC has received written notice from Direct Participants having interests, as shown in the records of DTC, in an aggregate principal amount of more than fifty percent (50%) of the aggregate principal amount of the then Outstanding Bonds to the effect that: (i) DTC is unable to discharge its responsibilities with respect to such Bonds, or (ii) a continuation of the requirement that all of the Outstanding Bonds be registered in the registration books kept by the Trustee in the name of Cede & Co., as nominee of DTC, is not in the best interest of the Beneficial Owners of such Bonds.  Upon receipt of the aforementioned notice from the DTC, the Trustee shall provide a copy of such notice to the Borrower.

(D)  Upon the termination of the services of DTC with respect to the Bonds pursuant to subsection (C)(3)(ii) hereof, or upon the discontinuance or termination of the services of DTC with respect to the Bonds pursuant to subsection (C)(1), (C)(2) or (C)(3)(i) hereof after which no substitute Securities Depository willing to undertake the functions of DTC hereunder can be found or which, in the opinion of the Authority, is willing and able to undertake such functions upon reasonable and customary terms, the Bonds shall no longer be restricted to being registered in the registration books kept by the Trustee in the name of Cede & Co. as nominee of DTC.  In such event, the Authority shall issue and the Trustee shall authenticate and register the transfer and exchange Bonds as requested by DTC or Direct Participants of like principal amount and maturity, in Authorized Denominations to the identifiable Beneficial Owners in replacement of such Beneficial Owners' beneficial interests in the Bonds.

(E)  Notwithstanding any other provision of this Indenture to the contrary, so long as any Bond is registered in the name of Cede & Co., as nominee of DTC, all payments with respect to the principal, redemption price of, and interest on, such Bond and all notices with respect to such Bond shall be made and given, respectively, to DTC as provided in the letter of representations of the Authority and the Trustee, addressed to DTC with respect to the Bonds.

(F)  In connection with any notice or other communication to be provided to Bondholders pursuant to this Indenture by the Authority or the Trustee with respect to any consent or other action to be

taken by Bondholders, the Authority or the Trustee, as the case may be, shall establish a record date for such consent or other action and give DTC notice of such record date not less than fifteen (15) calendar days in advance of such record date to the extent possible.

(G) Notwithstanding any provision herein to the contrary, the Authority and the Trustee may agree to allow DTC, or its nominee, Cede & Co., to make a notation on any Bond redeemed in part to reflect, for informational purposes only, the principal amount and date of any such redemption.

## ARTICLE III
## ISSUANCE OF BONDS; APPLICATION OF PROCEEDS

SECTION 3.01      Issuance of the Bonds.  At any time after the execution and delivery of this Indenture or from time to time thereafter, upon the execution of the Bonds by the Authority and delivery thereof to the Trustee, as hereinabove provided, and without any further action on the part of the Authority, the Trustee shall authenticate upon Request of the Authority, and deliver the Bonds in an aggregate principal amount not exceeding $117,200,000.

SECTION 3.02      Application of Proceeds of Bonds and Other Amounts.  The proceeds received by the Authority from the sale of the Bonds (consisting of the par amount thereof less original issue discount and underwriter's discount) in the amount of $111,449,000.50 shall, together with a Borrower contribution in the amount of $8,211,200.00, totaling an amount of $119,660,200.50, be deposited with the Trustee, who shall forthwith deposit:

(A) $1,643,214.41 of such proceeds into the Proceeds Account of the Costs of Issuance Fund, which fund and account the Trustee shall establish and maintain as further provided in Section 3.04 hereof;

(B) $59,369.60 of such proceeds into the Borrower Subaccount of the Costs of Issuance Fund, which fund and account the Trustee shall establish and maintain as further provided in Section 3.04 hereof;

(C) $81,527,923.59 of such proceeds into the Tax-Exempt Subaccount of the Project Fund, which fund and subaccount the Trustee shall establish and maintain as further provided in Section 3.03 hereof;

(D) $8,151,830.40 of such proceeds into the Taxable Subaccount of the Project Fund, which fund and subaccount the Trustee shall establish and maintain as further provided in Section 3.03 hereof;

(E) $17,192,925.00 of such proceeds into the Capitalized Interest Account of the Project Fund, which fund and account the Trustee shall establish and maintain as further provided in Section 3.03 hereof; and

(F) $11,084,937.50 of such proceeds into the Debt Service Reserve Fund, which fund the Trustee shall establish and maintain as further provided in Section 5.07 hereof.

SECTION 3.03      Project Fund.  The Trustee shall establish the Rialto Bioenergy Facility, LLC Project Fund (the "Project Fund"), to the credit of which proceeds of the Bonds will be deposited and applied to the payment of the Costs of the Project.  The Trustee shall also create separate accounts in the Project Fund designated as the Tax-Exempt Subaccount (the "Tax-Exempt Subaccount"), the Taxable Subaccount (the "Taxable Subaccount"), the Grant Subaccount (the "Grant Subaccount") and

the Rialto Bioenergy Facility, LLC Capitalized Interest Account (the "Capitalized Interest Account"), each of which will be funded as provided in Section 3.02. The moneys in each subaccount of the Project Fund shall be held by the Trustee in trust and applied to the payment of (i) the Costs of the Project, in the case of the Tax-Exempt Subaccount, (ii) Operating and Working Capital Costs, in the case of the Taxable Subaccount, (iii) the Costs of the Project or, following the Completion Date, Operating and Working Capital Costs or, to the extent permitted by Section 5.18(c) of the Agreement, to fund distributions to members of the Borrower, in the case of the Grant Subaccount and (iv) a portion of the interest due and payable on the Bonds, in the case of the Capitalized Interest Account, all in the manner set forth below.

Before each payment is made by the Trustee from the Project Fund or any account established therein (excluding transfers from the Capitalized Interest Account and transfers from the Tax-Exempt Subaccount to the Surplus Account, all as described below in this Section), there shall be filed with the Trustee a sequentially numbered Requisition of the Borrower conforming with the requirements of this Section and Section 3.1 of the Agreement, and in the form attached hereto as Exhibit C, stating with respect to each payment to be made:

 (1) the requisition number;

 (2) the name and address of the Person to whom payment is due;

 (3) the purpose for which such payment is to be made;

 (4) the amount to be paid;

 (5) that each obligation mentioned therein has been properly incurred and is a proper charge against the Project Fund;

 (6) that none of the items for which payment is requested has been previously paid or reimbursed from the Project Fund;

 (7) that each item for which payment is requested is or was necessary in connection with the acquisition, construction, installation, equipping or financing of the Project (as further provided in Section 3.1(b)(i) through (vi) of the Agreement) or, with respect to any payment from the Taxable Subaccount, the operation of the Project (as further provided in Section 3.1(b)(vii) of the Agreement), or with respect to any payment from the Grant Subaccount, (A) the acquisition, construction, installation or equipping of the Project or (B) following the Completion Date, the operation of the Project or, to the extent permitted by Section 5.18(c) of the Agreement, to fund distributions to members of the Borrower (in each case as further provided in Section 3.1(b)(viii) of the Agreement);

 (8) with respect to any payment from the Tax-Exempt Subaccount, that at least ninety-five percent (95.0%) of the amount requisitioned, together with all amounts requisitioned to date, have, in the aggregate been used to pay for or to reimburse the Borrower for expenditures properly allocable to Costs of the Project pursuant to the Tax Certificate (excluding Costs of Issuance); and

 (9) that an invoice evidencing each item for payment is attached thereto, including invoices for costs previously paid and for which reimbursement is being requested; or, alternatively, that a single invoice payable to the Borrower, addressed to the Trustee, is attached thereto, for payment by the Borrower of Costs of the Project or Operating and Working Capital Costs, as applicable, due and payable, or previously paid, and for which reimbursement is being requested.

Each such Requisition of the Borrower, approved by the Construction Monitor with respect to amounts to be disbursed thereunder on or before the Completion Date, as evidenced by its written approval thereon, shall be sufficient evidence of the facts stated therein, and the Trustee shall have no duty to confirm the accuracy of such facts. Upon receipt of each such Requisition of the Borrower, signed by an Authorized Representative of the Borrower and (with respect to any such Requisition for payment on or before the Completion Date) the Construction Monitor, and accompanied by an invoice for each item for payment, or, alternatively, a single invoice payable to the Borrower for payment by the Borrower of Costs of the Project or Operating and Working Capital Costs, the Trustee shall thereupon disburse moneys in the Project Fund to pay the amount set forth therein as directed by the terms thereof.

Upon the receipt by the Trustee of a certificate conforming with the requirements of Section 3.2 of the Agreement, and after payment of costs payable from the Project Fund or provision having been made for payment of such costs not yet due by retaining such costs in the Project Fund or otherwise as directed in such certificate, the Trustee shall transfer any remaining balance in the Tax-Exempt Subaccount within the Project Fund into a separate account within the Revenue Fund, which the Trustee shall establish and hold in trust and which shall be entitled the "Surplus Account." In the alternative, the Borrower may submit to the Trustee a certificate, stating that its plans for the Project have changed and that it has determined to use a portion of unspent proceeds in the Project Fund to redeem Bonds. Upon receipt of either of the foregoing certificates, the Trustee shall arrange for the identified amount of unspent proceeds in the Tax-Exempt Subaccount within the Project Fund to be returned to the Trustee for deposit in the Surplus Account. The moneys in any Surplus Account shall be used and applied (subject to Section 5.03) at the written direction of the Borrower (unless some other application of such moneys permitted by the Indenture and the Agreement is requested by the Borrower and would not, in the opinion of Bond Counsel, cause interest on the Bonds to become no longer Tax-exempt) to redeem Bonds in Authorized Denominations, to the maximum degree permissible, and at the earliest possible dates at which the Bonds can be redeemed pursuant to Section 4.01 of this Indenture. Notwithstanding Section 5.05 hereof, the moneys in the Surplus Account shall be invested at the written instruction of the Borrower at a yield no higher than the yield on the Outstanding Bonds (unless in the opinion of Bond Counsel, addressed and delivered to the Authority and the Trustee, investment at a higher yield would not cause interest on the Bonds to become no longer Tax-exempt) and all such investment income shall be deposited in the Surplus Account and expended or reinvested as provided above.

In the event of redemption of all of the Bonds pursuant to Section 4.01 hereof or an Event of Default which causes acceleration of the Bonds, any moneys then remaining in the account within the Tax-Exempt Subaccount within the Project Fund relating to such Bonds shall be transferred to the Surplus Account within the Revenue Fund, and all moneys in the Revenue Fund relating to such Bonds shall be used to redeem Bonds.

In the event that the Trustee receives payment of any funds from the Borrower pursuant to Section 5.24 of the Agreement, the Trustee shall deposit such funds into the Grant Subaccount of the Project Fund.

Moneys in the Capitalized Interest Account shall be transferred by the Trustee on each Interest Payment Date, commencing June 1, 2019, to the Interest Account of the Revenue Fund in an amount sufficient to pay a portion of the interest due and payable on the Bonds on such Interest Payment Date, in accordance with the following schedule:

| Interest Payment Date | Capitalized Interest |
|---|---|
| June 1, 2019 | $2,889,366.56 |
| December 1, 2019 | $4,298,231.25 |
| June 1, 2020 | $4,298,231.25 |
| December 1, 2020 | $4,298,231.25 |
| June 1, 2021 | $1,408,864.69 |

SECTION 3.04    Costs of Issuance Fund.  The Trustee shall establish the Costs of Issuance Fund (the "Costs of Issuance Fund").  The Trustee shall also create separate accounts in the Costs of Issuance Fund designated the "Proceeds Account" and the "Borrower Subaccount" which will be funded as provided in Section 3.02.  The moneys in each account of the Costs of Issuance Fund shall be held by the Trustee in trust and applied to the payment of Costs of Issuance for the Bonds, upon a sequentially numbered Requisition of the Borrower, signed by an Authorized Representative of the Borrower and filed with the Trustee, in the form attached hereto as Exhibit D, together with an invoice evidencing each obligation to be paid or reimbursed from the proceeds of such Requisition.  Each Requisition of the Borrower shall be sufficient evidence to the Trustee of the facts stated therein and the Trustee shall have no duty to confirm the accuracy of such facts.  All payments from the Costs of Issuance Fund shall be reflected in the Trustee's regular accounting statements.  Any amounts remaining in a Proceeds Account of the Costs of Issuance Fund six (6) months following the Date of Delivery of the Bonds shall be transferred to the Tax-Exempt Subaccount of the Project Fund for such Bonds.  Any amounts remaining in the Borrower Subaccount of the Costs of Issuance Fund three (3) months following the Date of Delivery of the Bonds shall be transferred to the Borrower.  Upon completion of such transfers, the Trustee shall close the Costs of Issuance Fund.

SECTION 3.05    Validity of Bonds.  The validity of the authorization and issuance of the Bonds is not dependent on and shall not be affected in any way by any proceedings taken by the Authority or the Trustee after issuance and delivery of the Bonds with respect to or in connection with the Agreement or otherwise.  The recital contained in the Bonds that the same are issued pursuant to the Act and the Constitution and laws of the State of California shall be conclusive evidence of their validity and of compliance with the provisions of law in their issuance.

**ARTICLE IV**
**REDEMPTION AND PURCHASE OF BONDS**

SECTION 4.01    Terms of Redemption of Bonds.  The Bonds are subject to redemption as provided in this Section if and to the extent the Borrower is entitled to make and makes, or is required to make, a prepayment pursuant to Articles IV or VIII of the Agreement.  All such prepayments shall be deposited in the Redemption Account.  The Bonds shall not be called for optional redemption, and the Trustee shall not give notice of any such redemption, unless the Borrower has so directed in writing to the Trustee with a copy to the Authority.

Subject to the provisions of the preceding paragraph, the Bonds shall be redeemed upon the following terms:

36

(1)    <u>Sinking Fund Redemption</u>.  The Bonds shall be subject to semi-annual mandatory sinking fund redemption on each mandatory sinking fund redemption date and in the respective principal amounts as set forth below.

The Trustee shall redeem the Bonds maturing on December 1, 2028 at a redemption price equal to one hundred percent (100%) of the principal amount thereof to be redeemed (without premium), together with interest accrued thereon to the date fixed for redemption, as follows:

| Redemption Date | Principal Amount |
| --- | --- |
| June 1, 2021 | $1,260,000.00 |
| December 1, 2021 | $1,265,000.00 |
| June 1, 2022 | $1,350,000.00 |
| December 1, 2022 | $1,350,000.00 |
| June 1, 2023 | $1,440,000.00 |
| December 1, 2023 | $1,445,000.00 |
| June 1, 2024 | $1,540,000.00 |
| December 1, 2024 | $1,545,000.00 |
| June 1, 2025 | $1,645,000.00 |
| December 1, 2025 | $1,650,000.00 |
| June 1, 2026 | $1,760,000.00 |
| December 1, 2026 | $1,765,000.00 |
| June 1, 2027 | $1,880,000.00 |
| December 1, 2027 | $1,885,000.00 |
| June 1, 2028 | $2,010,000.00 |
| December 1, 2028† | $2,015,000.00 |

_____
† Final maturity of 2028 term Bond.

[Remainder of Page Intentionally Blank]

37

The Trustee shall redeem the Bonds maturing on December 1, 2040 at a redemption price equal to one hundred percent (100%) of the principal amount thereof to be redeemed, together with interest accrued thereon to the date fixed for redemption, as follows:

| Redemption Date | Principal Amount |
|---|---|
| June 1, 2029 | $2,155,000.00 |
| December 1, 2029 | $2,155,000.00 |
| June 1, 2030 | $2,320,000.00 |
| December 1, 2030 | $2,320,000.00 |
| June 1, 2031 | $2,500,000.00 |
| December 1, 2031 | $2,495,000.00 |
| June 1, 2032 | $2,685,000.00 |
| December 1, 2032 | $2,690,000.00 |
| June 1, 2033 | $2,890,000.00 |
| December 1, 2033 | $2,895,000.00 |
| June 1, 2034 | $3,115,000.00 |
| December 1, 2034 | $3,115,000.00 |
| June 1, 2035 | $3,355,000.00 |
| December 1, 2035 | $3,350,000.00 |
| June 1, 2036 | $3,605,000.00 |
| December 1, 2036 | $3,610,000.00 |
| June 1, 2037 | $3,880,000.00 |
| December 1, 2037 | $3,885,000.00 |
| June 1, 2038 | $4,180,000.00 |
| December 1, 2038 | $4,180,000.00 |
| June 1, 2039 | $4,500,000.00 |
| December 1, 2039 | $4,500,000.00 |
| June 1, 2040 | $4,840,000.00 |
| December 1, 2040† | $16,175,000.00 |

_____
† Final maturity of 2040 term Bond.

In the event of a partial redemption pursuant to this Section 4.01(3), (4), (5), (6) and (7), the Borrower shall provide the Trustee with a revised sinking fund schedule giving effect to the redemption so completed on a pro-rata basis (i.e. each sinking fund redemption shall be reduced by a like percentage as closely as possible, in Authorized Denominations, after giving effect to any partial redemption).

(2)     Mandatory Redemption Upon Invalidity.  In the event of a prepayment pursuant to Section 8.3(a) of the Agreement as a result of invalidity, Bonds Outstanding on the date of the occurrence of the invalidity shall be redeemed in whole at any time within thirty (30) days thereafter, at a redemption price of one hundred percent (100%) of the principal amount thereof, without premium, plus accrued interest to the date of redemption.  No redemption of Bonds shall be made pursuant to any of the other provisions of this Section following invalidity.

(3)     Mandatory Redemption of Bonds Upon a Determination of Taxability.  In the event of a prepayment pursuant to Section 8.3(b) of the Agreement as a result of a Determination of Taxability, Bonds Outstanding on the date of the occurrence of the Determination of Taxability shall be redeemed in whole or in part (as required by Section 8.3(b) of the Agreement) at any time within thirty (30) days thereafter, at a redemption price of one hundred five percent (105%) of the principal amount thereof, without premium, plus accrued interest to the date of redemption.  No redemption of Bonds shall be made

pursuant to any of the other provisions of this Section following a Determination of Taxability until after all redemptions required in respect of such Determination of Taxability have been effected.

(4)    <u>Mandatory Redemption from Excess Cash due to Offtake Expiration Event</u>.  In the event that the Trustee receives any funds from the Borrower pursuant to Section 8.3(d) of the Agreement, then if, as of the date on which notice of redemption is required to be delivered pursuant to Section 4.03 hereof in respect of the next succeeding Interest Payment Date, (i) the Trustee has not received notice from the Borrower that an Offtake Expiration Event is no longer continuing, then such funds shall be applied to redeem the Bonds then Outstanding, in whole or in part, on such Interest Payment Date, at a redemption price of one hundred percent (100%) of the principal amount thereof, without premium, plus accrued interest to the date of redemption, and the amount so redeemed shall be credited to the payment of Loan Repayments under the Agreement, or (ii) the Trustee has received notice from the Borrower that an Offtake Expiration Event is no longer continuing, then such funds shall be transferred to the Revenue Fund.

(5)    <u>Optional Redemption Upon Occurrence of Extraordinary Events</u>.  The Bonds may be redeemed in whole or in part on any date, as described below, at a redemption price equal to the principal amount thereof, without premium, plus accrued interest to the date of redemption, upon receipt by the Trustee (with a copy to the Authority) of a written notice from the Borrower stating that any of the following events has occurred:

(i)    all of the Project or a portion thereof is damaged or destroyed, condemned or taken by eminent domain to such extent that, in the opinion of an Independent Consultant evidenced by a certificate provided to the Authority and the Trustee, which opinion may be conclusively relied upon by the Trustee and the Authority, that (1) it is not practicable or desirable to rebuild, repair or replace the Project or such portion thereof or the facility at which the Project is located within a period of six (6) consecutive months following such damage, destruction or condemnation, and the Borrower is or will be thereby prevented from carrying on its normal operations at the Project or such portion thereof or the facility at which the Project is located for a period of at least six (6) consecutive months, or (2) the cost of repair or replacement of the Project or such portion thereof or the facility at which the Project is located would substantially exceed the Net Proceeds of insurance carried thereon; or

(ii)    the continued operation of all or a portion of the Project is enjoined or prevented or is otherwise prohibited by, or conflicts with, any order, decree, rule or regulation of any court or federal, state or local regulatory body, administrative agency or other governmental body.

Anything in this subsection 4.01(5) to the contrary notwithstanding, (A) the Bonds shall not be redeemed in part pursuant to this subsection 4.01(5) unless the Borrower has delivered the certificate required by Section 6.2(b)(2) of the Agreement and (B) if any of the events described above shall have occurred with respect to a portion of, but not all of, the Project, the amount of Bonds that may be redeemed shall not exceed an amount derived by multiplying the total principal amount of the Bonds by a fraction (x) the numerator of which is the original cost of the Project or portion thereof so affected and (y) the denominator of which is the total original cost of the Project.

(6)    <u>Optional Redemption</u>.  On any date on and after December 1, 2024, the Bonds may be redeemed by the Authority, at the direction of the Borrower, in whole or in part, at a redemption price expressed as a percentage of the principal amount of the Bonds to be redeemed, plus accrued interest thereon to the date of redemption as follows:

| Redemption Date | Redemption Price |
|---|---|
| December 1, 2024 through November 30, 2025 | 105.00% |
| December 1, 2025 through November 30, 2026 | 103.75% |
| December 1, 2026 through November 30, 2027 | 102.50% |
| December 1, 2027 through November 30, 2028 | 101.25% |
| December 1, 2028 and any date thereafter | 100.00% |

(7)    Optional Redemption from Excess Proceeds in the Project Fund.  On any date on and after December 1, 2021, the Bonds may be redeemed from excess Bond proceeds on deposit in the Project Fund, in whole or in part, at a redemption price equal to one hundred percent (100%) of the principal amount thereof to be redeemed (without premium), plus accrued interest thereon to the date of redemption.

SECTION 4.02    Selection of Bonds for Redemption.  Whenever provision is made in this Indenture for the redemption of less than all of the Bonds, the Trustee shall select the Bonds to be redeemed from all Bonds or such given portion thereof not previously called for redemption by lot in any manner which the Trustee in its sole discretion shall deem appropriate.

SECTION 4.03    Notice of Redemption.

(A)  Notice of redemption shall be mailed by first class mail not less than thirty (30) days nor more than sixty (60) days before such redemption date to the respective Holders of any Bonds designated for redemption at their addresses on the registration books maintained by the Bond Registrar. Each notice of redemption shall state the redemption date, the place or places of redemption, if less than all of the Bonds are to be redeemed, the distinctive number(s) of the Bonds to be redeemed and, in the case of Bonds to be redeemed in part only, the respective portions of the principal amount thereof to be redeemed. Each such notice shall also state that on said date there will become due and payable on each of said Bonds the principal thereof or of said specified portion of the principal thereof in the case of a Bond to be redeemed in part only, and that from and after such redemption date interest thereon shall cease to accrue, and shall require that such Bonds be then surrendered, and, with regard to optional redemption pursuant to Section 4.01(6), in the event that funds required to pay the redemption price are not on deposit under the Indenture at the time the notice of redemption is sent, a statement to the effect that the redemption is conditioned upon the receipt of the appropriate funds required to pay the redemption price by the Trustee on or prior to the redemption date.  Neither failure to receive such notice nor any defect therein shall affect the sufficiency of such redemption.  With respect to any notice of optional redemption of Bonds, such notice may be conditional upon the fulfillment of any conditions set out within such notice.  In the event that such notice of redemption contains conditions which are not met, the redemption shall not be made and the Trustee shall give notice, no less than two (2) Business Days before the redemption was to be made, in the manner in which the notice of redemption was given, that the redemption will not be made.

(B)  Notice of redemption of such Bonds shall be given by the Trustee, at the expense of the Borrower, for and on behalf of the Authority.

(C)  At the same time that it sends notice of redemption to Owners of such Bonds, the Trustee shall also send a copy of the notice by first class mail, by Electronic Means (as hereinafter defined) or by overnight delivery to the Authority, the Securities Depositories and an Information Service.  Failure to provide notice to the Authority, the Securities Depositories or an Information Service shall not affect the validity of proceedings for the redemption of such Bonds.

SECTION 4.04    Partial Redemption of Bonds.  Upon surrender of any Bond redeemed in part only, the Authority shall execute and the Trustee shall authenticate and deliver to the Owner thereof,

40

at the expense of the Borrower, a new Bond or Bonds of Authorized Denominations and of like maturity equal in aggregate principal amount to the unredeemed portion of the Bond surrendered.

SECTION 4.05    Effect of Redemption.  Notice of redemption having been duly given as aforesaid, and moneys for payment of the redemption price (including premium, if any) of, together with interest accrued to the date fixed for redemption on, the Bonds (or portions thereof) so called for redemption being held by the Trustee, on the redemption date designated in such notice, the Bonds (or portions thereof) so called for redemption shall become due and payable, interest on the Bonds so called for redemption shall cease to accrue, said Bonds (or portions thereof) shall cease to be entitled to any benefit or security under this Indenture, except for payment of particular Bonds for which moneys are being held by the Trustee which moneys shall be pledged to such payment, and the Holders of said Bonds shall have no rights in respect thereof except to receive payment of said redemption price (including premium, if any) and interest accrued to the date fixed for redemption.

All Bonds redeemed pursuant to the provisions of this Article shall be canceled and destroyed by the Trustee upon surrender thereof, and the Trustee shall thereupon deliver to the Authority a certificate evidencing such cancellation and destruction.

## ARTICLE V
## REVENUES; FUNDS AND ACCOUNTS;
## PAYMENT OF PRINCIPAL AND INTEREST

SECTION 5.01    Pledge and Assignment; Revenue Fund.

(A)  Subject only to the provisions of this Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein, all of the Revenues and any other amounts (including proceeds of the sale of Bonds) held in any fund or account established pursuant to this Indenture (except the Rebate Fund and the Borrower Subaccount of the Costs of Issuance Fund) are hereby pledged to secure the full payment of the principal of, premium, if any, and interest on the Bonds in accordance with their terms and the provisions of this Indenture.  Said pledge shall constitute a lien on and security interest in such assets and shall attach, be perfected and be valid and binding from and after delivery by the Trustee of the Bonds, without any physical delivery thereof or further act.

(B)  The Authority hereby transfers in trust, and assigns to the Trustee, for the benefit of the Holders from time to time of the Bonds all of the Revenues and other assets pledged in subsection (A) of this Section and all of the right, title and interest of the Authority in the Agreement (except for the Retained Rights).  Such assignment to the Trustee is solely in its capacity as Trustee under this Indenture, subject to the protections, immunities and limitations from liability afforded the Trustee hereunder.  The Trustee shall be entitled to and shall collect and receive all of the Revenues, the Gross Revenues pledged to the Authority under the Agreement and any Revenues or Gross Revenues collected or received by the Authority shall be deemed to be held, and to have been collected or received, by the Authority as the agent of the Trustee and, subject to the provisions of the Indenture, shall forthwith be paid by the Authority to the Trustee.  Notwithstanding anything to the contrary in this Indenture, the Authority shall have no obligation to, and instead the Trustee may, without further direction from the Authority, take any and all steps, actions and proceedings to enforce any or all rights of the Authority (other than the Retained Rights) under the Indenture or the Guaranty Agreement or any of the other Loan Documents, including, without limitation, the rights to enforce the remedies upon the occurrence and continuation of an Event of Default, the obligations of the Borrower under the Loan Documents and the obligations of the Guarantor under the Guaranty Agreement.

(C) All Revenues (except investment earnings, which shall be deposited as provided in Section 5.05) shall be promptly deposited by the Trustee upon receipt thereof in a special fund designated as the Revenue Fund which the Trustee shall establish, maintain and hold in trust; except as otherwise provided in Section 5.02 hereof, all moneys received by the Trustee and required to be deposited in the Redemption Account, if any, shall be promptly deposited in the Redemption Account, which the Trustee shall establish, maintain and hold in trust as provided in Section 5.02 hereof. All Revenues deposited with the Trustee shall be held, disbursed, allocated and applied by the Trustee only as provided in this Indenture.

SECTION 5.02    Deposits to Revenue Fund; Allocation of Revenues. The Trustee shall establish, maintain and hold in trust a separate fund designated as the "Revenue Fund" and accounts therein designated the "Interest Account," "Principal Account," "Redemption Account," "Debt Service Reserve Fund" and "Capital Replacement Fund." Subject to the provisions of Section 7.03, on the first Business Day of each calendar month, the Trustee shall transfer from the Revenue Fund and deposit into the following respective accounts (each of which the Trustee is hereby directed to establish and maintain within the Revenue Fund), the following amounts, in the following order of priority, the requirements of each such account (including the making up of any deficiencies in any such account resulting from lack of Revenues sufficient to make any earlier required deposit) at the time of deposit to be satisfied before any transfer is made to any account subsequent in priority:

First: to the Interest Account, an amount equal to one-sixth of the aggregate amount of interest becoming due and payable on the next succeeding Bond Payment Date or date of redemption of all Bonds then Outstanding (to the extent the amount of such interest exceeds the amount on deposit in the Capitalized Interest Account).

Second: to the Principal Account, an amount equal to one-sixth of the aggregate amount of any principal or sinking fund payments becoming due and payable on the next succeeding Bond Payment Date.

Third: to the Redemption Account, the aggregate amount of principal and premium, if any, next coming due by acceleration or by redemption (other than sinking fund payments) permitted or required under Article IV hereof, or any portion thereof paid by the Borrower.

Fourth: to the Debt Service Reserve Fund, the amount necessary to restore such fund to the Reserve Requirement (taking into account any reserve funds then held in respect of Parity Debt), if required, in three equal installments, all as provided in Section 5.07(B).

In addition, following the completion of the transfers contemplated in *First* through *Fourth* above, on the first Business Day of June and December of each year, commencing with December 2021, the Trustee shall transfer from the Revenue Fund to the Capital Replacement Fund an amount equal to $190,000 or such other amount as determined by the Independent Consultant in accordance with Section 5.13 of the Agreement.

In the event that the Trustee receives any payment in respect of any Guaranteed Obligations (as defined in the Guaranty Agreement) from the Guarantor (a "Guaranty Payment"), the Trustee shall deposit such payment into the applicable fund or account of the Indenture (or, as applicable, remit to the account of the Authority or Trustee) in accordance with the purpose for which such payment was paid pursuant to the Guaranty Agreement. For the avoidance of doubt, (i) Guaranty Payments in respect of fees, expenses or other amounts payable to the Authority or the Trustee shall be respectively remitted to the Authority or the Trustee (for its own account), (ii) Guaranty Payments in respect of Guaranteed Project Costs shall be deposited in the Tax-Exempt Subaccount and (iii) Guaranty Payments in respect of Guaranteed Debt Service Obligations (except those described in Section 1(b) of the Guaranty Agreement)

42

shall be deposited in the Interest Account, Principal Account or Redemption Account, as applicable, in accordance with such purpose.

In the event that the Trustee receives any funds from the Borrower pursuant to Section 8.3(d) of the Agreement, the Trustee shall deposit such funds into the Redemption Account, to be further applied or transferred in accordance with Section 4.01(4) hereof.

SECTION 5.03    <u>Priority of Moneys in Revenue Fund</u>.  Funds for the payment of the principal or redemption price (including premium, if any) of and interest on the Bonds shall be derived from the following sources in the order of priority indicated below from each of the accounts in the Revenue Fund:

(1)    moneys paid into the Interest Account, if any, representing accrued interest received at the initial sale of the Bonds and proceeds from the investment thereof which shall be applied to the payment of interest on such Bonds;

(2)    moneys paid into the Revenue Fund pursuant to clause (2) of Section 10.01 hereof and proceeds from the investment thereof; and

(3)    any other moneys paid into the Revenue Fund and deposited in the Revenue Fund and proceeds from the investment thereof.

SECTION 5.04    <u>Reserved</u>.

SECTION 5.05    <u>Investment of Moneys</u>.  All moneys in any of the funds or accounts established pursuant to this Indenture shall be invested by the Trustee as directed in writing by the Borrower or its agent, solely in Investment Securities.  Notwithstanding any other provision herein, in the absence of written investment instructions directing the Trustee by noon of the second Business Day preceding the day when investments are to be made, the Trustee is directed to invest available funds in Investment Securities described in paragraph (7) of the definition thereof.  The Trustee shall not be liable for any losses resulting from any investments made pursuant to the preceding two sentences.

Investment Securities may be purchased at such prices as the Trustee may in its discretion determine or as may be directed in writing by the Borrower or its agent.  All Investment Securities shall be acquired subject to the limitations set forth in Section 6.05 hereof, the limitations as to maturities hereinafter in this Section set forth and such additional limitations or requirements consistent with the foregoing as may be established by Request of the Borrower.

Moneys in all funds and accounts shall be invested in Investment Securities maturing not later than the date on which such moneys will be required for the purposes specified in this Indenture.  Notwithstanding anything else in this Section, any moneys in the Interest Account, the Principal Account or the Redemption Account held for the payment of particular Bonds shall be invested at the written direction of the Borrower in direct obligations of the United States or bonds or other obligations guaranteed by the United States government or for which the full faith and credit of the United States is pledged for the full and timely payment of principal and interest thereof (or money market funds investing solely in such bonds or other obligations), rated in the highest rating category applicable to such investments which mature or are subject to redemption at the option of the holder thereof not later than the date on which it is estimated that such moneys will be required to pay such Bonds (but in any event maturing or subject to such redemption in not more than thirty (30) days).  Moneys held for non-presented Bonds shall be held uninvested.

Except as otherwise provided in the last paragraph of this Section 5.05, all interest, profits and other income received or losses incurred from the investment of moneys in any fund or account established pursuant to this Indenture shall be deposited or booked in the fund or account which gave rise to the investment earnings or losses.  Notwithstanding anything to the contrary contained in this paragraph, an amount of interest received with respect to any Investment Security equal to the amount of accrued interest, if any, paid as part of the purchase price of such Investment Security shall be credited to the fund or account from which such accrued interest was paid.  To the extent that any Investment Securities are registrable, such Securities shall be registered in the name of the Trustee or its nominee.

For the purpose of determining the amount in any fund, all Investment Securities credited to such fund shall be valued at the lesser of cost or par value plus, prior to the first payment of interest following purchase, the amount of accrued interest, if any, paid as a part of the purchase price.

Subject to Section 6.06 hereof, investments in any and all funds and accounts held by the Trustee hereunder (other than moneys held in the Borrower Subaccount of the Costs of Issuance Fund or moneys held for the payment of particular Bonds (including moneys held for non-presented Bonds or held under 10.03 hereof)) may be commingled for purposes of making, holding and disposing of investments, notwithstanding provisions herein for transfer to or holding in particular funds and accounts, the amounts received or held by the Trustee hereunder, provided that the Trustee shall at all times account for such investments strictly in accordance with the funds and accounts to which they are credited and otherwise as provided in this Indenture.  Subject to Section 6.05 hereof, any moneys invested in accordance with this Section may be invested in a pooled investment account consisting solely of funds held by the Trustee as a fiduciary.  The Authority (and the Borrower by its execution of the Agreement) acknowledges that to the extent regulations of the Comptroller of the Currency or other applicable regulatory entity grant the Authority or the Borrower the right to receive brokerage confirmations of security transactions as they occur, the Authority and the Borrower specifically waive receipt of such confirmations to the extent permitted by law.  The Trustee will furnish the Authority and the Borrower periodic cash transaction statements which include detail for all investment transactions made by the Trustee hereunder.  The Trustee may act as principal or agent in the making or disposing of any investment.  The Trustee may sell or present for redemption any Investment Securities whenever it shall be necessary to provide moneys to meet any required payment, transfer, withdrawal or disbursement from the fund to which such Investment Security is credited, and the Trustee shall not be liable or responsible for any loss resulting from such investment.  The Trustee may make any and all such investments through its own investment department or that of its affiliates or subsidiaries, and may charge its ordinary and customary fees for such trades, including cash sweep account fees.  The Trustee may implement its automated cash investment system, to assure that cash on hand is invested and to charge reasonable cash management fees, which may be deducted from income earned on investments.

Notwithstanding anything to the contrary in this Section 5.05, all interest, profits and other income received from the investment of moneys in each of the Debt Service Reserve Fund and the Capitalized Interest Account shall be deposited or booked in the Tax-Exempt Subaccount of the Project Fund until (i) the receipt by the Trustee of a certificate conforming with the requirements of Section 3.2 of the Agreement and (ii) either (A) payment of costs payable from the Project Fund or (B) provision having been made for payment of such costs not yet due (1) by retaining the amount of such costs in the Project Fund or (2) as otherwise directed in such certificate.

SECTION 5.06    Rebate Fund.

(A) The Trustee shall establish and maintain a fund separate from any other fund established and maintained hereunder designated as the "Rebate Fund" (the "Rebate Fund").  Within the Rebate Fund, the Trustee shall maintain such other accounts as it is instructed by the Borrower as shall be

necessary in order to comply with the terms and requirements of the Tax Certificate. Subject to the transfer provisions provided in paragraph (E) below, all money at any time deposited in the Rebate Fund shall be held by the Trustee in trust, to the extent required to satisfy the Rebate Requirement (as defined in the Tax Certificate), for payment to the federal government of the United States of America, and no other Person shall have any rights in or claim to such money. All amounts deposited into or on deposit in the Rebate Fund shall be governed by this Section, by Section 6.06 hereof and by the Tax Certificate (which is incorporated herein by reference). The Trustee shall be deemed conclusively to have complied with such provisions if it follows the directions of the Borrower, including supplying all necessary information in the manner provided in the Tax Certificate, shall not be required to take any actions thereunder in the absence of written directions by the Borrower and shall have no liability or responsibility to enforce compliance by the Borrower or the Authority with the terms of the Tax Certificate.

(B)  Upon the Borrower's written direction, an amount shall be deposited to the Rebate Fund by the Trustee from deposits by the Borrower, or from available investment earnings on amounts (other than moneys held for the payment of particular Bonds (including moneys held for non-presented Bonds or held under Section 10.03 hereof)) held in the Revenue Fund, if and to the extent required, so that the balance of the amount on deposit thereto shall be equal to the Rebate Requirement. Computations of the Rebate Requirement shall be furnished by or on behalf of the Borrower in accordance with the Tax Certificate. The Trustee may rely conclusively upon the Borrower's determinations, calculations and certifications required by this Section 5.06(B). The Trustee shall have no responsibility to make any independent calculations or determinations or to review the Borrower's calculations hereunder.

(C)  The Trustee shall have no obligation to rebate any amounts required to be rebated pursuant to this Section other than from moneys held in the funds and accounts created under this Indenture (other than moneys held in the Borrower Subaccount of the Costs of Issuance Fund or moneys held for the payment of particular Bonds (including moneys held for non-presented Bonds or held under Section 10.03)) or from other moneys provided to it by or on behalf of the Borrower.

(D)  The Trustee shall invest all amounts held in the Rebate Fund in Investment Securities as instructed in writing by the Borrower, and the Borrower shall be responsible for such Rebate Instructions complying with the Tax Certificate. Money shall not be transferred from the Rebate Fund except as provided in paragraph (E) below.

(E)  Upon receipt of the Borrower's written directions, the Trustee shall remit part or all of the balances in the Rebate Fund to the United States, as so directed. In addition, if the Borrower so directs, the Trustee will deposit moneys into or transfer moneys out of the Rebate Fund from or into such accounts or funds (other than moneys held for the payment of particular Bonds (including moneys held for non-presented Bonds or held under Section 10.03 hereof)) as directed by the Borrower's written directions. Any funds remaining in the Rebate Fund after redemption and payment of all of the Bonds and payment and satisfaction of any Rebate Requirement or provision made therefor shall be withdrawn and remitted to the Borrower upon the Borrower's written request.

(F)  Notwithstanding any other provision of this Indenture, including in particular Article X hereof, the obligation to remit the Rebate Requirements to the United States and to comply with all other requirements of this Section, Section 6.06 hereof and the Tax Certificate shall apply only to any Tax-exempt Bonds issued under this Indenture and shall survive the defeasance or payment in full of such Bonds.

SECTION 5.07    <u>Debt Service Reserve Fund</u>.

(A)  The Trustee is hereby authorized to create and establish a separate account which shall be known as the "Debt Service Reserve Fund" which shall be held in trust by the Trustee until applied as

directed in this Indenture.  So long as no Event of Default shall have occurred and be continuing, the Debt Service Reserve Fund shall be used solely to pay the principal of and interest on the Bonds in the event of a deficiency in the amounts required to be on deposit in the Revenue Fund.  Upon the occurrence and during the continuation of an Event of Default, funds on deposit in the Debt Service Reserve Fund shall be applied by the Trustee at the direction of the Holders of a majority in aggregate principal amount of the Bonds then Outstanding.  The total amount required to be maintained in the Debt Service Reserve Fund shall equal the then applicable Reserve Requirement (taking into account any reserve funds then held in respect of Parity Debt).  On the date of initial delivery of the Bonds, the Debt Service Reserve Fund shall be funded as follows: $11,084,937.50 from proceeds of the Bonds.

(B)  On any Interest Payment Date immediately following the incurrence of any deficiency in the amount required to be maintained in the Debt Service Reserve Fund as a result of a withdrawal from the Debt Service Reserve Fund or a valuation pursuant to Section 5.07(D), after first having made the transfers provided for in Sections 5.01 and 5.02 (but prior to a transfer in the case of an optional redemption of the Bonds), the Trustee shall notify the Borrower that it is required to make payments pursuant to the Agreement with respect to the Bonds in an aggregate amount sufficient to eliminate the deficiency, and upon receipt of such payments the Trustee shall cause such deficiency to be eliminated from the Debt Service Reserve Fund in three (3) months as provided in Section 5.02, regardless of whether such deficiency is the result of a draw on the Debt Service Reserve Fund by the Trustee or a valuation of investments held in the Debt Service Reserve Fund pursuant to Section 5.07(D).

(C)  Moneys on deposit in the Debt Service Reserve Fund shall be applied as follows:

(1)    on the date of each permitted or required payment from the Revenue Fund with respect to the Bonds, after use of all available funds in the Revenue Fund, moneys in the Debt Service Reserve Fund shall be applied to cure any deficiency in the Revenue Fund for the payment of the Bonds;

(2)    as soon as practicable following each annual valuation of amounts held in the Debt Service Reserve Fund, any amount in the Debt Service Reserve Fund in excess of the Reserve Requirement (taking into account any reserve funds then held in respect of Parity Debt) shall be transferred to the Revenue Fund; and

(3)    in each month during the twelve month period preceding the final maturity date of a series of Bonds, moneys held in the Debt Service Reserve Fund in respect of such Bonds shall be credited against payment of installment payments otherwise payable in respect of principal of and interest on such Bonds and shall be transferred to the Revenue Fund for the payment of such principal and interest; provided, however, that no such transfer shall be made to the extent that, immediately prior to such crediting and transfer, the amount on deposit in the Debt Service Reserve Fund is not at least equal to the Reserve Requirement (taking into account any reserve funds then held in respect of Parity Debt) less the amounts previously transferred to the Revenue Fund during such twelve month period pursuant to this subparagraph (3) or otherwise.

(D)  Investments in the Debt Service Reserve Fund shall be valued by the Trustee on December 1 of each year and at the time of any withdrawal from the Debt Service Reserve Fund, at the lesser of the face amount or the market value thereof as reflected in the Trustee's trust accounting system.

(E)  Trustee shall give notice to the Authority not later than five (5) days after any deficiency in the amount required to be maintained in the Debt Service Reserve Fund as a result of a draw on the Debt Service Reserve Fund.

SECTION 5.08    Capital Replacement Fund.  The Trustee is hereby authorized to create and establish a separate account which shall be known as the "Capital Replacement Fund" which shall be held in trust by the Trustee until applied (subject to Section 5.03) as directed in this Indenture.  The Trustee shall withdraw funds from the Capital Replacement Fund to pay for the maintenance and repair costs related to the Facility so long as there exists no Event of Default described in Section 7.01(A) or (B) of this Indenture.  Moneys in the Capital Replacement Fund to be used for such purpose shall be disbursed upon receipt of a Requisition of the Borrower for payment substantially in the form attached hereto as Exhibit E, which, by this reference thereto, is incorporated herein, executed by the Authorized Representative of the Borrower, and the Trustee shall issue its checks for each such disbursement upon receipt of such a requisition.  The Trustee may conclusively rely upon such Requisition and shall have no responsibility or duty to investigate any of the matters set forth therein.

## ARTICLE VI
## PARTICULAR COVENANTS

SECTION 6.01    Punctual Payment.  The Authority shall punctually pay or cause to be paid the principal, premium, if any, and interest to become due in respect of all the Bonds, in strict conformity with the terms of the Bonds and of this Indenture, according to the true intent and meaning thereof, but only out of Revenues and other assets pledged for such payment as provided in this Indenture.  When and as paid in full, all Bonds, if any, shall be delivered to the Trustee, shall forthwith be canceled and destroyed, and a certificate of such destruction shall thereafter be delivered to the Authority.

SECTION 6.02    Extension of Payment of Bonds.  The Authority shall not directly or indirectly extend or assent to the extension of the maturity of any of the Bonds or the time of payment of any claims for interest by the purchase or funding of such Bonds or claims for interest or by any other arrangement and, in case the maturity of any of the Bonds or the time of payment of any such claims for interest shall be extended, such Bonds or claims for interest shall not be entitled, in case of any default hereunder, to the benefits of this Indenture, except subject to the prior payment in full of the principal of all of the Bonds then Outstanding and of all claims for interest thereon which shall not have been so extended.  Nothing in this Section shall be deemed to limit the right of the Authority to issue bonds for the purpose of refunding any Outstanding Bonds, and such issuance shall not be deemed to constitute an extension of maturity of Bonds.

SECTION 6.03    Against Encumbrances.  The Authority shall not create, or permit the creation of, any pledge, lien, charge or other encumbrance upon the Revenues and other assets pledged or assigned under this Indenture while any of the Bonds are Outstanding, except the pledge and assignment created by this Indenture.  Subject to this limitation, the Authority expressly reserves the right to enter into one or more other indentures for any of its corporate purposes, including other programs under the Act, and reserves the right to issue other obligations for such purposes.

SECTION 6.04    Power to Issue Bonds and Make Pledge and Assignment.  The Authority is duly authorized pursuant to law to issue the Bonds and to enter into this Indenture and to pledge and assign the Revenues and other assets pledged and assigned, respectively, under this Indenture in the manner and to the extent provided in this Indenture.  The Bonds and the provisions of this Indenture are and will be the legal, valid and binding limited obligations of the Authority in accordance with their terms, and the Authority and Trustee shall at all times, to the extent permitted by law, defend, preserve and protect said pledge and assignment of Revenues and other assets and all the rights of the Bondholders under this Indenture against all claims and demands of all Persons whomsoever, subject to the limitations set forth in Article VIII relating to the Trustee.

SECTION 6.05     Accounting Records and Reports.  The Trustee shall keep or cause to be kept proper books of record and account in which complete and correct entries shall be made of all transactions made by it relating to the receipt, investment, disbursement, allocation and application of the Revenues and the proceeds of the Bonds.  Such records shall specify the account or fund to which each investment (or portion thereof) held by the Trustee is to be allocated and shall set forth, in the case of each Investment Security, (a) its purchase price, (b) identifying information, including par amount, coupon rate and payment dates, (c) the amount received at maturity or its sale price, as the case may be, (d) the amounts and dates of any payments made with respect thereto and (e) such documentation as is required to be retained by the Trustee as evidence to establish the requirements set forth in the Tax Certificate or with respect to establishing market price, to the extent provided to it.  Such records shall be open to inspection by the Authority and any Holder, at any reasonable time during regular business hours on reasonable notice.

SECTION 6.06     Arbitrage Covenants.

(A)  The Authority and the Borrower covenant and agree that neither will take any action, nor fail to take any action, if such action or failure to take such action would adversely affect the exclusion from gross income of the interest payable on the Bonds under Section 103 of the Code.  Without limiting the generality of the foregoing, the Authority and the Borrower each covenants and agrees that it will each comply with the requirements of the Tax Certificate.

(B)  The Trustee agrees to comply with all written Rebate Instructions of the Borrower given pursuant to the Tax Certificate; provided, however, that the Borrower shall be responsible for such Rebate Instructions complying with the Tax Certificate.

The Trustee conclusively shall be deemed to have complied with the provisions of this Section 6.06(B) if it follows the Rebate Instructions and directions of the Borrower and shall not be required to take any action under this Section 6.06(B) in the absence of such directions from the Borrower.  The Trustee shall not be liable for any consequences resulting from its failure to act if no Rebate Instructions from the Borrower (or in the absence of Borrower Rebate Instructions, instructions from the Authority) are delivered to it.

(C)  Notwithstanding any provision of this Section, if the Borrower shall provide to the Trustee and the Authority, an opinion of Bond Counsel that any action required under Section 5.06 or this Section is no longer required, or that some further action is required to maintain the Tax-exempt status of interest on the Bonds, the Trustee and the Authority may rely conclusively on such opinion in complying with the requirements of this Section, and the covenants contained herein shall be deemed to be modified to that extent.

SECTION 6.07     Other Covenants.

(A)  The Trustee shall promptly collect all amounts due from the Borrower pursuant to the Agreement, shall perform all duties imposed upon it pursuant to the Agreement and shall enforce, and take all steps, actions and proceedings reasonably necessary for the enforcement of all of the rights of the Authority (except Retained Rights) and all of the obligations of the Borrower pursuant to the Loan Documents and all obligations of the Guarantor under the Guaranty Agreement.  If the Borrower fails to make a Loan Repayment by the due date thereof, the Trustee shall promptly notify the Authority, such notice to be given by telephone or facsimile followed by written notice.

(B)  The Authority shall not amend, modify or terminate any of the terms of the Loan Documents, or consent to any such amendment, modification or termination, without the prior written consent of the Trustee.  The Trustee shall give such written consent only if (1) in the Opinion of Counsel,

48

such amendment, modification or termination will not materially adversely affect the interests of the Bondholders or result in any material impairment of the security hereby given for the payment of the Bonds, and (2) the Trustee first obtains the written consent of the Holders of a majority in aggregate principal amount of the Bonds then Outstanding to such amendment, modification or termination, provided, however, that no such amendment, modification or termination shall reduce the amount of Loan Repayments to be made to the Authority or the Trustee by the Borrower pursuant to the Agreement, or extend the time for making such payments, without the written consent of all of the Holders of the Bonds then Outstanding. The Trustee and the Authority shall be entitled to rely upon an Opinion of Counsel with respect to the effect of any amendments hereto or to the Agreement.  The Trustee may in its discretion, but shall not be obligated to, give its written consent if such amendment, modification or termination affects the Trustee's own rights, duties or immunities.

(C)  The Authority shall not purchase Bonds.

SECTION 6.08    Waiver of Laws.  The Authority shall not at any time insist upon or plead in any manner whatsoever, or claim or take the benefit or advantage of, any stay or extension law now or at any time hereafter in force that may affect the covenants and agreements contained in this Indenture or in the Bonds, and all benefit or advantage of any such law or laws is hereby expressly waived by the Authority to the extent permitted by law.

SECTION 6.09    Further Assurances.  The Authority will make, execute and deliver any and all such further indentures, instruments and assurances as may be reasonably necessary or proper to carry out the intention or to facilitate the performance of this Indenture and for the better assuring and confirming unto the Holders of the Bonds of the rights and benefits provided in this Indenture.

SECTION 6.10    Continuing Disclosure.  Pursuant to Section 5.14 of the Agreement, the Borrower has agreed to execute, deliver and comply with the Continuing Disclosure Agreement, and the Authority shall have no liability to the Holders of the Bonds or any other Person with respect to compliance with the continuing disclosure requirements promulgated under S.E.C. Rule 15c2 12, as it may from time to time be amended or supplemented.  Notwithstanding any other provision of this Indenture, failure of the Borrower to comply with the Continuing Disclosure Agreement or requirements of S.E.C. Rule 15c2-12, as it may from time to time be amended or supplemented, shall not be considered an Event of Default; however, the Trustee, at the written request of the Holders of at least twenty-five percent (25%) aggregate principal amount of Outstanding Bonds, shall, but only to the extent indemnified as provided in this Indenture, or any Bondholder or Beneficial Owner of any Bonds may, take such actions as may be necessary and appropriate, including seeking mandamus or specific performance by court order, to cause the Borrower to comply with its obligations under Section 5.14 of the Agreement.

## ARTICLE VII
## EVENTS OF DEFAULT AND REMEDIES OF BONDHOLDERS

SECTION 7.01    Events of Default; Acceleration; Waiver of Default.  Each of the following events which has occurred and is continuing shall constitute an "Event of Default" hereunder:

(A)  default in the due and punctual payment of the principal of, or premium (if any) on, any Bond when and as the same shall become due and payable, whether at maturity as therein expressed, by proceedings for redemption, by declaration or otherwise;

(B)  default in the due and punctual payment of any installment of interest on any Bond, when and as the same shall become due and payable;

49

(C)  failure by the Authority to perform or observe any other of the covenants, agreements or conditions on its part in this Indenture or in the Bonds contained, and the continuation of such failure for a period of sixty (60) days after written notice thereof, specifying such default and requiring the same to be remedied, shall have been given to the Authority and the Borrower by the Trustee, or to the Authority, the Borrower and the Trustee by the Holders of a majority in aggregate principal amount of the Bonds then Outstanding; or

(D)  the occurrence and continuance of a Loan Default Event described in the Agreement, or any other default or event of default under any of the Loan Documents, including, without limitation, any Event of Default under the Guaranty Agreement.

No default specified in (C) above shall constitute an Event of Default unless the Authority or the Borrower on behalf of the Authority shall have failed to correct such default within the applicable period; provided, however, that if the default shall be such that it cannot be corrected within such period, it shall not constitute an Event of Default if corrective action is instituted by the Authority or the Borrower on behalf of the Authority within the applicable period and diligently pursued.  With regard to any alleged default concerning which notice is given to the Authority under the provisions of this Section, the Borrower shall have full authority to perform any covenant or obligation the non-performance of which is alleged in said notice to constitute a default with full power to do any and all things and acts to the same extent that the Authority could do and perform any such things and acts.

During the continuance of an Event of Default, unless the principal of all the Bonds shall have already become due and payable, the Trustee may, and upon the written request of the Holders of a majority in aggregate principal amount of the Bonds then Outstanding and upon being indemnified to its satisfaction therefor pursuant to Sections 8.01 and 8.03(G) hereof shall, promptly upon such occurrence, by notice in writing to the Authority and the Borrower, declare the principal of all the Bonds then Outstanding, and the interest accrued thereon, to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable, anything in this Indenture or in the Bonds contained to the contrary notwithstanding.  Interest on the Bonds shall continue to accrue as of the date of declaration of acceleration at the Post-Default Rate until paid.  The Trustee shall promptly notify the Bondholders of the date of declaration of acceleration in the same manner as for a notice of redemption.

The preceding paragraph, however, is subject to the condition that if, at any time after the principal of the Bonds shall have been so declared due and payable, and before any judgment or decree for the payment of the moneys due shall have been obtained or entered as hereinafter provided, there shall have been deposited with the Trustee a sum sufficient to pay all the principal of the Bonds matured prior to such declaration and all matured installments of interest (if any) upon all the Bonds, with interest on such overdue installments of principal as provided in the Agreement, and the reasonable fees and expenses of the Trustee, including reasonable fees and expenses of its attorneys, and any and all other defaults known to the Trustee (other than in the payment of principal of and interest on the Bonds due and payable solely by reason of such declaration) shall have been made good or cured to the satisfaction of the Trustee or provision deemed by the Trustee to be adequate shall have been made therefor, then, and in every such case, the Holders of a majority in aggregate principal amount of the Bonds then Outstanding, by written notice to the Authority and to the Trustee, may, on behalf of the Holders of all the Bonds, rescind and annul such declaration and its consequences and waive such default; but no such rescission and annulment shall extend to or shall affect any subsequent default, or shall impair or exhaust any right or power consequent thereon.

SECTION 7.02    Institution of Legal Proceedings by Trustee.  If one or more of the Events of Default shall happen and be continuing, the Trustee in its discretion may, and upon the written request of the Holders of a majority in aggregate principal amount of the Bonds then Outstanding and upon

being indemnified to its satisfaction therefor pursuant to Sections 8.01 and 8.03(G) hereof shall, proceed to protect or enforce its rights or the rights of the Holders of Bonds under the Act or under this Indenture or the Agreement by a suit in equity or action at law, either for the specific performance of any covenant or agreement contained herein or therein, or in aid of the execution of any power herein or therein granted, or for appointment of a receiver, or by mandamus or other appropriate proceeding for the enforcement of any other legal or equitable remedy as the Trustee shall deem most effectual in support of any of its rights or duties hereunder.

SECTION 7.03    Application of Revenues and Other Funds After Default. Notwithstanding the provisions of Section 5.02 hereof, if an Event of Default shall occur and be continuing, all Revenues and any other funds then held or thereafter received by the Trustee under any of the provisions of this Indenture (subject to Sections 3.04 (relative to the Borrower Subaccount of the Costs of Issuance Fund), 5.06 and 11.11 hereof) shall be promptly applied by the Trustee as follows and in the following order:

(1)    To the payment of reasonable fees and expenses of the Trustee (including reasonable fees and disbursements of its counsel) incurred in and about the performance of its powers and duties under this Indenture;

(2)    To the payment of the principal of and interest then due on the Bonds (upon presentation of the Bonds to be paid, and stamping thereon of the payment if only partially paid, or surrender thereof if fully paid) subject to the provisions of this Indenture (including Section 6.02 hereof), as follows:

(i)    Unless the principal of all of the Bonds shall have become or have been declared due and payable,

First: To the payment to the Persons entitled thereto of all installments of interest then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment or installments maturing on the same date, then to the payment thereof ratably, according to the amounts due thereon, to the Persons entitled thereto, without any discrimination or preference; and

Second: To the payment to the Persons entitled thereto of the unpaid principal of any Bonds which shall have become due, whether at maturity or by call for redemption, with interest on the overdue principal at the rate borne by the respective Bonds, and, if the amount available shall not be sufficient to pay in full all the Bonds, together with such interest, then to the payment thereof ratably, according to the amounts of principal due on such date to the Persons entitled thereto, without any discrimination or preference.

(ii)    If the principal of all of the Bonds shall have become or have been declared due and payable, to the payment of the principal and interest then due and unpaid upon the Bonds, with interest on the overdue principal at the rate borne by the Bonds, and, if the amount available shall not be sufficient to pay in full the whole amount so due and unpaid, then to the payment thereof ratably, without preference or priority of principal over interest, or of interest over principal, or of any installment of interest over any other installment of interest, or of any Bond over any other Bond, according to the amounts due respectively for principal and interest, to the Persons entitled thereto without any discrimination or preference;

51

provided, however, that in no event shall moneys set aside to pay principal or interest on any particular Bonds (including moneys held for non-presented Bonds or held under Section 10.03 hereof), be used to pay any of the items listed in clause (1) of this Section.

 SECTION 7.04 <u>Trustee to Represent Bondholders</u>.  The Trustee is hereby irrevocably appointed (and the successive respective Holders of the Bonds, by taking and holding the same, shall be conclusively deemed to have so appointed the Trustee) as trustee and true and lawful attorney in fact of the Holders of the Bonds for the purpose of exercising and prosecuting on their behalf such rights and remedies as may be available to such Holders under the provisions of the Bonds, this Indenture, the Loan Documents, the Act and applicable provisions of any other law.  Subject to Section 7.01 hereof, upon the occurrence and continuance of an Event of Default or other occasion giving rise to a right in the Trustee to represent the Bondholders, the Trustee in its discretion may, and upon the written request of the Holders of a majority in aggregate principal amount of the Bonds then Outstanding, and upon being indemnified to its satisfaction therefor, shall, proceed to protect or enforce its rights or the rights of such Holders by such appropriate action, suit, mandamus or other proceedings as it shall deem most effectual to protect and enforce any such right, at law or in equity, either for the specific performance of any covenant or agreement contained herein, or in aid of the execution of any power herein granted, or for the enforcement of any other appropriate legal or equitable right or remedy vested in the Trustee or in such Holders under this Indenture, the Loan Documents, the Act or any other law; and upon instituting such proceeding, the Trustee shall be entitled, as a matter of right, to the appointment of a receiver of the Revenues and other assets pledged under this Indenture, pending such proceedings.  All rights of action under this Indenture or otherwise may be prosecuted and enforced by the Trustee without the possession of any of the Bonds or the production thereof in any proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in the name of the Trustee for the benefit and protection of all the Holders of such Bonds, subject to the provisions of this Indenture (including Section 6.02 hereof).

 SECTION 7.05 <u>Bondholders' Direction of Proceedings</u>.  Anything in this Indenture to the contrary notwithstanding, but subject to Section 8.03(G), the Holders of a majority in aggregate principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law and the provisions of this Indenture, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondholders not parties to such direction or for which it has not been provided adequate indemnity.

 SECTION 7.06 <u>Limitation on Bondholders' Right to Sue</u>.  Subject to Section 7.01 hereof, no Holder of any Bond shall have the right to institute any suit, action or proceeding at law or in equity, for the protection or enforcement of any right or remedy under this Indenture, the Loan Documents, the Act or any other applicable law with respect to such Bond, unless (1) such Holder shall have given to the Trustee written notice of the occurrence of an Event of Default; (2) the Holders of a majority in aggregate principal amount of the Bonds then Outstanding shall have made written request upon the Trustee to exercise the powers hereinbefore granted or to institute such suit, action or proceeding in its own name; (3) subject to Section 8.03(G) hereof, such Holder or said Holders shall have tendered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request; and (4) the Trustee shall have refused or omitted to comply with such request for a period of sixty (60) days after such written request shall have been received by, and said tender of indemnity shall have been made to, the Trustee.

 Such notification, request, tender of indemnity and refusal or omission are hereby declared, in every case, at the option of the Trustee, to be conditions precedent to the exercise of any remedy hereunder or under law; it being understood and intended that no one or more Holders of Bonds shall have

any right in any manner whatever by such Holders' action to affect, disturb or prejudice the security of this Indenture or the rights of any other Holders of Bonds, or to enforce any right under this Indenture, the Loan Documents, the Act or other applicable law with respect to the Bonds, except in the manner herein provided, and that all proceedings at law or in equity to enforce any such right shall be instituted, had and maintained in the manner herein provided and for the benefit and protection of all Holders of the Outstanding Bonds, subject to the provisions of this Indenture (including Section 6.02 hereof).

SECTION 7.07    Absolute Obligation of Authority.  Nothing in Section 7.06 or in any other provision of this Indenture, or in the Bonds, shall affect or impair the obligation of the Authority, which is absolute and unconditional, to pay the principal of and interest on the Bonds to the respective Holders of the Bonds at their respective dates of maturity, or upon call for redemption, as herein provided, but only out of the Revenues and other assets herein pledged therefor, or affect or impair the right of such Holders, which is also absolute and unconditional, to enforce such payment by virtue of the contract embodied in the Bonds.

SECTION 7.08    Termination of Proceedings.  In case any proceedings taken by the Trustee or any one or more Bondholders on account of any Event of Default shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee or the Bondholders, then in every such case the Authority, the Trustee and the Bondholders, subject to any determination in such proceedings, shall be restored to their former positions and rights hereunder, severally and respectively, and all rights, remedies, powers and duties of the Authority, the Trustee and the Bondholders shall continue as though no such proceedings had been taken.

SECTION 7.09    Remedies Not Exclusive.  No remedy herein conferred upon or reserved to the Trustee or to the Holders of the Bonds is intended to be exclusive of any other remedy or remedies, and each and every such remedy, to the extent permitted by law, shall be cumulative and in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or otherwise.

SECTION 7.10    No Waiver of Default.  No delay or omission of the Trustee or of any Holder of the Bonds to exercise any right or power arising upon the occurrence of any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein; and every power and remedy given by this Indenture to the Trustee or to the Holders of the Bonds may be exercised from time to time and as often as may be deemed expedient.

## ARTICLE VIII
## THE TRUSTEE, THE PAYING AGENT AND THE BOND REGISTRAR

SECTION 8.01    Duties, Immunities and Liabilities of Trustee.

(A)  The Trustee and the Registrar shall, prior to an Event of Default, and after the curing or waiver of all Events of Default which may have occurred, perform such duties and only such duties as are specifically set forth in this Indenture.  The Trustee shall, during the existence of any Event of Default (which has not been cured or waived), exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of its affairs.  Notwithstanding any other provision of this Indenture, the Trustee shall perform all duties required of it hereunder.

No provision of this Indenture shall be construed to relieve the Trustee or the Registrar from liability for its own negligent action or its own negligent failure to act, except that:

(B)  Prior to such an Event of Default hereunder and after the curing or waiver of all Events of Default which may have occurred,

(i)       the duties and obligations of the Trustee and the Registrar, as the case may be, shall be determined solely by the express provisions of this Indenture, the Trustee and Registrar, as the case may be, shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee and the Registrar, as the case may be; and

(ii)      in the absence of bad faith on the part of the Trustee or the Registrar, as the case may be, the Trustee or Registrar, as the case may be, may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificate or opinion furnished to the Trustee or the Registrar, as the case may be, conforming to the requirements of this Indenture; but in the case of any such certificate or opinion which by any provision hereof is specifically required to be furnished to the Trustee or the Registrar, as the case may be, the Trustee or Registrar, as the case may be, shall be under a duty to examine the same to determine whether or not it conforms to the requirements of this Indenture.

(C)  At all times, regardless of whether or not any Event of Default shall exist,

(i)       the Trustee and the Registrar shall not be liable for any error of judgment made in good faith by a responsible officer, director or employee of the Trustee or the Registrar unless it shall be proved that the Trustee or the Registrar, as the case may be, was negligent in ascertaining the pertinent facts;

(ii)      neither the Trustee nor the Registrar shall be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of not less than a majority, or such larger percentage as may be required hereunder, in aggregate principal amount of the Bonds then Outstanding relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or Registrar, or exercising any trust or power conferred upon the Trustee or the Registrar under this Indenture;

(iii)     none of the provisions contained in this Indenture shall require the Trustee or Registrar to expend or risk their own funds or otherwise incur individual financial liability in the performance of any of their duties or in the exercise of any of their rights or powers other than to notify the Authority that they intend to take no particular action or to notify the Bondholders that they will take no action if adequate indemnity against such risk or liability is not assured to them; and

(iv)      all indemnifications and releases from liability granted herein to the Trustee shall extend to the directors, officers, employees and agents of the Trustee.

(D)  Notwithstanding anything contained herein or in the Leasehold Deed of Trust to the contrary, upon the occurrence and continuance of an Event of Default, before taking any foreclosure action or any action which may subject the Trustee to liability under any Environmental Regulation, the Trustee may require that a satisfactory indemnity bond, indemnity or environmental impairment insurance be furnished for the payment or reimbursement of all expenses to which it may be put and to protect it against all liability resulting from any claims, judgments, damages, losses, penalties, fines, liabilities (including

54

strict liability) and expenses which may result from such foreclosure or other action.  The Trustee shall not be required to take any foreclosure action if the approval of a government regulator shall be a condition precedent to taking such action.

(E)  The Authority may remove the Trustee at any time upon its own decision, or upon Request of the Borrower (if no Event of Default exists hereunder) which request is consented to by the Holders of a majority in aggregate principal amount of the Bonds then Outstanding, and shall remove the Trustee if at any time requested to do so by an instrument or concurrent instruments in writing signed by the Holders of not less than a majority in aggregate principal amount of the Bonds then Outstanding (or their attorneys duly authorized in writing) or if at any time the Trustee shall cease to be eligible in accordance with subsection (H) of this Section, or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or its property shall be appointed, or any public officer shall take control or charge of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, in each case by giving written notice of such removal to the Trustee, and thereupon shall appoint a successor Trustee by an instrument in writing.

(F)  The Trustee may at any time resign by giving written notice of such resignation to the Authority and the Borrower and by giving the Bondholders notice of such resignation by mail at the addresses shown on the registration books maintained by the Trustee.  Upon receiving such notice of resignation, the Authority shall promptly appoint a successor Trustee by an instrument in writing.  The Trustee shall not be relieved of its duties until such successor Trustee has accepted appointment.

(G)  Any removal or resignation of the Trustee pursuant to (E) or (F) above and appointment of a successor Trustee shall become effective upon acceptance of appointment by the successor Trustee.  If no successor Trustee shall have been appointed and have accepted appointment within forty-five (45) days of giving notice of removal or notice of resignation as aforesaid, the resigning Trustee or any Bondholder (on behalf of itself and all other Bondholders) may petition any court of competent jurisdiction for the appointment of a successor Trustee, and such court may thereupon, after such notice (if any) as it may deem proper, appoint such successor Trustee.  Any successor Trustee appointed under this Indenture shall signify its acceptance of such appointment by executing and delivering to the Authority and to its predecessor Trustee a written acceptance thereof, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become vested with all the moneys, estates, properties, rights, powers, trusts, duties and obligations of such predecessor Trustee, with like effect as if originally named Trustee herein; provided, however, that at the Request of the Authority or the request of the successor Trustee, and upon the payment of the fees and expenses owed to the predecessor, such predecessor Trustee shall execute and deliver any and all instruments of conveyance or further assurance and do such other things as may reasonably be required for more fully and certainly vesting in and confirming to such successor Trustee all the right, title and interest of such predecessor Trustee in and to any property held by it under this Indenture and shall pay over, transfer, assign and deliver to the successor Trustee any money or other property subject to the trusts and conditions herein set forth.  Upon request of the successor Trustee, the Authority shall execute and deliver any and all instruments as may be reasonably required for more fully and certainly vesting in and confirming to such successor Trustee all such moneys, estates, properties, rights, powers, trusts, duties and obligations.  Upon acceptance of appointment by a successor Trustee as provided in this subsection, the successor Trustee shall mail a notice of the succession of such Trustee to the trusts hereunder to the Bondholders at the addresses shown on the registration books maintained by the Trustee.

(H)  Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a trust company, association, corporation or bank having the powers of a trust company which either (i) has a combined capital and surplus of at least fifty million dollars ($50,000,000) and is subject to supervision or examination by federal or state authority or (ii) is a wholly-owned subsidiary of a bank, association, trust company, corporation or bank holding company meeting, on an aggregate basis, the tests

set out in clause (i).  If such bank, association, bank holding company, corporation or trust company publishes a report of condition at least annually, pursuant to law or to the requirements of any supervising or examining authority above referred to, then for the purpose of this subsection the combined capital and surplus of such bank, association, bank holding company, corporation or trust company shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  In case at any time the Trustee shall cease to be eligible in accordance with the provisions of this subsection (H), the Trustee shall resign immediately in the manner and with the effect specified in this Section.

(I)  The Trustee is not responsible for effecting, maintaining or renewing any policies of insurance of the Borrower or for any representations regarding the sufficiency of any policy of insurance of the Borrower and shall not be responsible for monitoring or reviewing any policy of insurance of the Borrower or be obligated to file claims or proofs of loss in the case of insurance or to pay taxes or assessments.

(J)  The Trustee is not responsible for filing financing or continuation statements. On or prior to the Date of Delivery, the Borrower shall, in accordance with Section 5.12(e) of the Agreement, file or cause to be filed all financing statements required to be filed in connection with the Bonds and the security therefor.

(K)  Subject to the provisions of Sections 5.06 and 10.03 hereof, all moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated from other funds except to the extent required by law or by this Indenture.  The Trustee shall be under no liability for interest on any moneys received by them hereunder except such as they may agree with the Authority to pay thereon.  Any interest allowed on any such moneys shall be deposited in the fund or account to which such moneys are credited.  Any moneys held by the Trustee may be deposited by it in its banking department and invested as provided herein.

(L)  The Trustee shall have the right to accept and act upon instructions, including funds transfer instructions ("Instructions") given pursuant to this Indenture and delivered using Electronic Means ("Electronic Means" shall mean the following communications methods: e-mail, facsimile transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another method or system specified by the Trustee as available for use in connection with its services hereunder); provided, however, that the Borrower shall provide to the Trustee an incumbency certificate listing officers with the authority to provide such Instructions ("Authorized Officers") and containing specimen signatures of such Authorized Officers, which incumbency certificate shall be amended by the Borrower whenever a person is to be added or deleted from the listing.  If the Borrower elects to give the Trustee Instructions using Electronic Means and the Trustee in its discretion elects to act upon such Instructions, the Trustee's understanding of such Instructions shall be deemed controlling.  The Borrower understands and agrees that the Trustee cannot determine the identity of the actual sender of such Instructions and that the Trustee shall conclusively presume that directions that purport to have been sent by an Authorized Officer listed on the incumbency certificate provided to the Trustee have been sent by such Authorized Officer.  The Borrower shall be responsible for ensuring that only Authorized Officers transmit such Instructions to the Trustee and that the Borrower and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords and/or authentication keys upon receipt by the Borrower.  The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction.  The Borrower agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions

56

to the Trustee and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Borrower; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee immediately upon learning of any compromise or unauthorized use of the security procedures.

The parties agree that the transactions described herein may be conducted and related documents may be stored by Electronic Means. Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents shall be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

(M) The Trustee shall inform the Holders of environmental hazards that the Trustee has reason to believe exist, and the Trustee has the right to take no further action and, in such event no fiduciary duty exists which imposes any obligation for the Trustee to foreclose upon, manage, maintain or operate the Facility, if the Trustee in its individual capacity, determines that any such action would materially and adversely subject the Trustee to environmental or other liability for which the Trustee has not been adequately indemnified.

The Trustee shall not be responsible for or accountable to anyone for the subsequent use or application of any moneys which shall be released or withdrawn in accordance with the provisions hereof.

The permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty and it shall not be answerable for other than its negligence or willful misconduct.

SECTION 8.02   Merger or Consolidation. Any company into which the Trustee may be merged or converted or with which it may be consolidated, or any company resulting from any merger, conversion or consolidation to which it shall be a party, or any company to which the Trustee may sell or transfer all or substantially all of its corporate trust business, provided such company shall be eligible under subsection (H) of Section 8.01, shall be the successor to such Trustee without the execution or filing of any paper or any further act, anything herein to the contrary notwithstanding.

SECTION 8.03   Liability of Trustee.

(A) The recitals of facts herein and in the Bonds contained shall be taken as statements of the Authority, and the Trustee shall assume no responsibility for the correctness of the same, or make any representations as to the validity or sufficiency of this Indenture or of the Bonds. In addition, the Trustee shall assume no responsibility with respect to this Indenture or the Bonds other than in connection with the duties or obligations assigned to or imposed upon the Trustee herein or in the Bonds. The Trustee shall, however, be responsible for its representations contained in its certificate of authentication on the Bonds. The Trustee shall not be liable in connection with the performance of its duties hereunder, except for its own negligence or willful misconduct. The Trustee may become the Holder of Bonds with the same rights it would have if it were not Trustee and, to the extent permitted by law, may act as Depository for and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondholders, whether or not such committee shall represent the Holders of a majority in aggregate principal amount of the Bonds then Outstanding.

The Trustee may execute any of the trusts or powers set forth herein and perform the duties required of it hereunder by or through attorneys, agents or receivers and shall be entitled to the advice of counsel concerning all matters of trusts and its duties herein.

(B)  The Trustee shall not be liable for any error of judgment made in good faith by a responsible officer, director or employee unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts.

(C)  The Trustee shall not be liable with respect to any action or inaction taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of not less than a majority in aggregate principal amount of the Bonds then Outstanding relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee under this Indenture.

(D)  The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any of the Bondholders pursuant to the provisions of this Indenture unless such Bondholders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby.

(E)  The Trustee shall not be liable for any action or inaction taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Indenture.

(F)  The Trustee shall not be deemed to have knowledge of any default or Event of Default hereunder unless and until it shall have actual knowledge thereof, or shall have received written notice thereof, at its Corporate Trust Office.  Except as otherwise expressly provided herein, the Trustee shall not be bound to ascertain or inquire as to the performance or observance of any of the terms, conditions, covenants or agreements herein or of any of the documents executed in connection with the Bonds, or as to the existence of a default or Event of Default thereunder.  The Trustee shall not be responsible for the validity or effectiveness of any collateral given to or held by it.

(G)  No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of its rights or powers, other than to notify the Authority that it intends to take no particular action or to notify the Bondholders that it will take no action, if repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.  The Trustee shall, however, in any case, pay principal of and premium, if any, or interest on the Bonds as it becomes due and accelerate the Bonds as required by the Indenture, notwithstanding anything to the contrary herein.

(H)  The Trustee shall have no responsibility, opinion or liability with respect to any information statement or recital found in any official statement or other disclosure material, prepared or distributed with respect to the issuance of such bonds, except for information provided by the Trustee.

SECTION 8.04    Right of Trustee to Rely on Documents.  The Trustee may conclusively rely and shall be protected, absent its own negligence or willful misconduct, in acting or refraining from acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties; in particular, the Trustee shall be entitled to rely upon a Certificate of the Borrower to the effect that no Act of Bankruptcy has occurred.  The Trustee may consult with counsel, who may be counsel of or to the Authority or the Borrower, with regard to legal questions, and the advice or opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder in good faith and in accordance therewith.

The Trustee shall not be bound to recognize any Person as the Holder of a Bond unless and until such Bond is submitted for inspection, if required, and its title thereto is satisfactorily established, if disputed.

Whenever in the administration of the trusts imposed upon it by this Indenture the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a Certificate of the Authority, and such Certificate shall be full warrant to the Trustee for any action taken or suffered in good faith under the provisions of this Indenture in reliance upon such Certificate, but in its discretion the Trustee may, in lieu thereof, accept other evidence of such matter or may require such additional evidence as it may deem reasonable.

SECTION 8.05    Preservation and Inspection of Documents.  All documents received by the Trustee under the provisions of this Indenture shall be retained in its possession and shall be subject to the inspection of the Authority and any Bondholder, and their agents and representatives duly authorized in writing, at reasonable hours and under reasonable conditions.

SECTION 8.06    Compensation and Indemnification.  The Borrower shall pay to the Trustee, the Paying Agent and the Registrar from time to time reasonable compensation for all services rendered under this Indenture, and also all reasonable expenses, charges, legal and consulting fees and other disbursements and those of its attorneys, agents and employees, incurred in and about the performance of its powers and duties under this Indenture, and the Trustee shall have a lien therefor on any and all funds (except the Rebate Fund, the moneys held for particular Bonds (including non-presented Bonds) and moneys held pursuant to Section 10.03) at any time held by it under this Indenture which lien shall be prior and superior to the lien of the Holders of the Bonds.  In the event that it should become necessary for the Trustee to perform extraordinary services, the Trustee shall be entitled to reasonable additional compensation therefor and to reimbursement for reasonable and necessary extraordinary expenses in connection therewith; provided that if such necessary extraordinary services or necessary extraordinary costs and expenses are occasioned by the negligence or willful misconduct of the Trustee it shall not be entitled to compensation or reimbursement therefore.  The Borrower shall indemnify and save the Trustee, the Paying Agent and the Registrar harmless against any losses, expenses and liabilities which they may incur arising out of or in the exercise and performance of its powers and duties hereunder, including the costs and expenses of defending against any claim of liability, but excluding liabilities which are due to the negligence or willful default of the indemnified party.  The obligations of the Borrower under this Section shall survive resignation or removal of the Trustee, the Paying Agent and the Registrar under this Indenture and payment of the Bonds and discharge of this Indenture.

SECTION 8.07    Paying Agent.  The Trustee shall be the Paying Agent for the Bonds.

SECTION 8.08    Notices to the Authority.  The Trustee shall provide the Authority with the following:

(A)  On or before January 15 of each year, commencing January 15, 2020, during which any of the Bonds are Outstanding, or upon any significant change that occurs which would adversely impact the Trustee's ability to perform its duties under the Indenture, a written disclosure of any such change, or if applicable, of any conflicts that the Trustee may have as a result of other business dealings between the Trustee and the Borrower.  The Trustee may rely on a Certificate of the Borrower delivered pursuant to Section 5.11(a) of the Agreement to the extent of the information required in such certificate for purposes of this subsection (A).  If there are no such instances of a significant change, or of a conflict existing, then a statement to that effect shall be provided on such date;

59

(B)  If there is a failure to pay any amount of principal or premium, if any, or interest on any Bond when due; or if there is a failure of the Borrower to provide any notice, certification or report specified in Section 5.11 of the Agreement; or if there is an occurrence of an Event of Default hereunder, of which the Trustee has knowledge, the Trustee shall provide written notice to the Authority and the Holders within five (5) Business Days of its receipt of notice of its occurrence and such notice shall include a statement setting forth the steps the Trustee is taking to remedy such failure or Event of Default, as applicable; and

(C)  As of June 30 and December 31 of each year, commencing December 31, 2019, a Trustee Audit Letter, with a copy to the Holders, in the form of Exhibit B attached hereto, which shall be received no later than July 15 or January 15 next following each such June 30 or December 31, as the case may be.

SECTION 8.09      Appointment and Duties of Bond Registrar.  The Authority hereby designates the Trustee as the Bond Registrar.

The Bond Registrar shall not be entitled to any compensation from the Authority or the Trustee but, rather, shall only be entitled to compensation from the Borrower.

SECTION 8.10      Bond Registrar's Performance of Duties.  The Bond Registrar shall perform the duties provided for in this Indenture and in exercising such duties shall be subject to the same standards and entitled to the same rights and immunities applicable to the Trustee as set forth in this Indenture and shall not be liable for any action or omission to act except for negligence or willful misconduct.

# ARTICLE IX
## MODIFICATION OR AMENDMENT OF THE INDENTURE

SECTION 9.01      Amendments Permitted.

(A)  This Indenture and the rights and obligations of the Authority and of the Holders of the Bonds and of the Trustee may be modified or amended from time to time and at any time by an indenture or indentures supplemental hereto, which the Authority and the Trustee may enter into when the written consent of the Holders of a majority in aggregate principal amount of the Bonds then Outstanding shall have been filed with the Trustee.  No such modification or amendment shall (1) extend the fixed maturity of any Bond, or reduce the amount of principal thereof, or extend the time of payment, or change the method of computing the rate of interest thereon, or extend the time of payment of interest thereon, without the consent of the Holder of each Bond so affected, or (2) reduce the aforesaid percentage of Bonds the consent of the Holders of which is required to effect any such modification or amendment, or permit the creation of any lien on the Revenues and other assets pledged under this Indenture prior to or on a parity with the lien created by this Indenture, or deprive the Holders of the Bonds of the lien created by this Indenture on such Revenues and other assets (except as expressly provided in this Indenture), without the consent of the Holders of all of the Bonds then Outstanding.  It shall not be necessary for the consent of the Bondholders to approve the particular form of any Supplemental Indenture, but it shall be sufficient if such consent shall approve the substance thereof.  Promptly after the execution by the Authority and the Trustee of any Supplemental Indenture pursuant to this subsection (A), the Trustee shall mail a notice, setting forth in general terms the substance of such Supplemental Indenture, to the Holders of the Bonds at the address shown on the registration books of the Trustee.  Any failure to give such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such Supplemental Indenture.

(B)  This Indenture and the rights and obligations of the Authority, of the Trustee and of the Holders of the Bonds may also be modified or amended from time to time and at any time by an indenture or indentures supplemental hereto, which the Authority and the Trustee may enter into without the consent of any Bondholders (but with thirty (30) days' notice to the Bondholders), but with the written consent of the Borrower and only to the extent permitted by law including, without limitation, for any one or more of the following purposes:

(1)    to add to the covenants and agreements of the Authority contained in this Indenture other covenants and agreements thereafter to be observed, to pledge or assign additional security for the Bonds (or any portion thereof), or to surrender any right or power herein reserved to or conferred upon the Authority;

(2)    to make such provisions for the purpose of curing any ambiguity, inconsistency or omission, or of curing or correcting any defective provision, contained in this Indenture, or in regard to matters or questions arising under this Indenture, as the Authority may deem necessary or desirable and not inconsistent with this Indenture which will not adversely affect the interests of the Holders of the Bonds;

(3)    to modify, amend or supplement this Indenture in such manner as to permit the qualification hereof under the Trust Indenture Act of 1939, as amended, or any similar federal statute hereafter in effect, and to add such other terms, conditions and provisions as may be permitted by said act or similar federal statute;

(4)    to modify, amend or supplement this Indenture in such a manner to permit the Authority, the Trustee, the Borrower or any other responsible party to comply with the requirements of S.E.C.  Rule 15c2-12, as it may from time to time be amended or supplemented, with respect to the Bonds;

(5)    to make any other changes which will not adversely affect the interests of the Holders of the Bonds; or

(6)    for the avoidance of doubt and without limiting the other provisions of this Section 9.01(B), to make any modification contemplated in subclause (1), (2) or (5) above in connection with the Borrower's entry into an additional Offtake Agreement, Project Revenue Generating Agreement or Feedstock Agreement.

(C)  The Trustee may in its discretion, but shall not be obligated to, enter into any such Supplemental Indenture authorized by subsections (A) or (B) of this Section which materially adversely affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

(D)  Anything herein to the contrary notwithstanding, a Supplemental Indenture under this Section shall not become effective unless and until the Borrower shall have consented thereto in writing, unless a Loan Default Event has occurred and is continuing, in which case no such consent shall be required with respect to any Supplemental Indenture entered into under Section 9.01(A) of the Indenture.

SECTION 9.02    Effect of Supplemental Indenture.  Upon the execution of any Supplemental Indenture pursuant to this Article, this Indenture shall be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under this Indenture of the Authority, the Trustee and all Holders of Bonds Outstanding shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modification and amendment, and all the terms and conditions of any such Supplemental Indenture shall be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

Any such Supplemental Indenture shall comply with the terms of this Article, and the Trustee and the Authority may conclusively rely on an Opinion of Counsel that the Supplemental Indenture complies with the provisions therein.

SECTION 9.03    Endorsement of Bonds; Preparation of New Bonds.  Bonds delivered after the execution of any Supplemental Indenture pursuant to this Article may, and if the Trustee so determines shall, bear a notation by endorsement or otherwise in form approved by the Authority and the Trustee as to any modification or amendment provided for in such Supplemental Indenture, and, in that case, upon demand of the Holder of any Bond Outstanding at the time of such execution and presentation of such Holder's Bond for the purpose at the office of the Trustee or at such additional offices as the Trustee may select and designate for that purpose, a suitable notation shall be made on such Bond.  If the Supplemental Indenture shall so provide, new Bonds so modified as to conform, in the opinion of the Authority and the Trustee, to any modification or amendment contained in such Supplemental Indenture, shall be prepared and executed by the Authority and authenticated by the Trustee, and upon demand of the Holders of any Bonds then Outstanding shall be exchanged at the Corporate Trust Office of the Trustee, without cost to any Bondholder, for Bonds then Outstanding, upon surrender for cancellation of such Bonds, in equal aggregate principal amounts.

SECTION 9.04    Amendment of Particular Bonds.  The provisions of this Article shall not prevent any Bondholder from accepting any amendment as to the particular Bonds held by him or her, provided that due notation thereof is made on such Bonds.

SECTION 9.05    Opinion for Supplement.  In executing, or accepting the additional trusts created by, any Supplemental Indenture permitted by this Article or the modification thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and shall be fully protected in relying upon, an opinion of Bond Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and complies with the terms hereof.  The Trustee may, but shall not be obligated to, enter into any such Supplemental Indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

**ARTICLE X**
**DEFEASANCE**

SECTION 10.01    Discharge of Indenture.  Bonds may be paid by the Authority in any of the following ways, provided that the Authority also pays or causes to be paid any other sums payable hereunder by the Authority and related to the Bonds:

(1)    paying or causing to be paid the principal of, interest and premium, if any, on the Bonds Outstanding, as and when the same become due and payable;

(2)    by depositing with the Trustee, in trust, at or before maturity, money or securities in the necessary amount (as provided in Section 10.03) to pay or redeem all Bonds then Outstanding; or

(3)    by delivering to the Trustee, for cancellation by it, the Bonds then Outstanding.

If the Authority shall also pay or cause to be paid all other sums payable hereunder by the Authority, then and in that case, at the election of the Authority (evidenced by a Certificate of the Authority, filed with the Trustee, signifying the intention of the Authority to discharge all such indebtedness and this Indenture), and notwithstanding that any Bonds shall not have been surrendered for payment, this Indenture and the pledge of Revenues and other assets made under this Indenture and all covenants, agreements and other obligations of the Authority under this Indenture shall cease, terminate, become void and be

completely discharged and satisfied except only as provided in Section 10.02 hereof. In such event, upon Request of the Authority, the Trustee shall cause an accounting for such period or periods as may be requested by the Authority to be prepared and filed with the Authority and shall execute and deliver to the Authority all such instruments as may be necessary or desirable to evidence such discharge and satisfaction, and the Trustee shall pay over, transfer, assign or deliver all moneys or securities or other property held by it pursuant to this Indenture (other than the Rebate Fund) which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption and any amounts owed to the Trustee hereunder or to the Authority under the Agreement to the Borrower, provided, however, that the Borrower may not receive any moneys held for the payment of particular Bonds (including moneys held for non-presented Bonds).

SECTION 10.02    Discharge of Liability on Bonds. Upon the deposit with the Trustee, in trust, at or before maturity, of money or securities in the necessary amount (as provided in Section 10.03 hereof) to pay or redeem any Outstanding Bond (whether upon or prior to its maturity or the redemption date of such Bond), provided that, if such Bond is to be redeemed prior to its maturity, notice of such redemption shall have been given as in Article IV provided or provision satisfactory to the Trustee shall have been made for the giving of such notice, then all liability of the Authority in respect of such Bond shall cease, terminate and be completely discharged, except only that the Holder thereof shall thereafter be entitled to payment of the principal of, premium, if any, and interest on such Bond by the Authority, and the Authority shall remain liable for such payment, but only out of such money or securities deposited with the Trustee as aforesaid for their payment and such money or securities shall be pledged to such payment; provided further, however, that the provisions of Section 10.04 hereof shall apply in all events.

The Authority may at any time surrender to the Trustee for cancellation by it any Bonds previously issued and delivered, which the Authority may have acquired in any manner whatsoever, and such Bonds, upon such surrender and cancellation, shall be deemed to be paid and retired.

SECTION 10.03    Deposit of Money or Securities With Trustee. Whenever in this Indenture it is provided or permitted that there be deposited with or held in trust by the Trustee money or securities in the necessary amount to pay or redeem any Bonds, the money or securities to be deposited or held may include money or securities held by the Trustee in the funds and accounts established pursuant to this Indenture (exclusive of the Rebate Fund and the Borrower Subaccount of the Costs of Issuance Fund) and shall be:

(1)    Moneys in an equal amount to the principal amount of such Bonds, and all unpaid interest thereon to maturity except that, in the case of Bonds which are to be redeemed prior to maturity and in respect of which notice of such redemption shall have been given as in Article IV provided or provision satisfactory to the Trustee shall have been made for the giving of such notice, the amount to be deposited or held shall be the principal amount or redemption price of such Bonds and all unpaid interest thereon to the maturity or redemption date; or

(2)    Investment Securities of the type described in clause (2) (including funds described in clause (5) rated Fitch "AAA" or equivalent which consist solely of securities described in clause (2)) of the definition of Investment Securities which are purchased with moneys and which are nonredeemable and noncallable, the principal of and interest on which when due and without reinvestment will provide money sufficient to pay the principal of, premium, if any, all unpaid interest to maturity, or to the redemption date, on the Bonds to be paid or redeemed, as such principal and interest become due, with maturities as may be necessary to make the required payment on the Bonds provided that, in the case of Bonds which are to be redeemed prior to the maturity thereof, notice of such redemption shall have been given as in Article IV provided or irrevocable provision satisfactory to the Trustee shall have been made for the giving of such notice;

provided, in each case, that the Trustee shall have been irrevocably instructed (by the terms of this Indenture or by Request of the Authority) to apply such money or Investment Securities to the payment of such principal, premium, if any, and interest with respect to such Bonds and provided further that the Authority and the Trustee shall have received a report of an Accountant that the moneys or Investment Securities on deposit are sufficient to pay the principal, premium, if any, and interest on the Bonds to maturity or the redemption date, and a legal opinion from a nationally recognized firm in bankruptcy law that payment of the Bonds from such moneys will not be a voidable preference in the event of the bankruptcy of the Borrower, the Guarantor or the Authority.

SECTION 10.04    <u>Payment of Bonds After Discharge of Indenture Obligation</u>. Notwithstanding any provisions of this Indenture, any moneys deposited with the Trustee in trust for the payment of the principal of, or interest or premium on, any Bonds remaining unclaimed after the principal of any Bond has become due and payable (whether at maturity or upon call for redemption or by declaration as provided in this Indenture), shall be disposed of as provided by law and the Holders of such Bonds shall thereafter be entitled to look only to the transferee of such moneys (presently the State Controller) for payment thereof, and all liability of the Trustee with respect to such moneys shall thereupon cease; provided, however, that before the disposition of such moneys as aforesaid, the Trustee may (at the cost of the Borrower) first publish at least once in a Qualified Newspaper a notice, in such form as may be deemed appropriate by the Trustee, in respect of the Bonds so payable and not presented and in respect of the provisions relating to the disposition of the moneys held for the payment thereof.

## ARTICLE XI
## MISCELLANEOUS

SECTION 11.01    <u>Liability of Authority Limited to Revenues</u>.    Notwithstanding anything in this Indenture or in the Bonds contained, the Authority shall not be required to advance any moneys derived from any source other than the Revenues and other assets pledged under this Indenture for any of the purposes in this Indenture mentioned, whether for the payment of the principal of or interest on the Bonds or for any other purpose of this Indenture.  Nevertheless, the Authority may, but shall not be required to, advance for any of the purposes hereof any funds of the Authority which may be made available to it for such purposes.  NEITHER THE FULL FAITH AND CREDIT NOR THE TAXING POWER OF THE STATE OF CALIFORNIA OR ANY POLITICAL SUBDIVISION THEREOF OR ANY LOCAL AGENCY IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON THE BONDS.  The Authority shall not be liable for any costs, expenses, losses, damages, claims or actions, of any conceivable kind on any conceivable theory, under or by reason of or in connection with the Agreement, the Bonds or this Indenture, except only to the extent amounts are received for the payment thereof from the Borrower under the Agreement.

SECTION 11.02    <u>Successor Is Deemed Included in All References to Predecessor</u>. Whenever in this Indenture either the Authority or the Trustee is named or referred to, such reference shall be deemed to include the successors or assigns thereof, and all the covenants and agreements in this Indenture contained by or on behalf of the Authority or the Trustee shall bind and inure to the benefit of the respective successors and assigns thereof whether so expressed or not.  All the covenants, stipulations, promises and agreements in this Indenture contained, by or on behalf of the Authority, shall bind and inure to the benefit of its successors and assigns, whether so expressed or not.  If any of the powers or duties of the Authority shall hereafter be transferred by any law of the State of California, and if such transfer shall relate to any matter or thing permitted or required to be done under this Indenture by the Authority, then the body, board or official of the State of California who shall succeed to such powers or duties shall act and be obligated in the place and stead of the Authority as in this Indenture provided.

SECTION 11.03    Limitation of Rights to Parties and Bondholders.   Nothing in this Indenture or in the Bonds expressed or implied is intended or shall be construed to give to any Person other than the Authority, the Trustee, the Borrower, the Direct Participants and the Holders of the Bonds, any legal or equitable right, remedy or claim under or in respect of this Indenture or any covenant, condition or provision therein or herein contained; and all such covenants, conditions and provisions are and shall be held to be for the sole and exclusive benefit of the Authority, the Trustee, the Borrower, the Direct Participants and the Holders of the Bonds.

SECTION 11.04    Waiver of Notice.   Whenever in this Indenture the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the Person entitled to receive such notice and in any such case the giving or receipt of such notice shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

SECTION 11.05    Destruction of Bonds.   Whenever in this Indenture provision is made for the cancellation by the Trustee and the delivery to the Authority of any Bonds, the Trustee may, in lieu of such cancellation and delivery, destroy such Bonds and deliver a certificate of such destruction to the Authority.

SECTION 11.06    Severability of Invalid Provisions.   If any one or more of the provisions contained in this Indenture or in the Bonds shall for any reason be held to be invalid, illegal or unenforceable in any respect, then such provision or provisions shall be deemed severable from the remaining provisions contained in this Indenture and such invalidity, illegality or unenforceability shall not affect any other provision of this Indenture, and this Indenture shall be construed as if such invalid or illegal or unenforceable provision had never been contained herein.  The Authority hereby declares that it would have entered into this Indenture and each and every other Section, paragraph, sentence, clause or phrase hereof and authorized the issuance of the Bonds pursuant thereto irrespective of the fact that any one or more Sections, paragraphs, sentences, clauses or phrases of this Indenture may be held illegal, invalid or unenforceable.

SECTION 11.07    Governing Law; Venue.   This Indenture shall be construed in accordance with and governed by the Constitution and laws of the State of California applicable to contracts made and performed in the State of California.  This Indenture shall be enforceable in the State of California and any action arising out of this Indenture shall be filed and maintained in the Sacramento County Superior Court, Sacramento, California, unless the Authority waives this requirement in writing.

SECTION 11.08    Notices.   Notices shall be delivered to each Bondholder by first class mail, postage prepaid, at the address set forth for such Bondholder on the registration books of the Trustee.  Any notice to or demand upon the Trustee may be served or presented, and such demand may be made, at the Corporate Trust Office of the Trustee, which at the date of adoption of this Indenture is located at the following address:

UMB Bank, N.A.
Corporate Trust & Escrow Services
120 South Sixth Street, Suite 1400
Minneapolis, MN 55402
Attn:  Katie Carlson
Facsimile No.: 612-337-7039

or at such other address as may have been filed in writing by the Trustee with the Authority. Any notice to or demand upon the Authority, the Borrower or the Guarantor shall be deemed to have been sufficiently given or served for all purposes by being delivered or by being deposited, postage prepaid, in a post office letter box, addressed, as the case may be, as follows:

| | |
|---|---|
| To the Authority: | California Pollution Control |
| | Financing Authority |
| | P.O. Box 942809 |
| | Sacramento, CA 94209 |
| | Attn: Executive Director |
| | |
| To the Borrower: | Rialto Bioenergy Facility, LLC |
| | 5780 Fleet Street, Suite 310 |
| | Carlsbad, California 92008 |
| | Attn: President |
| | |
| To the Guarantor: | Anaergia Services LLC |
| | 5780 Fleet Street, Suite 310 |
| | Carlsbad, California 92008 |
| | Attn: Managing Director |

or such other addresses as may have been filed in writing with the Trustee. Any notice given to the Borrower as provided above shall be deemed to have been given to any affiliate of the Borrower affected by such notice.

SECTION 11.09    Evidence of Rights of Bondholders.

(A)  Any request, consent or other instrument required or permitted by this Indenture to be signed and executed by Bondholders may be in any number of concurrent instruments of substantially similar tenor and shall be signed or executed by such Bondholders in person or by an agent or agents duly appointed in writing. Proof of the execution of any such request, consent or other instrument or of a writing appointing any such agent, or of the holding by any Person of Bonds transferable by delivery, shall be sufficient for any purpose of this Indenture and shall be conclusive in favor of the Trustee and of the Authority if made in the manner provided in this Section.

(B)  The fact and date of the execution by any Person of any such request, consent or other instrument or writing may be proved by the certificate of any notary public or other officer of any jurisdiction, authorized by the laws thereof to take acknowledgments of deeds, certifying that the individual signing such request, consent or other instrument acknowledged to such notary public or other officer the execution thereof, or by an affidavit of a witness of such execution duly sworn to before such notary public or other officer.

(C)  The ownership of registered Bonds shall be proved by the bond registration books held by the Trustee. The Trustee and the Authority may conclusively assume that such ownership continues until written notice to the contrary is served upon the Trustee. The fact and the date of execution of any request, consent or other instrument and the amount and distinguishing numbers of Bonds held by the Person so executing such request, consent or other instrument may also be proved in any other manner which the Trustee may deem sufficient. The Trustee may nevertheless, in its discretion, require further proof in cases where it may deem further proof desirable.

Any request, consent or other instrument or writing of the Holder of any Bond shall bind every future Holder of the same Bond and the Holder of every Bond issued in exchange therefor or in lieu thereof, in respect of anything done or suffered to be done by the Trustee or the Authority in accordance therewith or reliance thereon.

SECTION 11.10    Disqualified Bonds.    In determining whether the Holders of the requisite aggregate principal amount of Bonds have concurred in any demand, request, direction, consent or waiver under this Indenture, Bonds which are owned or held by or for the account of the Authority or the Borrower, or by any other obligor on the Bonds, or by any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, the Authority or the Borrower or any other obligor on the Bonds, shall be disregarded and deemed not to be Outstanding for the purpose of any such determination provided that, for the purpose of determining whether the Trustee shall be protected in relying on any such demand, request, direction, consent or waiver, only Bonds which the Trustee knows to be so owned shall be disregarded.  Bonds so owned which have been pledged in good faith may be regarded as Outstanding for the purposes of this Section if the pledgee shall establish to the satisfaction of the Trustee the pledgee's right to vote such Bonds and that the pledgee is not a Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, the Authority or the Borrower or any other obligor on the Bonds.  Upon the written request of the Trustee, the Authority and the Borrower shall each certify to the Trustee those Bonds disqualified pursuant to this Section and the Trustee may conclusively rely on such Certificates.  Notwithstanding the foregoing, with respect to the Certificate of the Authority, the Authority shall be required to specify only those Bonds that are owned or held by or for the account of the Authority or any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, the Authority, if any, of which the officer signing the Certificate on behalf of the Authority has actual knowledge.  In case of a dispute as to such right, any decision by the Trustee taken upon the advice of counsel shall be full protection to the Trustee.

SECTION 11.11    Money Held for Particular Bonds.  The money held by the Trustee for the payment of the interest, principal or premium due on any date with respect to particular Bonds (or portions of Bonds in the case of registered Bonds redeemed or tendered in part only) shall, on and after such date and pending such payment, be set aside on its books and held by it uninvested in trust for the Holders of the Bonds entitled thereto, subject, however, to the provisions of Section 10.04 hereof.

SECTION 11.12    Funds and Accounts; Business Day.

(A) Any fund or account required by this Indenture to be established and maintained by the Trustee may be established and maintained in the accounting records of the Trustee, either as a fund or an account, and may, for the purposes of such records, any audits thereof and any reports or statements with respect thereto, be treated either as a fund or as an account; but all such records with respect to all such funds and accounts shall at all times be maintained in accordance with corporate trust industry standards and with due regard for the requirements of Section 6.05 hereof and for the protection of the security of the Bonds and the rights of every Holder thereof.  The Trustee may establish and maintain for as long as necessary one or more temporary funds or accounts under this Indenture in order to carry out the purposes set forth therein.

(B)  Any payment or transfer which otherwise would become due on any day which is not a Business Day shall become due or shall be made on the next Business Day, with the same effect as if it had been made on the due date.

SECTION 11.13    Waiver of Personal Liability.  No member, officer, agent or employee of the Authority, and no officer, official agent or employee of the State of California or any department, board or agency of the foregoing shall be individually or personally liable for the payment of the principal

67

of or premium or interest on the Bonds or be subject to any personal liability or accountability by reason of the issuance thereof; provided, however, that nothing herein contained shall relieve any such member, officer, agent or employee from the performance of any official duty provided by law or by this Indenture.

SECTION 11.14    <u>Complete Agreement</u>.  The parties agree that the terms and conditions of this Indenture supersede those of all previous agreements between the parties relative to the Bonds, and that this Indenture, together with the documents referred to in this Indenture, contains the entire agreement between the parties hereto relative to the Bonds.

SECTION 11.15    <u>Execution in Several Counterparts</u>.  This Indenture may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original; and all such counterparts, or as many of them as the Authority and the Trustee shall preserve undestroyed, shall together constitute but one and the same instrument.

SECTION 11.16    <u>Third Party Beneficiary</u>.  The parties agree that CDLAC is a third party beneficiary of this Indenture for purposes of enforcing the Allocation Resolution.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the CALIFORNIA POLLUTION CONTROL FINANCING AUTHORITY has caused this Indenture to be signed in its name and its facsimile seal to be hereunto affixed and attested by its authorized officers, and UMB BANK, N.A., in token of its acceptance of the trusts created hereunder, has caused this Indenture to be signed in its corporate name by one of the officers thereunto duly authorized all as of the day and year first above written.

CALIFORNIA POLLUTION CONTROL
FINANCING AUTHORITY

By: Fiona Ma, CPA, Chair

By: _____
Deputy Treasurer

By: _____
Executive Director

(Seal)

UMB BANK, N.A., as Trustee

By: _____
Authorized Officer

[Signature Page to Indenture relating to Solid Waste Disposal Revenue Bonds (Rialto Bioenergy Facility, LLC Project) Series 2019 (AMT) (Green Bonds)]

IN WITNESS WHEREOF, the CALIFORNIA POLLUTION CONTROL FINANCING AUTHORITY has caused this Indenture to be signed in its name and its facsimile seal to be hereunto affixed and attested by its authorized officers, and UMB BANK, N.A., in token of its acceptance of the trusts created hereunder, has caused this Indenture to be signed in its corporate name by one of the officers thereunto duly authorized all as of the day and year first above written.

CALIFORNIA POLLUTION CONTROL
FINANCING AUTHORITY

By: Fiona Ma, CPA, Chair

By: _____
                 Deputy Treasurer

By: _____
                 Executive Director

(Seal)

UMB BANK, N.A., as Trustee

By: _____
                 Authorized Officer

[Signature Page to Indenture relating to Solid Waste Disposal Revenue Bonds (Rialto Bioenergy Facility, LLC Project) Series 2019 (AMT) (Green Bonds)]

EXHIBIT A

FORM OF BOND

THE BONDS SHALL BE SUBJECT TO TRANSFER RESTRICTIONS AS SET FORTH IN THE INDENTURE.

UNITED STATES OF AMERICA

STATE OF CALIFORNIA

No.  R-___                                                                                          $_____

$117,200,000
CALIFORNIA POLLUTION CONTROL
FINANCING AUTHORITY
SOLID WASTE DISPOSAL REVENUE BONDS
(RIALTO BIOENERGY FACILITY, LLC PROJECT)
SERIES 2019 (AMT) (GREEN BONDS)

NEITHER THE FULL FAITH AND CREDIT NOR THE TAXING POWER OF THE STATE OF CALIFORNIA OR ANY POLITICAL SUBDIVISION THEREOF OR ANY LOCAL AGENCY IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON THIS BOND.

| MATURITY DATE | DATE OF DELIVERY | INTEREST RATE | CUSIP |
|---|---|---|---|
| _____ | January 30, 2019 | __% | _____ |

Registered Owner:        CEDE & CO.

Principal Amount:        _____ DOLLARS

        The California Pollution Control Financing Authority, a public instrumentality and political subdivision of the State of California (the "Authority"), for value received, hereby promises to pay (but only out of the hereinafter defined Revenues as hereinafter provided) to the registered owner identified above or registered assigns, on the maturity date set forth above, the principal sum set forth above and to pay (but only out of Revenues as hereinafter provided) interest thereon from the interest payment date to which interest has been paid or, if this Bond is authenticated on or before May 15, 2019, from the Date of Delivery specified above, until payment of such principal sum shall be discharged as provided in the Indenture hereinafter mentioned, and to pay (but only out of Revenues as hereinafter provided) interest on overdue principal at the rate borne by this Bond plus four percent (4%) (the "Post-Default Rate") on the date on which such principal or interest became due and payable, except as the provisions hereinafter set forth with respect to redemption prior to maturity or purchase may become applicable hereto.  Interest shall be computed at the interest rate per annum set forth above, payable on June 1 and December 1 in each year (each, an "Interest Payment Date"), commencing on June 1, 2019, based on a 360-day year of twelve 30-day months.  The principal of and premium, if any, on this Bond are payable at final maturity, acceleration or redemption in lawful money of the United States of America upon surrender hereof at the Corporate Trust Office of UMB Bank, N.A., as Trustee, or its successor in trust (the "Trustee").  Interest payments on this Bond shall be made to the Person appearing on the bond registration books of the Trustee, as bond registrar, as the Bondholder thereof on the applicable Record Date, which is the date as of the close of

A-1

business on the fifteenth day of the calendar month preceding any Interest Payment Date (the "Record Date"), and shall be paid (i) by check mailed on the Interest Payment Date to such Bondholder's address as it appears on the registration books or at such other address as has been furnished to the Trustee as provided below, in writing by such Bondholder not later than the Record Date or (ii) upon written request, at least three (3) Business Days prior to the applicable Record Date of the Bondholder of Bonds (as hereinafter defined) aggregating not less than $1,000,000 in principal amount, by wire transfer in immediately available funds at an account maintained in the United States at such wire address as such Bondholder shall specify in its written notice; except, in each case, that, if and to the extent that there shall be a default in the payment of the interest due on such Interest Payment Date, such defaulted interest shall be paid to the Bondholder in whose name any such Bonds are registered at the close of business on the fifth Business Day next preceding the date of payment of such defaulted interest.

This Bond is one of a duly authorized issue of bonds of the Authority designated as "California Pollution Control Financing Authority Solid Waste Disposal Revenue Bonds (Rialto Bioenergy Facility, LLC Project)" (the "Bonds"), unlimited in aggregate principal amount, except as otherwise provided in the hereinafter defined Indenture, which issue consists of or may consist of one or more series of varying dates, maturities, interest rates, redemption and other provisions, all issued pursuant to the provisions of Division 27 of the California Health and Safety Code as amended and supplemented. The Bonds are all issued under and secured by and entitled to the benefits of an Indenture, dated as of January 1, 2019 (the "Indenture"), between the Authority and the Trustee. The Bonds are limited obligations of the Authority and, as and to the extent set forth in the Indenture, are payable solely from, and secured by a pledge of and lien on, the Revenues (as defined in the Indenture), and there shall be no other recourse against the Authority or any property now or hereafter owned by it. Proceeds from the sale of the Bonds will be loaned by the Authority to Rialto Bioenergy Facility, LLC, a Delaware limited liability company (the "Borrower"), under the terms of a Loan Agreement, dated as of January 1, 2019 (the "Agreement"), between the Authority and the Borrower.

This Bond is also one of a duly authorized series of Bonds of the Authority additionally designated as "Series 2019", limited in aggregate principal amount as provided in, and issued under and secured by the Indenture. Reference is hereby made to the Indenture and all indentures supplemental thereto for a description of the rights thereunder of the registered Bondholders of the Bonds, of the nature and extent of the security, of the rights, duties and immunities of the Trustee and of the rights and obligations of the Authority thereunder, to all of the provisions of which Indenture and of the Agreement the Holder of this Bond, by acceptance hereof, assents and agrees.

All terms not herein defined shall have the meanings ascribed to them in the Indenture.

The Bonds are issuable as fully registered bonds without coupons in Authorized Denominations of $250,000 or any integral multiple of $5,000 in excess of thereof. Subject to the limitations and upon payment of the charges, if any, provided in the Indenture, Bonds may be exchanged at the Corporate Trust Office of the Trustee, for a like aggregate principal amount of Bonds of other Authorized Denominations of like maturity.

This Bond is transferable by the Bondholder hereof, in person, or by its attorney duly authorized in writing, but only in the manner, subject to the limitations and upon payment of the charges provided in the Indenture, and upon surrender and cancellation of this Bond. Upon such transfer a new fully registered Bond or Bonds, in an Authorized Denomination or Denominations, for the same aggregate principal amount, and of like maturity, will be issued to the transferee in exchange therefor. The Authority and the Trustee may treat the Bondholder hereof as the absolute Bondholder hereof for all purposes, and the Authority and the Trustee shall not be affected by any notice to the contrary.

The Bonds are subject to redemption prior to maturity as set forth in the Indenture.

The Holder of this Bond shall have no right to institute any suit, action or proceeding at law or in equity, for any remedy under or upon the Indenture, except as provided in the Indenture.

No recourse shall be had for the payment of the principal of, premium, if any, or interest on any of the Bonds or for any claim based thereon or upon any obligation, covenant or agreement in the Indenture contained, against any past, present or future member, director, officer, employee or agent of the Authority, or through the Authority, or any successor to the Authority, under any rule of law or equity, statute or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such member, director, officer, employee or agent as such is hereby expressly waived and released as a condition of and in consideration for the execution of the Indenture and the issuance of any of the Bonds.

The Indenture contains provisions permitting the Authority and the Holders of a majority in aggregate principal amount of the Bonds then Outstanding to execute supplemental indentures, or add any provisions to, or change in any manner, or eliminate any of the provisions of, the Indenture; provided, however, that no such supplemental indenture, alteration or modification shall (1) extend the fixed maturity of any Bond, or reduce the amount of principal thereof, or extend the time of payment, or change the method of computing the rate of interest thereon, or extend the time of payment of interest thereon, without the consent of the Holder of each Bond so affected, or (2) reduce the aforesaid percentage of Bonds the consent of the Holders of which is required to effect any such modification or amendment, or permit the creation of any lien on the Revenues and other assets pledged under the Indenture prior to or on a parity with the lien created by the Indenture, or deprive the Holders of the Bonds of the lien created by the Indenture on such Revenues and other assets (except as expressly provided in the Indenture), without the consent of the Holders of all of the Bonds then Outstanding. Under certain circumstances described in the Indenture, the Trustee and the Authority may enter into a Supplemental Indenture without consent of Holders.

The Indenture prescribes the manner in which it may be discharged and after which the Bonds shall no longer be secured by or entitled to the benefits of the Indenture, except for the purposes of payment of the principal of and premium, if any, and interest on the Bonds as the same become due and payable, including a provision that under certain circumstances the Bonds shall be deemed to be paid if certain securities, as defined in the Indenture, maturing as to principal and interest in such amounts and at such times as to insure the availability of sufficient moneys to pay the principal of, premium, if any, and interest on such Bonds and all necessary and proper fees, compensation and expenses of the Trustee shall have been deposited with the Trustee.

No member or officer of the Authority, nor any individual executing this Bond, shall in any event be subject to any personal liability or accountability by reason of the issuance of the Bonds.

It is hereby certified that all of the conditions, things and acts required to exist, to have happened and to have been performed precedent to and in the issuance of this Bond do exist, have happened and have been performed in due time, form and manner as required by the Constitution and statutes of the State of California.

This Bond shall not be entitled to any benefit under the Indenture, or become valid or obligatory for any purpose, until the certificate of authentication hereon endorsed shall have been manually signed by the Trustee.

A-3

IN WITNESS WHEREOF, California Pollution Control Financing Authority has caused this Bond to be executed in its name and on its behalf by the facsimile signature of its Chair and its seal to be affixed hereto, all as of the above date.

(SEAL)

CALIFORNIA POLLUTION CONTROL
FINANCING AUTHORITY


By _____
                    Chair

A-4

FORM OF TRUSTEE'S CERTIFICATE OF AUTHENTICATION

Dated: _____.

This is one of the Bonds described in the within mentioned Indenture.

UMB BANK, N.A., as Trustee

By _____
Authorized Signature

Unless this Bond is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC"), to Issuer or its agent for registration of transfer, exchange, or payment, and any Bond issued upon such registration of transfer is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co.  or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof Cede & Co., has an interest herein.

## FORM OF ASSIGNMENT

        For value received the undersigned do(es) hereby sell, assign and transfer unto _____ [name, address and tax i.d. number of transferee] the within mentioned Registered Bond and do(es) hereby irrevocably constitute and appoint _____ attorney, to register the transfer of the same on the books of the Trustee with full power of substitution in the premises.

        Dated: _____, _____

Note:   The signature(s) to this Assignment must correspond with the name(s) as written on the face of the within Registered Bond in every particular, without alteration or enlargement or any change whatsoever.

Note:   Signature(s) must be guaranteed by a guarantor institution participating in the Securities Transfer Agents Medallion Program or in such other guarantee program acceptable to the Trustee.

EXHIBIT B

FORM OF TRUSTEE AUDIT LETTER

California Pollution Control Financing
  Authority
P.O. Box 942809
Sacramento, CA 94209
Attn: Executive Director

|  | | Principal<br>Amount<br>Issued | Bonds Outstanding as of<br>June 30, _____ or<br>December 31, _____,<br>as applicable |
|---|---|---|---|
| 1. | Description of Bond Issue | | |

2.     The above information _____ agrees _____ does not agree with our records. **Please identify differences and documentation of details.**

3.     During the past six (6) months, did the Borrower or the Guarantor make all required payments to the Trustee at the proper time and in the manner required by the Indenture?

      Yes_____ No_____

4.     If the Borrower or the Guarantor failed to make required payments, please attach copies of any correspondence between the Trustee and the Borrower or the Guarantor discussing the failure and any steps to correct such failure.

5.     Has the Trustee received a copy of the latest annual financial statements of Borrower, if any, within one hundred fifty (150) days of the close of the applicable fiscal year?

      Yes_____ No _____ Not Required _____ Not Applicable _____

6.     If required under the terms of the Indenture, has the Trustee received a certificate of an officer of the Borrower, signed within one hundred fifty (150) days of the close of the fiscal year, stating whether there exists any default under the Loan Agreement, and if a default exists, what the default is, what steps have been or will be taken to correct the default?

      Yes _____ No _____ Not Required _____

7.     If a letter of credit or other credit enhancement supports this bond issue, will such letter of credit or other credit enhancement continue in full force during the next twelve (12) months?

      Yes _____ No _____ Not Applicable _____

8.     Has the Trustee received a copy of the Borrower's annual rebate calculations prepared by or on behalf of the Borrower? Yes _____ No _____ Not Applicable _____

      If no, and the Trustee has any actual knowledge of why it did not receive such calculations, please explain on a separate page.

9.    Has the Trustee received a Final Project Account Disbursement Certificate (Exhibit B of the Loan Agreement) from the Borrower?

Yes _____ No _____ Not Applicable _____

10.    Has a Certificate of the Borrower been received stating that its Financial Statements have been completed?

Yes _____ No _____ Not Applicable _____

11.    Has Borrower provided Project Fund Requisitions with accompanying invoices (if required), approved by the Borrower, to the Trustee?

Yes _____ No _____ Not Applicable _____

12.    Has Borrower provided Cost of Issuance Fund Requisitions with accompanying invoices (if required), approved by the Borrower or the Authority (if required), to the Trustee?

Yes _____ No _____ Not Applicable _____

13.    (A) Has the Trustee been notified by the Borrower of any conflicts that the Trustee may have as a result of other business dealings between the Trustee and the Borrower?

Yes _____ No _____ Not Applicable _____

(B) If yes, has the Trustee sent a letter to the Authority and the Bank informing them about this matter?

Yes _____ No _____ Not Applicable _____

| **If you answered "No" to any of the above (or "Yes" in the case of 13(A)), please explain on a separate paper.** |
| --- |

UMB Bank, N.A.

By _____          Date _____
Authorized Signature

Title:_____          Phone No. _____

Cc: Holders of the Bonds

EXHIBIT C

FORM OF PROJECT FUND REQUISITION

To:             UMB Bank, N.A., as trustee
               Attn:

Re:            California Pollution Control Financing Authority
               Solid Waste Disposal Revenue Bonds
               (Rialto Bioenergy Facility, LLC Project)
               Series 2019 (AMT) (Green Bonds) (the "Bonds")
               Requisition No.___            Project Fund - _____ Subaccount

The undersigned, on behalf of Rialto Bioenergy Facility, LLC (the "Borrower"), hereby requests payment, from the Subaccount of the Project Fund identified above for the Project identified above, the total amount shown below to the order of the payee or payees named below, as payment or reimbursement for costs incurred or expenditures made in connection with the Project.  The payee(s), the purpose and the amount of the disbursement requested are as follows and as stated in the attached invoice(s) (no payment to be made without an accompanying invoice):

| Payee | Purpose | Amount |
|---|---|---|
| [name and address] | | |

Total $

The undersigned hereby certifies as follows:

1.      [Of the payment requested, $_____ constitute costs that (A) were Preliminary Expenditures (as defined in the Tax Certificate and Agreement, dated January 30, 2019 (the "Tax Certificate")), between the Borrower and the California Pollution Control Financing Authority or (B) (i) were paid or incurred by the Borrower or a Participating Affiliate on or after sixty (60) days prior to July 13, 2018 and with respect to assets that were not placed in service prior to May 14, 2018, (ii) have been used to finance the acquisition, construction, installation, land and buildings and the acquisition and installation of machinery and equipment constituting a qualified solid waste disposal project, as defined in Section 142(a) of the Internal Revenue Code of 1986 (the "Code") and Section 1.103 8(f) and Section 1.142(a)(6)-1 of the Treasury Regulations thereunder, all of which property other than land is of a character subject to the allowance for depreciation under Section 167 of the Code, and (iii) are chargeable to the capital account of the Project or would be so chargeable either with a proper election by the Borrower or but for proper election by the Borrower to deduct such costs, within the meaning of Treasury Regulation 1.103 8(a)(1); and if any such payment is to be made to a "related person" of the Borrower within the meaning of Section 147(a) of the Code, such payment represents only the actual out of pocket costs incurred by such related person in connection with the Project and does not include any intercompany profits or payments for early completion.  All of such costs are for items that comply with Section 3.3 (Good Costs) of the Tax Certificate.][1]

---

[1] This paragraph to be included for any payments from the Tax-Exempt Subaccount.

2.	[Of the payment herein requested, $_____ constitute costs not described in paragraph 1 and accordingly are denominated "Bad Costs." The sum of all Bad Costs paid to date from proceeds of the Bonds together with the amount of Bad Costs herein requisitioned, including all Bond proceeds spent for costs of issuing the Bonds, does not exceed $_____, which is 0%-5% of the Bond proceeds and the earnings from investing and reinvesting such proceeds or from investing and reinvesting such earnings, unless this requisition is accompanied with an opinion of Bond Counsel allowing a greater amount of Bond proceeds to be spent for Bad Costs.][2]

3.	Each obligation mentioned herein is described in Section 3.1 of the Loan Agreement relating to the Project, has been properly incurred and is a proper charge against the Project Fund, and each item for which payment is requested is or was necessary in connection with the acquisition, construction, installation or equipping of the Project (as further provided in Section 3.1(b)(i) through (vi) of the Loan Agreement), or, for any payments from the Taxable Subaccount, the operation of the Project (as further provided in Section 3.1(b)(vii) of the Loan Agreement), or, for any payments from the Grant Subaccount, (A) the acquisition, construction, installation or equipping of the Project or (B) following the Completion Date, the operation of the Project or, to the extent permitted by Section 5.18 (c) of the Loan Agreement, to fund distributions to members of the Borrower (in each case as further provided in Section 3.1(b)(viii) of the Loan Agreement). None of the items for which payment is requested has been reimbursed previously from the Project Fund, and none of the payments herein requested will result in a breach of the representations and agreements in Section 2.3 of the Loan Agreement relating to the Project. [At least 95.0% of the amount requisitioned, together with all amounts requisitioned to date, have in the aggregate been used to pay for or to reimburse the Borrower or a Participating Affiliate for expenditures properly allocable to costs of the Project.][3] Attached hereto are the invoices (if any) required by Section 3.1(c) of the Loan Agreement.

4.	[The loan policy of title insurance insuring the lien of the Leasehold Deed of Trust has been endorsed and down-dated in a manner satisfactory to the Trustee to increase the coverage by the amount of this Requisition through the date of disbursement of this Requisition with no additional title change or exception not approved by Trustee.][4]

Dated:	Rialto Bioenergy Facility, LLC

By:_____
Authorized Representative

[APPROVED][5]

[NAME OF CONSTRUCTION MONITOR]

By: _____
Authorized Representative

_____
[2] This paragraph to be included for any payments from the Tax-Exempt Subaccount.
[3] This sentence to be included for any payments from the Tax-Exempt Subaccount.
[4] This paragraph (i) supplements the requirements of Section 3.1(b) of the Loan Agreement and Section 3.03 of the Indenture, (ii) is required for all Project Fund Requisitions commencing with (and including) Project Fund Requisition No. 3 and all Project Fund Requisitions thereafter and (iii) may not be amended or removed except in accordance with the provisions of the Indenture and Loan Agreement governing amendments.
[5] Approval of the Construction Monitor is required only for payments requested on or before the Completion Date.

EXHIBIT D

FORM OF COSTS OF ISSUANCE FUND REQUISITION

To:             UMB Bank, N.A., as trustee
                Attn:

Re:           California Pollution Control Financing Authority
                Solid Waste Disposal Revenue Bonds
                (Rialto Bioenergy Facility, LLC Project)
                Series 2019 (AMT) (Green Bonds) (the "Bonds")

Requisition No.____      Account:     Costs of Issuance Fund - _____ Account

The undersigned, on behalf of Rialto Bioenergy Facility, LLC (the "Borrower"), hereby requests payment, from the Account of the Costs of Issuance Fund identified above for the Project identified above, the total amount shown below to the order of the payee or payees named below, as payment or reimbursement for costs incurred or expenditures made in connection with the issuance of the Bonds. The payee(s), the purpose and the amount of the disbursement requested are as follows and as stated in the attached invoice(s) (no payment to be made without an accompanying invoice):

| Payee | Purpose | Amount |
|---|---|---|
| [name and address] | | |
| | Total $ | |

The undersigned hereby certifies as follows:

Each obligation mentioned herein is described in Section 3.04 of the Indenture, has been properly incurred and is a proper charge against the Costs of Issuance Fund, and each item for which payment is requested is or was necessary in connection with the issuance of the Bonds. None of the items for which payment is requested has been reimbursed previously from the Costs of Issuance Fund, and none of the payments herein requested will result in a breach of the representations and agreements in Section 2.3 of the Loan Agreement relating to the Project. Invoices evidencing each obligation mentioned herein are attached hereto.

Dated:              Rialto Bioenergy Facility, LLC

By:_____
                Authorized Representative

EXHIBIT E

FORM OF REQUISITION FROM THE CAPITAL REPLACEMENT FUND

To:         UMB Bank, N.A., as trustee
             Attn:

Re:        California Pollution Control Financing Authority
             Solid Waste Disposal Revenue Bonds
             (Rialto Bioenergy Facility, LLC Project)
             Series 2019 (AMT) (Green Bonds) (the "Bonds")

Requisition No.____      Account:  Capital Replacement Fund

The undersigned, on behalf of Rialto Bioenergy Facility, LLC (the "Borrower"), hereby requests payment, from the Capital Replacement Fund identified above for the Project identified above, the total amount shown below to the order of the payee or payees named below, as payment or reimbursement for costs incurred or expenditures made in connection with the repair and/or maintenance of the Project. The payee(s), the purpose and the amount of the disbursement requested are as follows and as stated in the attached invoice(s) (no payment to be made without an accompanying invoice):

| Payee | Purpose | Amount |
|---|---|---|
| [name and address] | | |
| | Total $ | |

The undersigned hereby certifies as follows:

Each obligation mentioned herein has been properly incurred and is a proper charge against the Capital Replacement Fund in accordance with the terms of the Indenture, and each item for which payment is requested is or was necessary in connection with the repair and/or maintenance of the Project. None of the items for which payment is requested has been reimbursed previously from the Capital Replacement Fund, and none of the payments herein requested will result in a breach of the representations and agreements in Section 2.3 of the Loan Agreement relating to the Project.  Invoices evidencing each obligation mentioned herein are attached hereto.

Dated:               Rialto Bioenergy Facility, LLC

By:_____
                Authorized Representative

# EXHIBIT "7"

**RIALTO BIOENERGY FACILITY, LLC**

| Utility Company | Purpose | Account Number | Last 3 Bill Amounts | | | Monthly Average | Proposed Deposit |
|---|---|---|---|---|---|---|---|
| SoCal Gas Company | Core Gas | 4038997252 | 61,375.09 | 53,034.11 | 23,078.38 | 45,829.19 | **45,829.19** |
| SoCal Gas Company | Non-Core Gas | 17493118313 | 25,137.21 | 24,982.20 | 22,556.46 | 24,225.29 | **24,225.29** |
| SoCal Gas Company | Sundry Billing - Ops and Maintence fees | 400023068 | 4,276.85 | 4,276.85 | 4,276.85 | 4,276.85 | **4,276.85** |
| Southern California Edison | Master Electricity Account # (see billing details below by sub account) | 700628618143 | | | | | **-** |
| Southern California Edison | *Service Account - 1 invoice each month* | *8003579866* | 85,194.64 | 67,925.49 | 51,729.30 | 68,283.14 | **68,283.14** |
| Southern California Edison | *Interconnect Account - separate invoice each month billed with Distribution acct* | *8004924500* | 745.01 | 745.01 | 745.01 | 745.01 | **745.01** |
| Southern California Edison | *Distribution Account- separate invoice each month billed with interconnect acct* | *8004928480* | 609.87 | 609.87 | 609.87 | 609.87 | **609.87** |
| Southern California Edison | *Maintenance Trailer / Construction Account* | *8015400106* | 928.85 | 928.85 | 928.85 | 928.85 | **928.85** |
| West Valley Water | Water | 13-045694-00 | 167.83 | 167.65 | 169.96 | 168.48 | **168.48** |
| West Valley Water | Water | 01-039716-01 | 188.95 | 188.95 | 188.95 | 188.95 | **188.95** |
| Rialto Water Services | Water | 2076347-123334 | 1,767.06 | 1,767.06 | 1,767.06 | 1,767.06 | **1,767.06** |
| Rialto Water Services | Water | 2064028-121757 | 2,814.97 | 3,063.56 | 3,794.72 | 3,224.42 | **3,224.42** |

TOTAL          $          150,247.11

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
2818 La Cienega Avenue, Los Angeles, CA 90034

A true and correct copy of the foregoing document entitled **OMNIBUS DECLARATION OF DR. YANIV SCHERSON IN SUPPORT OF DEBTOR'S EMERGENCY FIRST DAY MOTIONS FOR ENTRY OF: 1. AN INTERIM ORDER: (I) AUTHORIZING THE DEBTOR TO (A) USE CASH COLLATERAL AND (B) OBTAIN POST-PETITION FINANCING ON A SENIOR LIEN BASIS, (II) GRANTING ADEQUATE PROTECTION; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF; AND 2. AN ORDER AUTHORIZING DEBTOR TO PROVIDE ADEQUATE ASSURANCE OF FUTURE PAYMENT TO UTILITY COMPANIES PURSUANT TO 11 U.S.C. § 366** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 2, 2023** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender**    rb@lnbyg.com, bry@lnbyb.com
- **Haeji Hong**    Haeji.Hong@usdoj.gov, USTP.Region15@usdoj.gov,tiffany.l.carroll@usdoj.gov
- **United States Trustee**    ustp.region15@usdoj.gov
- **Nahal Zarnighian**    zarnighiann@ballardspahr.com

**2**.  **SERVED BY UNITED STATES MAIL**:  On  **June 2, 2023**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

.☐  *Service information continued on attached page*

**3**.  **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 2, 2023**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒ *Service **BY OVERNIGHT MAIL** information continued on attached page*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 2, 2023 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

Debtor
Rialto Bioenergy Facility, LLC
705 Palomar Airport Road
Suite 200
Carlsbad, CA 92011

Haeji Hong
Office of The United States Trustee
880 Front Street
Third Floor, Suite 3230
San Diego, CA 92101

**Attorneys for Indenture Trustee UMB Bank, N.A. (RSN)**
Nahal Zarnighian
Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915

**20 Largest Unsecured Creditors**

Aerzen Rental USA LLC
5500 South Cobb Drive SE, BLDG 50
Atlanta, GA 30339

Aerzen USA Corporation
108 Independence Way
Coatesville, PA 19320

American Turn-Key Fabricators
9175 Milliken Avenue
Rancho Cucamonga, CA 91730

Anew Climate, LLC
3200 Southwest Freeway, STE 1310
Houston, TX 77027

Avensys Solutions Inc
300 rue Stinson
Saint-Laurent QC H4N 2E7
CANADA

Bare Ground Electric, Inc
PO Box 90040
San Bernardino, CA 92427

City of Rialto
P.O. Box 800
Rialto, CA 92377

Denali Water Solutions LLC
PO Box 3036
Russellville, AR 72801

MAYEKAWA USA, INC.
29875 Medline Lane
Katy, TX 77494

Professional Boiler Repair
PO Box 7525
Huntington Beach, CA 92615

Putzmeister America Inc.
1733 90th Street
Sturtevant, WI 53177

R & S Industrial Field Services, Inc
P.O. Box 2796
Victorville, CA 92393

Richard Price Automation, Inc
815 Anchorage Place
Chula Vista, CA 91914

Santa Ana Watershed Project Authority
11615 Sterling Avenue
Riverside, CA 92503

SB Industrial Vacuum Service Inc.
PO Box 310097
Fontana, CA 92331

Schwing Bioset Inc
350 SMC Drive
Somerset, WI 54025

20 Largest Unsecured Creditor + Utility
SoCal Edison
P.O. Box 300
Rosemead, CA 91772

20 Largest Unsecured Creditor + Utility
SoCal Gas
PO Box C
Monterey Park, CA 91756

W.M. Lyles Co.
42142 Roick Drive
Temecula, CA 92590

Waste Management
10910 Dawson Canyon Road
Corona, CA 92883

**Agents for Service of Process for Top Twenty Unsecured Creditors (where available)**

**R & S Industrial Field Services, Inc.**
Attn: Nicole Marie Reimers
12998 Cedarbrook Lane
Victorville, CA 92395

**Putzmeister America, Inc.**
Attn: Jackson Yang
720 14th Street
Sacramento, CA 95814

**Anew Climate, LLC**
Attn: Erin Haggerty
1325 J St., Suite 1550
Sacramento, CA 95814

**Southern California Gas Company**
United Agent Group Inc.
Attn: Sarah Clemens
5901 W. Century Blvd.
Los Angeles, CA 90045

**Southern California Edison**
Attn: CRISTINA LIMON
2244 WALNUT GROVE AVE
ROSEMEAD, CA 91770

**Aerzen USA Corp.**
Attn: Amanda Garcia
330 N. Brand Blvd.
Glendale, CA 91203

**Denali Water Solutions LLC**
Attn: Sarah Clemens
5901 W. Century Blvd.
Los Angeles, CA 90045

**SB Industrial Vacuum Services, Inc.**
Attn: Silvestre Bahena
10656 Jaggery St.
Fontana, CA 92337

**Bare Ground Electric Inc.**
Attn: Sebastian Cruz
4227 W. Mayers Rd.
San Bernardino, CA 92407

**Richard Price Automation Inc.**
Attn: Claudia Elena Islas-Villagomez
3237 Via San Vitale
Chula Vista, CA 91914

**Mayekawa U.S.A., Inc.**
Attn: Amanda Garcia
330 N. Brand Blvd.
Glendale, CA 91203

**Procter Real Estate Holdings, LLC dba Professional Boiler Repair**
9591 Atlanta Ave #7525
Huntington Beach, CA 92615

## Utilities

**Southern California Gas Company**
555 West 5th Street
Los Angeles, CA 90013

SoCal Gas Company
ML 711D
PO BOX 2007
Monterey Park, CA 91754-0957

Rialto Water Services
Utility Bill Customer Service
PO BOX 800
Rialto, CA 92377-0800

**Rialto Water Services**
437 N Riverside Ave.
Rialto, CA 92376

West Valley Water
855 West Base Line Road
PO BOX 920
Rialto, CA 92377-0920

**West Valley Water District**
Attn: Greg Young, President
855 W. Baseline Road
Rialto, CA 92376

## Other

**City of Rialto**
Attn: City Administrator
150 S. Palm Avenue
Rialto, CA 92376

**Rialto Utility Authority**
Attention: Executive Director
150 S. Palm Avenue
Rialto, CA 92376

## Secured Debt, Bonds and Funds Service List

**Massachusetts Mutual Life Insurance Company**
Attn: MassMutual Muni GIC Team
100 Bright Meadow Boulevard
MIP M379
Enfield, CT 60682

**Winters & Co. Advisors, LLC Registered Municipal Advisors**
Attn: Mr. Chris Winters, Principal
2530 Pesquera Drive
Los Angeles, CA 90049

**Goldman Sachs Asset Management**
Attn: Michael Messersmith
Arnold & Porter
70 West Madison Street | Suite 4200
Chicago, Illinois 60602-4321

**UMB Bank, N.A.**
Attn: Ms. Katie Carlson
Corporate Trust & Escrow Services
120 South Sixth Street, Suite 1400
Minneapolis, MN 55402

**California Pollution Control Financing Authority**
Attn: Executive Director
P.O. Box 942809
Sacramento, CA 94209

**Marquette Business Credit, A subsidiary of UMB Bank, N.A.**
Attention: Mr. Greg Carasik
333 S Grand Ave, Suite 2200
Los Angeles, CA 90071

**California Debt Limit Allocation Committee**
Attn: Executive Director
915 Capitol Mall, Room 311
Sacramento, CA 95815